

1      UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA - CENTRAL DIVISION

3      HONORABLE ANDRE BIROTTE, JR., U.S. DISTRICT JUDGE

4

5  UNITED STATES OF AMERICA,

6                    PLAINTIFF,

7        VS.                          CASE NO. 20-CR-387-AB

8  STEVEN DUARTE,

9                    DEFENDANT.
                                            /
10

11

12

13
            REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS
14             TRIAL DAY 2 - AFTERNOON SESSION
               WEDNESDAY, AUGUST 25, 2021
15                   12:30 P.M.
               LOS ANGELES, CALIFORNIA
16

17

18

19

20

21

22     _____

23          TERRI A. HOURIGAN, CSR NO. 3838, CCRR
            FEDERAL OFFICIAL COURT REPORTER
24          350 WEST FIRST STREET, ROOM 4311
            LOS ANGELES, CALIFORNIA  90012
25                (213) 894-2849

                  UNITED STATES DISTRICT COURT

1                          **APPEARANCES OF COUNSEL:**

2

3    **FOR THE PLAINTIFF:**

4         UNITED STATES ATTORNEY'S OFFICE
          UNITED STATES ATTORNEY
5         BY:  JUAN M. RODRIGUEZ
               KYLE WALKER KAHAN
6              LAUREN RESTREPO
           ASSISTANT UNITED STATES ATTORNEYS
7         UNITED STATES COURTHOUSE
          312 NORTH SPRING STREET
8         LOS ANGELES, CALIFORNIA  90012

9

10   **FOR THE DEFENDANT:**

11        LAW OFFICE OF OLIVER P. CLEARY
          BY:  OLIVER P. CLEARY
12        ATTORNEY AT LAW
          468 NORTH CAMDEN DRIVE, SUITE 200
13        BEVERLY HILLS, CALIFORNIA  90210

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

```
1                    INDEX OF WITNESSES

2                         * * *
     WITNESS:                              PAGE
3
     TROY WUNDERLICH
4
          CROSS-EXAMINATION BY MR. CLEARY        8
5         REDIRECT EXAMINATION BY MR. RODRIGUEZ  25

6    NICHOLAS BOBBS

7         DIRECT EXAMINATION BY MR. KAHAN        27
          CROSS-EXAMINATION BY MR. CLEARY        41
8         REDIRECT EXAMINATION BY MR. KAHAN      48

9    JOSE BARRAGAN

10        DIRECT EXAMINATION BY MR. KAHAN        49
          CROSS-EXAMINATION BY MR. CLEARY        57
11
     CELESTE HEWSON
12
          DIRECT EXAMINATION BY MR. KAHAN        61
13        CROSS-EXAMINATION BY MR. CLEARY        86

14   DANIEL LEWIS

15        DIRECT EXAMINATION BY MR. RODRIGUEZ    96
          CROSS-EXAMINATION BY MR. CLEARY        105
16        REDIRECT EXAMINATION BY MR. RODRIGUEZ  107

17   LUIS OLMOS

18        DIRECT EXAMINATION BY MR. KAHAN        109
          CROSS-EXAMINATION BY MR. CLEARY        136
19        REDIRECT EXAMINATION BY MR. KAHAN      149
          RECROSS EXAMINATION BY MR. CLEARY      151
20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

```
 1                        INDEX OF EXHIBITS

 2                             * * *
          EXHIBIT NO.                        PAGE
 3
          (PREVIOUSLY ADMITTED)
 4
          10                                 26
 5        101                                31
          12-1                               32
 6        11-1                               33
          8-1                                33, 68
 7        9-1                                34
          10-1                               36, 38
 8        13                                 39
          49, 50, 51                         38, 83
 9        4                                  68
          3-1                                69
10        15                                 70, 73, 100
          16                                 72
11        17                                 72, 76, 77
          18                                 79, 80, 118
12        41                                 82
          40                                 103
13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

```
 1            LOS ANGELES, CALIFORNIA; WEDNESDAY, AUGUST 25, 2021

 2                            12:43 P.M.

 3                            --oOo--

 4

 5

 6            THE COURTROOM DEPUTY:  The judge is going to take

 7   the bench.

 8            THE COURTROOM DEPUTY:  All rise.

 9                   (Court called to order.)

10            THE COURT:  So what is the issue we need to deal

11   with, if anything?

12            MR. KAHAN:  This YouTube video that just popped up,

13   Your Honor.

14            THE COURT:  What is the status?  Have you talked at

15   all with Mr. Cleary?

16                 So where we are at, Mr. Cleary -- this is a

17   YouTube or DVD?

18            MR. CLEARY:  At this point, this was not going to be

19   a defense case in chief.  Most of it was going to be for

20   impeachment purposes.

21            THE COURT:  Impeachment of whom?

22                 My worry is -- are we going to have to take a

23   recess to deal with this when the witness about to be called?

24            MR. CLEARY:  I believe the witness is Officer Bobbs.

25   The officer has not testified.
```

```
 1              THE COURT:  He's next?

 2              MR. CLEARY:  Is he next?

 3              MR. KAHAN:  Yes.

 4              MR. CLEARY:  He's next.

 5              THE COURT:  So, can you tell me what the issue is or

 6    are you going to spring this up in the middle of the trial?

 7              MR. CLEARY:  No, I didn't want to do that, Your

 8    Honor.  I was going to use it if it was impeachment evidence.

 9              I don't know if it's impeachment evidence because

10    Officer Bobbs is testifying.  He did not write a report in this

11    case either, so I would have to see --

12              THE COURT:  Let me try it this way.  Is -- do you

13    want to give me an offer of proof as to why this is evidence

14    because I'm just confused.

15              Is he on this video?  I don't know what is

16    happening.

17              MR. CLEARY:  The video depicts Officer Wunderlich on

18    the video and that is who the officer is on the video.

19              THE COURT:  Okay.

20              MR. CLEARY:  The officer in the video is conducting

21    a destructive search of Mr. Duarte's tow truck.

22              THE COURT:  That's his tow truck?

23              MR. CLEARY:  That's his tow truck.

24              THE COURT:  When did this occur?

25              MR. CLEARY:  Within the last year.
```

1          THE COURT:  The purpose of this is to suggest what?

2          MR. CLEARY:  Well, there was a -- it's a search of

3    Mr. Duarte's tow truck that was destructive in nature.  The

4    officer applied a crow bar to the interior, according to the

5    video.

6          THE COURT:  Wait, wait, wait.  We have got to be

7    fair here.

8              The video doesn't show the inside of the vehicle.

9    In fact, this person is asking -- I guess it's Mr. Duarte -- I

10   didn't recognize him, asking the driver, are you good, are you

11   okay?  Did they tear up the car?

12             Whoever is that person doesn't respond and drives

13   off.

14         MR. CLEARY:  That's fair.

15         THE COURT:  So I'm just concerned on a number of

16   levels that:  A, I didn't know the context.  I didn't watch the

17   video.  I didn't observe that it was Officer Wunderlich.

18             B, I didn't know it was Mr. Duarte.

19             C, it's a narration by someone else who is not

20   connected to -- I don't believe -- Mr. Duarte or Wunderlich.

21             Isn't there a hearsay problem with the narration

22   of the video?

23         MR. CLEARY:  Yes, I think there is.  I don't think

24   we would ask that the narration be admitted into evidence.

25             So then it would be a video showing a search of

```
 1   Mr. Duarte's tow truck with the officers then letting
 2   Mr. Duarte go.
 3              THE COURT:  I'm having trouble seeing the relevance.
 4              Let's bring the jury in.  Let's get the testimony
 5   in.  We will cross that bridge if and when we need to.  Thank
 6   you.
 7              THE COURTROOM DEPUTY:  All rise for the jury.
 8              (Jury enters the courtroom at 12:55 p.m.)
 9              Please be seated.
10              THE COURT:  Good afternoon, ladies and gentlemen.
11   We are ready to resume testimony.
12              I believe where we left off we were going to
13   begin cross-examination.  If we could get the witness here.
14              All right.  Mr. Cleary, you may begin
15   cross-examination.
16              Mr. Wunderlich, you are still under oath.
17                      TROY WUNDERLICH,
18              having been previously duly sworn,
19                   testified as follows:
20              THE COURT:  Go ahead, Mr. Cleary.
21                    CROSS-EXAMINATION
22   BY MR. CLEARY:
23   Q    Good afternoon, Mr. Wunderlich.
24   A    Good afternoon.
25   Q    You didn't have an opportunity to write a report in this
```

1    case; is that correct?

2    A      No, sir.

3    Q      It was Officer Villicana who wrote the report?

4    A      Yes, sir.

5    Q      You had an opportunity to review the report before you

6    testified here today?

7    A      Yes, sir.

8    Q      So you read Officer Villicana's report in order to refresh

9    your recollection?

10   A      Yes.

11   Q      And in reading the report, was there anything in the

12   report you saw as a mistake or an error you wish to correct?

13   A      No, sir.

14   Q      And I wanted to direct your attention to some comments you

15   made on your testimony.

16                   So, Officer Wunderlich, you were patrolling

17   with your partner, Officer Villicana, and you were the driver,

18   correct?

19   A      Yes, sir.

20   Q      And you indicated that when you initiated a stop by

21   illuminating your flashers, spotlights, the floodlights, the

22   sirens, and the vehicle, Ms. Ortiz was driving, she pulled over

23   and when she came to the intersection by making a right and

24   pulling up to the curb; is that correct?

25   A      I want to say yes.

```
 1   Q    Is it fair to say that that was the kind of first open

 2   space to pull over along that route that she was driving,

 3   otherwise, she would have essentially be stopping in the middle

 4   of the street?

 5   A    Yes.

 6   Q    And the neighborhood is residential in nature; is that

 7   correct?

 8   A    Yes, sir.

 9   Q    So it's not a commercial neighborhood.  There is not a lot

10   coming from signs or billboards or businesses, correct?

11   A    No signs, no billboards, but there is a street light on

12   the corner of Doty and 109th.

13   Q    Fair enough.  And when -- when you exited your vehicle

14   upon making the stop, you got out of the driver's side of the

15   police car, and Officer Villicana got out on the passenger

16   side, correct?

17   A    Yes.

18   Q    And both of you had your guns drawn; is that fair to say?

19   A    No.

20   Q    Okay.  Did you draw your weapons when you approached the

21   vehicle?

22   A    I don't recall.

23   Q    Fair enough.

24        Do you know if you recall whether Officer Villicana had

25   his weapon drawn at the time?
```

1   A     No, I did not.

2   Q     Very well.

3         And the individuals inside, you went to the driver,

4   Ms. Ortiz, and you removed her from the vehicle, correct?

5   A     Yes, sir.

6   Q     And you also placed her in handcuffs, correct?

7   A     Yes.

8   Q     And you placed her seated on the curb; is that fair to

9   say?

10  A     Yes, sir.

11  Q     And did you then assist Officer Villicana when he and you

12  removed Mr. Duarte from the passenger seat?

13  A     Yes.

14  Q     And did you -- so you participated in the -- I guess

15  detention and removal of Mr. Duarte from the vehicle; is that

16  correct?

17  A     Yes.

18  Q     And you assisted in the placing Mr. Duarte at the curb in

19  handcuffs, correct?

20  A     Yes, sir.

21  Q     After you and Officer Villicana secured both the passenger

22  and the driver, you went about searching the vehicle, correct?

23  A     No, I did not.

24  Q     Okay.  Did Officer Villicana search the vehicle?

25  A     No, he did not.

```
 1   Q     Was there an Officer Bobbs who searched the vehicle?
 2   A     No, he did not.
 3   Q     Did anybody search the vehicle?
 4   A     Not at that point.
 5   Q     Okay.  So, there was an amount of time that passed and
 6   eventually Officer Bobbs arrived at the location; is that
 7   correct?
 8   A     Yes.
 9   Q     Do you know how much time passed before or after you
10   secured Mr. Duarte and Ms. Ortiz on the curb that Officer Bobbs
11   arrived at the scene?
12   A     No, I did not.
13   Q     Short amount of time, fair to say?
14   A     It was a short period of time, yes.
15   Q     He was working kind of in tandem with you guys that night,
16   correct?
17   A     Usually, when we are in an area we have our team together
18   -- in the general area, yes.
19   Q     And he was on the radio and you guys were in
20   communication, correct?
21   A     Yes, sir.
22   Q     And you heard Officer Villicana put out on the radio that
23   there had been -- you believe a gun had been thrown out of the
24   vehicle, correct?
25   A     Yes.
```

```
1   Q    And that -- you heard him put that out over the radio?

2   A    Yes.

3   Q    And at this point it was still possible *are firearm not

4   quite sure of it, because you knew it was a dark object but it

5   was at night so you couldn't be sure what it was, correct?

6   A    It looked like a firearm when it was tossed out.

7   Q    It was hard to say because you are in a moving vehicle,

8   they are in this moving vehicle, it's dark out, fair to say?

9   A    In all honesty, I have seen it happen several times, and

10  it looked like a black firearm.

11  Q    It triggered that it was a firearm?

12  A    In my mind, it was a black firearm that was tossed out of

13  the vehicle.

14  Q    You stopped that vehicle, and that was when you had -- in

15  your mind you believed it was a firearm, you didn't need any

16  *fourth waiver or anything like that for you to take those

17  individuals out of the vehicle and do a search, correct?

18  A    Correct.

19  Q    So, when did you do the vehicle search?

20  A    After we clarified his PRCS.

21  Q    Okay.  So, how long did you wait for that to occur?

22  A    After my partner clarified he was on PRCS with search

23  conditions.

24  Q    You could have searched that vehicle whether or not that

25  was his status, correct?
```

**UNITED STATES DISTRICT COURT**

```
1   A      Correct.
2   Q      So but anyway, you decided to wait for that and then you
3   searched the vehicle, correct?
4   A      Correct.
5   Q      So in searching the vehicle, you examined the interior of
6   the vehicle, correct?
7   A      Yes, sir.
8   Q      You did it according to go your protocols and procedures,
9   correct?
10  A      Yes.
11  Q      You were wearing gloves at the time, correct?
12  A      Correct.
13  Q      These were standard gloves and you wear them all of the
14  time, don't you?
15  A      Yes.
16  Q      So, you go inside, you check around the dashboard area and
17  under the seats, correct?
18  A      Yes.
19  Q      And any compartments that are open that are accessible to
20  the individuals in the car you wanted to look inside?
21  A      Correct.
22  Q      You did that too, right?
23  A      Yes.
24  Q      You want to look at anything that might be left property,
25  personal items, like a bag or sweater or shirt that might
```

```
 1   contain something, so you checked that, correct?
 2   A     Yes.
 3   Q     You might have even opened the glove box, right?
 4   A     Yes.
 5   Q     Then you put your hands in and you moved around and you
 6   checked those things, right?
 7   A     Yes.
 8   Q     You might feel something under the seat, but you can't see
 9   -- for example, if the carpet is black and the item is
10   dark-colored, you can't see it, so you have got to feel around,
11   right?
12   A     Correct.
13   Q     That's why you wear gloves to protect yourself, correct?
14   A     Correct.
15   Q     In the back seat, you did the same thing, you are feeling
16   around looking for something, right?
17   A     Uh-huh, correct.
18   Q     And did you find something right away?
19   A     No, it took a little bit.
20   Q     Okay.  So, you are rummaging around, you look in the
21   interior and at that point has Officer Bobbs arrived at the
22   scene?
23   A     I do not recall.
24   Q     All right.  Did you have an opportunity to talk to Officer
25   Bobbs when he arrived at the scene?
```

```
 1    A      When he arrived at the scene, I did talk to him*I am had.

 2    Q      Okay.  And was it your instruction to Officer Bobbs to go

 3    down to the mid block area, that you believed there was a gun

 4    thrown and for him to look for it?

 5    A      I don't recall.

 6    Q      Okay.  Did Officer Bobbs, when he arrived on the scene,

 7    have the gun already in his hand?

 8    A      When I contacted him, he had a weapon in his hand, yes.

 9    Q      So Officer Bobbs already had gotten the gun in his hand

10    when you talked to him?

11    A      When I talked to him after I searched the vehicle.

12    Q      Okay.  So did you then, at that point, have the magazine?

13    A      Did I have it at that time?  I had to locate it first.

14    Q      Okay.  So, did you search the vehicle a second time in

15    order to locate the magazine?

16    A      No, I did not.

17    Q      Did you ever have Officer Bobbs search the vehicle in

18    order to locate the magazine?

19    A      No.

20    Q      Did anybody else participate in the searching of the

21    vehicle besides yourself?

22    A      No.

23    Q      When Officer Bobbs arrived at the scene and you contacted

24    him, and he had the firearm at that point, you had searched --

25    you had finished your search and you went and contacted Officer
```

```
1   Bobbs, correct?
2   A    No.  We waited to photograph everything, remove anything
3   from the vehicle.
4   Q    All right.  Who was the photographer?
5   A    I don't recall.
6   Q    Was it you or Officer Bobbs that secured the weapon?
7   A    He had -- if he recovered the weapon at the intersection
8   he had to secure the weapon then.
9   Q    Okay.  By securing the weapon, you mean rendering it safe?
10  A    Yes.
11  Q    Making sure there is not a bullet in the chamber?
12  A    Exactly.
13  Q    That would have been the officer who located or retrieved
14  the firearms to do that first, correct?
15  A    Yes, sir.
16  Q    So, it was your decision then to see whether the magazine
17  and the weapon fit, correct?
18  A    Correct.
19  Q    Because the .380, that is a common round, is it not?
20  A    Smaller weapon like that, yes, a .380.
21  Q    So in other words, it's not so unique, only one weapon has
22  a .380, and there are many of them, correct?
23  A    Correct.
24  Q    So to satisfy your curiosity whether this magazine would
25  fit into that weapon, you decided to insert the magazine into
```

**UNITED STATES DISTRICT COURT**

1  the handle of the gun to check to see if it fit?

2  A    Correct.

3  Q    And it's a universal magazine; is that correct?

4  A    Yes.

5  Q    So that magazine could fit into a different manufacturer,

6  a .38 or .380?

7  A    Correct.

8  Q    But as it happened, as expected, the magazine fit into the

9  handle in this particular case, correct?

10 A    Correct.

11 Q    So then you removed the magazine from the firearm,

12 correct?

13 A    Correct.

14 Q    And was it your responsibility then to take the magazine

15 and secure it in the evidence bag or did you turn it over to

16 another officer?

17 A    My responsibility was to put it in the bag -- evidence

18 bag.  It's like a brown bag with a magazine and the firearm and

19 put it in the trunk of my vehicle.

20 Q    Is that the same envelope that we see in court today or a

21 different one?

22 A    A different envelope.

23 Q    So the magazine is -- probably the lab used it in a

24 particular envelope, correct?

25 A    No.  The procedure is we put the gun with the magazine and

1    the bullets in a property bag.  It's a brown bag next to the

2    yellow bags.

3    Q    This lunch bag looking thing here on the table?

4    A    Yes.

5    Q    That is the property bag?

6    A    *yes.

7    Q    Does it look like the property bag or is it actually *this

8    one?

9    A    I'm not sure that is the one.

10   Q    But you can't tell, there are no marks on it, correct?

11   A    Yeah, on that bag.

12             But then we go to the station and then we put it

13   in the yellow envelopes marked for prints.

14   Q    Once you categorize where the evidence is and establish

15   the chain of custody, correct?

16   A    Yes, sir.

17   Q    So at the time at the scene, though, all items are placed

18   into one property bag?

19   A    Yes, sir.

20   Q    That would be the bullets?  The magazine?

21   A    Yes.

22   Q    And the firearm?

23   A    Yes, sir.

24   Q    And they are then placed in a trunk, correct?

25   A    Yes, sir.

```
 1   Q    And you did that according to your testimony?
 2   A    Yes, sir.
 3   Q    Do you have a direct recollection of doing that or is it
 4   just do you remember actually doing that in this case?
 5   A    That is the standard procedure that I do.
 6   Q    Okay.  So your testimony is more based on what you
 7   normally do, but you don't recall exactly if this is what you
 8   did in this case?
 9   A    My standard procedure, so it is what I usually do, I put
10   it in the trunk.
11   Q    In the trunk.  It's not placed into some type of evidence
12   collection box or something like that, it's just placed in the
13   trunk?
14   A    Yes, sir.  Just placed in the trunk.
15   Q    All right.  And how far is it from the location at the
16   scene in this case to the Inglewood Police Department in this
17   case, a couple of miles?
18   A    Yeah, about a mile and a half, two miles.
19   Q    Let me ask you this:  Before you left the scene, did you
20   travel back to the location where Officer Bobbs found the
21   firearm?
22   A    No, I did not.
23   Q    Were you present when the photographer was with Officer
24   Bobbs and taking photographs of where the firearm was located?
25   A    I don't recall.
```

**UNITED STATES DISTRICT COURT**

```
 1   Q     Is it your estimation that the firearm was discarded
 2   somewhere mid block on that particular incident?
 3   A     As soon as the vehicle made a left turn onto Doty
 4   northbound, it was discarded.
 5   Q     That is not mid block, is it?
 6   A     No.  It's not mid block.
 7   Q     All right.  And just, do you know if Officer Bobbs was
 8   wearing gloves at the time he retrieved the firearm?
 9   A     No, I do not recall.  Standard procedure he should be.
10   Q     He should be wearing his gloves?
11   A     Yes.
12   Q     You guys are issued gloves along with your uniform items?
13   A     Yes.
14   Q     These aren't gloves you discard and change, they are
15   better than that?
16   A     We use both.  We use latex discarding gloves and regular
17   gloves.
18   Q     Latex for situations where maybe you have bodily fluids or
19   something like that?
20   A     Or at the current situation the last year and a half,
21   pretty much we all wear gloves.
22   Q     Because of COVID?
23   A     Yes.
24   Q     And that is a good question, do you recall if you were
25   wearing a mask or a shield on this particular day?
```

1    A    I think this was prior to that, and I probably was not.

2    Q    And you have to record the items that were seized; is that

3    correct?

4    A    Yes, sir.

5    Q    And it calls for you to write down a list of items and you

6    do that at the end, like a laundry list, correct?

7    A    Yes, sir.

8    Q    And you -- you probably weren't wearing a face mask, is

9    that your testimony?

10        When you got to the Inglewood Police Department, what

11   did you do with the evidence bag?

12   A    Put it into the evidence -- I booked it into the evidence

13   room.

14   Q    So is that like a room with a picnic table and you sit

15   down and you fill out your paperwork?

16   A    No.  It's a confined room, gated and locked.  You put the

17   evidence into evidence lockers if it's late, and then the

18   evidence sergeant and the property room workers pretty much

19   take care of the property the following day.

20   Q    And in this case, would it be considered late?  It was

21   probably after 10 o'clock at night?

22   A    Yes, sir, it was late, yes.

23   Q    So then you would -- at this point you would have taken

24   the brown evidence bag and placed it in a locker?

25   A    Not the brown evidence bag, it would have been in the two

```
 1   yellow hold for prints bags that were put in and marked and

 2   written on and sealed.

 3   Q    The ones we have here in court?

 4   A    Yes, sir.

 5   Q    That you held up?

 6   A    Yes, sir.

 7   Q    So you actually filled those out at the scene?

 8   A    No.

 9   Q    You filled those out at the station?

10   A    Yes.

11   Q    And then you deposit them at the evidence room?

12   A    Correct.

13   Q    So you have to sit down at a table, I imagine, and

14   write -- when you are doing your reports and writing down --

15   you are filling out your envelopes?

16   A    Correct.

17   Q    So while you are doing that you are sitting there with the

18   evidence bag with the firearm, the bullets, and the magazine?

19   A    Yes.

20   Q    In front of you?

21   A    Yes, sir.

22   Q    And then you are removing them one at a time while you put

23   them in the envelopes and fill them out?

24   A    Correct, with latex gloves.

25   Q    Okay.  Now, you put on latex gloves when you get to the
```

1   police station; is that fair to say?

2   A      No.

3   Q      Okay.

4   A      But when you are booking evidence, you put on the latex.

5   Q      You put on gloves when you put the evidence in the

6   station, but you were wearing your field gloves when you were

7   out on the scene?

8   A      Right.

9   Q      Different sets of gloves?

10  A      Right.

11  Q      Is it fair to say you handled the items with both sets of

12  gloves -- your field gloves and your latex gloves?

13  A      Correct.

14  Q      Thanks.

15         And do you know how the evidence is then taken to the

16  lab or is that outside?

17  A      That is outside, yeah.

18  Q      And do you use your regular pen when you are filling out

19  these tags or do you -- are you issued a special science pen

20  that is wrapped in plastic or anything like that?

21  A      No, we're not issued -- there is pens around.  We don't

22  have a specific pen I keep, I do not.

23  Q      And do you know if you sneezed or cough while you were

24  filling out this stuff?

25  A      No recollection.

```
 1   Q    And it's fair to say that when you reviewed the report in
 2   this particular case, it was noted by Officer Villicana that
 3   Officer Bobbs located the firearm in the center of the street
 4   on Doty, correct?
 5   A    Correct.
 6            MR. CLEARY:  Thank you very much.  No further
 7   questions, Your Honor.
 8            THE COURT:  Any redirect?
 9            MR. RODRIGUEZ:  One moment, Your Honor.
10                     REDIRECT EXAMINATION
11   BY MR. RODRIGUEZ:
12   Q    Going back to when you booked -- or you placed evidence
13   into your trunk, you just testified that is your standard
14   operating procedure?
15   A    Yes.
16   Q    Do you have any reason to believe you would not have
17   followed your standard operating procedure that night?
18   A    No.
19   Q    You also just testified you saw the gun in the center of
20   the street.
21            Do you have a specific recollection of seeing the
22   gun hit the street?
23   A    I did not see the gun in the middle of the street.  I
24   heard -- I heard the gun hit a car a parked car on the east
25   curb and hit the ground as we were following the car.
```

1    Q     What was -- at that time when you are pursuing the

2    vehicle, you see the gun tossed, what are you focused on?

3    A     We're focused on trying to stop the car that is in front

4    of us with our lights, sirens, floodlights and spotlights.

5    Q     I'm going to now show you what has been marked as

6    Exhibit 10.

7                THE COURT:  Go ahead, counsel.

8                MR. RODRIGUEZ:  Thank you.

9    BY MR. RODRIGUEZ:

10   Q     Is the vehicle you could see on the left side on

11   Exhibit 10, is that your vehicle?

12   A     No, it is not.

13   Q     Is it identical to the vehicle you were in that night?

14   A     Yes.

15   Q     Anything about this particular vehicle that would be

16   different than the vehicle you were in?

17   A     Yes.  I have a dark tint on my vehicle.

18   Q     Can you please zoom in on the vehicle?

19         Aside from the tinting of your vehicle, anything

20   different about this vehicle than your vehicle?

21   A     That's one of my partners on the team, that would be her

22   vehicle.

23               MR. RODRIGUEZ:  No further questions.  Thank you.

24               THE COURT:  All right.  Mr. Cleary, anything

25   further?

```
 1            MR. CLEARY:  No.  Thank you, Your Honor.
 2            THE COURT:  May this witness be excused?
 3            MR. RODRIGUEZ:  Yes, Your Honor.
 4            MR. CLEARY:  Yes, Your Honor.
 5            THE COURT:  Thank you, sir.  You may step down.
 6        All right.  Call your next witness.
 7            MR. KAHAN:  At this time the government calls
 8   Nicholas Bobbs.
 9            THE COURTROOM DEPUTY:  Please raise your right hand.
10                 (Oath was administered.)
11            THE WITNESS:  I do.
12            THE COURTROOM DEPUTY:  Thank you.  Please be seated.
13   Please state and spell your name for the record.
14            THE WITNESS:  Nicholas, N-i-c-h-o-l-a-s Bobbs
15   B-o-b-b-s.
16                     NICHOLAS BOBBS,
17                  having been duly sworn,
18                  testified as follows:
19            THE COURT:  You may proceed.
20            MR. KAHAN:  If the record can reflect the witness is
21   wearing a clear face mask.  Good afternoon, sir.
22            THE WITNESS:  Good afternoon.
23                    DIRECT EXAMINATION
24   BY MR. KAHAN:
25   Q    Where do you currently work?
```

```
1    A     Inglewood Police Department, City of Inglewood.
2    Q     What's your *parole there?
3    A     On patrol.
4    Q     Are you a peace officer?
5    A     Yes.
6    Q     How long have you worked for the Inglewood Police
7    Department?
8    A     A little over seven years.
9    Q     Do you have I in sort of training and experience in the
10   collection of evidence?
11   A     Yes.
12   Q     What sort of training and experience do you have?
13   A     We were taught to always glove up before recovering
14   evidence, place it inside of evidence bag, and then seal it.
15   Q     Why do you wear gloves?
16   A     To refrain from contaminating evidence.
17   Q     Did this also include the collection of firearm evidence?
18   A     Yes.
19   Q     Were you on duty for the Inglewood Police Department on
20   March 20th, 2020, at around 9:36 p.m.?
21   A     Yes.
22   Q     Were you on duty at that time?
23   A     I was on the southern portion of the city in the City of
24   Inglewood.
25   Q     At around that time, did you receive any request for
```

```
 1    assistance by another officer?
 2    A    Yes.
 3    Q    Which officer?
 4    A    Officer Villicana.
 5    Q    How did you receive this request?
 6    A    Via radio.
 7    Q    Was it a specific request for you, or?
 8    A    Just an additional unit.
 9    Q    What was that request for?
10    A    For assistance with a traffic stop and then to recover an
11    object that was tossed from a vehicle.
12    Q    What sort of object?
13    A    Firearm.
14    Q    Were you provided any sort of information as to where the
15    firearm was located?
16    A    Yes.
17    Q    Where?
18    A    At the intersection of 109th and Doty in the street.
19    Q    What city?
20    A    In the City of Inglewood.
21    Q    How far were you from 109th and Doty when you received
22    this request?
23    A    A couple of blocks.
24    Q    Did you respond to the request?
25    A    Yes.
```

30

```
1    Q     Did you arrive at 109th and Doty?

2    A     Not initially.

3    Q     Where did you go first?

4    A     I went to Officer Villicana and Officer Wunderlich's

5    traffic stop.

6    Q     Why?

7    A     Did assist with them in the stop of a vehicle.

8    Q     What did you do upon arriving?

9    A     I got in my vehicle and I approached Officer Villicana and

10   then he told me to go back and secure the firearm.

11   Q     How long did that conversation last?

12   A     Seconds.

13   Q     Is it fair to say you weren't at 108th and Doty for that

14   long?

15   A     Correct.

16   Q     What did you do upon receiving a request to look for the

17   firearm?

18   A     I ran back to 108th and Doty.

19   Q     108th?

20   A     I'm sorry, 109th and Doty.

21   Q     Did you conduct a search for a firearm?

22   A     Yes.

23   Q     Did you find a firearm?

24   A     Yes.

25   Q     Where?
```

```
 1   A    It was on the sidewalk just north of the intersection of

 2   Hunter and 109th and Doty.

 3   Q    Were there any other officers present at the scene?

 4   A    Yes.

 5   Q    Which officers?

 6   A    Officer Villicana and Officer *Lee.

 7   Q    Where were they?

 8   A    They were standing in the street by their vehicle.

 9   Q    Did you see them interact with the fireman at all?

10   A    I did not.

11   Q    Based on just your observation of the firearm, did it

12   appear anyone had moved it?

13   A    No.

14   Q    Was it easy to find the gun or difficult?

15   A    Easy.

16   Q    Why?

17   A    It was right in the middle of the sidewalk.

18   Q    I'm going to show you what has previously been admitted as

19   Exhibit 101.

20            Can you see on your screen?

21   A    Yes.

22   Q    What is this?

23   A    This is a photo I took of the area where the firearm is

24   located.

25   Q    Why did you take this photo?
```

UNITED STATES DISTRICT COURT

1   A     To show geographically where I located it.

2   Q     Can you see the firearm depicted in this firearm?

3   A     Yes.

4   Q     If we could zoom into the center of the photograph on the

5   sidewalk next to a parked truck.

6              Can you see the zoomed-in image?

7   A     Yes.

8   Q     Can you describe what you see in that image?

9   A     It's the firearm that I located.

10  Q     Can you -- using your finger, can you circle where you

11  found it?

12             Let the record reflect the witness has circled an

13  object in the center of the screen with a red circle.

14             THE COURT:  The record will so reflect.

15  BY MR. KAHAN:

16  Q     Is that -- was that a fair depiction of where the firearm

17  was when you first saw it?

18  A     Yes.

19  Q     Had you moved it by that point?

20  A     No.

21  Q     When you saw the firearm, what did you do?

22  A     I immediately photographed it.

23  Q     I'm going to show you what has been marked as

24  Exhibit 12-1.

25             Do you recognize that?

1    A    Yes.

2    Q    What is it?

3    A    That's the firearm where I found it.

4    Q    Is that a fair and accurate depiction of the firearm as

5    you found it?

6    A    Yes.

7    Q    I'm going to show you now Exhibit 11-1.

8         Do you recognize that?

9    A    Yes.

10   Q    What is it?

11   A    A firearm where I found it.

12   Q    Is this also a fair and accurate depiction of the firearm

13   as you found it when you arrived on scene?

14   A    Yes.

15   Q    Now, I'm going to show you Exhibit 8-1.

16        Do you recognize that?

17   A    Yes.

18   Q    What is it?

19   A    A firearm where I found it.

20   Q    Is this a fair and accurate depiction of the firearm as

21   you found it?

22   A    Yes.

23   Q    Is this on the sidewalk?

24   A    Yes.

25   Q    What did you do after taking photographs of the firearm?

**UNITED STATES DISTRICT COURT**

```
 1   A     I recovered it wearing gloves.  I rendered it safe, and I
 2   placed it inside of a evidence bag.
 3   Q     I want to break that down a little bit.
 4              Where did you get the gloves from?
 5   A     From my back pocket.
 6   Q     I'm going to show you what has been marked as Exhibit 9-1.
 7         Do you recognize that?
 8   A     Yes.
 9   Q     What is depicted in 9-1?
10   A     A photograph showing that the chamber of the firearm is
11   empty.
12   Q     Who is depicted in the photograph?
13   A     That is me.
14   Q     Can you see your hands?
15   A     Yes.
16   Q     What are you wearing?
17   A     Gloves.
18   Q     Are those the gloves you just testified about?
19   A     Yes.
20   Q     What sort of gloves are those?
21   A     Black nitrile gloves.
22   Q     Now, you also mentioned you rendered it safe.
23              What does that mean?
24   A     When you recover firearms depending how the firearm is
25   located, you remove the magazine, check the chamber to make
```

**UNITED STATES DISTRICT COURT**

1    sure there is not a round in the chamber and if there is you

2    remove it and then lock the slide to the rear to prevent an

3    accidental discharge of the firearm.

4    Q     Was there any round in the chamber?

5    A     No.

6    Q     Was there anything about the firearm that caught your

7    attention?

8    A     There was no magazine in the magazine well.

9    Q     What is a magazine?

10   A     A magazine is what holds the bullets.

11   Q     What is a magazine well?

12   A     Where the magazine is placed to seat the bullets to the

13   chamber.

14   Q     What type of firearm was it that you found on the sidewalk

15   near 109th and Doty?

16   A     Smith and Wesson.

17   Q     What caliber?

18   A     That is a .380.

19   Q     When you corrected the firearm off the sidewalk, was there

20   anything unusual that happened?

21   A     No.

22   Q     Anything outside of your training that you did?

23   A     No.

24   Q     What did you do with the firearm that you can see in

25   Exhibit 9-1 after retrieving it?

```
 1   A     I placed it in a brown evidence bag.

 2   Q     Where did you get this evidence bag from?

 3   A     From the trunk of Officer Lee and Officer Vega's vehicle.

 4   Q     I'm going to show you Exhibit 10-1.

 5             Can you see that vehicle in the photograph?

 6   A     Yes.

 7   Q     Can you circle it?

 8   A     Let the record reflect the witness has drawn a red circle

 9   around a parked car with an opened door on the left side of

10   Exhibit 10.

11             THE COURT:  The record will so reflect.

12   BY MR. KAHAN:

13   Q     The firearm you recovered, what type of firearm was it?  A

14   rifle, pistol?

15   A     Pistol.

16   Q     Are you familiar with the different types of pistols?

17   A     Yes.

18   Q     Revolver, automatic, semiautomatic?

19   A     Yes.

20   Q     What type is this?

21   A     A semiautomatic with an external hammer.

22   Q     So you placed the firearm you recovered with gloves inside

23   of a brown evidence bag.

24             Was the evidence bag empty before placing the

25   firearm inside?
```

```
 1    A    Yes.

 2    Q    What did you do with the firearm once you placed it inside

 3    the evidence bag?

 4    A    I walked it back to the officer.

 5    Q    Where were they at that time?

 6    A    They were still at the traffic stop at 108th and Doty.

 7    Q    When you arrived back at the scene, were there any other

 8    people with them?

 9    A    Yes.

10    Q    Did you see any of those individuals in court today?

11    A    Yes.

12    Q    Can you identify where that person is seated and something

13    that that person is wearing?

14    A    The subject seated diagonally from me in the light blue

15    shirt and blue tie.

16         MR. KAHAN:  May the record reflect the witness has

17    identified the defendant?

18         THE COURT:  Yes, the record will so reflect.

19    BY MR. KAHAN:

20    Q    So you arrived at the traffic stop.  What did you do with

21    the gun and evidence bag?

22    A    I gave it to Officer Wunderlich.

23    Q    Why?

24    A    It's his case, so I handed it to him.

25    Q    Did you have any other involvement with this case at the
```

1    scene?

2    A    No.

3    Q    Did you ever search the car?

4    A    No.

5    Q    Did you ever physically handle the defendant at the scene?

6    A    No.

7    Q    Did you ever handle any magazines?

8    A    No.

9    Q    About how far away -- you can see in Exhibit 10-1 where

10   you found the firearm -- about how far away is that from where

11   Officer Wunderlich and Officer Villicana were?

12   A    Roughly a block.

13            MR. KAHAN:  If I could have a moment, Your Honor?

14            THE COURT:  Yes.

15            MR. KAHAN:  Your Honor, if I could have Special

16   Agent provide Exhibits 49, 50, and 51 to Officer Bobbs?

17            THE COURT:  Please do.  Thank you.

18            MR. KAHAN:  Let the record reflect the witness has

19   been provided envelopes containing Exhibits 49, 50 and 51.

20            THE COURT:  All right.

21   BY MR. KAHAN:

22   Q    Officer Bobbs, can you open Exhibit 49 which is the

23   firearm?

24   A    Yes.

25   Q    Can you show it to the jury.

```
1                    Do you recognize that item?
2    A    Yes.
3    Q    What is it?
4    A    It's a firearm I located.
5    Q    How can you tell it's the same firearm?
6    A    Make, model, and style.
7    Q    Is that a fair and accurate depiction of the firearm as
8    you saw it on the sidewalk near 109th and Doty in Inglewood?
9    A    Yes.
10   Q    On March 20th, 2020?
11   A    Yes.
12   Q    You can place it back in the bag and the Special Agent can
13   retrieve the items.
14              THE COURT:  Go ahead.
15   BY MR. KAHAN:
16   Q    Finally, I'm going to show you what has been admitted as
17   Exhibit 13.
18              Do you recognize what this depicts?
19   A    Yes.
20   Q    What is it?
21   A    The area in which the firearm and the traffic stop were
22   located or conducted.
23   Q    More generally, can you describe what you are looking at
24   here?
25   A    The residential area between 108th and 109th on Doty
```

1    Avenue.

2    Q    Is that fair to say this is a Google map of the area?

3    A    Yes.

4    Q    Can you circle the area where you found the gun?

5    A    It's upside down.  I'm trying to figure out north and

6    south, I'm sorry.

7    Q    Do you need me to clear that?

8    A    I sorry.

9    Q    I'm going to -- let the record reflect the witness drew a

10   red circle, the first red circle on Doty Avenue next to 108th

11   Street next to a house with a number 3800 next to it.

12            And then after apologizing to a second circle --

13   red circle at the intersection of Doty Avenue and 109th Street

14   next to a house with 3753 next to it?

15            THE COURT:  All right.

16            MR. KAHAN:  I'm going to clear the screen.

17   BY MR. KAHAN:

18   Q    Now, is it upside down for you?

19   A    No, we're good.

20   Q    Can you show -- draw -- let's do a red X to differentiate,

21   a red X where you found the gun?

22            Let he record reflect the witness has drawn a red

23   X near the corner of 109th Street and Doty Avenue to the left

24   of a house with the number 3753 on it.

25            Is that a fair and accurate depiction of where

1   you found the gun on Doty Avenue?

2   A    Yes.

3   Q    The same area that was depicted in Exhibit 10?

4   A    Yes.

5              MR. KAHAN:  No further questions, Your Honor.

6              THE COURT:  All right.  Cross-examination?

7                        CROSS-EXAMINATION

8   BY MR. CLEARY:

9   Q    Good afternoon, Officer Bobbs.

10  A    Good afternoon.

11  Q    I wanted to ask you about the photograph depicting your

12  gloves.

13              You had a word for those gloves.  Nitrile gloves?

14  A    Yes.

15  Q    What a nitron glove?

16  A    It's supposed to be a non-porous texture and some come

17  with non-puncture, but those were standard nitron.

18  Q    Those are not the disposable latex gloves, correct?

19  A    No.

20  Q    Those are gloves that you might be issued and be your duty

21  gloves that you carry with you every night?

22  A    I dispose of them, I don't reuse gloves, especially ones

23  like that.  If you have regular gloves, they are baseball

24  gloves, but those are for when I contact people, not for

25  collection of evidence.

```
 1    Q     A different glove for people contact versus evidence
 2    collection?
 3    A     Yes.
 4    Q     Okay.  So the nitrile glove, that is more akin to a latex
 5    glove that we night know of?
 6    A     Yes.
 7    Q     You would have disposed of that?
 8    A     Yes.
 9    Q     You would not have reused that, that would have been
10    something you would have taken from the vehicle specifically
11    that night for that purpose only?
12    A     Yes.
13    Q     Very good.  So, that is your standard procedure, right?
14    A     Correct.
15    Q     That's when you are trained to do and collection of
16    evidence is to use a glove that might not be susceptible to
17    leaking or tearing, correct?
18    A     Yes.
19    Q     And to use something that is disposable and non-porous,
20    correct?
21    A     Correct.
22    Q     That's why you have the nitrile gloves, correct?
23    A     Yes.
24    Q     Different than your baseball-style other gloves?
25    A     Correct.
```

**UNITED STATES DISTRICT COURT**

```
1    Q    Those you may reuse every night?

2    A    Correct.

3    Q    So, the government asked you some questions about whether

4    the firearm had been moved.

5              Is there any way you would have known if the

6    firearm had been moved?

7    A    No, sir.

8    Q    Okay.  Let me ask you this:  There was Officer Vega and

9    another officer that you identified as being in the area, Lee,

10   I believe.  Officer Vega and Officer Lee were generally around

11   to secure the scene because of the traffic stop going on,

12   correct?

13   A    Yes.

14   Q    And that is to keep from people from milling about and

15   getting involved in the arrest, correct?

16   A    Yes, sir.

17   Q    To kind of crowd control, correct?

18   A    Yes, sir.

19   Q    It's in residential neighborhood, correct?

20   A    Yes.

21   Q    There are people that live there?

22   A    Yes, sir.

23   Q    Lookie loos and people kind of curious about what is going

24   on, right?

25   A    Yes, sir.
```

```
 1   Q    Do you recall anybody looking around and seeing what is
 2   good on?
 3   A    I don't recall.
 4   Q    All right.  And were you in an undercover vehicle that
 5   night?
 6   A    Undercover, being unmarked?
 7   Q    Unmarked.
 8   A    Correct.
 9   Q    And was it also a Dodge charger, were you in the Ford
10   Explorer, what were you driving?
11   A    Dodge Charger, I wasn't driving, but I was in a Dodge
12   Charger yes.
13   Q    It's an unmarked vehicle?
14   A    Except for license plates, yes.
15   Q    And you don't recall if there were people milling about?
16   A    I do not.
17   Q    Okay.  And it was -- it's your testimony or your
18   recollection that when you first arrived, you arrived at the
19   traffic stop, and you spoke to Officer Villicana.
20             Was Officer Wunderlich there or was he busy with
21   the vehicle?
22   A    He was there.  He was at the same scene.
23   Q    You kind of talked to both of them, then?
24   A    Directed towards Officer Villicana because we were on the
25   same side.
```

**UNITED STATES DISTRICT COURT**

```
1   Q    Okay.  And he said to run back down the street, and that's
2   what you did?
3   A    Correct.
4   Q    So did you have to run from one end of the block to the
5   other end of the block in order to find this particular
6   firearm?
7   A    Yes.  One intersection to the next, yes.
8   Q    How far is that if you might -- I know we saw it on the
9   Google maps, but the estimate?
10  A    One city block, I'm not too sure about feet.
11  Q    Just the average city block?
12  A    Right.
13  Q    And it was not located mid block, was it?
14  A    No.
15  Q    It wasn't in the middle of the street, was it?
16  A    No, sir.
17  Q    And it's your testimony that you placed it in an evidence
18  bag in the back of Lee's and Vega's vehicle?
19  A    No.
20  Q    You retrieved an evidence bag from Lee's and Vega's
21  vehicle?
22  A    Yes.
23  Q    Is this the brown bag we see on the table?
24  A    It's a different bag.
25  Q    We don't have it in the courtroom today?
```

**UNITED STATES DISTRICT COURT**

```
 1   A     The brown bag is.

 2   Q     Is that right there in front of the Special Agent?

 3   A     Correct.

 4   Q     Can I ask Special Agent if you could show Officer Bobbs

 5   that brown paper bag so he can confirm that is the bag he

 6   retrieved.

 7               Is that the brown evidence bag you retrieved from

 8   Officer Vega and Lee's vehicle?

 9   A     Yes.

10   Q     How do you know that?

11   A     It's a standard evidence collection bag.

12   Q     Are there any notes on the bag to indicate that you

13   retrieved it or where or when it was retrieved?

14   A     No, sir.

15   Q     There is no markings on it?

16   A     No, sir.

17   Q     Did you normally -- wouldn't you have marked where and

18   when you found the contents of a bag that you are retrieving

19   for evidence purposes?

20   A     Normally after the stop, yes, correct, but not on the

21   scene.

22   Q     From looking at that bag, you can't tell if that is the

23   bag you retrieved from the vehicle or some other bag that

24   looked similar, correct?

25   A     Correct.
```

**UNITED STATES DISTRICT COURT**

```
 1   Q    All right.  So then you took the firearm and the brown
 2   paper bag similar to the one up there, and you handed it to him
 3   -- to Officer Wunderlich?
 4   A    The bag, correct.
 5   Q    What did Officer Wunderlich do with the bag?
 6   A    He took it from my position.
 7   Q    And no other involvement at the scene regarding this?
 8   A    As far as the firearm, no.
 9   Q    Okay.  Do you recall doing any duties at the scene?
10   A    I'm unaware.  Maybe I think we might have transported the
11   defendant, but I can't remember, I can't recall.
12   Q    Okay.  Did you handle any physical -- any other physical
13   evidence at the scene?
14   A    Not that I recall.
15   Q    All right.  But you were the one who secured the firearm
16   to make sure it was not loaded, correct?
17   A    Correct.
18   Q    And it wasn't, correct?
19   A    Correct.
20   Q    All right.
21           MR. CLEARY:  Nothing further.  Thank you very much.
22           THE COURT:  Any redirect?
23           MR. KAHAN:  Could I have a moment?  Very, very
24   briefly, Your Honor.
25              THE COURT:  All right.
```

**UNITED STATES DISTRICT COURT**

```
 1                      REDIRECT EXAMINATION
 2  BY MR. KAHAN:
 3  Q     The firearm you recovered, the Smith and Wesson, did it
 4  appear to be a working firearm?
 5  A     Yes.
 6  Q     Just to confirm, the brown bag, the one that is currently
 7  to your left on the witness stand, you can't tell whether or
 8  not -- that's a standard issue bag?
 9  A     Right.
10  Q     There is no way for you to differentiate right now whether
11  or not that is the same bag you used on March 20, 2020 versus
12  any other bag from Inglewood Police Department?
13  A     Correct.
14            MR. KAHAN:  Nothing further.
15            THE COURT:  All right.  Mr. Cleary, anything
16  further?
17            MR. CLEARY:  No.  Thank you, Your Honor.
18            THE COURT:  May this officer be excused?
19            MR. KAHAN:  Yes, Your Honor.
20            MR. CLEARY:  Yes.
21            THE COURT:  All right.  Thank you, sir.  You may
22  step down.
23         All right.  Please call your next witness.
24            MR. KAHAN:  United States calls Jose Barragan.
25            THE COURTROOM DEPUTY:  Please raise your right hand.
```

```
 1                        (Oath was administered.)
 2              THE WITNESS:  I do.
 3              THE COURTROOM DEPUTY:  Thank you.  Please be seated.
 4          Please state and spell your name for the record.
 5              THE WITNESS:  Jose J-o-s-e Barragan B-a-r-r-a-g-a-n.
 6                          JOSE BARRAGAN,
 7                      having been duly sworn,
 8                       testified as follows:
 9              THE COURT:  You may proceed.
10              MR. KAHAN:  Let the record reflect that the witness
11    has put on a clear face mask.
12              THE COURT:  All right.
13                       DIRECT EXAMINATION
14    BY MR. KAHAN:
15    Q     Good afternoon.
16    A     Good afternoon.
17    Q     Were do you currently work?
18    A     Inglewood Police Department.
19    Q     What is your title there?
20    A     I'm a gang intelligence detective.
21    Q     How long have you been with the Inglewood Police
22    Department?
23    A     Over eight years.
24    Q     Do you have any sort of training or experience in the
25    collection of DNA samples from suspects?
```

```
 1   A     Yes.
 2   Q     Can you describe that training you had?
 3   A     It's just a training that goes over the collection of DNA
 4   from suspects using a swab.
 5   Q     What sort of swab?
 6   A     It's a buccal swab.
 7   Q     What is a buccal swab?
 8   A     It's a piece of -- it looks like a plastic popsicle stick
 9   with the end and it has like a little bit of cotton type of
10   material attached to the end that goes inside the individual's
11   mouth.
12   Q     How many times have you -- well, what is the purpose of
13   using that swab?
14   A     It's to obtain DNA from the defendant at the time and
15   compare it to any kind of evidence we may have to see if their
16   DNA is on that piece of evidence.
17   Q     How many DNA samples, using the buccal swab, have you done
18   against potential suspects over the course of your career?
19   A     I would say somewhere around 20 or more.
20   Q     When you -- where do you get the swab from?
21   A     They are usually -- I have some in my office.  We keep
22   them there or they are outside in Inglewood Police Department
23   city jail in a box.
24   Q     Are they sealed?
25   A     Yes.
```

```
 1   Q     So you retrieve one of these boxes, and what do you do
 2   with it whenever you want to take a buccal swab from someone?
 3   A     Well, we retrieve the kit, it's called a DNA kit, that's
 4   what we refer them to.
 5                What it is, is the envelope, maybe six by four or
 6   something like that, and a manila envelope with the -- with
 7   information in the front, information pertaining to the purpose
 8   of obtaining a DNA from either a victim or suspect.
 9                I would have the report number attached to it, or
10   you actually write it in there.  It would have the defendant
11   suspect's name also attached to that.
12                It would have my name, it would have time of
13   collection.
14   Q     Now, were you on duty for the Inglewood Police Department
15   on March 24th, 2020?
16   A     Yes, I was.
17   Q     On that date, did you contact anyone in this courtroom?
18   A     I did.
19   Q     Can you identify where that person is seated and something
20   that person is wearing?
21   A     Yes.  He's seated to the left of defense counsel, wearing
22   the -- I believe a light blue long-sleeved shirt and a tie.
23                MR. KAHAN:  May the record reflect the witness has
24   identified the defendant?
25                THE COURT:  The record will so reflect.
```

**UNITED STATES DISTRICT COURT**

BY MR. KAHAN:

Q     Where was the defendant when you contacted him?

A     Inside the Inglewood Police Jail.

Q     Why you did contact him that day?

A     To obtain DNA from the defendant.

Q     Did you already have the DNA package you described earlier with the buccal swab in there?

A     Correct.

Q     What's contained in that actual package?

A     It's the actual the envelope that I just described, you open it, and it is closed, it has those little metal clips that close envelopes.

        You open that, you pull out another smaller white envelope and that's about maybe a four by three, so it's a smaller envelope.

        You pull -- the contents in there is going to be some gloves, the buccal swab that I described earlier, and I believe that's it.  Oh, and an evidence -- like, evidence tape is also in there.  And that is used to seal it completely.

Q     Did you have all of these materials with you when you met with the defendant on March 24th, 2020?

A     Yes.

Q     The package you described, was it sealed when you had it prior to meeting with defendant?

A     Yes.

```
 1   Q     Anything you could visibly see that could have potentially
 2   contaminate any of the materials?
 3   A     No.
 4   Q     Any tears in the bag or gaps or anything like that?
 5   A     No.
 6   Q     Did anyone else mark anything on the bag with writing or
 7   anything?
 8   A     No.
 9   Q     Did you perform a buccal swab for defendant's DNA on that
10   date?
11   A     I did.
12   Q     Prior to doing that, did you wear gloves?
13   A     Yes.
14   Q     Why did you wear gloves?
15   A     That way we don't cross contaminate anything.
16   Q     How long did you swab the defendant's mouth?
17   A     A few seconds.
18   Q     Did -- was that consistent with the training you received?
19   A     Yes.
20   Q     Did anything out of the ordinary happen as you were taking
21   this swab sample of defendant's mouth?
22   A     No.
23   Q     What happened once you finished swabbing the defendant's
24   mouth?
25   A     I left.
```

54

```
1    Q      What did you do with the swab?

2    A      I took it to my office and placed it in the locker.

3    Q      Did you do anything with the swab itself to secure it from

4    any sort of contamination before doing that?

5    A      Yes.  I sealed the whole entire envelope, so the white

6    envelope gets sealed and then the exterior of the manila

7    envelope also gets sealed.

8    Q      Just so I understand, you take the swab you use in

9    defendant's mouth, you place that in a white envelope, and then

10   you seal it?

11   A      Correct.

12   Q      And then you take that white envelope you sealed and place

13   it in another envelope?

14   A      So the way it comes in, you put it back in and you write

15   the defendant's name and the report number on the actual swab.

16   You place that back in the white envelope, you close it, you

17   seal it, then you take that white envelope and you place it

18   back into the manila envelope and then you seal that as well.

19   Q      What name did you write as the suspect's name in this

20   case?

21   A      Steven Duarte.

22   Q      What report number did you write?

23   A      What report number?

24   Q      Yes.

25   A      I believe it was 17470.  I'm sorry, there is 20 dash
```

**UNITED STATES DISTRICT COURT**

```
 1   consistent to the year.
 2   Q    Can you repeat that since it's before just to make sure?
 3   A    I believe it's 20-17470.
 4   Q    Are those unique case numbers assigned for each individual
 5   case?
 6   A    Yes.
 7   Q    It's not -- it's for the entirety of the case, it's not
 8   for your individual role?
 9   A    Correct.
10             THE WITNESS:  This fell apart.
11             MR. KAHAN:  Let the record reflect the witness has
12   put on another clear mask.
13             THE COURT:  Put it up above your nose.  I think
14   that's the way it's supposed to go.  Thank you.
15   BY MR. KAHAN:
16   Q    So you sealed this, and just to back up for just one
17   moment, the swabbing that you did of defendant's mouth was that
18   with the buccal swab that was contained in the packet you
19   described earlier?
20   A    Yes.
21   Q    Not saying with any other materials, but just the glove?
22   A    Correct.
23   Q    Okay.  So you sealed the buccal swab you did of defendant
24   that you just described.  What do you do with it now that it's
25   sealed and labeled?
```

```
 1   A      Book it into the property room.

 2   Q      Why do you book it there?

 3   A      Because they process it.

 4   Q      Is that standard?

 5   A      Yes.

 6   Q      Is there a way for the property room to deliver items for

 7   to Los Angeles Sheriff's Department Laboratory for further

 8   forensic analysis?

 9   A      Yes.

10   Q      Did you write your name at all in any of the materials

11   regarding this swab that you took?

12   A      Yes.

13   Q      Just the last subject matter I want to talk to you about.

14          Do you see a brown bag at the end of counsel's table?

15   A      Yes.

16   Q      If the Special Agent can provide that to Detective

17   Barragan?

18              THE COURT:  All right.  Go ahead.

19   BY MR. KAHAN:

20   Q      Do you recognize that bag?

21   A      I do.

22   Q      What is if?

23   A      It's an evidence bag that is provided for us from property

24   -- Inglewood Police property.

25   Q      Were you involved at all in the transportation of firearm,
```

```
 1  magazine, and ammunition from the Inglewood Police Department
 2  to courthouse for the purposes of this trial?
 3  A    I was.
 4  Q    Did you transfer those materials using the brown bag to
 5  your right?
 6  A    Yes.
 7           MR. KAHAN:  Nothing further.
 8           THE COURT:  All right.  Cross-examination?
 9                    CROSS-EXAMINATION
10  BY MR. CLEARY:
11  Q    Good afternoon.  Is it Detective Barragan?
12  A    Detective, yes, sir.
13  Q    Well, I thought that my mask is uncomfortable, but I have
14  to admit those masks are a little bit more uncomfortable than
15  what we have to wear.  I do appreciate you are wearing that.
16       I also want to compliment you.  It seems you have a
17  recollection for numbers.  You are good with numbers, aren't
18  you?
19  A    Sometimes.
20  Q    Let me ask you this:  You had to undergo some training in
21  order to be designated someone who could obtain a buccal swab;
22  is that fair to say?
23  A    Of some sort, yes.
24  Q    And is the training part of a class on how to handle DNA
25  collection of evidence in particular situations?
```

```
 1   A     No, it is informal.

 2   Q     It is more informal?

 3   A     Yes, sir.

 4   Q     It's not a class, per se, it's more of a training you

 5   might get from another officer?

 6   A     Correct.  Another officer -- forensic specialist, yes.

 7   Q     Someone to show you how to operate the -- go through the

 8   procedures of the evidence and labeling so that it's a sample

 9   is taken correctly?

10   A     Correct.

11   Q     And the purpose in undergoing that informal training is so

12   that you can avoid what you said earlier which was cross

13   contamination?

14   A     Correct.

15   Q     What is cross contamination?

16   A     It would be something in regards to my DNA showing up.

17   You wear -- that is why we wear gloves so we don't cross

18   contaminate or try to contaminate than piece of evidence.

19               I can have the DNA -- if I could have did it

20   without gloves, it's a possibility I could have gotten my DNA

21   on the buccal swab if I would have touched it with sweat or

22   something.

23   Q     So you can fully end up putting your own DNA on a buccal

24   swab if you don't take the proper precautions?

25   A     It's possible.
```

```
1    Q     And likewise, the buccal swab, if it's not inserted into
2    the subject's mouth in order to obtain their DNA, but rather if
3    it's dropped on the floor, for example, it could get somebody
4    else's DNA on the buccal swab?  So you don't want to drop it on
5    the floor?
6    A     I'm not an expert on it, but it's possible, it's sounds
7    possible.
8    Q     So, but that is why you -- the buccal swab is in a sealed
9    package?
10   A     Yes.
11   Q     You have to remove it from the sealed package so each one
12   of these buccal swabs are individually wrapped?
13   A     Correct.
14   Q     Once you obtain it, that buccal swab is placed back into a
15   sealed vessel; is that fair to say?
16   A     Yes, sir.
17   Q     It's sealed and that is completed by you, and it's
18   documented by you in that you sign it and date it and indicate
19   you did it in accordance with the instructions?
20   A     Yes, sir.
21   Q     That is so you can attest that the buccal swab that you
22   obtained is free from cross contamination?
23   A     To the best of my -- yes.
24   Q     That's the whole point, right?
25   A     That's correct.
```

**UNITED STATES DISTRICT COURT**

```
1    Q     And you did that in this particular case?

2    A     Yes, I did.

3    Q     And that was really your only involvement with Mr. Duarte.

4    You weren't present at the time of his arrest or anything like

5    that, correct?

6    A     No.

7    Q     You weren't present in the obtaining of the other evidence

8    that was seized in this case, being the firearm, magazine or

9    ammunition?

10   A     That's correct.

11   Q     You had nothing to do with that, correct?

12   A     That's correct.

13   Q     Okay.  And then after you obtained a buccal swab,

14   Mr.  Duarte was released; is that fair to say?

15   A     He was -- I gave him back to the custody of our jailers,

16   yes.  He was still in custody.

17   Q     Okay.  All right.  I appreciate your cooperation.

18              THE COURT:  Any redirect?

19              MR. KAHAN:  No, Your Honor.

20              THE COURT:  All right.  May this witness be excused?

21              MR. KAHAN:  Yes.

22              THE COURT:  Mr. Cleary, may the witness be excused?

23              MR. CLEARY:  Yes, Your Honor.

24              THE COURT:  All right, sir, you may step down.

25                  You may call your next witness.
```

```
1          MR. KAHAN:  At this time the government calls
2    Celeste Hewson.
3          THE COURTROOM DEPUTY:  Please raise your right hand.
4               (Oath was administered.)
5          THE WITNESS:  I do.
6          THE COURTROOM DEPUTY:  Thank you.  Please be seated.
7       Please state and spell your name for the record.
8          THE WITNESS:  Celeste C-e-l-e-s-t-e Hewson
9    H-e-w-s-o-n.
10                   CELESTE HEWSON,
11                having been duly sworn,
12                 testified as follows:
13         THE COURT:  All right.  Counsel, you may proceed.
14                 DIRECT EXAMINATION
15   BY MR. KAHAN:
16   Q    Thank you.  I covers your mouth.
17   A    Is this how it goes?
18         THE COURT:  It goes over your nose and mouth,
19   believe it or not.
20         THE WITNESS:  The other way?
21         THE COURT:  I think that is right.
22         MR. KAHAN:  You are not the first witness to make
23   that mistake.
24         THE WITNESS:  I have neither worn one of these
25   before.
```

**UNITED STATES DISTRICT COURT**

```
 1              THE COURT:  Neither have I.
 2              MR. KAHAN:  For the record, I don't believe they are
 3   comfortable.
 4              THE COURT:  Perfect.  Thank you.
 5              MR. KAHAN:  Let the record reflect the witness is
 6   wearing a clear plastic mask.
 7              THE COURT:  It's better for all of her efforts.
 8                  Go ahead.
 9   BY MR. KAHAN:
10   Q    Good afternoon.
11   A    Good afternoon.
12   Q    Were you do currently work?
13   A    I work at the Inglewood Police Department.
14   Q    What is your current position there?
15   A    I'm a senior forensic specialist.
16   Q    What are your duties as a senior forensic specialist?
17   A    It's my responsibility to respond to crime scenes and
18   criminal investigations and search for, collect, record, and
19   preserve physical evidence.
20              I document crime scenes through photographs and
21   videotape.  I prepare diagrams of crime scenes.
22              I take measurements of items of evidence.
23              I process items of evidence for both fingerprints
24   and DNA and I perform latent print comparisons.
25   Q    Have you always worked at the Inglewood Police Department
```

1    doing this sort of thing?

2    A     No.  I started out in 1999 working for the Burbank Police

3    Department.

4              I worked for Burbank for about seven years, and

5    then in 2006, I came to Inglewood Police Department.  I have

6    been with Inglewood for the past 15 years.

7    Q     What unit are you assigned to within the Inglewood Police

8    Department?

9    A     The forensic section.

10   Q     And the forensic section, are they in charge of the

11   various duties you just described?

12   A     Yes, they are.

13   Q     Does that also include the collection of DNA?

14   A     Yes.

15   Q     Do you have any sort of training or experience in the

16   collection of DNA evidence?

17   A     Yes.  Our DNA swabs are analyzed by the Los Angeles

18   Sheriff's Department Crime Lab.

19             And I have had training from the LASD on proper -- the

20   proper way -- the proper techniques to swab items of evidence.

21   Q     You mentioned LASD, is that a common abbreviation for the

22   Los Angeles Sheriff's Department?

23   A     It is, yes.

24   Q     What sort of specific training have you had regarding the

25   collection of DNA evidence?

```
 1  A     The course that LASD did for us was a course where we had
 2  a variety of stations, and at each station was a different item
 3  of evidence.
 4       For example, there were guns and knives, baseball cap,
 5  T-shirts, shoes, hammer, screwdriver, just a wide variety of
 6  items that were at stations and each station was manned by a
 7  crime lab staff member.
 8       And we went hands on to each station and had a chance to
 9  swab the item of evidence under the direction of the staff
10  member and have them there to answer questions, if we had any.
11  Q     You said you swab items, why do you swab items?
12  A     We swab items to collect DNA.
13  Q     Is that the standard protocol to collect DNA from an item?
14  A     Yes.
15  Q     Including firearms?
16  A     Yes.
17  Q     What sort of swab do you use in order to collect DNA?
18  A     We use a cotton sterile swab.
19  Q     Why do you use a cotton sterile swab?
20  A     That is the best method for collecting potential DNA.
21  Q     Is there any concern about potential cross contamination
22  if you use a sterile cotton swab?
23  A     No.  Each swab we use is individually packed and sterile.
24  Q     Where do you get these swabs from when you are collecting
25  potential evidence?
```

**UNITED STATES DISTRICT COURT**

1    A    We order our swabs through a forensic company that

2    supplies them to us.

3    Q    When you obtain one of these swabs, when you are about to

4    actually collect potential DNA evidence using these swabs, how

5    do they come to you?  Are they free-standing, are they

6    packaged, sealed?

7    A    The swabs are individually packaged.

8    Q    Are they sealed?

9    A    Yes.

10   Q    How are they sealed?

11   A    An individual package where you have to actually tear

12   open the package, the individual package to get the swab out.

13   Q    Have you ever used the swabs in order to collect DNA from

14   a firearm?

15   A    Yes.

16   Q    What type of firearms have you used swabs on to collect

17   potential DNA evidence from?

18   A    All types of firearms.  It could be a semiautomatic,

19   handgun, it could be a revolver, it could be a rifle, a

20   shotgun, any type of hand -- any type of gun.

21   Q    When you are collecting DNA evidence from a semi-automatic

22   handgun, are there particular areas that you focus on swabbing?

23   A    Yes.  Per LASD, we take two swabs from a handgun.  We take

24   one swab from the grip area and then one swab from the trigger

25   and the slide area.

Q    Why do you take swabs from those specific areas?

A    Those areas are typically textured, so they would have the best potential of holding DNA.

Q    What sort of DNA can stay on a textured item based on your training and experience?

A    It could be skin cells.  It could be sweat from our hands.

Q    How many DNA samples have you retrieved using this swabbing method in the course of your career?

A    I would guess maybe on average -- maybe about two -- two a week.

Q    For 19 years?

A    22 years.

Q    22 years, excuse me.

     Were you on duty for the Inglewood Police Department as a senior forensic specialist in March 2020?

A    Yes.

Q    Where were you stationed that day?

A    At Inglewood PD.

Q    Did you receive a request on March 20th, 2020 to process certain items for potential forensic material?

A    I did.

Q    Who did you receive that request from?

A    The request came to our section by e-mail.

Q    What sort of items were you asked to examine?

A    A gun and a magazine.

```
1   Q      Did you retrieve these items?

2   A      I did, yes.

3   Q      Where did you get them from?

4   A      I retrieved them from the property section of the

5   Inglewood Police Department.

6   Q      When you retrieved the items from the property section,

7   what sort of were they -- free-standing, were they packaged?

8   A      When I retrieve items of evidence, they are packaged in

9   evidence envelopes or evidence bags.

10         And I retrieve the items and bring them into my lab.

11  Q      Were the items sealed when you retrieved them from the

12  property room?

13  A      They were sealed, yes.

14  Q      Why was there a delay between when you initially retrieved

15  this request to when you actually retrieved the items?

16  A      It's typically about one to three weeks before we get to

17  our items of evidence that we are to process.  It depends on

18  our workload sometimes or personnel.

19         So one to three weeks is pretty much the normal amount

20  of time.

21  Q      Is there anything about the six-day gap between receiving

22  the request and actually retrieving the items that based off of

23  what you have been trained on that could impact the amount of

24  DNA you could retrieve from an item?

25  A      No.
```

```
 1    Q    Or any sort of contamination?
 2    A    No.
 3    Q    I'm going to show you what has been admitted into evidence
 4    as 8-1.
 5              Is that consistent with the firearm that you
 6    retrieved from the property room on March 26th, 2020?
 7    A    Yes.
 8    Q    I'm going to show you now Exhibit 4.
 9         Do you recognize that?
10    A    It appears to be the magazine in the live rounds, although
11    that is not my handwriting.
12    Q    Is this consistent with the magazine that you recovered?
13    A    Yes.
14    Q    If I can show you --
15              THE COURT:  I'm sorry, the audio -- the video is not
16    up.  Thank you.
17         Now is it up.
18              MR. KAHAN:  It's turning on.  I will wait for it to
19    reboot.
20              THE COURT:  Once it does, maybe go back to the prior
21    exhibit just in the event they did not see that.
22              MR. KAHAN:  I will start at Exhibit 8.  I want to go
23    back to Exhibit 8 in case there were audio issues.
24              THE WITNESS:  Okay.
25    BY MR. KAHAN:
```

1    Q    Is that consistent with the firearm that you retrieved on
2    March 26, 2020?
3    A    Yes.
4    Q    I'm going to show you Exhibit 4-1 or just 4.
5         Is that consistent with the magazine you retrieved on
6    March 26, 2020?
7    A    Yes.
8    Q    If I can show you Exhibit 3-1?
9         Is that consistent with the magazine as well that you
10   retrieved on March 26, 2020?
11   A    Yes.
12   Q    Did you -- we can turn that off for the moment.
13        So you retrieved the items from property.  What do you
14   do with them.
15   A    I bring them into the lab.  I begin by putting down a
16   clean piece of butcher paper.  I put on clean sterile gloves
17   and a mask and I opened the package.
18   Q    Why do you do these things?
19   A    To avoid any possible contamination.
20   Q    Where are you actually doing this at?
21   A    In our lab.
22   Q    Is that a sterile environment?
23   A    Yes.
24   Q    When you opened the bags from property and retrieved the
25   firearm and magazine, could you see any signs of tampering?

```
1    A     I did not see any signs.
2    Q     Did you take any photographs of the firearm and magazine
3    that you retrieved?
4    A     I did, yes.
5    Q     I'm going to show you Exhibit 15.
6          Do you recognize this?
7    A     I do.
8    Q     What is it?
9    A     It's a photograph of the gun -- a photograph I took of the
10   gun.
11   Q     Is that a fair and accurate depiction of the firearm you
12   retrieved on March 26, 2020?
13   A     Yes.
14   Q     If you could zoom in on the number in the middle.
15            Do you recognize that?
16   A     I do.
17   Q     What is that?
18   A     That's the serial number.
19   Q     What is the serial number?
20   A     EA T2760.
21   Q     If we can back out of that.  If you can zoom in on the top
22   of the firearm in the middle there?
23          Do you see some letters and some numbers to the right of
24   the zoomed-in area?
25   A     I do.
```

```
 1    Q      What are the numbers and letters?

 2    A      BG 380.

 3    Q      You can back out.

 4                 What sort of firearm was it that you -- is

 5    depicted here?

 6    A      It was a .380 caliber.

 7    Q      What company?

 8    A      I do not -- I don't know.

 9    Q      The -- when you retrieved the firearm from the property

10    room, was it labeled with any sort of markings describing what

11    sort of firearm it should be that was contained in the

12    envelope?

13    A      Yes.

14    Q      And the firearm you retrieved, was that consistent with

15    the materials from the envelope?

16    A      Yes.

17    Q      If you could zoom in towards the barrel of the gun.

18                 All right.  Let the record reflect I have zoomed in on

19    the barrel of the gun.

20                    Can you see a label?

21    A      Yes.

22    Q      What type of -- let me rephrase.

23                    Specifically, can you see a label indicating what

24    brand of firearm this?

25    A      Yes, I did.
```

**UNITED STATES DISTRICT COURT**

```
 1    Q     What is it?
 2    A     Smith and Wesson.
 3    Q     Is there a city and state located underneath that?
 4    A     Springfield, MA, USA.
 5    Q     Do you know what MA would be?
 6    A     Massachusetts.
 7    Q     Can you back out.
 8                I'm going to show you Exhibit 16.
 9            Do you recognize that?
10    A     Yes.
11    Q     Is that the serial number of the firearm?
12    A     It is.
13    Q     And is it a fair and accurate depiction of the serial
14    number of the firearm?
15    A     Yes.
16    Q     I'm going to show you Exhibit 17.
17            Do you recognize that?
18    A     Yes, I do.
19    Q     What is if?
20    A     It's the magazine and the six live rounds.
21    Q     Did you take this photograph?
22    A     Yes.
23    Q     Are these fair and accurate depictions of the magazine and
24    six live rounds you retrieved on March 26, 2020?
25    A     Yes.
```

```
1    Q     Can you describe how -- you were able to swab the firearm

2    for potential DNA evidence?

3    A     Yes.

4    Q     If you can go back to Exhibit 15.

5          Can you see Exhibit 15?

6    A     Yes.

7    Q     Can you -- you can use your finger to draw on the screen.

8    Can you use -- actually, before you even do that, let me ask

9    where on this firearm did you swab for DNA evidence?

10   A     I took two swabs on this gun.  I did one swab of the grip

11   and I did a second swab of the trigger and slide.

12   Q     Can you circle the area you would label as the grip?

13              Let the record reflect the witness has drawn a

14   red circle on the bottom of the firearm.

15              THE COURT:  The record will so reflect.

16   BY MR. KAHAN:

17   Q     Can you -- I'm going to clear that screen.

18              Can you now go back to 15?  Can you now draw a circle

19   around where you swabbed that you have described as the trigger

20   and slide?

21              Let the record reflect the witness has made two

22   red circles.  One on the trigger of the firearm, and one on the

23   back of the slide of the firearm, which is the top left portion

24   of the firearm.

25              THE COURT:  The record will so reflect.
```

1    BY MR. KAHAN:

2    Q     Let's start with the grip.  How did you swab this grip?

3    A     I begin by taking the sterile cotton swab.  I wet the tip

4    of the swab with some distilled water.  I then use the swab to

5    swab over the grip area of the handgun.

6    Q     And were you able to do that on the grip?

7    A     Yes.

8    Q     How long did you swab for?

9    A     I probably swabbed for approximately 30 seconds.

10   Q     Is that standard for you?

11   A     Yes, it is.

12   Q     Is that consistent with the training you have received?

13   A     Yes.

14   Q     The -- you mentioned that the grip is usually textured.

15   Can you see that sort of texture in this photograph?

16   A     I do see, yes.

17   Q     Can you describe what you mean by textured?

18   A     The textured area -- actually, it's sort of a more heavily

19   textured area on the grip.

20            Do you want me to circle it?

21   Q     Yeah, go ahead.

22   A     You could see more of a heavily textured area on the side

23   of the grip here.

24            Also, on the front of the grip, it's hard to see

25   in this picture, and is also more of a heavily textured area.

```
 1   Q    Let the record reflect the witness first drew a red
 2   rectangle around the portion of the grip of the firearm,
 3   specifically what appears to be sort of craggly area, and then
 4   the witness drew a red semi-circle to the right of that.
 5              THE COURT:  All right.  So reflected.
 6   BY MR. KAHAN:
 7   Q    Is that where you swabbed for the grip of the gun?
 8   A    I did.  Also, this heavily textured material is also on
 9   the back portion of the grip -- this area here, and the other
10   side of the grip, so all four sides of the grip.
11   Q    Let the record reflect the witness, on Exhibit 15, has
12   drawn a red -- I'm going to call it a flat arc -- to the left
13   of the grip?
14              THE COURT:  The record will so reflect.
15   BY MR. KAHAN:
16   Q    So you also mentioned you took a swab of the firearm's
17   trigger and slide?
18   A    Yes.
19   Q    Is that with the -- are those two separate sample swabs
20   that you are using or just one?
21   A    It's one.
22   Q    And those are the areas you circled earlier?
23   A    Yes.
24   Q    Did you swab those areas in the same manner you did the
25   grip?
```

1    A     Yes.

2    Q     At any point -- did the swabs you used for the grip touch

3    the swab you used for the trigger and slide?

4    A     No.

5    Q     Did anything unusual happen or -- let me take it one at a

6    time.

7                    Did anything unusual happen while you collected

8    the swab of the grip?

9    A     No.

10   Q     What about the swab at the trigger and slide?

11   A     No.

12   Q     What did you do with the swabs after you collected these

13   samples?

14   A     I then -- after I collect the samples -- I place the swabs

15   in separate coin envelopes which I seal with evidence tape and

16   initial.

17   Q     Why do you do that?

18   A     To keep them all separated.

19   Q     What did you do with those samples once they were

20   separated?

21   A     They are then placed into larger evidence envelope.

22   Q     Do you make any sort of markings?

23   A     I fill out the front of the evidence envelope.

24   Q     Before we get into that, I do want to ask if we can go to

25   17 -- Exhibit 17.

```
 1              Did you also take a swab of the magazine?
 2    A    I did.
 3    Q    Do you normally take a swab of a magazine?
 4    A    Yes.
 5    Q    Is there anything about this texture that would impact the
 6    amount of DNA you could recover?
 7    A    Well, this item has less bumpy textured areas.
 8              I would concentrate on the black base of this
 9    magazine which is sort of that similar bumpy textured material.
10    Q    Were you able to swab the magazine?
11    A    Yes.
12    Q    Did anything unusual happen as you swabbed the magazine?
13    A    No.
14    Q    Was -- what did you do with this swab upon swabbing?
15    A    I placed that swab into a coin envelope, which again, I
16    sealed and initialed and placed that with the two swabs from
17    the gun into a larger evidence envelope.
18    Q    Was it kept separate from the other swabs you retrieved in
19    this case?
20    A    Yes, it was.
21    Q    Can you see on Exhibit 17, a number on a sticky note?
22    A    Yes.
23    Q    What is that number?
24    A    That is our case number.
25    Q    Can you read that case number?
```

**UNITED STATES DISTRICT COURT**

```
 1   A      20-17470.
 2   Q      Is that a unique case number assigned to each individual
 3   case?
 4   A      Yes, it is.
 5   Q      And a way to also keep track of evidence?
 6   A      Yes.
 7   Q      Now, have you retrieved -- have you had any sort of
 8   evidence -- you mentioned that you have done fingerprints
 9   earlier.
10              Have you had any sort of training in that?
11   A      Yes.
12   Q      What sort of training?
13   A      I have had approximately 1,300 hours of training which is
14   primarily in the areas of fingerprints and crime scene
15   investigation, so I have had quite a bit of training on
16   fingerprints.
17   Q      Were you asked to try to obtain any sort of fingerprints
18   from either the firearm or the magazine in this case?
19   A      Yes.
20   Q      Were you able to retrieve any fingerprints?
21   A      I was not able to retrieve any fingerprints.
22   Q      Is that unusual for a firearm?
23   A      No, it's not.
24   Q      Why is that?
25   A      Because of the texture of the firearm.
```

```
1    Q      What about the texture?
2    A      The ideal texture the ideal surface for fingerprints is a
3    smooth clean non-porous surface.
4    Q      Would the magazine fit that?
5    A      No.
6    Q      What about any area of the firearm?
7    A      No.
8    Q      So you take the three swabs you took from the grip, the
9    trigger, and slide and the magazine, and after you seal them up
10   individually, what do you do with the three swabs?
11   A      I place them into a larger evidence envelope.  I seal that
12   evidence envelope with evidence tape.  I initial that tape.
13               I fill out the front of the evidence envelope and
14   then I give that to the property section.
15   Q      I'm going to show you Exhibit 18.
16               Do you recognize this?
17   A      Yes.
18   Q      What is it?
19   A      That is the evidence envelope that I filled out and it
20   contains the three swabs.
21   Q      How can you tell that you filled it out?
22   A      I see my initials and my serial number.
23   Q      What is your serial number?
24   A      3111.
25   Q      Did you put a name on the suspect in this case who was
```

**UNITED STATES DISTRICT COURT**

1   associated with the case number?

2   A    I did.

3   Q    What name was that?

4   A    Duarte, Steven.

5   Q    Did you date when you obtained these samples?

6   A    I did.

7   Q    Is that reflected on 18 as 3/26/20?

8   A    Yes, it is.

9   Q    The case number you described earlier, 20-17470 reflected

10  on this?

11  A    Yes.

12  Q    As well as the locations of the swabs you placed inside of

13  this envelope?

14  A    Yes.

15  Q    Now, can you see in 18-1 at the top of the exhibit sort of

16  like we are going to circle that -- I will have to describe it.

17       To the top left and top right, sort of different -- what

18  appears to be a different material?

19  A    I think you are referring to the evidence tape that is

20  folding around towards the front of the envelope?

21  Q    Can you circle those?

22  A    Yes.

23  Q    Let the record reflect the witness has placed red circles

24  on the top left and top right portions of the bag featured in

25  Exhibit 18?

1          THE COURT:  The record will so reflect.

2    BY MR. KAHAN:

3    Q     What is that?

4    A     That is the evidence tape that I place on the seal of the

5    envelope, and I always make sure that the evidence tape goes a

6    little bit into the front of the envelope as well as, of

7    course, the entire back of the envelope.

8    Q     And at any point did you unseal the envelope?

9    A     No.

10   Q     So what do you do with this packet once you are done with

11   it?

12   A     I give it to our property section where they store it.

13   Q     At any point -- is there a way for items that are

14   submitted to the property room to be transferred to the Los

15   Angeles Sheriff's Department Laboratory for further forensic

16   analysis?

17   A     Yes.  We have a weekly courier that LASD sends to our

18   department every week to collect any evidence that might be

19   needing to go to their lab.

20   Q     Does there have to be any of specific request to analyze

21   certain evidence?

22   A     Yes.  There does have to be a request.  I need to get

23   permission from the crime lab supervisor in order to send him

24   swabs to be analyzed.

25   Q     How does that process work?

**UNITED STATES DISTRICT COURT**

1    A    I send the supervisor of the crime lab an e-mail by giving

2    a brief synopsis of the case, and I explain what I want to send

3    to him, and I wait for him to give me permission or not.

4    Q    Did you send out an e-mail requesting this permission?

5    A    I did.

6    Q    Did you receive permission?

7    A    I did.

8    Q    What did you request to be sent to the Los Angeles

9    Sheriff's Department Laboratory for further forensic analysis?

10   A    The three swabs that I collected as well as a reference

11   swab from Mr. Duarte.

12   Q    What is a reference swab?

13   A    It's basically a swab from the inside of your cheek.

14   Q    Were you involved at all in the process of taking the

15   reference swab from Steven Duarte?

16   A    I was not.

17   Q    Have you ever met Steven Duarte?

18   A    I'm sorry?

19   Q    Have you ever met Steven Duarte?

20   A    No.

21   Q    When did you make this request?

22   A    I would have to refer to my notes.

23   Q    There should be a binder to the right of you.  If you

24   could look at Exhibit 41.

25              Read to yourself and then close the binder once

```
 1    you are done.
 2    A     Okay.
 3    Q     Has that refreshed your recollection?
 4    A     Yes.
 5    Q     When did you make that request?
 6    A     April 9th of 2020.
 7    Q     Did you, in this request, list who took the reference
 8    sample?
 9    A     Yes.
10    Q     Who?
11    A     Detective Barragan.
12    Q     If I could have the case agent bring up Exhibits 49, 50
13    and 51.
14              THE COURT:  All right.  Yes, please.
15              MR. KAHAN:  Your Honor?
16              THE COURT:  Yes.  It appears some members of the
17    public have entered.
18              UNIDENTIFIED VOICE:  Is there a place where we can
19    observe?
20              THE COURT:  I will give you a courtroom now, 9C, so
21    the 9th floor.
22              UNIDENTIFIED VOICE:  Thank you very much.
23              THE COURT:  Okay.  Please continue.
24    BY MR. KAHAN:
25    Q     Can you open up Exhibit 49?  I don't believe they're
```

1    marked.  The front of the package should indicate it's a

2    handgun?

3    A     The handgun?

4    Q     Yes.

5    A     Okay, it is opened.

6    Q     Can you retrieve the item?

7    A     Yes.

8    Q     If you could hold it up so the jury could see what you are

9    holding.  Is that consistent with the firearm you took DNA

10   swabs from on March 26, 2020?

11   A     Yes, it is.

12   Q     The grip you described earlier, can you see the grip as

13   well?

14   A     Yes.

15   Q     Including that texture you described?

16   A     Yes.

17   Q     Same with the trigger and slide?

18   A     Yes.

19   Q     You could put that back in the envelope and retrieve

20   Exhibit 50 from the other packet which should be the magazine.

21   A     Yes.

22   Q     You can hold that up.  Is that the magazine you swabbed on

23   March 26, 2020?

24   A     Yes.

25   Q     A similar condition as when you swabbed it?

**UNITED STATES DISTRICT COURT**

```
 1   A      Yes.

 2              MR. KAHAN:  And place it back in the bag, and no

 3   further questions.

 4              Actually, if I could have a moment actually?

 5              THE COURT:  Take your time.

 6              MR. KAHAN:  I was right to begin with.  No further

 7   questions.

 8              THE COURT:  All right.  Why don't we take our

 9   afternoon recess at this time.

10              Let's take a 15-minute break and have everyone

11   come back at 2:45.

12              Ladies and gentlemen, please do not form or

13   express any opinion about the case until the matter is finally

14   submitted to you.

15              Don't talk with anyone about the case, do not

16   allow anyone to talk to you about the case.

17              Do not conduct any research of any kind on any

18   subject matter connected with this case.

19              We will see you back at 2:45, thank you.

20              THE COURTROOM DEPUTY:  All rise for the jury.

21         (Jury exits the courtroom at 2:28 p.m.)

22              THE COURT:  All right.  Please be seated.

23              THE COURTROOM DEPUTY:  Please be seated.

24              THE COURT:  Anything further we need to talk before

25   the break?
```

```
 1              MR. KAHAN:  No, Your Honor.

 2              MR. CLEARY:  No, Your Honor.

 3              THE COURT:  I will see you back after the break.

 4              THE COURTROOM DEPUTY:  This Court is in recess.

 5                      (Afternoon recess.)

 6              THE COURTROOM DEPUTY:  All rise for the jury.

 7                 (Jury enters courtroom at 2:47 p.m.)

 8              THE COURTROOM DEPUTY:  Please be seated.

 9                 All rise.  Please be seated.

10              THE COURT:  All right.  Mr. Cleary, you may begin

11     your cross-examination.

12              MR. CLEARY:  Thank you, Your Honor.

13                      CROSS-EXAMINATION

14     BY MR. CLEARY:

15     Q    Good afternoon.  Do I refer to you as?

16     A    Ms. Hewson.

17     Q    Ms. Hewson.

18     A    Yes.

19     Q    Thank you.  So as your duties as a senior forensic

20     specialist, I'm sure you underwent a lot of training, correct?

21     A    Yes.

22     Q    And you actually indicated you did over 1,000 hours, I

23     think, or 1,300 hours of fingerprint and other laboratory

24     training?

25     A    Yes.
```

```
 1   Q     And the purpose of all of the training is so that you can
 2   be confident in the integrity of the testing you are doing, is
 3   that fair to say?
 4   A     Confident in -- yes.
 5   Q     In the integrity of it to make sure there is not any type
 6   of cross contamination, for example?
 7   A     Yes.
 8   Q     And that's why you go to the trainings, for example?
 9   A     Yes.
10   Q     And the procedures you describe in sealing the envelope
11   with evidence tape, and you know, that is all to protect the
12   integrity of the samples you have obtained, fair to say?
13   A     Yes.
14   Q     So that they are not tampered with or contaminated, right?
15   A     Yes.
16   Q     And that is -- you can only control the sample's integrity
17   once it's in your possession.  What happens before that, you
18   have no control over, correct?
19   A     Correct.
20   Q     So if cross contamination or some type of interference or
21   tampering with the sample occurred before it was in your
22   possession, you would have no way of knowing if that affected
23   it, correct?
24   A     That's correct.
25   Q     Now, your training includes the proper handling of samples
```

**UNITED STATES DISTRICT COURT**

```
 1    including -- and I'm not a forensic specialist myself, but I
 2    can imagine part of your training you wear gloves; is that fair
 3    to say?
 4    A    Yes.
 5    Q    And the gloves you wear should be non-porous and like a
 6    latex glove, for example?
 7    A    Yes.
 8    Q    That is so your own sweat and DNA doesn't get on the
 9    sample, correct?
10    A    Yes.
11    Q    And I imagine you also must wear some type of protecting
12    clothing or gear; is that correct?
13    A    I have a lab coat that I have in the lab and I have a mask
14    that I wear in the lab as well.
15    Q    Is it as comfortable as the mask you are wearing now?
16         So, let me ask you this:  Did you follow the procedures
17    of the lab coat, you don't just shake it out between samples,
18    but it's cleaned or some kind of a process?
19    A    I'm sorry, can you say that again?
20    Q    The lab coat, is there a way you protect the integrity of
21    the process by making sure the lab coat is fresh or clean, for
22    example?
23    A    Our lab coats are just hung up in our lab and they are
24    laundered probably every couple of months.
25    Q    Okay.
```

```
1    A      They are not laundered every day or after every use.

2    Q      So it's not one of those PPE completely sterile

3    situations?

4    A      No, it's not.

5    Q      But in the lab, for example, at the banks you may operate

6    at, I'm sure that procedure requires you to clean the bench

7    between samples, correct?

8    A      Yes.

9    Q      You have a procedure that you wipe it down and make sure,

10   for example, if you have blood on a sample and the next sample

11   was skin cells, that you weren't mixing them up?

12   A      Yes.

13   Q      And you follow that protocol in every case so that you

14   ensure the integrity of the sample?

15   A      Yes.

16   Q      Your ultimate goal is to protect the integrity of the

17   result of the test, correct?

18   A      Yes.

19   Q      And to avoid cross contamination?

20   A      Yes.

21   Q      So you have gloves, you have a jacket.  Do you wear any

22   type of net or cap or anything to that effect?

23   A      No.

24   Q      Okay.  We did have an opportunity to see a picture of the

25   item that looked like it was taken at a lab environment, but
```

1  you didn't recognize the handwriting.

2          Was it because it was an assistant who might have

3  taken that picture or do you not know?

4  A    I do not know who took that picture.

5  Q    So someone else handled the weapon and placed it in a

6  position and wrote some numbers on it and took a picture of

7  that particular gun at sometime, and you don't know who that

8  was?

9  A    Correct.

10 Q    That could have been an example of cross contamination,

11 could it not?

12 A    I don't know, I don't know the situation.

13 Q    Fair enough.  So, the bulb is speaking to me.

14          So tampering is not the only way that cross

15 contamination can occur.  For example, that photograph that we

16 talked about it with the writing on it, that doesn't suggest

17 tampering, but it does suggest that somehow someone else must

18 have come in contact with that weapon?

19 A    Yes.

20 Q    That is not tampering, per se, right?

21 A    No.

22 Q    The photograph of the gun shows the gun to be what looks

23 like it has no visible damage; is that fair to say?

24 A    Yes.

25 Q    It looks like you can tell the serial number and the

1    maker.

2          Let's see.  But you can't tell from just looking at the

3    photograph whether the gun was operable.

4                Did you test the firearm for see if it was

5    operable?

6    A    No.

7    Q    The rounds themselves, the bullets, did you test the

8    bullets to see if they were operable?

9    A    No.

10   Q    You mentioned you tried fingerprinting, but there were no

11   fingerprints found on the weapon, correct?

12   A    No.

13   Q    Do fingerprints tend to be things left on shiny smooth

14   surfaces and the weapon wasn't an ideal situation for those,

15   correct?

16   A    Yes.

17   Q    So it's less likely that a fingerprint would be left on

18   like the gripping part of the firearm because it's porous and

19   plastic, right?

20   A    Yes.

21   Q    But there may be a chance that there is fingerprints left

22   on a slide because a slide is typically metal; is that fair to

23   say?

24   A    Yes.

25   Q    You checked the slide for fingerprints?

```
1   A     Yes.

2   Q     And there were none?

3   A     No.

4   Q     When you examined the magazine, the magazine has that

5   grippy plastic at the very bottom that is not ideal for

6   fingerprints, but there is a metal magazine that is constructed

7   out of metal itself, that may be a surface where potentially

8   fingerprints could be found?

9   A     Yes.

10  Q     And you checked the magazine and there were no

11  fingerprints, correct?

12  A     Correct.

13  Q     And the bullets themselves -- those shiny casings, the

14  shell casings, seem almost ideal to show a fingerprint if you

15  touched it?

16            MR. KAHAN:  Objection.  Relevance.

17            THE COURT:  Overruled.

18            MR. KAHAN:  If I could be heard?

19            THE COURT:  No.  Thank you.

20  BY MR. CLEARY:

21  Q     The shell casings, they seem to be a smooth metal surface

22  that might be ideal for fingerprints; is that true or not?

23  A     A smooth surface is good for fingerprints, but a metal

24  surface is not an ideal surface for fingerprints, so a metal

25  surface is not ideal.
```

1    Q     Did you check the bullet shell casings themselves for

2    fingerprints?

3    A     Yes.

4    Q     There were none, correct?

5    A     Correct.

6    Q     Now, I noticed that on the envelope, it did appear to

7    see -- say the word "freeze" on it?

8    A     Yes.

9    Q     And that is something you wrote on the envelope for the

10   evidence storing people; is that correct?

11   A     I did, I wrote it.

12   Q     And is that because the samples you obtained would be

13   better preserved in an environment that is cold than if they

14   were left at room temperature?

15   A     I don't know if there is much difference between a frozen

16   temperature or a room temperature, you wouldn't want to have

17   them at the hot temperature, but I don't think there is much

18   difference of a frozen or room temperature, but all swabs we

19   collect, we always write "freeze" on the packaging.

20   Q     So someone determines that they think it might be better?

21   A     Yes.

22   Q     And, for example, it's not a good idea to store samples in

23   a hot trunk, for example?

24   A     Correct.

25   Q     And finally, the form -- the forensic form you sent to the

```
 1    Sheriff's Department, LA County Sheriff's Department to do the
 2    DNA testing, you submitted that form; is that correct?
 3    A    I submitted that request for permission to send the swabs
 4    to them.
 5    Q    Right.  Did you create a synopsis of what happened in the
 6    case for the request?
 7    A    I did.
 8    Q    So that when the LA County Sheriff's Department receives a
 9    request, they actually have kind of a breakdown of what the
10    case is about and why they are being asked to look for DNA,
11    correct?
12    A    Yes.
13    Q    So they know what they are looking for, right?
14    A    They are looking for DNA, for a DNA profile, I believe.
15    Q    And they know what -- your theory of the case is written
16    down for them to review, correct?
17                MR. KAHAN:  Objection.  Relevance.
18                THE COURT:  Overruled.
19                THE WITNESS:  They see a brief synopsis of the case.
20    BY MR. CLEARY:
21    Q    Like, with the individual's name on it?
22    A    Yes.
23    Q    And actually some of the facts of what is claimed to have
24    happened?
25    A    Yes.
```

```
 1   Q    You weren't actually personally there, present to observe
 2   any of those facts, correct?
 3   A    Correct.
 4             MR. CLEARY:  Okay.  Thank you very much, ma'am.  No
 5   further questions.
 6             THE COURT:  Any redirect?
 7             MR. KAHAN:  No, Your Honor.
 8             THE COURT:  May this witness be excused?
 9             MR. KAHAN:  Yes, Your Honor.
10             THE COURT:  Thank you.  You may step down.
11        All right.  You may call your next witness.
12             MR. RODRIGUEZ:  The government calls FBI Special
13   Agent Daniel Lewis.
14             THE COURTROOM DEPUTY:  Please raise your right hand.
15                  (Oath was administered.)
16             THE WITNESS:  I do.
17             THE COURTROOM DEPUTY:  Thank you.  Please be seated.
18   Please state and spell your name for the record.
19             THE WITNESS:  My name is Daniel, D-a-n-i-e-l Lewis
20   L-e-w-i-s.
21                     DANIEL LEWIS,
22                 having been duly sworn,
23                  testified as follows:
24             THE COURT:  Counsel, you may proceed.
25             MR. RODRIGUEZ:  Thank you, Your Honor.
```

```
 1                      DIRECT EXAMINATION
 2              MR. RODRIGUEZ:  I would like the record to reflect
 3    that the witness is wearing a clear see-through mask?
 4              THE COURT:  All right.  The record will so reflect.
 5    BY MR. RODRIGUEZ:
 6    Q    Agent Lewis, where do you work?
 7    A    I work for the FBI.
 8    Q    Is that the Federal Bureau of Investigations?
 9    A    Yes.
10    Q    What is your current position at the FBI?
11    A    A special agent.
12    Q    What are your responsibilities as a special agent?
13    A    My responsibilities are to investigate violations of
14    federal law, to investigate crimes of federal law, and collect
15    and seize evidence and handle sources, among other things.
16    Q    When did you begin working for the FBI?
17    A    Approximately, March of 2017.
18    Q    As a special agent, do you have experience with firearms
19    and firearm related items?
20    A    I do.
21    Q    What training did you receive to become a special agent?
22    A    We received approximately five months at Quantico,
23    Virginia, the FBI academy which consists of firearm shooting,
24    defensive tactics, tactical training, federal law training, and
25    investigative training.
```

```
 1   Q      Have you received any additional training since then?
 2   A      I have.
 3   Q      Can you briefly describe your firearms related additional
 4   training?
 5   A      In addition to the quarterly firearms training that I
 6   receive through the FBI, I also went through a course to become
 7   a certified firearm specialist.
 8   Q      What is a certified firearms specialist?
 9   A      As a certified firearms specialist, that is somebody who
10   has the ability to conduct physical examinations of firearms
11   and ammunition, identify them, as either of those and then
12   conduct investigation to determine where they were
13   manufactured.
14   Q      Are you in fact a certified firearms specialist?
15   A      I am.
16   Q      What are your duties as a certified firearm specialist?
17   A      I examine firearms and ammunition, determine their
18   classification as firearms or ammunition.  I identify the
19   relevant identifying markings on each of them, and then with
20   that information, I reach out to manufacturers to determine
21   where the items were manufactured.
22   Q      How long have you been a certified firearm specialist?
23   A      Approximately, two years.
24   Q      Does a certified firearms specialist also get training on
25   ammunition?
```

```
1   A      Yes.

2   Q      Can you tell the jury a little bit more about that,

3   please?

4   A      The ammunition side is identifying the individual parts

5   that make up ammunition as well as the relevant markings that

6   are on the head stamps of ammunition that one might need to

7   positively identify it and determine the manufacturer and,

8   therefore, where it was manufactured.

9   Q      Do you know what a nexus course is?

10  A      Yes, sir.

11  Q      What is a nexus course?

12  A      It was part of my firearms specialist training.  And it

13  sort of focuses more on the aspects of the identifying aspects

14  of firearms and ammunition, and then how I, as a certified

15  firearms specialist go about reaching out to manufacturers to

16  determine where in fact firearms were manufactured.

17  Q      Can you estimate how many firearms you examined in your

18  career?

19  A      Approximately 120 to 150, I would say.

20  Q      Can you estimate how many rounds of ammunition you have

21  examined in your career?

22  A      Approximately 4,000 rounds of ammunition.

23          MR. RODRIGUEZ:  Your Honor, the government requests

24  that the special agent be designated as an expert.

25          THE COURT:  He will be so designated.
```

**UNITED STATES DISTRICT COURT**

```
1   BY MR. RODRIGUEZ:

2   Q    Are you familiar with the definition of a firearm?

3   A    I am.

4   Q    What is it?

5   A    The definition of a firearm is any weapon designed to

6   expel a projectile by the action of an explosion.

7   Q    Can you explain in lay terms, please?

8   A    Essentially, it is a weapon in which it is designed to

9   shoot or launch a projectile from it through using some sort of

10  a combustible material to create an explosion.

11  Q    Are you familiar with the case of US v Steven Duarte?

12  A    I am.

13  Q    Did you examine a gun in connection with this case?

14  A    I did.

15  Q    I'm going to have the Special Agent approach you and show

16  you what has been previously admitted as Exhibit 49.

17              Can you please remove the item from inside the

18  packing?

19          Please show it to the jury.

20  A    Can I make it safe?

21  Q    Yes.  Do you recognize this?

22  A    I do.

23  Q    What is it?

24  A    This is a Smith and Wesson bodyguard 380, 380 caliber

25  self-loading pistol with serial number EA T2760.
```

1    Q    How do you recognize it?

2    A    I examined this firearm for the purposes of determining

3    interstate nexus.

4    Q    Is it in the same condition or substantially the same

5    condition when you examined it?

6    A    At this point, I'm not sure if some of the markings for

7    DNA testing were on the gun at the time, but it's essentially

8    in the same condition.

9    Q    So you previously mentioned this, but do guns have serial

10   numbers?

11   A    They do.

12   Q    What is the purpose of a serial number?

13   A    Serial numbers are required to be on the frame of a

14   firearm per federal law, and what firearms manufacturers are

15   required to do is put the serial numbers to track where that

16   firearm is, and it must be unique for that firearm for that

17   manufacturer.

18             It allows the ATF to track where from firearm has

19   been and once it has been recovered.

20   Q    Can you show the jury on the physical firearm where the

21   serial number is?

22   A    On the right-hand side of the gun, just above the grip

23   portion.

24   Q    Now, I'm going to publish what has been previously

25   admitted as Exhibit 15.

**UNITED STATES DISTRICT COURT**

1        Is this a fair and accurate representation of the gun

2   that you have before you?

3   A    I don't see anything on my screen.

4   Q    Is this a fair and accurate representation of the firearm

5   you have before you?

6   A    It is.

7   Q    I'm going to ask my colleague to zoom in on the right side

8   of the barrel portion of the firearm.

9        Does the firearm identify the manufacturer of the

10  firearm?

11  A    It does.

12  Q    Does it also identify where the firearm was assembled?

13  A    It does.  Yes, it does.

14  Q    Where was the firearm assembled?

15  A    Springfield, Massachusetts.

16  Q    Is this definition of a federal firearm as a firearm as

17  defined under fed federal law?

18  A    Yes, it's.

19  Q    Can you describe to the jury what the term "interstate

20  nexus" means with regards to firearms and ammunition?

21  A    So, interstate nexus is the nexus, just shows a

22  relationship to the gun traveling and effecting interstate

23  commerce which essentially means that somebody -- if this -- if

24  a firearm is determined to have effected travel and effected

25  interstate commerce, that firearm at some point, while being a

1   firearm, crossed state lines and somebody had to spend some

2   sort of money or trade some sort of good, in order for that

3   firearm to travel state lines.

4   Q    What does it mean for you to examine a firearm to

5   interstate nexus?

6   A    I first conducted a physical examination of the firearm.

7   I first to make sure it was safe.  I rendered it safe to make

8   sure there is no ammo in it, and then I examined the exterior

9   the firearm as well as down the barrel for identifying markings

10  that are required beyond firearms by law.

11  Q    What do you mean by "markings"?

12  A    Markings is the manufacturer location -- where the

13  manufacturer does business, the caliber, the model of the

14  firearm, and the serial number.

15  Q    Does this examine -- does this interstate nexus

16  examination also apply to ammunition?

17  A    It does.

18  Q    Is there a difference in the analysis?

19  A    Ammunition does not have a serial number on the round of

20  ammunition.  So I'm examining the exterior of the ammunition,

21  and primarily the head stamp, which is the rear portion of the

22  ammunition for identifying marks, such as manufacturer and

23  caliber.

24  Q    So how do you determine whether a gun or ammunition has

25  traveled in interstate commerce?

```
1   A    Once I have conducted my physical examination and located
2   the identifying marks of the firearm and/or ammunition, I reach
3   out to the manufacturers, provide them with that identifying
4   information, they inform me where the firearm was manufactured
5   and where the ammo was manufactured.
6   Q    How are many interstate nexus have you conducted in your
7   career?
8   A    I have generated 120 reports with varying numbers of
9   exhibits on each report.
10  Q    And by exhibits, what do you mean by "exhibits"?
11  A    I classify each different type of ammunition on the report
12  as a different exhibit and then firearms is different exhibits.
13  Q    Are there many, many manufacturers located in California?
14  A    No, sir.
15  Q    So we're turning to Exhibit 40, which is the firearm you
16  have in front of you, is it your opinion in order to have been
17  recovered in California on March 20th, 2020, that the firearm
18  traveled at some point in interstate commerce?
19  A    That is correct.
20  Q    How do you know that?
21  A    I reached out -- we took the identifying information off
22  the firearm, reached out to Smith and Wesson and provided that
23  to them.  They informed me that this firearm was assembled into
24  a complete firearm in Massachusetts.
25  Q    I will ask that case agent retrieve Exhibit 49 and provide
```

**UNITED STATES DISTRICT COURT**

```
 1   you with what has been previously identified as Exhibit 51.
 2              THE COURT:  All right.  Go ahead.
 3   BY MR. RODRIGUEZ:
 4   Q    Can you please remove Exhibit 51 from its envelope?
 5   A    Okay.
 6   Q    And show it to the jury.
 7        Do you recognize this?
 8   A    I do.
 9   Q    What is it?
10   A    It's six cartridges of Blazer 380 ammunition.
11   Q    How do you recognize it?
12   A    I conducted a physical examination and wrote an interstate
13   nexus report on this ammunition.
14   Q    Is it in the same or substantially same condition as when
15   you examined it?
16   A    It is.
17   Q    Does this ammunition fit the definition of ammunition?
18   A    It does.
19   Q    Is it your opinion that in order to have been recovered in
20   California on March 20, 2020, that these six rounds of
21   ammunition had to have traveled at some point in interstate
22   commerce?
23   A    That is correct.
24   Q    How do you know that?
25   A    I conducted physical examination of the ammunition,
```

```
 1   determined the manufacturer to be Blazer, to be 380 auto
 2   caliber.  With that information I reached out to Blazer and
 3   they informed me that this ammunition was manufactured by a
 4   sister company of theirs which is CCI and Speer in Lewiston,
 5   Idaho.
 6   Q    How did you identify the manufacturer?
 7   A    It is written on the head stamp of the ammunition.
 8   Q    Can you show the jury where the head stamp is?
 9   A    It could be the rear portion of the opposite to the
10   bullet.
11             MR. RODRIGUEZ:  Thank you.  One moment, Your Honor.
12             THE COURT:  All right.
13   BY MR. RODRIGUEZ:
14   Q    When you did your examination of the firearm, were you
15   wearing gloves?
16   A    I was.
17   Q    When you did your examination of the ammunition, were you
18   wearing gloves?
19   A    I was.
20             MR. RODRIGUEZ:  Thank You.  No further questions.
21             THE COURT:  Cross-examination?
22                     CROSS-EXAMINATION
23   BY MR. CLEARY:
24   Q    Good afternoon, Special Agent Lewis.
25        So, you indicated the opinion about the weapon was
```

UNITED STATES DISTRICT COURT

1    through the examination of the weapon and then contact of the

2    manufacturer?

3    A    Yes, sir.

4    Q    And upon examination of the weapon, you told us that the

5    stamp, Smith and Wesson and Springfield Massachusetts, USA,

6    that is the manufacturing stamp, right?

7    A    I'm not quite sure what you mean.

8    Q    You said it said Smith and Wesson, Springfield,

9    Massachusetts, USA.  You identified that part of the firearm?

10   A    Yes, sir.

11   Q    It didn't say assembled at Smith and Wesson in

12   Springfield, USA, did it?

13   A    It did not say that.

14   Q    So your opinion was rendered through additional research

15   which you did by looking up the serial number and in the

16   manufacturer catalog; is that right?

17   A    I do not have access to the manufacturer's records.  I

18   provided the serial number and the identifying information to

19   the manufacturer, and they informed me where it was

20   manufactured.

21   Q    You sent them an e-mail with the serial number and they

22   send you one back?

23   A    That's correct.

24   Q    They are not able to tell and neither are you, as to when

25   this item particularly traveled in interstate commerce,

1  correct?

2  A    I believe in their e-mail it said approximately 2011, is

3  when it was shipped to Massachusetts from where the frame was

4  originally made.

5  Q    And then it hung out somewhere for nine years before it

6  was identified by you; is that correct?

7  A    I can't speak to where it was during that time period.

8  Q    And are you familiar with -- in this day and age -- there

9  are counterfeit goods?

10 A    I'm sorry, can you repeat that?

11 Q    There are counterfeit goods?

12 A    Yes.

13 Q    They look just like a Gucci purse or some other type of

14 thing, a Rolex watch, but even though it says Rolex on it and

15 it looks fancy, but it's not a Rolex, right?

16 A    Yes, I'm aware those things exist.

17              MR. CLEARY:  No further questions.

18              THE COURT:  Any redirect?

19              MR. RODRIGUEZ:  Briefly, Your Honor.

20                      REDIRECT EXAMINATION

21 BY MR. RODRIGUEZ:

22 Q    Agent Lewis, do you have any reason to believe that

23 firearm or ammunition are counterfeit?

24 A    Absolutely not.

25 Q    How do you know that the firearm was manufactured or

1    assembled in Massachusetts?

2    A    That is the information that the manufacturer provided to

3    me when I e-mailed them and asked them where it was

4    manufactured.

5              They informed me -- they informed me it was

6    assembled into a complete firearm in Massachusetts.

7              MR. RODRIGUEZ:  Thank you.

8              THE COURT:  Mr. Cleary, any further questions?

9              MR. CLEARY:  No.  Thank you.

10             THE COURT:  May this witness be excused?

11             MR. CLEARY:  Yes, Your Honor.

12             MR. RODRIGUEZ:  Yes.

13             THE COURT:  Thank you, sir.  You are excused.  Thank

14   you.

15             You may call your next witness.

16             MR. KAHAN:  The government calls Luis Olmos.

17             THE COURTROOM DEPUTY:  Please raise your right hand.

18                  (Oath was administered.)

19             THE WITNESS:  Yes, I do.

20             THE COURTROOM DEPUTY:  Thank you.  Please be seated.

21   Please state and spell your name for the record.

22             THE WITNESS:  Luis Olmos.  L-u-i-s O-l-m-o-s.

23                        LUIS OLMOS,

24                   having been duly sworn,

25                    testified as follows:

```
1              THE COURT:  You may inquire.
2                     DIRECT EXAMINATION
3    BY MR. KAHAN:
4    Q    Mr. Olmos, is there a clear mask to the left?
5    A    Yes.
6    Q    If could you put that on in place of the non-clear mask
7    that you have on?
8              If you can make sure it's covering your nose and
9    mouth?
10   A    Sure.
11             THE COURT:  It's actually upside down, I think.
12             THE WITNESS:  I have it upside down?
13             THE COURT:  I think.
14             THE WITNESS:  I'm not used to this.
15             THE COURT:  Below the chin, there we go.
16             MR. KAHAN:  Let the record reflect the witness is
17   wearing a clear mask.
18             THE COURT:  The record will so reflect.
19   BY MR. KAHAN:
20   Q    Good afternoon.
21   A    Good afternoon.
22   Q    Where do you currently work?
23   A    I work for the LA Sheriff's Department Crime Laboratory as
24   a senior criminalist.
25   Q    In Los Angeles?
```

```
 1   A     Correct.

 2   Q     What are your duties as a senior criminalist?

 3   A     As a senior criminalist, I collect items of evidence, and

 4   I analyze them specifically for DNA and also body fluids.

 5   Q     How long have you been a criminalist with the Los Angeles

 6   Sheriff's Department?

 7   A     I'm going on 16 years.

 8   Q     What is your educational background that qualifies you to

 9   be a criminalist?

10   A     I hold a Bachelor's of Science in psychobiology from UCLA.

11   I also received extensive training within my department for DNA

12   analysis.

13   Q     What sort of training have you received?

14   A     As far as DNA goes, lectures, demonstrations, hands on

15   practical sets.

16              Also external training, I received during

17   conferences, different types of lectures, emerging technologies

18   within the DNA field.

19   Q     How long have you -- do criminalists only focus on DNA at

20   the Los Angeles Sheriff's Department?

21   A     No.  There are also disciplines within the department, but

22   DNA is one of them.

23   Q     How long have you worked with DNA as a criminalist?

24   A     Yes.  About 11 years.

25   Q     Have you had any other jobs prior to working -- excuse me,
```

```
 1    jobs or any research prior working for the Sheriff's Department
 2    related to DNA analysis?
 3    A    Yes, I worked at UCLA as a researcher, and I conducted
 4    work involving DNA.
 5    Q    When was that?
 6    A    This was in early 2001, 2002.
 7    Q    Are you a member of any professional associations or
 8    groups related to DNA analysis?
 9    A    Yes.  I'm a member of the California Association of
10    Criminalists here in California.
11    Q    What does it take to become a member of that group?
12    A    In my situation, I just do active case work.  I also do
13    participation in the conferences.
14    Q    What is case work?
15    A    Case work involves actually looking on forensic samples
16    from real life cases.
17    Q    Now, regarding DNA analysis, do you have any particular
18    focus or expertise in that area?
19    A    For DNA?
20    Q    Yes.
21    A    Yes.  I have been conducting DNA work now for about
22    11 years now.
23    Q    How many -- how many times have you conducted DNA analysis
24    as a criminalist?
25    A    Hundreds of times.
```

```
1   Q    Have you ever testified before as an expert witness in DNA
2   comparison analysis before?
3   A    Yes, I have.
4   Q    How many times?
5   A    I would say in excess of 20 times.
6   Q    Are you ever tested at all as a criminalist in order to
7   make sure you are competent to perform DNA analysis?
8   A    Yes, I am.  There is two sets of proficiency tests that
9   are administered to our laboratory, and each analyst has to
10  pass both those examinations.
11  Q    How often are those tests administered?
12  A    Every six months.
13  Q    When were you last tested?
14  A    I would say about two or three months ago.
15  Q    What is this testing involve?
16  A    It involves an unknown samples that we don't know what the
17  profiles are.  Those samples are analyzed and tested, and
18  ultimately we have to verify what the profiles are and there is
19  an outside testing agency that ensures that everybody is
20  conducting the test properly, and that our results are
21  consistent with what they expect.
22  Q    How many proficiency tests have you taken as a
23  criminalist?
24  A    There is two per year, so I would say approximately 22
25  tests.
```

1  Q     Have you ever failed one?

2  A     No.

3  Q     This most recent one that you took two to three months

4  ago, is it safe to say you passed it?

5  A     Yes.

6  Q     Now you mentioned you are -- you have taken internal and

7  external training related to DNA analysis.

8              Have you ever, yourself, trained others on how to

9  conduct that sort of thing?

10  A     Yes, I have.

11  Q     When?

12  A     This was probably about five, six years ago.  I trained my

13  fellow co-workers to process samples for profile.

14  Q     When you are conducting an analysis and comparison at the

15  Los Angeles Sheriff's Department, where does that take place?

16  A     That takes place within a room that is controlled.  There

17  is restricted access to it, and we also have our own particular

18  work spaces where we open up the item, document and analyze

19  that item for evidentiary value.

20  Q     What sort of building is this all taking place in?

21  A     Within the Sheriff's Crime Lab.  Again, it's a restricted

22  building where there is limited access and there is only

23  qualified individuals that work there.

24  Q     Why is it done this way?

25  A     It's done to limit the accessibility to evidence in order

1   to ensure its integrity.

2   Q    If there is any sort of breach of integrity while evidence

3   is at the Los Angeles Sheriff's Department Lab, is there any

4   method to document?

5   A    Yes.  Everything is documented in our notes and case file

6   which is subject to review.

7   Q    This laboratory you work at, is this accredited?

8   A    Yes, it is.

9   Q    What does accredited mean?

10  A    It means there is often an outside body of individuals

11  that comes in and audits our staff to ensure that it's to the

12  highest standard, to make sure that our instruments are working

13  properly, and to ensure that our reports are meeting the

14  standards.

15  Q    Was your laboratory accredited throughout the year of

16  2020?

17  A    Yes.

18  Q    Is it still accredited?

19  A    Yes, it is.

20  Q    Is the process and tools that you, at the Los Angeles

21  Sheriff's Department Laboratory, used to conduct DNA comparison

22  analysis generally accepted in your field?

23  A    Yes, it is.

24  Q    And are their checks done at your laboratory in order to

25  ensure that whatever process you go through in order to conduct

1  DNA analysis comparison is done properly?

2  A    Yes.

3  Q    What sort of checks are there?

4  A    There is normally a -- what we call a technical review

5  process in which a second qualified analyst will review the

6  data that is generated in order to ensure that everything was

7  done properly, and that the conclusions that are being reported

8  are substantiated by the data.

9         MR. KAHAN:  Your Honor, at this time the government

10 moves Mr. Olmos as an expert in DNA comparison and analysis.

11        THE COURT:  Any objection?

12        MR. CLEARY:  No, Your Honor.

13        THE COURT:  All right.  He will be so designated.

14 BY MR. KAHAN:

15 Q    Mr. Olmos, what is DNA?

16 A    DNA is deoxyribonucleic acid.  It's a molecule that is

17 found within cells.

18        It's unique to every individual with the

19 exception of identical twins, you inherit half from your mother

20 and half from your father.

21 Q    Where did DNA come from?

22 A    DNA can come from a variety of body fluids, tissues, it

23 can come from hair, blood, semen, saliva.

24 Q    If someone touches an object, can they leave behind DNA?

25 A    Yes.

1   Q    Are there any sort of factors that can come into play as

2   to how much DNA someone can leave behind?

3   A    Yes.  There is multiple variables that come into play.

4            It could be the amount of materials on your hands

5   to begin with.  That is related to your hygiene.  If you are

6   constantly washing your hands or sanitizing your hands, it's

7   possible that you are removing that DNA or degrading it.

8            So there are multiple barriers that come into

9   play in addition to the item you touch itself.

10  Q    What about the item itself.  Does the material or texture

11  of the item come into play as to how much DNA can be collected

12  or left on an item?

13  A    Correct, it does.

14           So if the item that you are holding is textured,

15  it's possible that if the item is textured you are going to

16  remove more from the DNA from your hand, more of the cells

17  because of the nature of the surface.

18      If it's a smooth surface, it's possible you may not get

19  as much.  It also depends on the amount of time you are holding

20  that item.

21           If it's for a while, then it's possible to

22  continually transfer more DNA onto that item as opposed to if

23  you held it just briefly.

24  Q    What would you categorize as a texture?

25  A    Something, for example, if it has grooves, so if there is

```
 1    dips within that item, it's possible that you could collect
 2    more DNA from that item.
 3    Q    Does your laboratory analyze other evidence submitted from
 4    other law enforcement agencies?
 5    A    Yes.
 6    Q    Including from the Inglewood Police Department?
 7    A    Correct.
 8    Q    How -- when items are submitted to the Los Angeles
 9    Sheriff's Department Laboratory by law enforcement agencies for
10    DNA analysis, how do those items typically come in?  What is
11    that process?
12    A    They typically come into our evidence control section.
13    It's an area within the laboratory that is designated for
14    evidence, management, and control.
15         It's secure and with limited access.
16    Q    When you receive an item for DNA analysis, is it the
17    actual physical item itself?
18    A    It could be.  In this case, though, it was -- there were
19    swabs that were in a sealed envelope.
20    Q    Is that typical?
21    A    Yes.
22    Q    So when an item is provided to the laboratory for an
23    analysis, what are the steps that are taken to ensure that
24    everything within the item, within whatever has been submitted
25    is accounted for?
```

1   A     Right.  When we do a detailed job, we document exactly

2   what we received, the condition, and how we receive it.

3         We also will do this in our notes.  We will exactly say

4   what the contents are and the condition of those items.

5   Q     Now, for each individual incident report that has evidence

6   that is sent to the crime lab, is it a single criminalist at

7   the Sheriff's Department that works on the DNA analysis for

8   those items or can it be multiple?

9   A     It can be multiple.

10  Q     When looking at items that are provided to your

11  laboratory, for instance, swabs in this case, how do they come

12  into the laboratory.

13        Were they free-standing, were they packaged?

14  A     They were packaged in an envelope and that envelope had a

15  file number and the agency that was submitting agency.

16  Q     I'm going to show you what has been admitted as

17  Exhibit 18.

18        Do you see Exhibit 18 on your screen?

19  A     Yes, I do.

20  Q     Do you recognize that?

21  A     Yes.

22  Q     What is it?

23  A     This is an envelope that I received containing the

24  contents for this case.

25  Q     And what are those contents, at least shown on Exhibit 18?

```
 1   A    Yes.  There were swabs from a firearm, specifically the
 2   grip of a gun, the slide and trigger of the gun and the swab
 3   from the magazine.
 4   Q    Okay.  You can take that exhibit down.
 5        Did you also receive any other swabs relating to this
 6   case.
 7   A    Yes.  I received a reference sample from Steven Duarte.
 8   Q    When you received this reference sample, how was it
 9   presented to the lab?
10   A    It was in a sealed envelope that was labeled with the
11   submitting agency file number.
12   Q    Were the submitting agency and file number as what you saw
13   on Exhibit 18?
14   A    Correct.
15   Q    Did it also have the subject's name?
16   A    Yes, it did.
17   Q    What was the subject's name?
18   A    Steven Duarte.
19   Q    So you received these items.
20        What is the next step, once you received the
21   item?
22   A    Yes.  From that point, once those items are received and
23   documented, they were ultimately submitted for DNA analysis.
24   Q    What are the steps of DNA analysis?
25   A    Yes.  It could be thought of as four steps.  It's the
```

1    technical aspect of it is the extraction.  The quantification,

2    amplification, and typing in order to produce a profile.

3    Q    What is a profile?

4    A    A profile is a set of DNA markers or types that are

5    present you would use to generate a profile.

6    Q    Before we get more into profiles, I want to break down the

7    steps you just mentioned.  I want to talk to you first about

8    extraction.

9              What does it mean to extract?

10   A    Yes.  To extract a DNA means to remove the DNA from a

11   cell, for example.

12        There is a lot of different components within the cell

13   that we were not particularly interested in.  We are interested

14   more on the DNA which is contained within the cell.

15   Q    So if you were presented with a swab that contains

16   potential DNA evidence, how do you go about extracting the DNA

17   from that swab?

18   A    Yes.  So that swab is removed from the stick that it's on,

19   much like a cotton swab you would have in your house, so the

20   cotton portion is removed, placed into a small tube, and there

21   is an extraction process that goes on using various chemicals

22   in our laboratory.

23   Q    In terms of your involvement in this case, before we go

24   any further, did you analyze all of the swabs that were

25   submitted to the Sheriff's Department Laboratory in this case?

```
 1   A     They were -- yes, I did, but they were ultimately
 2   forwarded on to other qualified DNA analysts that did the
 3   actual steps that I explained earlier.
 4   Q     So in terms of the four steps you mentioned, did you
 5   perform all four steps on each of the swabs submitted to the
 6   laboratory or just a certain number of them?
 7   A     All three samples were actually conducted the same.
 8   Q     I'm sorry, the four steps for DNA analysis, extraction,
 9   quantification, and amplification?
10   A     That's correct.
11   Q     Amplification and typing, did you perform all four of
12   those steps on all four of the swabs that were submitted to the
13   Sheriff's Department?
14   A     No, I did not personally.
15   Q     What did you personally do, if at all?
16   A     I did the oral reference sample, I tested that one.
17   Q     So, let's talk about -- let's go back to extraction, then,
18   so you had a swab.  What sort of tool do you use in order to
19   extract DNA?
20   A     Yes.  There is an instrument that is used in our
21   laboratory that purifies DNA, that uses a magnetic beads in
22   order to do that.
23           At that point, it moves onto the next step in the
24   DNA process.
25   Q     That's quantitation?
```

1    A    Yes.

2    Q    What is quantification?

3    A    Quantification involves -- figuring out how much DNA is

4    present within a sample, because that is important in order to

5    know exactly how to do the next steps.  You have to know how

6    much is present.

7    Q    Is there a certain level that you need in order to go onto

8    the next step?

9    A    Yes.

10   Q    What happens if you are not able to meet that level?

11   A    At that point, you would report out insufficient amount of

12   DNA present.

13   Q    So once you do quantitation, what is the next step?

14   A    At that point, it moves onto amplification, in which there

15   are certain markers that are targeted within the DNA in order

16   to produce the profile.

17   Q    What sort of tool is used to do this?

18   A    There is a tool that is known as a thermo cycler in which

19   PCR is conducted.  PCR is process known as preliminary chain

20   reaction.

21   Q    And why is that important?

22   A    That is important in order to create many, many copies of

23   the DNA that we're interested in.

24   Q    Is that what the actual amplification is?

25   A    Yes.

```
1    Q     Why do you do that?

2    A     We do that in order to create the DNA profile.

3    Q     Once that is done, you go onto the next step?

4    A     Yes.

5    Q     Is that amplification?

6    A     That is typing.

7    Q     Excuse me, typing?

8    A     Yes.

9    Q     What is typing?

10   A     Typing is when you actually use the final instrument in

11   order to separate out the DNA fragments, and at that point

12   there is a software program that generates the actual data that

13   we use to create a profile.

14   Q     These fragments you mentioned, why are you only focused on

15   fragments as to opposed to entire DNA itself?

16   A     So in those fragments they are known as short time and

17   repeats, those are the markers that will allow one person to be

18   distinguished from another person.

19              That is where the variability is within DNA --

20   our DNA sequence.

21   Q     Is that except for twins?

22   A     Yes.

23   Q     How do you even do this?

24   A     Yes.  So at that point, once that data is generated, we

25   use a software program known as GeneMapper that will assist us
```

1    in actually generating the profile.

2    Q    What does it mean to do that?

3    A    Yes.  So what that involves at that point is when we're

4    looking at the actual final profile, if it's a single course

5    profile, I wouldn't expect to see more than two peaks, so

6    anywhere from one to two, if it's single source.  However, if I

7    see multiple peaks, for example, 3 or 4 or more than that, then

8    you start to know there is more contributor present, so it's

9    not one person.

10   Q    What does it mean to have multiple contributors to a DNA

11   profile?

12   A    That means it's a mixture as opposed to having one person

13   present, there are multiple people that are present within that

14   sample.

15   Q    What can cause a mixture of samples?

16   A    It could be a variety of reasons.  For example, if you are

17   driving your vehicle and let's say you have your spouse or

18   family member drive that vehicle, it's possible then that

19   person will leave their DNA on the steering wheel, and so

20   because multiple people have come into contact with that

21   steering wheel, you are going to produce a mixture profile.

22   Q    So once you developed this profile and determined whether

23   it's a single source or multiple, what is the next step?

24   A    At that point that is compared to -- well, let me step

25   back.  There is a software program that we use it's known as

1    STRmix, so that profile is entered in STRmix.  Once we have

2    determined the number of contributors in that mixture, that

3    software program then will give us an estimate of basically a

4    breakdown of that profile to ultimately compare to a reference.

5    Q      STRmix is S-T-R-m-i-x?

6    A      Correct.

7    Q      Now, in order to actually conduct this comparison, what do

8    you need?

9    A      At that point, we will need a reference profile in order

10   to compare to that mixture.

11   Q      What do you do with the reference profile in order to

12   compare?

13   A      Yes.  So at that point in order to make that reference

14   useful, you would take it through the same steps in order to

15   produce that DNA profile and you enter that profile into STRmix

16   and order to do a comparison.

17   Q      Is there any issue when using STRmix if you are comparing

18   a reference sample to a sample with multiple sources as opposed

19   to just a single source?

20   A      No.  It's essentially the same method.

21   Q      How does that work, if there is a multiple source?

22   A      Yes.  If it's a multiple donor mixture, then that

23   reference is compared to that mixture to see whether or not

24   there is an exclusion, if they could be omitted from that

25   mixture or they could be included, meaning that their profile

```
 1    could potentially be a donor to that mixture.
 2    Q     Is this done manually by your own eye, or all done in
 3    STRmix?
 4    A     It's all done in STRmix.
 5    Q     Does it have to be done in STRmix if it's a multiple
 6    source file?
 7    A     It can be done manually if it's a single source profile.
 8    Q     But not if it's a multiple source?
 9    A     Correct.
10    Q     Now, did you -- you mentioned earlier you were personally
11    involved in the steps for the reference sample in this case; is
12    that correct?
13    A     That's correct.
14    Q     When did you receive this reference sample?
15    A     May I refer to my notes in order to verify the dates?
16    Q     If that would refresh your recollection.
17                There should be a packet -- a binder to your
18    left.
19                One moment, if I could see the exhibit list.  If
20    could you turn to Tab Number 40.
21    A     What number?
22    Q     40.
23    A     40.  Can you repeat your question?
24    Q     When did you receive this reference sample?
25    A     Yes.  This reference was received on June 9th of 2020.
```

1    Q    If could you close the binder?

2    A    Sure.

3    Q    What sort of medium did this sample arrive on?

4    A    It arrived in an envelope -- a sealed envelope.

5    Q    And did the actual sample itself, is it fair to say you

6    opened the envelope?

7    A    Yes.

8    Q    What was inside the envelope?

9    A    There was a swab or what is known as a Body reference

10   collector.

11   Q    What is that?

12   A    That is essentially a flat kind of like a tongue

13   depressor, but there is a cotton portion where the DNA is

14   contained.

15   Q    Is that a standard method for your laboratory to receive a

16   reference sample?

17   A    Yes.

18   Q    Was there any sort of indication of where that reference

19   sample came from?

20   A    Yes.  There was an indication on the packaging it was from

21   Steven Duarte.

22   Q    Was there a file number associated with the case?

23   A    Yes.

24   Q    From the Inglewood Police Department?

25   A    Correct.

```
 1   Q     Was that File Number 20-17470?

 2   A     Correct.

 3   Q     Now, did you -- did you go through all of the steps you

 4   just described with the swab you received from Inglewood --

 5   A     Yes.

 6   Q     -- in order to extract a DNA profile from a reference

 7   sample?

 8   A     Yes.

 9   Q     From Steven Duarte?

10   A     Yes.

11   Q     When you opened -- when you received the reference sample

12   was it sealed?

13   A     Yes.

14   Q     When you either -- when you just saw the packet itself,

15   was there any outward indication of any tampering or

16   mishandling?

17   A     No, there was not.

18   Q     What about when you opened it, anything that would lead

19   you to think that anything within the packet was compromised?

20   A     No.

21   Q     You were able to successfully develop a DNA profile from

22   the reference sample from Steven Duarte?

23   A     Yes.

24   Q     Did you compare this reference sample to any other DNA

25   profiles that were developed in this case?
```

UNITED STATES DISTRICT COURT

A     Yes.  There are different samples that were collected from
the firearm, and they are compared to each of those samples.

Q     Were you able to review the steps that were done in order
to extract DNA profiles from those samples?

A     I'm sorry, could you repeat your question?

Q     Were you able to review notes or just the procedures that
were done in order to create a DNA profile from those other
three samples?

A     Yes.

Q     Was there any error?

A     No.

Q     Any issue that would cause you concern?

A     No.

Q     Can you describe the comparison -- let me back up.

          Were you able to compare the reference sample of
Steven Duarte to the DNA profile that was developed from the
firearm grip?

A     Yes.

Q     And what type of profile was developed from the firearm
grip?

A     It was a mixture profile.

Q     Did you use STRmix in order to do this comparison?

A     Yes.

Q     Now, when you are using STRmix, in order to do this
comparison, if there is an inclusion, what sort of output are

1   you looking for?

2   A    Yes.  There is actually -- if there is an inclusion, there

3   is a statistic that goes along with it in order to give that

4   weight.

5   Q    What sort of statistic is this?

6   A    It's known as a likelihood ratio.

7   Q    What a likelihood ratio?

8   A    A likelihood ratio is a way of comparing two different

9   probabilities in order to determine what is the more likely

10  reason as to why something happened.

11  Q    What are you comparing?

12  A    So, in this scenario, it would be the explanation that --

13  the initial explanation was that the profile came from one

14  particular source versus another source.

15  Q    So, in terms of the likelihood ratio, you did for this

16  case, is it fair to say that your options are whether or not

17  Steven -- the reference sample of Steven Duarte's DNA profile

18  is included versus it being excluded?

19  A    Correct.

20  Q    Is this generally accepted -- this ratio and these

21  statistics from STRmix generally accepted in the scientific

22  community as an appropriate way to calculate this ratio?

23  A    Yes.

24  Q    How long has your laboratory been using STRmix?

25  A    For approximately three years.

```
 1   Q     You were able to determine whether or not using STRmix --
 2   were you able to calculate using STRmix a likelihood ratio for
 3   whether or not defendants -- excuse me, Steven Duarte's
 4   reference sample was included in the DNA profile developed from
 5   the firearm grip?
 6   A     Yes.
 7   Q     What use your conclusion?
 8   A     Yes.  May I refer to my report to give that number?
 9   Q     If that would refresh your recollection.  If you could
10   turn to 40 again, review it, and then close it before
11   continuing to testify?
12   A     Yes.
13   Q     Has that refreshed your recollection?
14   A     Yes.
15   Q     What did you conclude?
16   A     It was a mixture of four contributors.  The DNA profile
17   was 2 million times more likely if it originated from Steven
18   Duarte and three unknown individuals, than if originated from
19   four unknown individuals.
20              This provides strong support for the proposition
21   that Steven Duarte is a contributor to the mixture profile.
22   Q     I want to break that down a little bit.
23         The DNA profile developed from the firearm's grip was a
24   multi-contributor of four people.
25   A     Correct.
```

1  Q    Is there a certain level that your laboratory will -- is

2  there a certain number of contributors that would impact

3  whether or not your laboratory can properly do DNA analysis?

4  A    Yes.  If it had been a mixture of five or more

5  contributors, then the profile would not be interpreted.

6  Q    The fact there were four contributors, does that impact

7  your analysis at all?

8  A    I mean, that means if it's four people, that means I could

9  interpret it.

10 Q    In terms of the -- you mentioned it was 2 million times

11 more likely.  What does that mean in layman's terms?

12 A    Yeah.  So that means that it's a comparison between two

13 different types of probabilities where you are looking at what

14 is more likely.  So, for example, if somebody says that

15 tomorrow there is 80 percent chance of rain, you could fairly

16 say, okay, if there is a 80 percent chance of rain tomorrow

17 that means there is a 80 percent chance of no rain.

18          If you were to divide 80 percent of 20 percent,

19 it's four.  So that means it's four times likely to rain

20 tomorrow than not.

21 Q    And your likelihood ratio in this case was 2 million?

22 A    Correct.

23 Q    You mentioned earlier that this means a very strong

24 support of inclusion?

25 A    Yes.

1   Q    What does that mean, "very strong support"?

2   A    Yes.  So that -- it's what is known as a verbal scale, and

3   that is actually a way to explain what that number actually

4   means.

5              So what that means is that there is a committee

6   that came up with the ways of giving weight to the actual

7   statistic.  So they concluded that if it's a range of 1 million

8   or more, then that is going to translate as being very strong

9   support.

10  Q    What are the different -- what are the other options if

11  not very strong support.  Is there something higher?

12  A    No.  Very strong support, you mean highest, the next step

13  down would be strong support, followed by moderate or lower

14  limited support.

15  Q    And is there anything -- what about if a profile is

16  excluded?

17  A    Yes.  So at that point, there is an option of going down

18  that spectrum of being limited support for exclusion or

19  outright exclusion.

20  Q    Did you do a DNA comparison of the Steven Duarte's

21  reference sample to a DNA profile that was developed from the

22  swab that was used on the firearm trigger and slide?

23  A    Yes.

24  Q    What was -- using the same method that you described

25  before?

1  A    Yes.  It was a mixture of three contributors.  So the

2  statistic for this was that there was -- it was 100,000 times

3  more likely that the profile consisted of Steven Duarte being a

4  contributor, and two unknown individuals as opposed to four

5  unknown contributors.  And that provides strong support for the

6  proposition that Steven Duarte is included in the mixture.

7  Q    Did you also do the same thing for a DNA profile developed

8  from the swab that was used on the magazine?

9  A    Yes.

10  Q    What was that conclusion?

11  A    It was limited support for the inclusion of Steven Duarte.

12  Q    Do you recall the number for that?

13  A    11 times.

14  Q    Now, you weren't -- that doesn't mean that the defendant

15  is excluded from contributing to the magazine, correct?

16  A    That's correct.  They are just limited support.

17  Q    Is it fair to say several factors that you mentioned

18  earlier could have an impact upon any of the DNA that could

19  have been collected from any of the evidence in this case?

20  A    That's correct.

21  Q    Factors that you may not personally be aware of?

22  A    Yes.

23  Q    Because you had no actual analysis of the firearm or

24  magazine in this case?

25  A    Correct.  It was just the swabs.

1  Q    You did not -- you did not exclude -- you weren't able,

2  when you did your comparison, you did not exclude defendant

3  from being a contributor to the DNA profile developed from the

4  firearm's trigger and slide?

5  A    Correct.

6  Q    Same with the grip?

7  A    Correct.

8  Q    Was your work peer-reviewed?

9  A    Yes, it was.

10  Q    How so?

11  A    It was technically reviewed.  As I explained earlier, the

12  steps that I conducted that there were thoroughly done, there

13  were no technical issues, and that the conclusions I made were

14  based on data that was present in the case file.

15  Q    And was there any change to your results after it was

16  peer-reviewed?

17  A    There was one correction that was done for the grip.

18  Initially, when I conducted my review, I did it as a

19  three-person mixture; however, the second qualified analyst

20  that reviewed that same data was of the opinion that it was

21  actually four contributors.

22            And when I reviewed the data, I agreed that

23  actually it was four contributors instead of three.

24  Q    In terms of -- did you generate a report in this case?

25  A    Yes, I did.

```
 1   Q    The report you generated, did it reflect the four
 2   profile -- four contributors to the profile?
 3   A    Yes.
 4   Q    Is there anything about that peer review that was done
 5   that changes any of your analysis in this case?
 6   A    No.
 7   Q    Or the results?
 8   A    No.
 9   Q    Or your conclusions?
10   A    No.
11            MR. KAHAN:  Your Honor, could I have a moment?
12            THE COURT:  Yes.
13            MR. KAHAN:  No further questions, Your Honor.
14            THE COURT:  Cross-examination?
15            MR. CLEARY:  Thank you.
16                       CROSS-EXAMINATION
17   BY MR. CLEARY:
18   Q    And your peer review is done by somebody in your lab, I
19   take it?
20   A    Yes.
21   Q    Did you provide that peer review to the government?
22   A    Yes.
23   Q    All right.  So I imagine that the laboratory you work on
24   has a lot of very expensive equipment; is that fair to say?
25   A    Correct.
```

1   Q    And that most of these discussions involved in the

2   amplification, extraction, typing, and quantification are

3   different instruments that are performing those functions; is

4   that fair to say?

5   A    Correct, yes.

6   Q    And you are trained and familiar with each of the

7   different instruments in the lab, and you can perform or

8   utilize each of the different instruments that are responsible

9   for these different tasks?

10   A    Not with me personally, not with every single one of them.

11   So it just depends on the level of, I guess, interaction with

12   those instruments.  So every analyst has a varying degree of

13   work that they associate with those instruments.

14   Q    So are you qualified to do extraction?

15   A    Yes.

16   Q    And to utilize the instruments that conduct or perform

17   that task?

18   A    Correct.

19   Q    Which of the four steps are you not qualified to perform

20   or utilize the instruments for?

21   A    So I would say -- well, at the time for this particular

22   case, I did the reference sample, which involves all of those

23   steps.

24          So as far as the forensic unknown sample, there

25   is what we call batchers that actually you submit samples into

1   a plate in order for them to analyze.

2   Q     Them, who is them?

3   A     Other analysts within our laboratory.

4   Q     That is something that you personally do not do?

5   A     Correct.

6   Q     And in this particular case, you did not do -- perform any

7   of the steps regarding the reference -- the swabs that were

8   sent to the lab; is that correct?

9   A     There was swabs from the firearm that were submitted.

10  Those were tested by other an analysts within my laboratory.

11  However, the reference that was submitted from the person in

12  question, I tested that sample myself.

13  Q     And by the use of the term tested, what that means you

14  prepared it for injection into the machine that would then

15  create the --

16  A     Correct.

17  Q     -- the results?

18  A     That's correct.

19  Q     And you operated or typed into the programs GeneMapper and

20  STRmix?

21  A     That's correct.

22  Q     And when you received the samples, the government asked

23  about whether or not there was any visible or obvious signs of

24  tampering.  Do you recall that?

25  A     Correct, yes.

```
 1   Q      So did you actually personally review the swabs when they

 2   came in?

 3   A      Yes, I did.

 4   Q      And if those swabs were, for example, if they had cross

 5   contamination or something that happened to them prior to their

 6   arrival in the lab, you would not have any ability to know

 7   that, would you?

 8   A      That's correct.

 9   Q      And the term "cross contamination," it's something you are

10   aware of because of the way you are trained to avoid such

11   problems in the laboratory that you work at today, correct?

12   A      That's correct.

13   Q      And the reason you try to avoid cross contamination is so,

14   for example, you are not testing your own DNA in a sample when

15   you are supposed to be looking for somebody else's?

16   A      That's correct.

17   Q      And so your lab is a locked and sealed building?

18          You have to use a security pass to get in, I'm

19   sure?

20   A      You have a key card in order to access certain regions of

21   the laboratory.

22   Q      I imagine like any lab, you have to wear the appropriate

23   clothing that is to avoid cross contamination?

24   A      That's correct.

25   Q      You wear a lab coat?
```

A      Yes.

Q      You wear medical sweats or jumpsuits?

A      You wear a lab coat, gloves, a face mask, such as the one I came in wearing earlier.

              This is in order to ensure that your own DNA doesn't get into the samples, correct.

Q      Do you wear head covering or type of cap?

A      Head covering, no.

Q      And the purpose of the lab coat and the mask is again, so you don't inject your own DNA into the work that you are doing?

A      That's correct.

Q      And you are familiar with the process of DNA transfer, correct?

A      Yes.

Q      And that concept is where someone's DNA gets transferred from their person to an object, correct?

A      Yes.

Q      So a simple example would be if somebody bleeds onto the floor, they transfer their DNA on the floor by the mere fact their blood is on the floor?

A      Yes.

Q      That is considered to be a primary transfer, correct?

A      That's correct.

Q      Now, if someone steps on it, the person's blood on the floor, and that the blood is now transferred from the floor to

```
 1   under their shoe, that is also a form of DNA transfer, correct?
 2   A     That's correct.
 3   Q     That's called a secondary transfer, right?
 4   A     Correct.
 5   Q     And let's say that person then walked across the room and
 6   when that happens, the blood is transferred with each step; is
 7   that correct?
 8   A     Yes.
 9   Q     And that is called tertiary transfer.  That is how you can
10   get blood into a room where a person who bled was never
11   present, correct?
12   A     That's possible.
13   Q     This is true for other DNA sources, not just blood,
14   correct?
15   A     It's possible, yes.
16   Q     For example, skin cells can transfer from your hands, for
17   example, this podium, by me touching it, correct?
18   A     Correct.
19   Q     So when I touch this podium I can be transferring cells
20   from my hands onto the podium?
21   A     Correct.
22   Q     And it's possible that if, for example, Mr. Kahan came up
23   here, he also touched the podium, it's possible that some of my
24   DNA would transfer onto his hands from the fact that he touched
25   the podium where I did?
```

1   A    That's possible.

2   Q    And if Mr. Kahan went to open the door to the courtroom at

3   the end of the afternoon, that is how it's possible that

4   perhaps some of my DNA ended up on the door handle, right?

5   A    That's possible.

6   Q    Without me even touching it?

7   A    That's correct.

8   Q    Have you heard that the average person sheds about 30,000

9   skin cells per hour?

10  A    I mean, I have heard of different shedding amounts, but

11  it just depends.  There is a lot of variation between person to

12  person.

13  Q    Right.  But that is not something that -- something you

14  haven't heard of, that is accepted within the scientific

15  community, for example, correct?

16  A    I'm not familiar with that specific number.  I don't know

17  what the reference is, but I have heard there is different

18  amounts of cells that are shed, I just don't know exactly what

19  the number is.

20  Q    Okay.  So, in this particular case, we have some DNA you

21  tested, and you discussed about how Mr. Duarte may or may not

22  have been a contributor to certain samples.

23       Now, to talk about, instead of the podium, it would be

24  true, for example, you would expect that my DNA would transfer

25  onto the clothes like anybody else's that they are wearing,

1   correct?

2   A     It's possible, yes.

3   Q     For example, if you would expect to find DNA on the collar

4   of my shirt, for example?

5   A     Yes.

6   Q     And that is something called wearer DNA; is that correct?

7   A     That's correct.

8   Q     And you mentioned the driving example where you might

9   share your vehicle with your spouse or partner.  If two people,

10  for example, wear the same shirt, you could find that two

11  different profiles would be on that shirt, one from each of the

12  individuals that wore it, correct?

13  A     That's possible.

14  Q     And as you kind of alluded to, there are some people that

15  shed more DNA than others?

16  A     Correct.

17  Q     Some people -- maybe you said if they don't wash their

18  hands repeatedly, or if they are not showering on a daily

19  basis, they may have collected more DNA if they are wearing the

20  same clothes more than one day in a row, they may have a lot

21  more skin cells hanging out on them than someone who has woke

22  up, took a shower, put on fresh clean clothes and walked out

23  the door, correct?

24  A     That's correct.

25  Q     And some people, you know, as you discuss, some people

1    there are different factors of some people's skin cells, they

2    can shed their skin cells at different rates.

3              When you talk about profiles of individuals or

4    contributors, that is what you look at a sample and you did the

5    calculation as the machine did about how much of a percentage

6    or what the contribution is to that particular DNA sample,

7    because in this particular case, you have a mix, correct?

8    A    Correct.

9    Q    So this isn't a case where you have a match that you have

10   taken a reference sample and the DNA from the gun is this is a

11   match, it's Steven Duarte.  Instead, what you have is a

12   mixture, correct?

13   A    Correct.

14   Q    And when you are doing a mixture and you are looking at

15   who is the major contributor or not, the calculations that you

16   provided for us, don't necessarily explain when the individual

17   who was a major contributor actually came in contact with or

18   touched that particular item, correct?

19   A    Yeah.  We don't know the time of deposition of when that

20   DNA was transferred onto an item.  We can't define that or say

21   when that occurred.

22   Q    So what the DNA tells us is that as the language -- I

23   think you used was that the DNA is that a person cannot be

24   excluded from the fact that his skin cells appeared on a

25   particular item, correct?

```
1    A    Can you rephrase your question?

2    Q    What the DNA tells us is that an individual's skin cells

3    appeared on a particular item?

4    A    Is that a question?  I'm not sure.

5    Q    Well, let me try to turn it into one, how about that?

6         The profile tells us that an individual's skin cells

7    might appear on an item, but it doesn't tell us exactly what

8    happened, correct?

9    A    Correct.

10   Q    We don't know how the skin cells ended up on the item,

11   right?

12   A    That's correct.

13   Q    So we can't -- and you can't tell us when the DNA was left

14   on the item, how the DNA was left on the item, what happened to

15   have the DNA left on the item, what was the day it was left on

16   the item, none of those things, correct?

17   A    That's correct.

18   Q    And it doesn't tell you whether or not the item that has

19   the DNA on it -- has the DNA because of this concept of DNA

20   transfer.  It doesn't say DNA transfer or not?

21   A    That's correct.

22   Q    So in this particular case, you cannot rule out the

23   possibility that Mr. Duarte's DNA ended up on those samples

24   because of DNA or through DNA transfer, can you?

25   A    That's correct.
```

```
1    Q    It's possible that the DNA could have been left there

2    through the shedding of skin cells, correct?

3    A    That's correct.

4    Q    And in fact, Mr. Duarte's DNA is on this particular object

5    doesn't even mean that he possessed or even touched it,

6    correct?

7    A    That's a possibility.

8              MR. KAHAN:  Speculation.  Relevance to this witness.

9              THE COURT:  Overruled.

10   BY MR. CLEARY:

11   Q    Now we -- do you wear gloves at the laboratory?

12   A    Yes, I do.

13   Q    Is that to prevent DNA transfer?

14   A    It minimizes it.  It's a good way to minimize the DNA

15   transfer.

16   Q    Do you wear the same gloves every day or do you switch

17   your gloves?

18   A    I throw them away once I'm done using them.

19   Q    So you dispose of the gloves?

20   A    They are disposable latex gloves.

21   Q    That way you preserve the integrity of the sample,

22   correct?

23   A    That's correct.

24   Q    So someone can wear gloves, but if wearing the same gloves

25   every day or they touch with those gloves, you know, various
```

1    things outside the lab, then they can -- so wearing the gloves

2    doesn't really help much, does it?

3    A    I mean, it just depends.  It depends on the type of gloves

4    you are wearing.

5                  It depends on how -- what you coming into contact

6    with.  If the sample you are touching is liquid, then it's

7    possible you are going to transfer some of that liquid onto

8    your hands.  If it's a dry item, it's possible you may not get

9    any DNA transfer onto that item.

10   Q    Well, like a baseball glove, is not the type of glove, you

11   know, using a baseball kind of players mit, they hold the bat,

12   use a batting glove, that is not the type of glove you are

13   using in the lab, correct?

14   A    No.  It's the latex glove we're using in the laboratory.

15   Q    Is it true for the DNA test, you are actually testing one

16   nanogram or less or that is considered to be the optimal amount

17   you test?

18   A    That's correct.

19   Q    I'm just going to give you an example.

20        I'm holding up a little packet, are you familiar with

21   these little yellow packages?  This happens to be Splenda.

22   A    Okay.

23   Q    There is sugar packages come in the same size, the small

24   package weighs one gram.

25                  So let's assume for the purposes of this

1    question, that this one gram package of Splenda has maybe 1,000

2    granules of Splenda that composes this package?

3    A    Okay.

4    Q    To obtain a nanogram you would have to divide one of the

5    crystals, just one, in the small package in half; is that fair

6    to say?

7    A    Yes.  A nanogram is a very small amount of DNA.  It's a

8    very, very small amount.

9           It's a very small amount to describe.  If you

10   were to say there is a trillion dollars, for example, the

11   number a trillion, a nanogram is that direction to the same

12   magnitude, to the minus nine.

13          If you could imagine a million dollars now as a

14   small amount, it's a -- nanogram is basically what a trillion

15   would be, but back at the other spectrum which is minus nine,

16   which is a very small amount.

17   Q    You divide one granule in this package by 1,000, and

18   divide that granule by another thousand, to get approximately a

19   nanogram, correct?

20   A    It would be less than that, actually.

21   Q    It's not visible to the human eye, for sure?

22   A    That's correct.

23   Q    And that is all that is needed for a person's DNA profile

24   to appear in a test result; is that correct?

25   A    Yes.

```
 1              MR. CLEARY:  Nothing further.

 2              THE COURT:  Any redirect?

 3              MR. KAHAN:  Yes, Your Honor.

 4              THE COURT:  Go ahead.

 5                      REDIRECT EXAMINATION

 6   BY MR. KAHAN:

 7   Q     Are you testing for sugar substitutes when you are

 8   analyzing DNA?

 9   A     No.

10   Q     Why do you use a nanogram?

11   A     We use a nanogram because the instruments we use are

12   optimized to analyze a certain amount of DNA, and a nanogram is

13   where the optimal range is at.  So a nanogram is the sweet

14   spot, if you will, to generate a DNA profile.

15   Q     If you use, say, a milligram of DNA or a kilogram of DNA

16   would that do any difference to the results?

17   A     It would be overblown.  That is just a significant amount

18   of DNA that is present.

19              It would over blow the sample, you wouldn't be

20   able to interpret it.

21   Q     Is it fair to say that a nanogram is the ideal amount of

22   DNA that you need in order to do this analysis?

23   A     Yes.

24   Q     How long has that been the case?

25   A     That has been the case for many years now.
```

1    Q      Now, earlier on in cross-examination, defense counsel used

2    word "matching," you weren't able to match the DNA, correct?

3    A      Yes.

4    Q      Do you deal with matches?

5    A      Our laboratory no longer reports out a match.  The match

6    was previously designated only if you had a single source

7    profile.

8    Q      So --

9    A      In this case, we do not have single source profiles, they

10   are all mixtures.

11   Q      Because you have mix profiles, you can't say it's a match,

12   is that correct?

13   A      That's correct.

14   Q      You only deal with likelihood ratios and probabilities,

15   correct?

16   A      Correct.

17   Q      What was the probability again for comparing defendant's

18   DNA reference sample compared to the DNA profile developed from

19   the firearm grip?

20   A      From the grip, it was 2 million times more likely that

21   originated from Steven Duarte, and three unknown individuals

22   that if it came from four unknown individuals.

23   Q      Now, also on cross-examination, you mentioned that

24   shedding the skin cells can lead to DNA being transferred to an

25   object, right?

```
 1   A     That's correct.
 2   Q     Is it fair to say when you hold an item, you are shedding
 3   skin cells onto it?
 4   A     That's correct.
 5   Q     You can leave DNA on it?
 6   A     That's a possibility, yes.
 7   Q     And earlier defense counsel asked that, you know, because
 8   of how DNA works, you can't determine whether or not someone
 9   actually possessed an item, correct?
10   A     That's correct.
11   Q     Is it fair to say a skin cells are present on an item,
12   they could have also possessed it, right?
13   A     That's a possibility.
14   Q     In fact, hypothetically, if someone had a gun and held it
15   and then tossed it out of a window, that could be a way for him
16   to transfer their DNA onto the gun, right?
17   A     That's correct.
18   Q     If they had a magazine, hypothetically, and held it and
19   then stuffed it in front of a seat in front of them, that is
20   also a way to transfer your DNA to an item, right?
21   A     That's correct.
22              MR. KAHAN:  Nothing further.
23              THE COURT:  Anything further, Mr. Cleary?
24                       RECROSS EXAMINATION
25   BY MR. CLEARY:
```

```
1    Q    Were you aware of how many actual skin cells were found

2    on, for example, the trigger in this case?

3    A    We are not in the business of counting the number of skin

4    cells.  We just look at an item that developed a DNA profile.

5    Q    You are not aware of the data, again, it was less than 50

6    skin cells found?

7    A    We don't count the number of skin cells.

8    Q    In somebody were to touch, for example, a grip of a

9    handgun with their hand, wouldn't you expect to find three or

10   5,000 skin cells on that item?

11   A    It would depend on the hygiene of that individual.  If

12   they are constantly washing their hands.  You may get little or

13   none at all, it depends on multiple factors.  It's not a

14   straightforward as we may think it might be.

15             MR. CLEARY:  All right.  No further questions.

16             THE COURT:  All right.  Anything further from the

17   government?

18             MR. KAHAN:  No, Your Honor.

19             THE COURT:  May this witness be excused?

20             MR. KAHAN:  Yes, Your Honor.

21             THE COURT:  Thank you, sir, you may step down.  I

22   jumped the gun there, my apologies.

23                  You may call your next witness.

24             MR. KAHAN:  At this time the government rests.

25             THE COURT:  The government rests.  So given it is 20
```

1    after 4:00, why don't I let you out ten minutes early, if you

2    will.

3              We will have you come back, if you could be  so

4    kind, to be back at 8:45 tomorrow morning.  Again, we can't

5    start unless you are all here.

6              I'm doing everything I can to move this thing

7    along.  If you are here at 8:45, we will get started -- we will

8    get this matter to you as soon as possible.  Let's put it this

9    way, as I always say, please do not form or express any opinion

10   about the case until the matter is finally submitted to you.

11             Please do not talk with anyone about the case.

12   Don't allow anyone to talk to you about the case, and please do

13   not conduct any research of any kind on any subject matter

14   connected with in case.

15             We will see you all tomorrow morning at 8:45 a.m.

16             Thank you all, and have a wonderful evening.

17             THE COURTROOM DEPUTY:  All rise for the jury.

18             (Jury exits the courtroom at 4:19 p.m.)

19             THE COURTROOM DEPUTY:  Please be seated.

20             THE COURT:  All right.  Mr. Cleary, do you intend to

21   call any witnesses tomorrow?

22             MR. CLEARY:  I thought I would just repeat my

23   cross-examination of the defendant's DNA expert again.

24             THE COURT:  Okay.  So, I guess if I was on the other

25   side, I would say objection, nonresponsive.

1          Do you intend to call any witnesses tomorrow?

2          MR. CLEARY:  In my mind, no.

3          THE COURT:  No.  Okay.

4          All right.  So then government has rested.

5          Tomorrow, I will ask you in front of the jury

6     whether you wish to call any witnesses, and then what I will do

7     if you can wait maybe 10, 15 minutes, I will get you copies of

8     the closing jury instructions, so can you take them home this

9     evening, go over it, and let me know tomorrow morning.

10          If I could have you here at 8:30 in the morning,

11     we can go over jury instructions to make sure there are no

12     issues, and then I will instruct, and then you will give your

13     closing arguments, and then we will let the jury have it from

14     there.

15          Anything the government wishes to raise at this time?

16          MR. KAHAN:  No, Your Honor.

17          THE COURT:  Let me ask the government, are you doing

18     dual -- are both of you doing the closing, or one of you

19     drawing the short straw.

20          MR. KAHAN:  Mr. Rodriguez will be doing the closing,

21     I will be handling the rebuttal.

22          THE COURT:  Okay.  And I guess I just want to make

23     sure, forgive me because I'm not in my court, I don't have all

24     of my papers in front of me, so I didn't follow as long as

25     closely as I normally do.

1          Have all of the exhibits that were referenced

2     this morning, have they all been admitted into evidence?  1

3     through 18, and 43 and 49 through 51?

4          MR. KAHAN:  The government pre-admitted all of

5     those.

6          THE COURT:  I'm sorry, that was a poor question on

7     my part.

8          I know they have been pre-admitted.  Did the

9     government and utilize them during the course of the trial.

10         It seems like a lot of exhibits -- I don't

11    believe all of them were referenced with via witnesses.

12         MR. KAHAN:  So in terms of my recollection, I don't

13    believe that Exhibit 4 was referenced and shown to Ms. Hewson,

14    but I don't believe that that was actually authenticated.

15         THE COURT:  Exhibit 4?

16         MR. KAHAN:  Hold on.  They are all in, though.

17    There was no objection to them being in.

18         THE COURT:  I understand that.  I just want to make

19    sure, are you saying that all of these exhibits will go in and

20    the jury will figure out what they are for even though they

21    have never been discussed by any witness?

22         MR. KAHAN:  I believe so.  And I believe that it is

23    potentially our job during closing arguments to help explain

24    some of these exhibits.

25         THE COURT:  Okay.  Just checking.  Anything else

```
1   from the government?

2           MR. KAHAN:  No, Your Honor.

3           THE COURT:  Ms. Restrepo, you looked like you were

4   going to get up and saying something.

5           MS. RESTREPO:  No.

6           THE COURT:  Mr. Cleary, anything further?

7           MR. CLEARY:  I think Ms. Restrepo should give the

8   closing argument.

9           THE COURT:  I am sure she would love to, but she has

10  been there and done that.  She is going to let the other folks

11  fly solo.

12              Anything further, Mr. Cleary?

13          MR. CLEARY:  Nothing.

14          THE COURT:  So if you wouldn't mind, obviously, it

15  will take Mr. Duarte just so we won't have him delayed, if you

16  would wait 10 or 15 minutes, we will print out the

17  instructions.  My courtroom deputy and/or clerk will bring them

18  out to you, take them home tonight.  Once you get the

19  instructions you can leave.  We will discuss them at 8:30.

20              Thank you all.  Have a wonderful evening.

21          THE COURTROOM DEPUTY:  All rise.

22      This Court is adjourned.

23          (The proceedings concluded at 4:24 p.m.)

24                      * * *

25
```

**CERTIFICATE OF OFFICIAL REPORTER**

COUNTY OF LOS ANGELES   )
                        )
STATE OF CALIFORNIA     )

        I, TERRI A. HOURIGAN, Federal Official Realtime Court Reporter, in and for the United States District Court for the Central District of California, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the judicial conference of the United States.

Date: 13th day of June, 2022.


                           /s/ TERRI A. HOURIGAN
               _____
              TERRI A. HOURIGAN, CSR NO. 3838, RPR, CRR
                    Federal Court Reporter

## /

**/s** [1] - 157:19

## 1

**1** [2] - 133:4, 154:24
**1,000** [3] - 86:22, 147:23, 148:14
**1,300** [2] - 78:13, 86:23
**10** [7] - 22:21, 26:6, 26:11, 36:10, 41:3, 154:4, 156:13
**10-1** [2] - 36:4, 38:9
**100,000** [1] - 133:24
**101** [1] - 31:19
**108th** [6] - 30:13, 30:18, 30:19, 37:6, 39:25, 40:10
**109th** [11] - 10:12, 29:18, 29:21, 30:1, 30:20, 31:2, 35:15, 39:8, 39:25, 40:13, 40:23
**11** [3] - 110:21, 111:19, 134:10
**11-1** [1] - 33:7
**12-1** [1] - 32:24
**120** [2] - 98:19, 103:8
**12:30** [1] - 1:15
**12:43** [1] - 5:2
**12:55** [1] - 8:8
**13** [1] - 39:17
**13th** [1] - 157:16
**15** [9] - 63:6, 70:5, 73:4, 73:5, 73:18, 75:11, 100:25, 154:4, 156:13
**15-minute** [1] - 85:10
**150** [1] - 98:19
**16** [2] - 72:8, 110:4
**17** [4] - 72:16, 76:25, 77:21
**17470** [1] - 54:25
**18** [8] - 79:15, 80:7, 80:25, 118:14, 118:15, 118:22, 119:10, 154:25
**18-1** [1] - 80:15
**19** [1] - 66:11
**1999** [1] - 63:2

## 2

**2** [5] - 1:14, 131:14, 132:7, 132:18, 150:17
**20** [7] - 48:11, 50:19, 54:25, 104:20, 112:2, 132:15, 152:22

**20-17470** [4] - 55:3, 78:1, 80:9, 127:23
**20-CR-387-AB** [1] - 1:7
**200** [1] - 2:12
**2001** [1] - 111:3
**2002** [1] - 111:3
**2006** [1] - 63:5
**2011** [1] - 107:2
**2017** [1] - 96:17
**2020** [20] - 28:20, 39:10, 48:11, 51:15, 52:21, 66:15, 66:19, 68:6, 69:2, 69:6, 69:10, 70:12, 72:24, 83:6, 84:10, 84:23, 103:17, 104:20, 114:13, 126:22
**2021** [2] - 1:14, 5:1
**2022** [1] - 157:16
**20th** [4] - 28:20, 39:10, 66:19, 103:17
**213** [1] - 1:25
**22** [3] - 66:12, 66:13, 112:21
**24th** [2] - 51:15, 52:21
**25** [2] - 1:14, 5:1
**26** [7] - 69:2, 69:6, 69:10, 70:12, 72:24, 84:10, 84:23
**26th** [1] - 68:6
**28** [1] - 157:9
**2:28** [1] - 85:21
**2:45** [2] - 85:11, 85:19
**2:47** [1] - 86:7

## 3

**3** [1] - 124:4
**3-1** [1] - 69:8
**3/26/20** [1] - 80:7
**30** [1] - 74:9
**30,000** [1] - 142:5
**3111** [1] - 79:24
**312** [1] - 2:7
**350** [1] - 1:24
**3753** [2] - 40:14, 40:24
**38** [1] - 18:6
**380** [11] - 17:19, 17:20, 17:22, 18:6, 35:18, 71:2, 71:6, 99:24, 104:10, 105:1
**3800** [1] - 40:11
**3838** [2] - 1:23, 157:20

## 4

**4** [5] - 68:8, 69:4, 124:4, 155:10, 155:12
**4,000** [1] - 98:22
**4-1** [1] - 69:4
**40** [5] - 103:15, 126:17, 126:19, 126:20, 131:7
**41** [1] - 82:24
**43** [1] - 154:25
**4311** [1] - 1:24
**468** [1] - 2:12
**49** [8] - 38:16, 38:19, 38:22, 83:12, 83:25, 99:16, 103:25, 154:25
**4:00** [1] - 152:23
**4:19** [1] - 153:15
**4:24** [1] - 156:20

## 5

**5,000** [1] - 152:7
**50** [5] - 38:16, 38:19, 83:12, 84:20, 152:2
**51** [6] - 38:16, 38:19, 83:13, 104:1, 104:4, 154:25

## 7

**753** [1] - 157:9

## 8

**8** [2] - 68:22, 68:23
**8-1** [2] - 33:15, 68:4
**80** [4] - 132:12, 132:13, 132:14, 132:15
**894-2849** [1] - 1:25
**8:30** [2] - 154:7, 156:16
**8:45** [3] - 153:1, 153:4, 153:12

## 9

**9-1** [3] - 34:6, 34:9, 35:25
**90012** [2] - 1:24, 2:8
**90210** [1] - 2:13
**9:36** [1] - 28:20
**9C** [1] - 83:20
**9th** [3] - 83:6, 83:21, 126:22

## A

**a.m** [1] - 153:12

**abbreviation** [1] - 63:21
**ability** [2] - 97:10, 139:3
**able** [16] - 73:1, 74:6, 77:10, 78:20, 78:21, 106:24, 122:7, 128:18, 128:25, 129:3, 129:12, 130:23, 130:24, 134:23, 149:17, 149:24
**above-entitled** [1] - 157:12
**absolutely** [1] - 107:24
**academy** [1] - 96:23
**accepted** [4] - 114:19, 130:17, 130:18, 142:11
**access** [5] - 106:17, 113:14, 113:19, 117:12, 139:17
**accessibility** [1] - 113:22
**accessible** [1] - 14:19
**accidental** [1] - 35:3
**accordance** [1] - 59:19
**according** [3] - 7:4, 14:8, 20:1
**accounted** [1] - 117:22
**accredited** [4] - 114:4, 114:6, 114:12, 114:15
**accurate** [10] - 33:4, 33:12, 33:20, 39:7, 40:25, 70:11, 72:13, 72:23, 101:1, 101:4
**acid** [1] - 115:13
**action** [1] - 99:6
**active** [1] - 111:9
**actual** [12] - 52:9, 52:10, 54:15, 117:14, 120:25, 122:21, 123:9, 124:1, 127:2, 133:3, 134:20, 151:23
**addition** [2] - 97:5, 116:6
**additional** [4] - 29:8, 97:1, 97:3, 106:14
**adjourned** [1] - 156:19
**administered** [7] - 27:10, 49:1, 61:4, 95:15, 108:18, 112:6, 112:8
**admit** [1] - 57:14

**abbreviation** [1] - 63:21
**admitted** [10] - 7:24, 31:18, 39:16, 68:3, 99:16, 100:25, 118:13, 154:24, 155:1, 155:5
**affected** [1] - 87:22
**afternoon** [19] - 8:10, 8:23, 8:24, 27:21, 27:22, 41:9, 41:10, 49:15, 49:16, 57:11, 62:10, 62:11, 85:9, 86:5, 86:15, 105:24, 109:17, 109:18, 141:25
**AFTERNOON** [1] - 1:14
**age** [1] - 107:8
**agencies** [2] - 117:1, 117:6
**agency** [5] - 112:16, 118:12, 119:8, 119:9
**Agent** [8] - 38:16, 39:12, 46:2, 46:4, 56:16, 95:13, 99:15, 105:24
**agent** [9] - 83:12, 96:6, 96:11, 96:12, 96:18, 96:21, 98:24, 103:25, 107:22
**ago** [3] - 112:11, 113:1, 113:9
**agreed** [1] - 135:19
**ahead** [8] - 8:20, 26:7, 39:14, 56:18, 62:8, 74:21, 104:2, 149:1
**akin** [1] - 42:4
**allow** [5] - 85:16, 123:14, 153:9
**allows** [1] - 100:18
**alluded** [1] - 143:11
**almost** [1] - 92:14
**AMERICA** [1] - 1:5
**ammo** [1] - 102:8, 103:5
**ammunition** [31] - 57:1, 60:9, 97:11, 97:17, 97:18, 97:25, 98:4, 98:5, 98:6, 98:14, 98:20, 98:22, 101:20, 102:16, 102:19, 102:20, 102:22, 102:24, 103:2, 103:11, 104:10, 104:13, 104:17, 104:21, 104:25, 105:3, 105:7, 105:17, 107:23
**amount** [17] - 12:5, 12:13, 67:19, 67:23,

77:6, 116:1, 116:16, 122:8, 147:13, 148:4, 148:5, 148:6, 148:11, 148:13, 149:9, 149:14, 149:18

**amounts** [2] - 142:7, 142:15

**amplification** [7] - 119:24, 121:6, 121:8, 122:11, 122:21, 123:2, 136:24

**analysis** [28] - 56:8, 81:16, 82:9, 102:18, 110:9, 110:24, 111:5, 111:14, 111:20, 111:24, 112:4, 113:4, 113:11, 114:19, 114:23, 115:7, 117:7, 117:13, 117:20, 118:4, 119:20, 119:21, 121:5, 131:25, 132:4, 134:20, 136:2, 149:19

**analyst** [4] - 112:6, 115:2, 135:16, 137:9

**analysts** [3] - 120:24, 137:25, 138:7

**analyze** [7] - 81:20, 110:1, 113:15, 116:25, 120:21, 137:23, 149:9

**analyzed** [3] - 63:17, 81:24, 112:14

**analyzing** [1] - 149:5

**ANDRE** [1] - 1:3

**Angeles** [12] - 56:7, 63:17, 63:22, 81:15, 82:8, 109:22, 110:2, 110:17, 113:12, 113:25, 114:17, 117:5

**ANGELES** [5] - 1:15, 1:24, 2:8, 5:1, 157:3

**answer** [1] - 64:10

**anyway** [1] - 14:2

**apart** [1] - 55:10

**apologies** [1] - 152:19

**apologizing** [1] - 40:12

**appear** [5] - 31:12, 48:4, 93:6, 145:4, 148:21

**APPEARANCES** [1] - 2:1

**appeared** [2] - 144:21, 144:25

**applied** [1] - 7:4

**apply** [1] - 102:16

**appreciate** [2] - 57:15, 60:17

**approach** [1] - 99:15

**approached** [2] - 10:20, 30:9

**appropriate** [2] - 130:19, 139:19

**April** [1] - 83:6

**arc** [1] - 75:12

**area** [25] - 12:17, 12:18, 14:16, 16:3, 31:23, 39:21, 39:25, 40:2, 40:4, 41:3, 43:9, 65:24, 65:25, 70:24, 73:12, 74:5, 74:18, 74:19, 74:22, 74:25, 75:3, 75:9, 79:6, 125:17, 126:17

**areas** [7] - 65:22, 66:1, 66:2, 75:22, 75:24, 77:7, 78:14

**argument** [1] - 156:5

**arguments** [2] - 154:10, 155:20

**arrest** [2] - 43:15, 60:4

**arrival** [1] - 139:3

**arrive** [2] - 30:1, 126:25

**arrived** [13] - 12:6, 12:11, 15:21, 15:25, 16:1, 16:6, 16:23, 33:13, 37:7, 37:20, 44:18, 127:1

**arriving** [1] - 30:8

**aside** [1] - 26:19

**aspect** [1] - 119:23

**aspects** [2] - 98:13

**assembled** [6] - 101:12, 101:14, 103:23, 106:11, 108:1, 108:6

**assigned** [3] - 55:4, 63:7, 78:2

**assist** [3] - 11:11, 30:7, 123:22

**assistance** [2] - 29:1, 29:10

**ASSISTANT** [1] - 2:6

**assistant** [1] - 90:2

**assisted** [1] - 11:18

**associate** [1] - 137:10

**associated** [2] - 80:1, 127:19

**Association** [1] - 111:6

**associations** [1] - 111:4

**assume** [1] - 147:22

**AT** [1] - 2:12

**ATF** [1] - 100:18

**attached** [3] - 50:10, 51:9, 51:11

**attention** [2] - 9:14, 35:7

**attest** [1] - 59:21

**ATTORNEY** [2] - 2:4, 2:12

**ATTORNEY'S** [1] - 2:4

**ATTORNEYS** [1] - 2:6

**audio** [2] - 68:15, 68:23

**audits** [1] - 114:8

**AUGUST** [2] - 1:14, 5:1

**authenticated** [1] - 155:11

**auto** [1] - 105:1

**automatic** [2] - 36:18, 65:21

**Avenue** [5] - 40:1, 40:10, 40:13, 40:23, 41:1

**average** [3] - 45:11, 66:9, 142:5

**avoid** [6] - 58:12, 69:19, 89:19, 139:7, 139:10, 139:20

**aware** [5] - 107:16, 134:18, 139:7, 151:23, 152:2

---

**B**

**B-a-r-r-a-g-a-n** [1] - 49:5

**B-o-b-b-s** [1] - 27:15

**Bachelor's** [1] - 110:7

**background** [1] - 110:5

**bag** [54] - 14:25, 18:15, 18:17, 18:18, 19:1, 19:3, 19:5, 19:7, 19:11, 19:18, 22:11, 22:24, 22:25, 23:18, 28:14, 34:2, 36:1, 36:2, 36:23, 36:24, 37:3, 37:21, 39:12, 45:18, 45:20, 45:23, 45:24, 46:1, 46:5, 46:7, 46:11, 46:12, 46:18, 46:22, 46:23, 47:2, 47:4, 47:5, 48:6, 48:8, 48:11, 48:12, 53:4, 53:6, 56:14, 56:20, 56:23, 57:4, 80:24, 85:2

**bags** [4] - 19:2, 23:1,

67:9, 69:24

**banks** [1] - 89:5

**bar** [1] - 7:4

**Barragan** [5] - 48:24, 49:5, 56:17, 57:11, 83:11

**BARRAGAN** [1] - 49:6

**barrel** [4] - 71:17, 71:19, 101:8, 102:9

**barriers** [1] - 116:5

**base** [1] - 77:8

**baseball** [5] - 41:23, 42:24, 64:4, 147:7, 147:8

**baseball-style** [1] - 42:24

**based** [5] - 20:6, 31:11, 66:4, 67:22, 135:11

**basis** [1] - 143:16

**bat** [1] - 147:8

**batchers** [1] - 137:22

**batting** [1] - 147:9

**beads** [1] - 121:18

**become** [4] - 96:21, 97:6, 111:8

**begin** [8] - 8:13, 8:14, 69:15, 74:3, 85:6, 86:10, 96:16, 116:2

**behind** [2] - 115:21, 115:24

**below** [1] - 109:12

**bench** [2] - 5:7, 89:6

**best** [3] - 59:23, 64:20, 66:3

**better** [4] - 21:15, 62:7, 93:13, 93:20

**between** [8] - 39:25, 67:14, 67:21, 88:17, 89:7, 93:15, 132:9, 142:8

**BEVERLY** [1] - 2:13

**beyond** [1] - 102:10

**BG** [1] - 71:2

**billboards** [2] - 10:10, 10:11

**binder** [4] - 82:23, 82:25, 126:14, 126:23

**BIROTTE** [1] - 1:3

**bit** [8] - 15:19, 34:3, 50:9, 57:14, 78:15, 81:6, 98:2, 131:19

**black** [5] - 13:10, 13:12, 15:9, 34:21, 77:8

**Blazer** [3] - 104:10, 105:1, 105:2

**bled** [1] - 141:7

**bleeds** [1] - 140:15

**block** [10] - 16:3, 21:2, 21:5, 21:6, 38:12, 45:4, 45:5, 45:10, 45:11, 45:13

**blocks** [1] - 29:23

**blood** [8] - 89:10, 115:20, 140:17, 140:21, 140:22, 141:3, 141:7, 141:10

**blow** [1] - 149:16

**blue** [3] - 37:14, 37:15, 51:22

**Bobbs** [24] - 5:24, 6:10, 12:1, 12:6, 12:10, 15:21, 15:25, 16:2, 16:6, 16:9, 16:17, 16:23, 17:1, 17:6, 20:20, 20:24, 21:7, 25:3, 27:8, 27:14, 38:16, 38:22, 41:9, 46:4

**BOBBS** [1] - 27:16

**bodily** [1] - 21:18

**body** [3] - 110:1, 114:7, 115:19

**Body** [1] - 127:6

**bodyguard** [1] - 99:24

**book** [2] - 56:1, 56:2

**booked** [2] - 22:12, 25:12

**booking** [1] - 24:4

**bottom** [2] - 73:14, 92:5

**box** [3] - 15:3, 20:12, 50:23

**boxes** [1] - 51:1

**brand** [1] - 71:24

**breach** [1] - 113:24

**break** [6] - 34:3, 85:10, 85:25, 86:3, 120:3, 131:19

**breakdown** [2] - 94:9, 125:1

**bridge** [1] - 8:5

**brief** [2] - 82:2, 94:19

**briefly** [4] - 47:24, 97:3, 107:19, 116:20

**bring** [5] - 8:4, 67:10, 69:15, 83:12, 156:14

**brown** [14] - 18:18, 19:1, 22:24, 22:25, 36:1, 36:23, 45:23, 46:1, 46:5, 46:7, 47:1, 48:6, 56:14, 57:4

**buccal** [19] - 50:6, 50:7, 50:17, 51:2, 52:7, 52:17, 53:9, 55:18, 55:23, 57:21,

58:21, 58:23, 59:1, 59:4, 59:8, 59:12, 59:14, 59:21, 60:13
**building** [3] - 113:17, 113:19, 139:14
**bulb** [1] - 90:13
**bullet** [3] - 17:11, 93:1, 105:10
**bullets** [8] - 19:1, 19:20, 23:18, 35:10, 35:12, 91:7, 91:8, 92:13
**bumpy** [2] - 77:7, 77:9
**Burbank** [2] - 63:2, 63:4
**Bureau** [1] - 96:8
**business** [2] - 102:13, 151:25
**businesses** [1] - 10:10
**busy** [1] - 44:20
**butcher** [1] - 69:16
**BY** [44] - 2:5, 2:11, 8:22, 25:11, 26:9, 27:24, 32:15, 36:12, 37:19, 38:21, 39:15, 40:17, 41:8, 48:2, 49:14, 52:1, 55:15, 56:19, 57:10, 61:15, 62:9, 68:25, 73:16, 74:1, 75:6, 75:15, 81:2, 83:24, 86:14, 92:20, 94:20, 96:5, 99:1, 104:3, 105:13, 105:23, 107:21, 108:25, 109:16, 115:11, 136:14, 146:7, 149:3, 151:22

## C

**calculate** [2] - 130:19, 130:24
**calculation** [1] - 144:2
**calculations** [1] - 144:12
**caliber** [6] - 35:17, 71:6, 99:24, 102:13, 102:23, 105:2
**California** [6] - 103:13, 103:17, 104:20, 111:6, 111:7, 157:8
**CALIFORNIA** [7] - 1:2, 1:15, 1:24, 2:8, 2:13, 5:1, 157:4
**CAMDEN** [1] - 2:12
**cannot** [2] - 144:20,

145:19
**cap** [3] - 64:4, 89:22, 140:4
**car** [9] - 7:11, 10:15, 14:20, 25:24, 25:25, 26:3, 36:9, 38:3
**card** [1] - 139:17
**care** [1] - 22:19
**career** [5] - 50:18, 66:8, 98:18, 98:21, 103:7
**carpet** [1] - 15:9
**carry** [1] - 41:21
**cartridges** [1] - 104:10
**case** [76] - 5:19, 6:11, 9:1, 18:9, 20:4, 20:8, 20:16, 20:17, 22:20, 25:2, 37:24, 37:25, 54:20, 55:4, 55:5, 55:7, 60:1, 60:8, 68:23, 77:19, 77:24, 77:25, 78:2, 78:3, 78:18, 79:25, 80:1, 80:9, 82:2, 83:12, 85:13, 85:15, 85:16, 85:18, 89:13, 94:6, 94:10, 94:15, 94:19, 99:11, 99:13, 103:25, 111:9, 111:11, 111:12, 114:2, 117:15, 118:8, 118:21, 119:3, 120:20, 120:22, 126:8, 127:19, 128:22, 130:13, 132:18, 134:16, 134:21, 135:11, 135:21, 136:2, 137:19, 138:3, 142:17, 144:4, 144:6, 145:19, 149:21, 149:22, 150:6, 151:24, 153:7, 153:8, 153:9, 153:11
**CASE** [1] - 1:7
**cases** [1] - 111:13
**casings** [4] - 92:13, 92:14, 92:21, 93:1
**catalog** [1] - 106:16
**categorize** [2] - 19:14, 116:21
**caught** [1] - 35:6
**CCI** [1] - 105:4
**CCRR** [1] - 1:23
**Celeste** [2] - 61:2, 61:8
**CELESTE** [2] - 61:8, 61:10
**cell** [3] - 120:8,

120:9, 120:11
**cells** [24] - 66:6, 89:11, 115:14, 116:13, 141:13, 141:16, 142:6, 142:15, 143:18, 143:23, 143:24, 144:21, 144:24, 145:3, 145:7, 145:24, 150:21, 150:25, 151:8, 151:23, 152:1, 152:3, 152:4, 152:7
**center** [4] - 25:3, 25:19, 32:4, 32:13
**CENTRAL** [2] - 1:2
**Central** [1] - 157:8
**certain** [10] - 66:20, 81:21, 121:3, 122:4, 122:12, 131:23, 131:24, 139:17, 142:19, 149:9
**CERTIFICATE** [1] - 157:1
**certified** [8] - 97:7, 97:8, 97:9, 97:14, 97:16, 97:22, 97:24, 98:14
**certify** [1] - 157:8
**chain** [2] - 19:15, 122:16
**chamber** [6] - 17:11, 34:10, 34:25, 35:1, 35:4, 35:13
**chance** [5] - 64:8, 91:21, 132:12, 132:13, 132:14
**change** [2] - 21:14, 135:12
**changes** [1] - 136:2
**charge** [1] - 63:10
**charger** [1] - 44:9
**Charger** [2] - 44:11, 44:12
**check** [4] - 14:16, 18:1, 34:25, 93:1
**checked** [4] - 15:1, 15:6, 91:25, 92:10
**checking** [1] - 155:22
**checks** [2] - 114:21, 114:25
**cheek** [1] - 82:13
**chemicals** [1] - 120:18
**chief** [1] - 5:19
**chin** [1] - 109:12
**circle** [16] - 32:10, 32:13, 36:7, 36:8, 40:4, 40:10, 40:12, 40:13, 73:12, 73:14,

73:18, 74:20, 75:4, 80:16, 80:21
**circled** [2] - 32:12, 75:22
**circles** [2] - 73:22, 80:23
**City** [3] - 28:1, 28:23, 29:20
**city** [6] - 28:23, 29:19, 45:10, 45:11, 50:23, 72:3
**claimed** [1] - 94:23
**clarified** [2] - 13:20, 13:22
**class** [2] - 57:24, 58:4
**classification** [1] - 97:18
**classify** [1] - 103:11
**clean** [6] - 69:16, 79:3, 88:21, 89:6, 143:19
**cleaned** [1] - 88:18
**clear** [11] - 27:21, 40:7, 40:16, 49:11, 55:12, 62:6, 73:17, 96:3, 109:1, 109:3, 109:14
**CLEARY** [45] - 2:11, 2:11, 5:18, 5:24, 6:2, 6:4, 6:7, 6:17, 6:20, 6:23, 6:25, 7:2, 7:14, 7:23, 8:22, 25:6, 27:1, 27:4, 41:8, 47:21, 48:17, 48:20, 57:10, 60:23, 86:2, 86:12, 86:14, 92:20, 94:20, 95:4, 105:23, 107:17, 108:9, 108:11, 115:9, 136:12, 136:14, 146:7, 148:23, 151:22, 152:12, 153:19, 153:24, 156:4, 156:10
**Cleary** [13] - 5:15, 5:16, 8:14, 8:20, 26:24, 48:15, 60:22, 86:10, 108:8, 151:20, 153:17, 156:3, 156:9
**clerk** [1] - 156:14
**clips** [1] - 52:11
**close** [5] - 52:12, 54:16, 82:25, 126:23, 131:7
**closed** [1] - 52:11
**closely** [1] - 154:22
**closing** [6] - 154:5, 154:10, 154:15, 154:17, 155:20, 156:5
**clothes** [3] - 142:22,

143:17, 143:19
**clothing** [2] - 88:12, 139:20
**co** [1] - 113:10
**co-workers** [1] - 113:10
**coat** [7] - 88:13, 88:17, 88:20, 88:21, 139:22, 139:25, 140:6
**coats** [1] - 88:23
**Code** [1] - 157:9
**coin** [2] - 76:15, 77:15
**cold** [1] - 93:13
**collar** [1] - 142:25
**colleague** [1] - 101:7
**collect** [13] - 62:18, 64:12, 64:13, 64:17, 65:4, 65:13, 65:16, 76:14, 81:18, 93:19, 96:14, 109:25, 116:23
**collected** [7] - 76:7, 76:12, 82:10, 116:8, 128:23, 134:16, 143:16
**collecting** [3] - 64:20, 64:24, 65:21
**collection** [14] - 20:12, 28:10, 28:17, 41:25, 42:2, 42:15, 46:11, 49:25, 50:3, 51:13, 57:25, 63:13, 63:16, 63:25
**collector** [1] - 127:7
**colored** [1] - 15:10
**combustible** [1] - 99:10
**comfortable** [2] - 62:3, 88:15
**coming** [2] - 10:10, 147:2
**comments** [1] - 9:14
**commerce** [6] - 101:23, 101:25, 102:25, 103:18, 104:22, 106:25
**commercial** [1] - 10:9
**committee** [1] - 133:2
**common** [2] - 17:19, 63:21
**communication** [1] - 12:20
**community** [2] - 130:19, 142:12
**company** [3] - 65:1, 71:7, 105:4
**compare** [6] - 50:15, 125:1, 125:7, 125:9,

128:21, 129:12

**compared** [4] - 124:21, 125:20, 128:24, 150:15

**comparing** [4] - 125:14, 130:5, 130:8, 150:14

**comparison** [13] - 111:24, 113:11, 114:18, 114:23, 115:7, 125:4, 125:13, 129:11, 129:19, 129:22, 132:9, 133:17, 134:24

**comparisons** [1] - 62:24

**compartments** [1] - 14:19

**competent** [1] - 112:4

**complete** [2] - 103:24, 108:6

**completed** [1] - 59:17

**completely** [2] - 52:19, 89:2

**compliment** [1] - 57:16

**components** [1] - 120:9

**composes** [1] - 147:24

**compromised** [1] - 128:16

**concentrate** [1] - 77:8

**concept** [2] - 140:12, 145:16

**concern** [2] - 64:21, 129:9

**concerned** [1] - 7:15

**conclude** [1] - 131:12

**concluded** [2] - 133:4, 156:20

**conclusion** [2] - 131:4, 134:7

**conclusions** [3] - 115:4, 135:10, 136:6

**condition** [7] - 84:25, 100:4, 100:5, 100:8, 104:14, 117:24, 118:1

**conditions** [1] - 13:23

**conduct** [10] - 30:21, 85:17, 97:10, 97:12, 113:6, 114:18, 114:22, 125:4, 137:13, 153:10

**conducted** [12] -

39:22, 102:6, 103:1, 103:6, 104:12, 104:25, 110:25, 111:20, 121:4, 122:16, 135:9, 135:15

**conducting** [4] - 6:20, 111:18, 112:17, 113:11

**conference** [1] - 157:13

**conferences** [2] - 110:14, 111:10

**confident** [2] - 87:2, 87:4

**confined** [1] - 22:16

**confirm** [2] - 46:5, 48:6

**conformance** [1] - 157:13

**confused** [1] - 6:14

**connected** [2] - 7:20, 85:18, 153:11

**connection** [1] - 99:13

**considered** [3] - 22:20, 140:19, 147:13

**consisted** [1] - 133:25

**consistent** [11] - 53:18, 55:1, 68:5, 68:12, 69:1, 69:5, 69:9, 71:14, 74:12, 84:9, 112:18

**consists** [1] - 96:23

**constantly** [2] - 116:3, 152:9

**constructed** [1] - 92:6

**contact** [9] - 41:24, 42:1, 51:17, 52:4, 90:18, 106:1, 124:17, 144:14, 147:2

**contacted** [4] - 16:8, 16:23, 16:25, 52:2

**contain** [1] - 15:1

**contained** [5] - 52:9, 55:18, 71:11, 120:11, 127:11

**containing** [2] - 38:19, 118:20

**contains** [2] - 79:20, 120:12

**contaminate** [4] - 53:2, 53:15, 58:18

**contaminated** [1] - 87:14

**contaminating** [1] - 28:16

**contamination** [16] - 54:4, 58:13, 58:15,

59:22, 64:21, 68:1, 69:19, 87:6, 87:20, 89:19, 90:10, 90:15, 139:2, 139:6, 139:10, 139:20

**contents** [5] - 46:18, 52:16, 118:1, 118:21, 118:22

**context** [1] - 7:16

**continually** [1] - 116:19

**continue** [1] - 83:23

**continuing** [1] - 131:8

**contributing** [1] - 134:12

**contribution** [1] - 144:3

**contributor** [8] - 124:5, 131:18, 131:21, 134:1, 134:25, 142:19, 144:12, 144:14

**contributors** [12] - 124:7, 124:24, 131:13, 131:24, 132:2, 132:3, 133:23, 134:2, 135:18, 135:20, 135:24, 144:1

**control** [5] - 43:17, 87:16, 87:18, 117:9, 117:11

**controlled** [1] - 113:13

**conversation** [1] - 30:11

**cooperation** [1] - 60:17

**copies** [2] - 122:19, 154:4

**corner** [2] - 10:12, 40:23

**correct** [218] - 9:1, 9:12, 9:18, 9:24, 10:7, 10:10, 10:16, 11:4, 11:6, 11:16, 11:19, 11:22, 12:7, 12:16, 12:20, 12:24, 13:5, 13:17, 13:18, 13:25, 14:1, 14:3, 14:4, 14:6, 14:9, 14:11, 14:12, 14:17, 14:21, 15:1, 15:12, 15:13, 15:14, 15:17, 17:1, 17:14, 17:17, 17:18, 17:22, 17:23, 18:2, 18:3, 18:7, 18:9, 18:10, 18:12, 18:13, 18:24, 19:10, 19:15, 19:24, 22:3, 22:6, 23:12,

23:16, 23:24, 24:13, 25:4, 25:5, 30:15, 41:18, 42:14, 42:17, 42:20, 42:21, 42:22, 42:25, 43:2, 43:12, 43:15, 43:17, 43:19, 44:8, 45:3, 46:3, 46:20, 46:24, 46:25, 47:4, 47:16, 47:17, 47:18, 47:19, 48:13, 52:8, 54:11, 55:9, 55:22, 58:6, 58:10, 58:14, 59:13, 59:25, 60:5, 60:10, 60:11, 60:12, 86:20, 87:18, 87:19, 87:23, 87:24, 88:9, 88:12, 89:7, 89:17, 90:9, 91:11, 91:15, 92:11, 92:12, 93:4, 93:5, 93:10, 93:24, 94:2, 94:11, 94:16, 95:2, 95:3, 103:19, 104:23, 106:23, 107:1, 107:6, 109:23, 116:10, 117:4, 119:11, 121:7, 125:3, 126:6, 126:9, 126:10, 127:22, 127:24, 130:16, 131:22, 132:19, 134:12, 134:13, 134:17, 134:22, 135:2, 135:4, 136:22, 137:2, 137:15, 138:2, 138:5, 138:13, 138:15, 138:18, 138:22, 139:5, 139:8, 139:9, 139:13, 139:21, 140:3, 140:8, 140:10, 140:13, 140:19, 140:20, 140:23, 140:24, 141:1, 141:4, 141:8, 141:11, 141:14, 141:15, 141:18, 142:4, 142:12, 142:23, 143:3, 143:4, 143:9, 143:13, 143:20, 143:21, 144:4, 144:5, 144:9, 144:10, 144:15, 144:22, 145:5, 145:6, 145:9, 145:13, 145:14, 145:18, 145:22, 145:24, 145:25, 146:3, 146:19, 146:20, 147:10, 147:15, 148:16, 148:19, 148:21, 149:24, 150:9, 150:10,

150:12, 150:13, 150:23, 151:1, 151:6, 151:7, 151:14, 151:18, 157:10

**corrected** [1] - 35:19

**correction** [1] - 135:14

**correctly** [1] - 58:9

**cotton** [8] - 50:9, 64:18, 64:19, 64:22, 74:3, 120:16, 120:17, 127:10

**cough** [1] - 24:23

**COUNSEL** [1] - 2:1

**counsel** [6] - 26:7, 51:21, 61:13, 95:24, 149:23, 151:4

**counsel's** [1] - 56:14

**count** [1] - 152:4

**counterfeit** [3] - 107:9, 107:11, 107:23

**counting** [1] - 151:25

**County** [2] - 94:1, 94:8

**COUNTY** [1] - 157:3

**couple** [3] - 20:17, 29:23, 88:24

**courier** [1] - 81:17

**course** [10] - 50:18, 64:1, 66:8, 81:7, 97:6, 98:9, 98:11, 124:1, 155:6

**court** [4] - 18:20, 23:3, 37:10, 154:20

**COURT** [116] - 1:1, 1:23, 5:10, 5:14, 5:21, 6:1, 6:5, 6:12, 6:19, 6:22, 6:24, 7:1, 7:6, 7:15, 8:3, 8:10, 8:20, 25:8, 26:7, 26:24, 27:2, 27:5, 27:19, 32:14, 36:11, 37:18, 38:14, 38:17, 38:20, 39:14, 40:15, 41:6, 47:22, 47:25, 48:15, 48:18, 48:21, 49:9, 49:12, 51:25, 55:13, 56:18, 57:8, 60:18, 60:20, 60:22, 60:24, 61:13, 61:18, 61:21, 62:1, 62:4, 62:7, 68:15, 68:20, 73:15, 73:25, 75:5, 75:14, 81:1, 83:14, 83:16, 83:20, 83:23, 85:5, 85:8, 85:22, 85:24, 86:3, 86:10, 92:17, 92:19, 94:18, 95:6, 95:8, 95:10, 95:24, 96:4, 98:25, 104:2,

105:12, 105:21, 107:18, 108:8, 108:10, 108:13, 108:23, 109:8, 109:10, 109:12, 109:15, 115:8, 115:10, 136:9, 136:11, 146:6, 148:24, 149:1, 151:20, 152:13, 152:16, 152:18, 152:22, 153:17, 153:21, 153:25, 154:14, 154:19, 155:3, 155:12, 155:15, 155:22, 155:25, 156:3, 156:6, 156:11

**Court** [6] - 5:9, 86:4, 156:19, 157:7, 157:20

**courthouse** [1] - 57:2

**COURTHOUSE** [1] - 2:7

**courtroom** [9] - 8:8, 45:25, 51:17, 83:20, 85:21, 86:7, 141:24, 153:15, 156:14

**COURTROOM** [21] - 5:6, 5:8, 8:7, 27:9, 27:12, 48:25, 49:3, 61:3, 61:6, 85:20, 85:23, 86:4, 86:6, 86:8, 95:14, 95:17, 108:17, 108:20, 153:14, 153:16, 156:18

**covering** [3] - 109:5, 140:4, 140:5

**covers** [1] - 61:16

**COVID** [1] - 21:22

**craggly** [1] - 75:3

**create** [7] - 94:5, 99:10, 122:19, 122:24, 123:10, 129:4, 138:12

**crime** [8] - 62:17, 62:20, 62:21, 64:7, 78:14, 81:23, 82:1, 118:3

**Crime** [3] - 63:18, 109:20, 113:18

**crimes** [1] - 96:14

**criminal** [1] - 62:18

**criminalist** [10] - 109:21, 109:24, 109:25, 110:2, 110:6, 110:20, 111:21, 112:3, 112:20, 118:3

**criminalists** [1] -

110:16

**Criminalists** [1] - 111:7

**cross** [26] - 8:5, 8:13, 8:15, 41:6, 53:15, 57:8, 58:12, 58:15, 58:17, 59:22, 64:21, 86:11, 87:6, 87:20, 89:19, 90:10, 90:14, 105:21, 136:11, 139:1, 139:6, 139:10, 139:20, 149:23, 150:20, 153:20

**CROSS** [6] - 8:21, 41:7, 57:9, 86:13, 105:22, 136:13

**cross-examination** [10] - 8:13, 8:15, 41:6, 57:8, 86:11, 105:21, 136:11, 149:23, 150:20, 153:20

**CROSS-EXAMINATION** [5] - 8:21, 41:7, 57:9, 86:13, 105:22, 136:13

**crossed** [1] - 102:1

**crow** [1] - 7:4

**crowd** [1] - 43:17

**CRR** [1] - 157:20

**crystals** [1] - 148:2

**CSR** [2] - 1:23, 157:20

**curb** [5] - 9:24, 11:8, 11:18, 12:10, 25:25

**curiosity** [1] - 17:24

**curious** [1] - 43:23

**current** [3] - 21:20, 62:14, 96:10

**custody** [3] - 19:15, 60:15, 60:16

**cycler** [1] - 122:15

**D**

**daily** [1] - 143:15

**damage** [1] - 90:23

**Daniel** [2] - 95:13, 95:19

**DANIEL** [2] - 95:19, 95:21

**dark** [4] - 13:4, 13:8, 15:10, 26:17

**dark-colored** [1] - 15:10

**dash** [1] - 54:25

**dashboard** [1] - 14:16

**data** [8] - 115:3, 115:5, 123:9, 123:21, 135:11, 135:17,

135:19, 152:2

**date** [4] - 51:17, 53:10, 59:18, 80:5

**Date** [1] - 157:16

**dates** [1] - 126:12

**DAY** [1] - 1:14

**deal** [4] - 5:10, 5:23, 150:1, 150:11

**decided** [1] - 14:2, 17:25

**decision** [1] - 17:16

**defendant** [13] - 37:17, 38:5, 47:11, 50:14, 51:10, 51:24, 52:2, 52:5, 52:21, 52:24, 55:23, 134:11, 134:24

**DEFENDANT** [2] - 1:9, 2:10

**defendant's** [9] - 53:9, 53:16, 53:21, 53:23, 54:9, 54:15, 55:17, 150:14, 153:20

**defendants** [1] - 130:25

**defense** [4] - 5:19, 51:21, 149:23, 151:4

**defensive** [1] - 96:24

**define** [1] - 144:17

**defined** [1] - 101:17

**definition** [4] - 99:2, 99:5, 101:16, 104:17

**degrading** [1] - 116:4

**degree** [1] - 137:9

**delay** [1] - 67:14

**delayed** [1] - 156:12

**deliver** [1] - 56:6

**demonstrations** [1] - 110:11

**deoxyribonucleic** [1] - 115:13

**department** [3] - 81:18, 110:8, 110:18

**Department** [39] - 26:10, 22:10, 28:1, 28:7, 28:19, 48:12, 49:18, 49:22, 50:22, 51:14, 56:7, 57:1, 62:13, 62:25, 63:3, 63:5, 63:8, 63:18, 63:22, 66:15, 67:5, 81:15, 82:9, 94:1, 94:8, 109:20, 110:3, 110:17, 110:23, 113:12, 113:25, 114:18, 117:3, 117:6, 118:4, 120:22, 121:10, 127:21

**depicted** [5] - 32:2,

34:9, 34:12, 41:3, 71:5

**depicting** [1] - 41:11

**depiction** [8] - 32:16, 33:4, 33:12, 33:20, 39:7, 40:25, 70:11, 72:13

**depictions** [1] - 72:23

**depicts** [2] - 6:17, 39:18

**deposit** [1] - 23:11

**deposition** [1] - 144:16

**depressor** [1] - 127:10

**deputy** [1] - 156:14

**DEPUTY** [21] - 5:6, 5:8, 8:7, 27:9, 27:12, 48:25, 49:3, 61:3, 61:6, 85:20, 85:23, 86:4, 86:6, 86:8, 95:14, 95:17, 108:17, 108:20, 153:14, 153:16, 156:18

**describe** [11] - 32:8, 39:23, 50:2, 73:1, 74:17, 80:16, 87:10, 97:3, 101:19, 129:11, 148:6

**described** [13] - 52:6, 52:10, 52:17, 52:23, 55:19, 55:24, 63:11, 73:19, 80:9, 84:12, 84:15, 128:1, 133:21

**describing** [1] - 71:10

**designated** [6] - 57:21, 98:24, 98:25, 115:10, 117:10, 150:3

**designed** [2] - 99:5, 99:8

**destructive** [2] - 6:21, 7:3

**detailed** [1] - 117:23

**detective** [2] - 49:20, 57:12

**Detective** [3] - 56:16, 57:11, 83:11

**detention** [1] - 11:15

**determine** [9] - 97:12, 97:17, 97:20, 98:7, 98:16, 102:24, 130:6, 130:23, 151:5

**determined** [4] - 101:24, 105:1, 124:19, 124:24

**determines** [1] - 93:20

**determining** [1] - 100:2

**develop** [1] - 128:18

**developed** [11] - 124:19, 128:22, 129:13, 129:16, 131:1, 131:20, 133:18, 134:4, 134:25, 150:15, 152:1

**diagonally** [1] - 37:14

**diagrams** [1] - 62:21

**difference** [4] - 93:15, 93:18, 102:18, 149:13

**different** [31] - 18:5, 18:21, 18:22, 24:9, 26:16, 26:20, 36:16, 42:1, 42:24, 45:24, 64:2, 80:17, 80:18, 103:11, 103:12, 110:14, 120:9, 128:23, 130:5, 132:10, 133:7, 136:25, 137:4, 137:5, 137:6, 142:7, 142:14, 143:8, 143:23, 143:24

**differentiate** [2] - 40:20, 48:10

**difficult** [1] - 31:14

**dips** [1] - 116:23

**DIRECT** [5] - 27:23, 49:13, 61:14, 96:1, 108:24

**direct** [2] - 9:14, 20:3

**directed** [1] - 44:24

**direction** [2] - 64:9, 148:8

**discard** [1] - 21:14

**discarded** [2] - 21:1, 21:4

**discarding** [1] - 21:16

**discharge** [1] - 35:3

**disciplines** [1] - 110:18

**discuss** [1] - 143:22, 156:16

**discussed** [2] - 142:18, 155:18

**discussions** [1] - 136:23

**disposable** [3] - 41:18, 42:19, 146:17

**dispose** [2] - 41:22, 146:16

**disposed** [1] - 42:7

**distilled** [1] - 74:4

**distinguished** [1] - 123:15

**District** [2] - 157:7, 157:8
**DISTRICT** [3] - 1:1, 1:2, 1:3
**divide** [4] - 132:15, 148:1, 148:14, 148:15
**DIVISION** [1] - 1:2
**DNA** [177] - 49:25, 50:3, 50:14, 50:16, 50:17, 51:3, 51:8, 52:5, 52:6, 53:9, 57:24, 58:16, 58:19, 58:20, 58:23, 59:2, 59:4, 62:24, 63:13, 63:16, 63:17, 63:25, 64:12, 64:13, 64:17, 64:20, 65:4, 65:13, 65:17, 65:21, 66:3, 66:4, 66:7, 67:24, 73:2, 73:9, 77:6, 84:9, 88:8, 94:2, 94:10, 94:14, 100:7, 110:1, 110:8, 110:11, 110:15, 110:16, 110:19, 110:20, 110:24, 111:1, 111:5, 111:14, 111:16, 111:18, 111:20, 111:23, 112:4, 113:4, 114:18, 114:23, 115:7, 115:12, 115:13, 115:18, 115:19, 115:21, 115:24, 116:4, 116:8, 116:13, 116:19, 116:24, 117:7, 117:13, 118:4, 119:20, 119:21, 120:1, 120:7, 120:11, 120:13, 120:24, 121:5, 121:16, 121:18, 121:21, 121:25, 122:9, 122:12, 122:20, 122:24, 123:8, 123:12, 123:16, 123:17, 124:7, 124:16, 125:12, 127:10, 128:3, 128:18, 128:21, 129:1, 129:4, 129:13, 130:14, 131:1, 131:13, 131:20, 131:25, 133:17, 133:18, 134:4, 134:15, 134:25, 139:11, 140:2, 140:7, 140:9, 140:12, 140:16, 140:23, 141:10, 141:21,

142:1, 142:17, 142:21, 142:25, 143:3, 143:12, 143:16, 144:3, 144:7, 144:17, 144:19, 144:20, 144:24, 145:10, 145:11, 145:12, 145:16, 145:17, 145:20, 145:21, 145:23, 146:1, 146:10, 146:11, 147:6, 147:12, 148:4, 148:20, 149:5, 149:9, 149:11, 149:12, 149:15, 149:19, 149:24, 150:15, 150:21, 151:2, 151:5, 151:13, 151:17, 152:1, 153:20
**document** [4] - 62:20, 113:15, 114:1, 117:23
**documented** [3] - 59:18, 114:2, 119:20
**Dodge** [3] - 44:9, 44:11
**dollars** [2] - 148:7, 148:10
**done** [23] - 50:17, 78:8, 81:10, 83:1, 113:21, 113:22, 114:21, 114:23, 115:4, 122:25, 125:24, 126:1, 126:2, 126:4, 128:25, 129:4, 135:9, 135:14, 136:1, 136:15, 146:15, 156:7
**donor** [2] - 125:19, 125:23
**door** [4] - 36:9, 141:24, 142:1, 143:20
**Doty** [18] - 10:12, 21:3, 25:4, 29:18, 29:21, 30:1, 30:13, 30:18, 30:20, 31:2, 35:15, 37:6, 39:8, 39:25, 40:10, 40:13, 40:23, 41:1
**down** [25] - 16:3, 22:5, 22:15, 23:13, 23:14, 27:5, 34:3, 40:5, 40:18, 45:1, 48:22, 60:24, 69:15, 89:9, 94:16, 95:10, 102:9, 109:8, 109:9, 119:1, 120:3, 131:19, 133:10, 133:14, 152:18
**draw** [4] - 10:20,

40:20, 73:7, 73:18
**drawing** [1] - 154:16
**drawn** [6] - 10:18, 10:25, 36:8, 40:22, 73:13, 75:12
**drew** [3] - 40:9, 75:1, 75:4
**drive** [1] - 124:15
**DRIVE** [1] - 2:12
**driver** [4] - 7:10, 9:17, 11:3, 11:22
**driver's** [1] - 10:14
**drives** [1] - 7:12
**driving** [6] - 9:22, 10:2, 44:10, 44:11, 124:14, 143:5
**drop** [1] - 59:4
**dropped** [1] - 59:3
**dry** [1] - 147:5
**dual** [1] - 154:15
**Duarte** [32] - 7:9, 7:18, 7:20, 8:2, 11:12, 11:15, 11:18, 12:10, 54:21, 60:3, 60:14, 80:4, 82:11, 82:15, 82:17, 82:19, 99:11, 119:4, 119:15, 127:18, 128:6, 128:19, 129:13, 131:15, 131:18, 133:25, 134:3, 134:8, 142:18, 144:8, 150:18, 156:12
**DUARTE** [1] - 1:8
**Duarte's** [8] - 6:21, 7:3, 8:1, 130:14, 130:25, 133:17, 145:20, 146:1
**duly** [5] - 8:18, 27:17, 49:7, 61:11, 95:22
**during** [4] - 107:7, 110:13, 155:6, 155:20
**duties** [6] - 47:9, 62:16, 63:11, 86:19, 97:16, 109:24
**duty** [5] - 28:19, 28:22, 41:20, 51:14, 66:14
**DVD** [1] - 5:17

### E

**e-mail** [5] - 66:23, 82:1, 82:4, 106:21, 107:2
**e-mailed** [1] - 108:3
**EA** [2] - 70:20, 99:25
**early** [2] - 111:3, 152:23

east [1] - 25:24
**easy** [2] - 31:14, 31:15
**educational** [1] - 110:5
**effect** [1] - 89:22
**effected** [2] - 101:24
**effecting** [1] - 101:22
**efforts** [1] - 62:7
**eight** [1] - 49:23
**either** [5] - 6:11, 51:8, 78:18, 97:11, 128:11
**emerging** [1] - 110:14
**empty** [2] - 34:11, 36:24
**end** [8] - 22:6, 45:4, 45:5, 50:9, 50:10, 56:14, 58:23, 141:25
**ended** [3] - 142:1, 145:7, 145:20
**enforcement** [2] - 117:1, 117:6
**ensure** [8] - 89:14, 113:23, 114:8, 114:10, 114:22, 115:3, 117:20, 140:2
**ensures** [1] - 112:16
**enter** [1] - 125:12
**entered** [2] - 83:17, 124:23
**enters** [2] - 8:8, 86:7
**entire** [3] - 54:5, 81:7, 123:12
**entirety** [1] - 55:7
**entitled** [1] - 157:12
**envelope** [47] - 18:20, 18:22, 18:24, 51:5, 51:6, 52:10, 52:14, 52:15, 54:5, 54:6, 54:7, 54:9, 54:12, 54:13, 54:16, 54:17, 54:18, 71:12, 71:15, 76:21, 76:23, 77:15, 77:17, 79:11, 79:12, 79:13, 79:19, 80:13, 80:20, 81:5, 81:6, 81:7, 81:8, 84:19, 87:10, 93:6, 93:9, 104:4, 117:16, 118:11, 118:20, 119:7, 127:1, 127:3, 127:5
**envelopes** [7] - 19:13, 23:15, 23:23, 38:19, 52:12, 67:9, 76:15
**environment** [3] - 69:22, 89:25, 93:13

**equipment** [1] - 136:21
**error** [2] - 9:12, 129:7
**especially** [1] - 41:22
**essentially** [6] - 10:3, 99:8, 100:7, 101:23, 125:17, 127:9
**establish** [1] - 19:14
**estimate** [4] - 45:9, 98:17, 98:20, 124:25
**estimation** [1] - 21:1
**evening** [3] - 153:13, 154:6, 156:17
**event** [1] - 68:21
**eventually** [1] - 12:6
**evidence** [100] - 6:8, 6:9, 6:13, 7:24, 18:15, 18:17, 19:14, 20:11, 22:11, 22:12, 22:17, 22:18, 22:24, 22:25, 23:11, 23:18, 24:4, 24:5, 24:15, 25:12, 28:10, 28:14, 28:16, 28:17, 34:2, 36:1, 36:2, 36:23, 36:24, 37:3, 37:21, 41:25, 42:1, 42:16, 45:17, 45:20, 46:7, 46:11, 46:19, 47:13, 50:15, 50:16, 52:18, 56:23, 57:25, 58:8, 58:18, 60:7, 62:19, 62:22, 62:23, 63:16, 63:20, 63:25, 64:3, 64:9, 64:25, 65:4, 65:17, 65:21, 67:8, 67:9, 67:17, 68:3, 73:2, 73:9, 76:15, 76:21, 76:23, 77:17, 78:5, 78:8, 79:11, 79:12, 79:13, 79:19, 80:19, 81:4, 81:5, 81:18, 81:21, 87:11, 93:10, 96:15, 109:25, 113:22, 113:24, 116:25, 117:9, 117:11, 118:2, 120:13, 134:16, 154:24
**evidentiary** [1] - 113:16
**exactly** [7] - 17:12, 20:7, 117:23, 117:25, 122:2, 142:15, 145:4
**examination** [19] - 8:13, 8:15, 41:6, 57:8, 86:11, 102:6, 102:16, 103:1, 104:12, 104:25, 105:14,

105:17, 105:21, 106:1, 106:4, 136:11, 149:23, 150:20, 153:20

**EXAMINATION** [16] - 8:21, 25:10, 27:23, 41:7, 48:1, 49:13, 57:9, 61:14, 86:13, 96:1, 105:22, 107:20, 108:24, 136:13, 149:2, 151:21

**examinations** [2] - 97:10, 112:7

**examine** [5] - 66:24, 97:17, 99:13, 102:4, 102:15

**examined** [8] - 14:5, 92:4, 98:17, 98:21, 100:2, 100:5, 102:8, 104:15

**examining** [1] - 102:20

**example** [34] - 15:9, 59:3, 64:4, 87:6, 87:8, 88:6, 88:22, 89:5, 89:10, 90:10, 90:15, 93:22, 93:23, 116:22, 120:8, 124:4, 124:13, 132:11, 139:1, 139:11, 140:15, 141:13, 141:14, 141:19, 142:12, 142:21, 142:25, 143:1, 143:5, 143:7, 147:16, 148:7, 151:24, 152:5

**except** [2] - 44:14, 123:18

**exception** [1] - 115:16

**excess** [1] - 112:2

**exclude** [2] - 134:23, 134:24

**excluded** [4] - 130:15, 133:13, 134:12, 144:21

**exclusion** [3] - 125:21, 133:15, 133:16

**excuse** [4] - 66:13, 110:22, 123:4, 130:25

**excused** [8] - 27:2, 48:18, 60:20, 60:22, 95:8, 108:10, 108:13, 152:16

**EXHIBIT** [1] - 4:2

**exhibit** [5] - 68:21, 80:15, 103:12, 119:1, 126:16

**Exhibit** [44] - 26:6,

26:11, 31:19, 32:24, 33:7, 33:15, 34:6, 35:25, 36:4, 36:10, 38:9, 38:22, 39:17, 41:3, 68:8, 68:22, 68:23, 69:4, 69:8, 70:5, 72:8, 72:16, 73:4, 73:5, 75:11, 76:25, 77:21, 79:15, 80:25, 82:24, 83:25, 84:20, 99:16, 100:25, 103:15, 103:25, 104:1, 104:4, 118:14, 118:15, 118:22, 119:10, 155:10, 155:12

**Exhibits** [3] - 38:16, 38:19, 83:12

**exhibits** [8] - 103:9, 103:10, 103:12, 154:23, 155:7, 155:16, 155:21

**EXHIBITS** [1] - 4:1

**exist** [1] - 107:16

**exited** [1] - 10:13

**exits** [2] - 85:21, 153:15

**expect** [5] - 112:18, 124:2, 142:21, 142:25, 152:6

**expected** [1] - 18:8

**expel** [1] - 99:6

**expensive** [1] - 136:21

**experience** [6] - 28:9, 28:12, 49:24, 63:15, 66:5, 96:18

**expert** [5] - 59:6, 98:24, 111:23, 115:7, 153:20

**expertise** [1] - 111:15

**explain** [5] - 82:2, 99:7, 132:25, 144:13, 155:20

**explained** [2] - 120:25, 135:8

**explanation** [2] - 130:9, 130:10

**Explorer** [1] - 44:10

**explosion** [2] - 99:6, 99:10

**express** [2] - 85:13, 153:6

**extensive** [1] - 110:8

**exterior** [3] - 54:6, 102:8, 102:20

**external** [3] - 36:21, 110:13, 113:4

**extract** [5] - 120:6,

120:7, 121:16, 128:3, 129:1

**extracting** [1] - 120:13

**extraction** [7] - 119:23, 120:5, 120:18, 121:5, 121:14, 136:24, 137:11

**eye** [2] - 125:24, 148:18

## F

**face** [4] - 22:8, 27:21, 49:11, 139:25

**fact** [9] - 7:9, 97:14, 98:16, 132:3, 140:16, 141:21, 144:21, 146:1, 151:11

**factors** [5] - 115:23, 134:14, 134:18, 143:23, 152:10

**facts** [2] - 94:23, 95:2

**failed** [1] - 112:23

**fair** [43] - 7:7, 7:14, 10:1, 10:13, 10:18, 10:23, 11:8, 12:13, 13:8, 24:1, 24:11, 25:1, 30:13, 32:16, 33:4, 33:12, 33:20, 39:7, 40:2, 40:25, 57:22, 59:15, 60:14, 70:11, 72:13, 72:23, 87:3, 87:12, 88:2, 90:13, 90:23, 91:22, 101:1, 101:4, 127:2, 130:13, 134:14, 136:21, 137:1, 148:2, 149:18, 150:24, 151:8

**fairly** [1] - 132:12

**familiar** [8] - 36:16, 99:2, 99:11, 107:8, 137:3, 140:9, 142:13, 147:17

**family** [1] - 124:15

**fancy** [1] - 107:15

**far** [8] - 20:15, 29:21, 38:9, 38:10, 45:8, 47:8, 110:11, 137:21

**father** [1] - 115:17

**FBI** [6] - 95:12, 96:7, 96:10, 96:16, 96:23, 97:6

**featured** [1] - 80:24

**fed** [1] - 101:17

**Federal** [2] - 96:8, 157:6, 157:20

**FEDERAL** [1] - 1:23

**federal** [6] - 96:14, 96:24, 100:14, 101:16, 101:17

**feet** [1] - 45:10

**fell** [1] - 55:10

**fellow** [1] - 113:10

**few** [1] - 53:17

**field** [4] - 24:6, 24:12, 110:15, 114:19

**figure** [2] - 40:5, 155:17

**figuring** [1] - 121:25

**File** [1] - 127:23

**file** [7] - 114:2, 118:12, 119:8, 119:9, 126:3, 127:19, 135:11

**fill** [4] - 22:15, 23:23, 76:23, 79:13

**filled** [4] - 23:7, 23:9, 79:19, 79:21

**filling** [3] - 23:15, 24:18, 24:24

**final** [2] - 123:7, 124:1

**finally** [4] - 39:16, 85:13, 93:25, 153:7

**finger** [2] - 32:10, 73:7

**fingerprint** [3] - 86:23, 91:17, 92:14

**fingerprinting** [1] - 91:10

**fingerprints** [19] - 62:23, 78:8, 78:14, 78:16, 78:17, 78:20, 78:21, 79:2, 91:11, 91:13, 91:21, 91:25, 92:6, 92:8, 92:11, 92:22, 92:23, 92:24, 93:2

**finished** [2] - 16:25, 53:23

**firearm** [143] - 13:3, 13:6, 13:10, 13:11, 13:12, 13:15, 16:24, 18:11, 18:18, 19:22, 20:21, 20:24, 21:1, 21:8, 23:18, 25:3, 28:17, 29:13, 29:15, 30:10, 30:17, 30:21, 30:23, 31:11, 31:23, 32:2, 32:9, 32:16, 32:21, 33:3, 33:4, 33:11, 33:12, 33:19, 33:20, 33:25, 34:10, 34:24, 35:3, 35:6, 35:14, 35:19, 35:24, 36:13, 36:22, 36:25, 37:2, 38:10, 38:23, 39:4, 39:5, 39:7,

39:21, 43:4, 43:6, 45:6, 47:1, 47:8, 47:15, 48:3, 48:4, 56:25, 60:8, 65:14, 68:5, 69:1, 69:25, 70:2, 70:11, 70:22, 71:4, 71:9, 71:11, 71:14, 71:24, 72:11, 72:14, 73:1, 73:9, 73:14, 73:22, 73:23, 73:24, 75:2, 78:18, 78:22, 78:25, 79:6, 84:9, 91:4, 91:18, 96:19, 96:23, 97:7, 97:16, 97:22, 99:2, 99:5, 100:2, 100:14, 100:16, 100:18, 100:20, 101:4, 101:8, 101:9, 101:10, 101:12, 101:14, 101:16, 101:24, 101:25, 102:1, 102:3, 102:4, 102:6, 102:9, 102:14, 103:2, 103:4, 103:15, 103:17, 103:22, 103:23, 103:24, 105:14, 106:9, 107:23, 107:25, 108:6, 118:23, 128:24, 129:14, 129:16, 131:2, 133:19, 134:20, 138:6, 150:16

**firearm's** [3] - 75:16, 131:20, 135:1

**firearms** [24] - 17:14, 34:24, 64:15, 65:16, 65:18, 96:18, 97:3, 97:5, 97:8, 97:9, 97:10, 97:14, 97:17, 97:18, 97:24, 98:12, 98:14, 98:15, 98:16, 98:17, 100:14, 101:20, 102:10, 103:12

**fireman** [1] - 31:9

**first** [12] - 10:1, 16:13, 17:14, 30:3, 32:17, 40:10, 44:18, 61:22, 75:1, 102:6, 102:7, 120:4

**FIRST** [1] - 1:24

**fit** [7] - 17:17, 17:25, 18:1, 18:5, 18:8, 79:4, 104:17

**five** [3] - 96:22, 113:9, 132:1

**flashers** [1] - 9:21

**flat** [2] - 75:12, 127:9

**floodlights** [1] -

9:21, 26:4
**floor** [8] - 59:3, 59:5, 83:21, 140:16, 140:17, 140:22
**fluids** [3] - 21:18, 110:1, 115:19
**fly** [1] - 156:8
**focus** [3] - 65:22, 110:16, 111:15
**focused** [3] - 26:2, 26:3, 123:11
**focuses** [1] - 98:13
**folding** [1] - 80:20
**folks** [1] - 156:7
**follow** [3] - 88:16, 89:13, 154:21
**followed** [2] - 25:17, 133:10
**following** [2] - 22:19, 25:25
**follows** [5] - 8:19, 27:18, 49:8, 61:12, 95:23
**FOR** [2] - 2:3, 2:10
**Ford** [1] - 44:9
**foregoing** [1] - 157:10
**forensic** [16] - 56:8, 58:6, 62:15, 62:16, 63:9, 63:10, 65:1, 66:15, 66:20, 81:15, 82:9, 86:19, 88:1, 93:25, 111:12, 137:21
**forgive** [1] - 154:20
**form** [6] - 85:12, 93:25, 94:2, 140:23, 153:6
**format** [1] - 157:12
**forwarded** [1] - 120:24
**four** [23] - 51:5, 52:14, 75:10, 119:22, 121:1, 121:2, 121:5, 121:8, 121:9, 131:13, 131:16, 131:21, 132:3, 132:5, 132:16, 134:1, 135:18, 135:20, 135:23, 135:24, 137:16, 150:19
**fourth** [1] - 13:16
**fragments** [4] - 123:8, 123:11, 123:12, 123:13
**frame** [2] - 100:13, 107:3
**free** [4] - 59:22, 65:5, 67:7, 118:10
**free-standing** [3] - 65:5, 67:7, 118:10

**freeze** [2] - 93:7, 93:19
**fresh** [2] - 88:21, 143:19
**front** [15] - 23:20, 26:3, 46:2, 51:7, 74:24, 76:23, 79:13, 80:20, 81:6, 84:1, 103:16, 151:16, 154:2, 154:21
**frozen** [2] - 93:15, 93:18
**fully** [1] - 58:23
**functions** [1] - 136:25

## G

**gang** [1] - 49:20
**gap** [1] - 67:21
**gaps** [1] - 53:4
**gated** [1] - 22:16
**gear** [1] - 88:12
**GeneMapper** [2] - 123:22, 138:16
**general** [1] - 12:18
**generally** [5] - 39:23, 43:10, 114:19, 130:17, 130:18
**generate** [3] - 120:2, 135:21, 149:11
**generated** [4] - 103:8, 115:3, 123:21, 135:23
**generates** [1] - 123:9
**generating** [1] - 123:23
**gentlemen** [2] - 8:10, 85:12
**geographically** [1] - 32:1
**given** [1] - 152:22
**glove** [14] - 15:3, 28:13, 41:15, 42:1, 42:4, 42:5, 42:16, 55:21, 88:6, 147:7, 147:9, 147:11
**gloves** [59] - 14:11, 14:13, 15:13, 21:8, 21:10, 21:12, 21:14, 21:16, 21:17, 21:21, 23:24, 23:25, 24:5, 24:6, 24:9, 24:12, 28:15, 34:1, 34:4, 34:17, 34:18, 34:20, 34:21, 36:22, 41:12, 41:13, 41:18, 41:20, 41:21, 41:22, 41:23, 41:24, 42:22, 42:24, 52:17, 53:12, 53:14,

58:17, 58:20, 69:16, 88:2, 88:5, 89:21, 105:15, 105:18, 139:25, 146:8, 146:13, 146:14, 146:16, 146:17, 146:21, 146:22, 146:23, 146:25
**goal** [1] - 89:16
**goods** [2] - 107:9, 107:11
**Google** [2] - 40:2, 45:9
**government** [18] - 27:7, 43:3, 61:1, 95:12, 98:23, 108:16, 115:6, 136:18, 138:19, 152:14, 152:21, 152:22, 154:1, 154:12, 154:14, 155:1, 155:6, 155:23
**gram** [2] - 147:21, 147:23
**granule** [2] - 148:14, 148:15
**granules** [1] - 147:24
**grip** [34] - 65:24, 73:10, 73:12, 74:2, 74:5, 74:6, 74:14, 74:19, 74:23, 74:24, 75:2, 75:7, 75:9, 75:10, 75:13, 75:25, 76:2, 76:8, 79:8, 84:12, 100:22, 118:24, 129:14, 129:17, 131:2, 131:20, 135:3, 135:14, 150:16, 150:17, 152:5
**gripping** [1] - 91:18
**grippy** [1] - 92:5
**grooves** [1] - 116:22
**ground** [1] - 25:25
**group** [1] - 111:8
**groups** [1] - 111:5
**Gucci** [1] - 107:13
**guess** [6] - 7:9, 11:14, 66:9, 137:8, 153:21, 154:19
**gun** [41] - 12:23, 16:3, 16:7, 16:9, 18:1, 18:25, 25:19, 25:22, 25:23, 25:24, 26:2, 31:14, 37:21, 40:4, 40:21, 41:1, 65:20, 66:25, 70:9, 70:10, 71:17, 71:19, 73:10, 75:7, 77:17, 90:7, 90:22, 91:3, 99:13,

100:7, 100:22, 101:1, 101:22, 102:24, 118:24, 144:7, 151:11, 151:13, 152:19
**guns** [3] - 10:18, 64:4, 100:9
**guys** [3] - 12:15, 12:19, 21:12

## H

**H-e-w-s-o-n** [1] - 61:9
**hair** [1] - 115:20
**half** [5] - 20:18, 21:20, 115:16, 115:17, 148:2
**hammer** [2] - 36:21, 64:5
**hand** [12] - 16:7, 16:8, 16:9, 27:9, 48:25, 61:3, 65:20, 95:14, 100:22, 108:17, 116:13, 152:6
**handcuffs** [2] - 11:6, 11:19
**handed** [2] - 37:24, 47:2
**handgun** [7] - 65:19, 65:22, 65:23, 74:5, 84:2, 84:3, 152:6
**handle** [8] - 18:1, 18:9, 38:5, 38:7, 47:12, 57:24, 96:15, 142:1
**handled** [2] - 24:11, 90:5
**handling** [2] - 87:25, 154:18
**hands** [14] - 15:5, 34:14, 64:8, 66:6, 110:11, 116:1, 116:3, 141:13, 141:17, 141:21, 143:15, 147:5, 152:9
**handwriting** [2] - 68:11, 90:1
**hanging** [1] - 143:18
**hard** [2] - 13:7, 74:24
**head** [6] - 98:6, 102:21, 105:7, 105:8, 140:4, 140:5
**heard** [9] - 12:22, 13:1, 25:24, 92:18, 142:5, 142:7, 142:11, 142:14
**hearsay** [1] - 7:21
**heavily** [4] - 74:18, 74:22, 74:25, 75:8

**held** [5] - 23:5, 116:20, 151:11, 151:15, 157:11
**help** [2] - 146:24, 155:20
**hereby** [1] - 157:8
**Hewson** [5] - 61:2, 61:8, 86:16, 86:17, 155:10
**HEWSON** [1] - 61:10
**higher** [1] - 133:8
**highest** [2] - 114:9, 133:9
**HILLS** [1] - 2:13
**him'l** [1] - 16:1
**hit** [5] - 25:22, 25:24, 25:25
**hold** [7] - 23:1, 84:8, 84:22, 110:7, 147:8, 150:24, 155:13
**holding** [5] - 66:3, 84:9, 116:11, 116:16, 147:17
**holds** [1] - 35:10
**home** [2] - 154:5, 156:15
**honesty** [1] - 13:9
**Honor** [35] - 5:13, 6:8, 25:7, 25:9, 27:1, 27:3, 27:4, 38:13, 38:15, 41:5, 47:24, 48:17, 48:19, 60:19, 60:23, 83:15, 86:1, 86:2, 86:12, 95:7, 95:9, 95:25, 98:23, 105:11, 107:19, 108:11, 115:6, 115:9, 136:8, 136:10, 148:25, 152:15, 152:17, 154:13, 155:24
**HONORABLE** [1] - 1:3
**hot** [2] - 93:17, 93:23
**hour** [1] - 142:6
**HOURIGAN** [4] - 1:23, 157:6, 157:19, 157:20
**hours** [3] - 78:13, 86:22, 86:23
**house** [4] - 40:11, 40:14, 40:24, 120:16
**human** [1] - 148:18
**hundreds** [1] - 111:22
**hung** [2] - 88:23, 107:5
**Hunter** [1] - 31:2
**hygiene** [2] - 116:2, 152:8

**hypothetically** [2] - 151:11, 151:15

**I**

**Idaho** [1] - 105:5
**idea** [1] - 93:22
**ideal** [9] - 79:2, 91:14, 92:5, 92:14, 92:22, 92:24, 92:25, 149:18
**identical** [2] - 26:13, 115:16
**identified** [6] - 37:17, 43:9, 51:24, 104:1, 106:9, 107:6
**identify** [8] - 37:12, 51:19, 97:11, 97:18, 98:7, 101:9, 101:12, 105:6
**identifying** [9] - 97:19, 98:4, 98:13, 102:9, 102:22, 103:2, 103:3, 103:21, 106:18
**illuminating** [1] - 9:21
**image** [2] - 32:6, 32:8
**imagine** [6] - 23:13, 88:2, 88:11, 136:20, 139:19, 148:10
**immediately** [1] - 32:22
**impact** [5] - 67:23, 77:5, 131:24, 132:3, 134:15
**impeachment** [4] - 5:20, 5:21, 6:8, 6:9
**important** [3] - 122:1, 122:18, 122:19
**incident** [2] - 21:2, 118:2
**include** [2] - 28:17, 63:13
**included** [4] - 125:22, 130:15, 131:1, 134:3
**includes** [1] - 87:25
**including** [4] - 64:15, 84:15, 88:1, 117:3
**inclusion** [4] - 129:22, 129:24, 132:21, 134:8
**INDEX** [2] - 3:1, 4:1
**indicate** [3] - 46:12, 59:18, 84:1
**indicated** [3] - 9:20, 86:22, 105:25
**indicating** [1] - 71:23
**indication** [3] -

**individual** [10] - 55:4, 55:8, 65:11, 65:12, 78:2, 98:4, 115:15, 118:2, 144:13, 152:8
**individual's** [4] - 50:10, 94:21, 144:24, 145:3
**individually** [4] - 59:12, 64:23, 65:7, 79:10
**individuals** [13] - 11:3, 13:17, 14:20, 37:10, 113:20, 114:7, 131:15, 131:16, 134:1, 143:9, 143:25, 150:18, 150:19
**inform** [1] - 103:4
**informal** [3] - 58:1, 58:2, 58:11
**information** [9] - 29:14, 51:7, 97:20, 103:4, 103:21, 105:2, 106:18, 108:2
**informed** [5] - 103:23, 105:3, 106:19, 108:5
**Inglewood** [28] - 20:16, 22:10, 28:1, 28:6, 28:19, 28:24, 29:20, 39:8, 48:12, 49:18, 49:21, 50:22, 51:14, 52:3, 56:24, 57:1, 62:13, 62:25, 63:5, 63:6, 63:7, 66:14, 66:18, 67:5, 117:3, 127:21, 128:1
**inherit** [1] - 115:16
**initial** [3] - 76:16, 79:12, 130:10
**initialed** [1] - 77:16
**initials** [1] - 79:22
**initiated** [1] - 9:20
**inject** [1] - 140:7
**injection** [1] - 138:11
**inquire** [1] - 108:23
**insert** [1] - 17:25
**inserted** [1] - 59:1
**inside** [15] - 7:8, 11:3, 14:16, 14:20, 28:14, 34:2, 36:22, 36:25, 37:2, 50:10, 52:3, 80:12, 82:13, 99:17, 127:5
**instance** [1] - 118:8
**instead** [3] - 135:20, 142:20, 144:8
**instruct** [1] - 154:9

**instruction** [1] - 16:2
**instructions** [5] - 59:19, 154:5, 154:8, 156:14, 156:16
**instrument** [2] - 121:17, 123:7
**instruments** [9] - 114:9, 136:25, 137:4, 137:5, 137:9, 137:10, 137:13, 137:17, 149:8
**insufficient** [1] - 122:8
**integrity** [10] - 87:2, 87:5, 87:12, 87:16, 88:20, 89:14, 89:16, 113:23, 113:24, 146:18
**intelligence** [1] - 49:20
**intend** [2] - 153:17, 153:23
**interact** [1] - 31:9
**interaction** [1] - 137:8
**interested** [3] - 120:10, 122:20
**interference** [1] - 87:20
**interior** [3] - 7:4, 14:5, 15:21
**internal** [1] - 113:3
**interpret** [2] - 132:6, 149:17
**interpreted** [1] - 132:2
**intersection** [6] - 9:23, 17:7, 29:18, 31:1, 40:13, 45:7
**interstate** [13] - 100:3, 101:19, 101:21, 101:22, 101:25, 102:5, 102:15, 102:25, 103:6, 103:18, 104:12, 104:21, 106:25
**investigate** [2] - 96:13, 96:14
**investigation** [2] - 78:15, 97:12
**investigations** [1] - 62:18
**Investigations** [1] - 96:8
**investigative** [1] - 96:25
**involve** [1] - 112:12

**involvement** [4] - 37:25, 47:7, 60:3, 120:20
**involves** [5] - 111:12, 112:13, 121:25, 123:25, 137:19
**involving** [1] - 111:1
**issue** [5] - 5:10, 6:5, 48:8, 125:14, 129:9
**issued** [4] - 21:12, 24:19, 24:21, 41:20
**issues** [3] - 68:23, 135:10, 154:9
**item** [48] - 15:9, 39:1, 64:2, 64:9, 64:13, 66:4, 67:24, 77:7, 84:6, 89:25, 99:17, 106:25, 113:15, 113:16, 116:6, 116:7, 116:8, 116:9, 116:11, 116:12, 116:17, 116:19, 116:23, 116:24, 117:13, 117:14, 117:19, 117:21, 119:18, 144:15, 144:17, 144:22, 144:25, 145:4, 145:7, 145:11, 145:12, 145:13, 145:15, 147:5, 147:6, 150:24, 151:6, 151:8, 151:17, 152:1, 152:7
**items** [37] - 14:25, 19:17, 21:12, 22:2, 22:5, 24:11, 39:13, 56:6, 62:22, 62:23, 63:20, 64:6, 64:11, 64:12, 66:20, 66:24, 67:1, 67:6, 67:8, 67:10, 67:11, 67:15, 67:17, 67:22, 69:13, 81:13, 96:19, 97:21, 109:25, 117:5, 117:7, 118:1, 118:5, 118:7, 119:16, 119:19
**itself** [8] - 54:3, 92:7, 116:6, 116:7, 117:14, 123:12, 127:2, 128:11

**J**

**jacket** [1] - 89:21
**jail** [1] - 50:23
**Jail** [1] - 52:3
**jailers** [1] - 60:15
**job** [2] - 117:23, 155:20
**jobs** [2] - 110:22, 110:23

**Jose** [2] - 48:24, 49:5
**JOSE** [2] - 49:5, 49:6
**JR** [1] - 1:3
**JUAN** [1] - 2:5
**JUDGE** [1] - 1:3
**judge** [1] - 5:6
**judicial** [1] - 157:13
**jumped** [1] - 152:19
**jumpsuits** [1] - 139:24
**June** [2] - 126:22, 157:16
**jury** [18] - 8:4, 8:7, 38:25, 84:8, 85:20, 86:6, 98:2, 99:19, 100:20, 101:19, 104:6, 105:8, 153:14, 154:2, 154:5, 154:8, 154:10, 155:17
**Jury** [4] - 8:8, 85:21, 86:7, 153:15

**K**

**Kahan** [2] - 141:19, 141:24
**KAHAN** [79] - 2:5, 5:12, 6:3, 27:7, 27:20, 27:24, 32:15, 36:12, 37:16, 37:19, 38:13, 38:15, 38:18, 38:21, 39:15, 40:16, 40:17, 41:5, 47:23, 48:2, 48:14, 48:19, 48:24, 49:10, 49:14, 51:23, 52:1, 55:11, 55:15, 56:19, 57:7, 60:19, 60:21, 61:1, 61:15, 61:22, 62:2, 62:5, 62:9, 68:18, 68:22, 68:25, 73:16, 74:1, 75:6, 75:15, 81:2, 83:15, 83:24, 85:2, 85:6, 86:1, 92:16, 92:18, 94:17, 95:7, 95:9, 108:16, 108:25, 109:13, 109:16, 115:6, 115:11, 136:8, 136:10, 146:5, 148:25, 149:3, 151:19, 152:15, 152:17, 152:21, 154:13, 154:17, 155:1, 155:9, 155:13, 155:19, 155:24
**keep** [5] - 24:22, 43:14, 50:21, 76:18, 78:5
**kept** [1] - 77:18
**key** [1] - 139:17

**kilogram** [1] - 149:12
**kind** [14] - 10:1, 12:15, 43:17, 43:23, 44:23, 50:15, 85:17, 88:18, 94:9, 127:9, 143:11, 147:8, 153:1, 153:10
**kit** [2] - 51:3
**knives** [1] - 64:4
**knowing** [1] - 87:22
**known** [9] - 43:5, 122:15, 122:16, 123:13, 123:22, 124:22, 127:6, 130:3, 132:24
**KYLE** [1] - 2:5

---

**L**

**L-e-w-i-s** [1] - 95:20
**LA** [3] - 94:1, 94:8, 109:20
**lab** [32] - 18:23, 24:16, 64:7, 67:10, 69:15, 69:21, 81:19, 81:23, 82:1, 88:13, 88:14, 88:17, 88:20, 88:21, 88:23, 89:5, 89:25, 118:3, 119:6, 136:15, 137:4, 138:5, 139:3, 139:14, 139:19, 139:22, 139:25, 140:6, 146:23, 147:10
**Lab** [3] - 63:18, 113:18, 113:25
**label** [3] - 71:20, 71:23, 73:12
**labeled** [3] - 55:25, 71:10, 119:7
**labeling** [1] - 58:8
**laboratory** [25] - 86:23, 112:6, 114:4, 114:12, 114:21, 116:25, 117:10, 117:19, 118:8, 118:9, 120:19, 121:3, 121:18, 127:12, 130:21, 131:23, 131:25, 136:20, 137:25, 138:7, 139:8, 139:18, 146:8, 147:11, 150:2
**Laboratory** [7] - 56:7, 81:15, 82:9, 109:20, 114:18, 117:6, 120:22
**ladies** [2] - 8:10, 85:12
**language** [1] -

144:19
**larger** [3] - 76:21, 77:17, 79:11
**LASD** [5] - 63:19, 63:21, 64:1, 65:23, 81:17
**last** [5] - 6:25, 21:20, 30:11, 56:13, 112:10
**late** [3] - 22:17, 22:20, 22:22
**latent** [1] - 62:24
**latex** [11] - 21:16, 21:18, 23:24, 23:25, 24:4, 24:12, 41:18, 42:4, 88:6, 146:17, 147:11
**launch** [1] - 99:9
**laundered** [2] - 88:24, 89:1
**laundry** [1] - 22:6
**LAUREN** [1] - 2:6
**law** [8] - 96:14, 96:24, 100:14, 101:17, 102:10, 117:1, 117:6
**LAW** [2] - 2:11, 2:12
**lay** [1] - 99:7
**layman's** [1] - 132:8
**lead** [2] - 128:15, 150:21
**leaking** [1] - 42:17
**least** [1] - 118:22
**leave** [5] - 115:21, 115:24, 124:16, 151:2, 156:16
**lectures** [2] - 110:11, 110:14
**Lee** [4] - 31:6, 36:3, 43:9, 43:10
**Lee's** [3] - 45:18, 45:20, 46:8
**left** [26] - 8:12, 14:24, 20:19, 21:3, 26:10, 36:9, 40:23, 48:7, 51:21, 53:25, 73:23, 75:12, 80:17, 80:24, 91:13, 91:17, 91:21, 93:14, 109:1, 116:9, 126:15, 145:10, 145:11, 145:12, 145:23
**less** [5] - 77:7, 91:17, 147:13, 148:17, 152:2
**letters** [2] - 70:23, 71:1
**letting** [1] - 8:1
**level** [4] - 122:4, 122:7, 131:23, 137:8
**levels** [1] - 7:16
**Lewis** [5] - 95:13,

95:19, 96:6, 105:24, 107:22
**LEWIS** [1] - 95:21
**Lewiston** [1] - 105:4
**license** [1] - 44:14
**life** [1] - 111:13
**light** [3] - 10:11, 37:14, 51:22
**lights** [1] - 26:4
**likelihood** [7] - 130:3, 130:4, 130:5, 130:12, 130:24, 132:18, 150:11
**likely** [8] - 91:17, 130:6, 131:14, 132:8, 132:11, 132:16, 133:25, 150:17
**likewise** [1] - 59:1
**limit** [1] - 113:22
**limited** [6] - 113:19, 117:12, 133:11, 133:15, 134:8, 134:13
**lines** [2] - 102:1, 102:3
**liquid** [2] - 147:3, 147:4
**list** [4] - 22:5, 22:6, 83:7, 126:16
**live** [4] - 43:21, 68:10, 72:20, 72:24
**loaded** [1] - 47:16
**loading** [1] - 99:25
**locate** [3] - 16:13, 16:15, 16:18
**located** [14] - 17:13, 20:24, 25:3, 29:15, 31:24, 32:1, 32:9, 34:25, 39:4, 39:22, 45:13, 72:3, 103:1, 103:13
**location** [4] - 12:6, 20:15, 20:20, 102:12
**locations** [1] - 80:12
**lock** [1] - 35:2
**locked** [2] - 22:16, 139:14
**locker** [2] - 22:24, 54:2
**lockers** [1] - 22:17
**long-sleeved** [1] - 51:22
**look** [11] - 14:20, 14:24, 15:20, 16:4, 19:7, 30:16, 82:24, 94:10, 107:13, 144:1, 152:1
**looked** [5] - 13:6, 13:10, 46:24, 89:25, 155:25
**lookie** [1] - 43:23

**looking** [16] - 15:16, 19:3, 39:23, 44:1, 46:22, 91:2, 94:13, 94:14, 106:15, 111:12, 118:7, 124:1, 129:23, 132:10, 139:12, 144:11
**looks** [4] - 50:8, 90:22, 90:25, 107:15
**loos** [1] - 43:23
**Los** [12] - 56:7, 63:17, 63:22, 81:14, 82:8, 109:22, 110:2, 110:17, 113:12, 113:25, 114:17, 117:5
**LOS** [5] - 1:15, 1:24, 2:8, 5:1, 157:3
**love** [1] - 156:6
**lower** [1] - 133:10
**Luis** [2] - 108:16, 108:22
**LUIS** [1] - 108:22
**lunch** [1] - 19:3

---

**M**

**MA** [2] - 72:4, 72:5
**ma'am** [1] - 95:4
**machine** [2] - 138:11, 144:2
**magazine** [53] - 16:12, 16:15, 16:18, 17:16, 17:24, 17:25, 18:3, 18:5, 18:8, 18:11, 18:14, 18:18, 18:23, 18:25, 19:20, 23:18, 34:25, 35:8, 35:9, 35:10, 35:11, 35:12, 57:1, 60:8, 66:25, 68:10, 68:12, 69:5, 69:9, 69:25, 70:2, 72:20, 72:23, 77:1, 77:3, 77:9, 77:10, 77:12, 78:18, 79:4, 79:9, 84:20, 84:22, 92:4, 92:6, 92:10, 118:25, 134:5, 134:12, 134:21, 151:15
**magazines** [1] - 38:7
**magnetic** [1] - 121:18
**magnitude** [1] - 148:9
**mail** [5] - 66:23, 82:1, 82:4, 106:21, 107:2
**mailed** [1] - 108:3
**major** [2] - 144:12, 144:14
**maker** [1] - 91:1

**management** [1] - 117:11
**manila** [3] - 51:6, 54:6, 54:18
**manned** [1] - 64:6
**manner** [1] - 75:24
**manually** [2] - 125:24, 126:4
**manufactured** [10] - 97:13, 97:21, 98:8, 98:16, 103:4, 103:5, 105:3, 106:20, 107:25, 108:4
**manufacturer** [13] - 18:5, 98:7, 100:17, 101:9, 102:12, 102:13, 102:22, 105:1, 105:6, 106:2, 106:16, 106:19, 108:2
**manufacturer's** [1] - 106:17
**manufacturers** [5] - 97:20, 98:15, 100:14, 103:3, 103:13
**manufacturing** [1] - 106:6
**map** [1] - 40:2
**maps** [1] - 45:9
**March** [18] - 28:20, 39:10, 48:11, 51:15, 52:21, 66:15, 66:19, 68:6, 69:2, 69:6, 69:10, 70:12, 72:24, 84:10, 84:23, 96:17, 103:17, 104:20
**mark** [1] - 53:6
**marked** [7] - 19:13, 23:1, 26:5, 32:23, 34:6, 46:17, 84:1
**markers** [3] - 120:1, 122:12, 123:14
**markings** [9] - 46:15, 71:10, 76:22, 97:19, 98:5, 100:6, 102:9, 102:11, 102:12
**marks** [3] - 19:10, 102:22, 103:2
**mask** [16] - 21:25, 22:8, 27:21, 49:11, 55:12, 57:13, 62:6, 69:17, 88:13, 88:15, 96:3, 109:1, 109:3, 109:14, 139:25, 140:6
**masks** [1] - 57:14
**Massachusetts** [8] - 72:6, 101:15, 103:24, 106:5, 106:9, 107:3, 108:1, 108:6
**match** [6] - 144:6, 144:8, 149:24, 150:2,

150:8
**matches** [1] - 150:1
**matching** [1] - 149:24
**material** [7] - 50:10, 66:20, 75:8, 77:9, 80:18, 99:10, 116:7
**materials** [7] - 52:20, 53:2, 55:21, 56:10, 57:4, 71:15, 116:1
**matter** [7] - 56:13, 85:13, 85:18, 153:5, 153:7, 153:10, 157:12
**mean** [19] - 17:9, 34:23, 74:17, 102:4, 102:11, 103:10, 106:7, 114:6, 120:6, 123:24, 124:7, 132:5, 132:8, 132:23, 133:9, 134:11, 142:7, 146:2, 146:25
**meaning** [1] - 125:22
**means** [14] - 101:20, 101:23, 114:7, 120:7, 124:9, 132:5, 132:9, 132:14, 132:16, 132:20, 133:1, 133:2, 138:10
**measurements** [1] - 62:22
**medical** [1] - 139:24
**medium** [1] - 126:25
**meet** [1] - 122:7
**meeting** [2] - 52:24, 114:10
**member** [6] - 64:7, 64:10, 111:4, 111:6, 111:8, 124:15
**members** [1] - 83:16
**mentioned** [17] - 34:22, 63:21, 74:14, 75:16, 78:8, 91:10, 100:9, 113:3, 120:4, 121:1, 123:11, 126:7, 132:7, 132:20, 134:14, 143:5, 150:20
**mere** [1] - 140:16
**met** [3] - 52:20, 82:17, 82:19
**metal** [5] - 52:11, 91:22, 92:6, 92:7, 92:21, 92:23, 92:24
**method** [6] - 64:20, 66:8, 114:1, 125:17, 127:12, 133:21
**mid** [5] - 16:3, 21:2, 21:5, 21:6, 45:13
**middle** [7] - 6:6, 10:3, 25:23, 31:17, 45:15, 70:14, 70:22

**might** [17] - 14:24, 14:25, 15:3, 15:8, 41:20, 42:16, 45:8, 47:10, 58:5, 81:18, 90:2, 92:22, 93:20, 98:6, 143:5, 145:4, 152:11
**mile** [1] - 20:18
**miles** [2] - 20:17, 20:18
**milligram** [1] - 149:12
**milling** [2] - 43:14, 44:15
**million** [6] - 131:14, 132:7, 132:18, 133:4, 148:10, 150:17
**mind** [4] - 13:12, 13:15, 153:24, 156:11
**minimize** [1] - 146:11
**minimizes** [1] - 146:11
**minus** [2] - 148:9, 148:12
**minutes** [3] - 152:23, 154:4, 156:13
**mishandling** [1] - 128:13
**mistake** [2] - 9:12, 61:23
**mit** [1] - 147:8
**mix** [2] - 144:4, 150:8
**mixing** [1] - 89:11
**mixture** [18] - 124:9, 124:12, 124:18, 124:24, 125:7, 125:19, 125:20, 125:22, 125:23, 129:18, 131:13, 131:18, 132:1, 133:23, 134:3, 135:16, 144:9, 144:11
**mixtures** [1] - 150:7
**model** [2] - 39:6, 102:13
**moderate** [1] - 133:10
**molecule** [1] - 115:13
**moment** [9] - 25:9, 38:13, 47:23, 55:17, 69:12, 85:4, 105:11, 126:16, 136:8
**money** [1] - 102:2
**months** [5] - 88:24, 96:22, 112:9, 112:11, 112:25
**morning** [5] - 153:1, 153:12, 154:6, 154:7,

154:24
**most** [3] - 5:19, 112:25, 136:23
**mother** [1] - 115:16
**mouth** [10] - 50:11, 53:16, 53:21, 53:24, 54:9, 55:17, 59:2, 61:16, 61:18, 109:6
**move** [1] - 153:3
**moved** [5] - 15:5, 31:12, 32:19, 43:4, 43:6
**moves** [3] - 115:7, 121:20, 122:11
**moving** [2] - 13:7, 13:8
**MR** [141] - 5:12, 5:18, 5:24, 6:2, 6:3, 6:4, 6:7, 6:17, 6:20, 6:23, 6:25, 7:2, 7:14, 7:23, 8:22, 25:6, 25:9, 25:11, 26:8, 26:9, 26:23, 27:1, 27:3, 27:4, 27:7, 27:20, 27:24, 32:15, 36:12, 37:16, 37:19, 38:13, 38:15, 38:18, 38:21, 39:15, 40:16, 40:17, 41:5, 41:8, 47:21, 47:23, 48:2, 48:14, 48:17, 48:19, 48:20, 48:24, 49:10, 49:14, 51:23, 52:1, 55:11, 55:15, 56:19, 57:7, 57:10, 60:19, 60:21, 60:23, 61:1, 61:15, 61:22, 62:2, 62:5, 62:9, 68:18, 68:22, 68:25, 73:16, 74:1, 75:6, 75:15, 81:2, 83:15, 83:24, 85:2, 85:6, 86:1, 86:2, 86:12, 86:14, 92:16, 92:18, 92:20, 94:17, 94:20, 95:4, 95:7, 95:9, 95:12, 95:25, 96:2, 96:5, 98:23, 99:1, 104:3, 105:11, 105:13, 105:20, 105:23, 107:17, 107:19, 107:21, 108:7, 108:9, 108:11, 108:12, 108:16, 108:25, 109:13, 109:16, 115:6, 115:9, 115:11, 136:8, 136:10, 136:12, 136:14, 146:5, 146:7, 148:23, 148:25, 149:3, 151:19,

151:22, 152:12, 152:15, 152:17, 152:21, 153:19, 153:24, 154:13, 154:17, 155:1, 155:9, 155:13, 155:19, 155:24, 156:4, 156:10
**MS** [1] - 156:2
**multi** [1] - 131:21
**multi-contributor** [1] - 131:21
**multiple** [15] - 115:25, 116:5, 118:5, 118:6, 124:4, 124:7, 124:10, 124:17, 124:20, 125:15, 125:18, 125:19, 126:2, 126:5, 152:10
**must** [3] - 88:11, 90:17, 100:16

# N

**name** [17] - 27:13, 49:4, 51:11, 51:12, 54:15, 54:19, 56:10, 61:7, 79:25, 80:3, 94:21, 95:18, 95:19, 108:21, 119:12, 119:14
**nanogram** [11] - 147:13, 148:1, 148:4, 148:8, 148:11, 148:16, 149:7, 149:8, 149:9, 149:10, 149:18
**narration** [3] - 7:19, 7:21, 7:24
**nature** [3] - 7:3, 10:6, 116:14
**near** [3] - 35:15, 39:8, 40:23
**necessarily** [1] - 144:13
**need** [11] - 5:10, 8:5, 13:15, 40:7, 81:22, 85:24, 98:6, 122:4, 125:5, 125:6, 149:19
**needed** [1] - 148:20
**needing** [1] - 81:19
**neighborhood** [3] - 10:6, 10:9, 43:19
**net** [1] - 89:22
**never** [2] - 141:7, 155:18
**next** [26] - 6:1, 6:2, 6:4, 19:1, 27:6, 32:5, 40:10, 40:11, 40:14, 45:7, 48:23, 60:25, 89:10, 95:11, 108:15, 119:17, 121:20,

122:2, 122:5, 122:10, 122:25, 124:20, 133:9, 152:20
**nexus** [10] - 98:9, 98:11, 100:3, 101:20, 101:21, 102:5, 102:15, 103:6, 104:13
**Nicholas** [2] - 27:8, 27:14
**NICHOLAS** [2] - 27:14, 27:16
**night** [10] - 12:15, 13:5, 22:21, 25:17, 26:13, 41:21, 42:5, 42:11, 43:1, 44:5
**nine** [3] - 107:5, 148:9, 148:12
**Nitrile** [1] - 41:13
**nitrile** [3] - 34:21, 42:4, 42:22
**nitron** [2] - 41:15, 41:17
**NO** [4] - 1:7, 1:23, 4:2, 157:20
**non** [6] - 41:16, 41:17, 42:19, 79:3, 88:5, 109:3
**non-clear** [1] - 109:3
**non-porous** [4] - 41:16, 42:19, 79:3, 88:5
**non-puncture** [1] - 41:17
**none** [4] - 92:2, 93:4, 145:13, 152:10
**nonresponsive** [1] - 153:22
**normal** [1] - 67:19
**normally** [6] - 20:7, 46:17, 46:20, 77:3, 115:1, 154:22
**north** [2] - 31:1, 40:5
**NORTH** [2] - 2:7, 2:12
**northbound** [1] - 21:4
**nose** [3] - 55:13, 61:18, 109:5
**note** [1] - 77:21
**noted** [1] - 25:2
**notes** [6] - 46:12, 82:22, 114:2, 117:25, 126:12, 129:3
**nothing** [7] - 47:21, 48:14, 57:7, 60:11, 148:23, 151:19, 156:10
**noticed** [1] - 93:6
**number** [46] - 7:15, 40:11, 40:24, 51:9,

54:15, 54:22, 54:23, 70:14, 70:18, 70:19, 72:11, 72:14, 77:21, 77:23, 77:24, 77:25, 78:2, 79:22, 79:23, 80:1, 80:9, 90:25, 99:25, 100:12, 100:21, 102:14, 102:19, 106:15, 106:18, 106:21, 118:12, 119:8, 119:9, 121:3, 124:24, 126:18, 127:19, 131:5, 131:24, 132:25, 134:9, 142:13, 142:16, 148:8, 151:25, 152:4

**Number** [2] - 126:17, 127:23

**numbers** [10] - 55:4, 57:17, 70:23, 71:1, 90:6, 100:10, 100:13, 100:15, 103:8

# O

**o'clock** [1] - 22:21
**O-l-m-o-s** [1] - 108:22
**oath** [6] - 8:16, 27:10, 49:1, 61:4, 95:15, 108:18
**object** [8] - 13:4, 29:11, 29:12, 32:13, 115:21, 140:13, 146:1, 150:22
**objection** [5] - 92:16, 94:17, 115:8, 153:22, 155:14
**observation** [1] - 31:11
**observe** [3] - 7:17, 83:19, 95:1
**obtain** [8] - 50:14, 52:5, 57:21, 59:2, 59:14, 65:3, 78:17, 148:1
**obtained** [5] - 59:22, 60:13, 80:5, 87:12, 93:12
**obtaining** [2] - 51:8, 60:7
**obvious** [1] - 138:20
**obviously** [1] - 156:11
**occur** [3] - 6:24, 13:21, 90:15
**occurred** [2] - 87:21, 144:18
**OF** [10] - 1:2, 1:5,

1:13, 2:1, 2:11, 3:1, 4:1, 157:1, 157:3, 157:4
**offer** [1] - 6:13
**OFFICE** [2] - 2:4, 2:11
**office** [2] - 50:21, 54:2
**Officer** [53] - 5:24, 6:10, 6:17, 7:17, 9:3, 9:8, 9:16, 9:17, 10:15, 10:24, 11:11, 11:21, 11:24, 12:1, 12:6, 12:10, 12:22, 15:21, 15:24, 16:2, 16:6, 16:9, 16:17, 16:23, 16:25, 17:6, 20:20, 20:23, 21:7, 25:2, 25:3, 29:4, 30:4, 30:9, 31:6, 36:3, 37:22, 38:11, 38:16, 38:22, 41:9, 43:8, 43:10, 44:19, 44:20, 44:24, 46:4, 46:8, 47:3, 47:5, 47:25, 5:25, 6:18, 6:20, 7:4, 17:13, 18:16, 28:4, 29:1, 29:3, 31:6, 37:4, 43:9, 43:10, 48:18, 58:5, 58:6
**officers** [3] - 8:1, 31:3, 31:5
**Official** [1] - 157:6
**OFFICIAL** [2] - 1:23, 157:1
**often** [2] - 112:8, 114:7
**OLIVER** [2] - 2:11, 2:11
**Olmos** [5] - 108:16, 108:22, 109:1, 115:7, 115:12
**omitted** [1] - 125:21
**once** [20] - 19:14, 37:2, 53:23, 59:14, 68:20, 76:19, 81:10, 82:25, 87:17, 100:19, 103:1, 119:17, 119:19, 122:10, 122:25, 123:21, 124:19, 124:23, 146:15, 156:15
**one** [56] - 17:21, 18:21, 19:8, 19:9, 19:18, 23:22, 25:9, 26:21, 45:4, 45:7, 45:10, 47:2, 47:15, 48:6, 51:1, 55:16, 59:11, 61:24, 65:3, 65:24, 67:16, 67:19,

73:10, 73:22, 75:20, 75:21, 76:5, 89:2, 98:6, 105:11, 106:22, 110:19, 112:23, 112:25, 121:13, 123:14, 124:3, 124:6, 124:9, 126:16, 130:10, 135:14, 137:7, 139:25, 143:8, 143:17, 145:2, 147:12, 147:21, 147:23, 148:1, 148:2, 148:14, 154:15
**ones** [2] - 23:3, 41:22
**oOo** [1] - 5:3
**open** [9] - 10:1, 14:19, 38:22, 52:11, 52:13, 65:12, 83:25, 113:15, 141:24
**opened** [8] - 15:3, 36:9, 69:17, 69:24, 84:5, 127:3, 128:8, 128:15
**operable** [3] - 91:3, 91:5, 91:8
**operate** [2] - 58:7, 89:5
**operated** [1] - 138:16
**operating** [2] - 25:14, 25:17
**opinion** [7] - 85:13, 103:16, 104:19, 105:25, 106:14, 135:17, 153:6
**opportunity** [4] - 8:25, 9:5, 15:24, 89:24
**opposed** [5] - 116:19, 123:12, 124:9, 125:15, 134:1
**opposite** [1] - 105:9
**optimal** [2] - 147:13, 149:10
**optimized** [1] - 149:9
**option** [1] - 133:14
**options** [2] - 130:13, 133:7
**oral** [1] - 121:13
**order** [46] - 5:9, 9:8, 16:15, 16:18, 45:5, 57:21, 59:2, 64:17, 65:1, 65:13, 81:23, 102:2, 103:16, 104:19, 112:3, 113:22, 114:21, 114:22, 115:3, 119:24, 121:15, 121:19, 122:1, 122:4, 122:12, 122:19,

122:24, 123:8, 125:4, 125:6, 125:8, 125:10, 125:11, 125:13, 126:12, 128:3, 128:25, 129:4, 129:19, 129:21, 129:25, 130:6, 137:23, 139:17, 140:2, 149:19
**ordinary** [1] - 53:20
**originally** [1] - 107:4
**originated** [3] - 131:14, 131:15, 150:18
**Ortiz** [3] - 9:22, 11:4, 12:10
**otherwise** [1] - 10:3
**output** [1] - 129:22
**outright** [1] - 133:16
**outside** [7] - 24:16, 24:17, 35:22, 50:22, 112:16, 114:7, 146:23
**outward** [1] - 128:12
**overblown** [1] - 149:14
**overruled** [3] - 92:17, 94:18, 146:6
**own** [7] - 58:23, 88:8, 113:14, 125:24, 139:11, 140:2, 140:7

# P

**p.m** [6] - 8:8, 28:20, 85:21, 86:7, 153:15, 156:20
**P.M** [2] - 1:15, 5:2
**package** [15] - 52:6, 52:9, 52:23, 59:9, 59:11, 65:11, 65:12, 69:17, 84:1, 147:21, 147:23, 147:24, 148:2, 148:14
**packaged** [6] - 65:6, 65:7, 67:7, 67:8, 118:10, 118:11
**packages** [2] - 147:18, 147:20
**packaging** [2] - 93:19, 127:17
**packed** [1] - 64:23
**packet** [7] - 55:18, 81:10, 84:20, 126:14, 128:11, 128:16, 147:17
**packing** [1] - 99:18
**PAGE** [2] - 3:2, 4:2
**page** [1] - 157:12
**paper** [3] - 46:5, 47:2, 69:16

**papers** [1] - 154:21
**paperwork** [1] - 22:15
**parked** [3] - 25:24, 32:5, 36:9
**parole** [1] - 28:2
**part** [6] - 57:24, 88:2, 91:18, 98:12, 106:9, 155:4
**participate** [1] - 16:20
**participated** [1] - 11:14
**participation** [1] - 111:10
**particular** [24] - 18:9, 18:24, 21:2, 21:25, 25:2, 26:15, 45:5, 57:25, 60:1, 65:22, 90:7, 111:14, 113:14, 130:11, 137:18, 138:3, 142:17, 144:3, 144:4, 144:15, 144:22, 144:25, 145:19, 146:1
**particularly** [2] - 106:25, 120:10
**partner** [3] - 9:17, 13:22, 143:6
**partners** [1] - 26:21
**parts** [1] - 98:4
**pass** [2] - 112:7, 139:15
**passed** [3] - 12:5, 12:9, 113:1
**passenger** [3] - 10:15, 11:12, 11:21
**past** [1] - 63:6
**patrol** [1] - 28:3
**patrolling** [1] - 9:16
**PCR** [2] - 122:16
**PD** [1] - 66:18
**peace** [1] - 28:4
**peaks** [2] - 124:2, 124:4
**peer** [5] - 135:5, 135:13, 136:1, 136:15, 136:18
**peer-reviewed** [2] - 135:5, 135:13
**pen** [3] - 24:18, 24:19, 24:22
**pens** [1] - 24:21
**people** [17] - 37:8, 41:24, 42:1, 43:14, 43:21, 43:23, 44:15, 93:10, 124:10, 124:17, 131:21, 132:5, 143:6, 143:11, 143:14, 143:22

**people's** [1] - 143:23
**per** [6] - 58:4, 65:23, 90:20, 100:14, 112:21, 142:6
**percent** [5] - 132:12, 132:13, 132:14, 132:15
**percentage** [1] - 144:2
**perfect** [1] - 62:4
**perform** [9] - 53:9, 62:24, 112:4, 121:2, 121:8, 137:4, 137:13, 137:16, 138:3
**performing** [1] - 136:25
**perhaps** [1] - 142:1
**period** [2] - 12:14, 107:7
**permission** [5] - 81:23, 82:3, 82:4, 82:6, 94:3
**person** [20] - 7:9, 7:12, 37:12, 37:13, 51:19, 51:20, 123:14, 123:15, 124:6, 124:9, 124:16, 135:16, 138:8, 140:13, 141:2, 141:7, 142:5, 142:8, 142:9, 144:20
**person's** [2] - 140:21, 148:20
**personal** [1] - 14:25
**personally** [8] - 95:1, 121:11, 121:12, 126:7, 134:18, 137:7, 138:1, 138:23
**personnel** [1] - 67:18
**pertaining** [1] - 51:7
**photo** [2] - 31:23, 31:25
**photograph** [13] - 17:2, 32:4, 34:10, 34:12, 36:5, 41:11, 70:9, 72:21, 74:15, 90:15, 90:22, 91:3
**photographed** [1] - 32:22
**photographer** [2] - 17:4, 20:23
**photographs** [4] - 20:24, 33:25, 62:20, 70:2
**physical** [10] - 47:12, 62:19, 97:10, 100:20, 102:6, 103:1, 104:12, 104:25, 117:14
**physically** [1] - 38:5
**picnic** [1] - 22:14
**picture** [5] - 74:25,

89:24, 90:3, 90:4, 90:6
**piece** [4] - 50:8, 50:16, 58:18, 69:16
**pistol** [3] - 36:14, 36:15, 99:25
**pistols** [1] - 36:16
**place** [15] - 28:14, 39:12, 54:9, 54:12, 54:16, 54:17, 76:14, 79:11, 81:4, 83:18, 85:2, 109:3, 113:12, 113:13, 113:17
**placed** [24] - 11:6, 11:8, 19:17, 19:24, 20:11, 20:12, 20:14, 22:24, 25:12, 34:2, 35:12, 36:1, 36:22, 37:2, 45:17, 54:2, 59:14, 76:21, 77:15, 77:16, 80:12, 80:23, 90:5, 120:17
**placing** [2] - 11:18, 36:24
**PLAINTIFF** [2] - 1:6, 2:3
**plastic** [5] - 24:20, 50:8, 62:6, 91:19, 92:5
**plate** [1] - 137:23
**plates** [1] - 44:14
**play** [4] - 115:23, 115:25, 116:6, 116:8
**players** [1] - 147:8
**pocket** [1] - 34:5
**podium** [6] - 141:14, 141:16, 141:17, 141:20, 141:22, 142:20
**point** [27] - 5:18, 12:4, 13:3, 15:21, 16:12, 16:24, 22:23, 32:19, 59:24, 76:2, 81:8, 81:13, 100:6, 101:25, 103:18, 104:21, 119:19, 121:20, 122:8, 122:11, 123:8, 123:21, 123:25, 124:21, 125:6, 125:10, 133:14
**police** [2] - 10:15, 24:1
**Police** [22] - 20:16, 22:10, 28:1, 28:6, 28:19, 48:12, 49:18, 49:21, 50:22, 51:14, 52:3, 56:24, 57:1, 62:13, 62:25, 63:2, 63:5, 63:7, 66:14,

67:5, 117:3, 127:21
**poor** [1] - 155:3
**popped** [1] - 5:12
**popsicle** [1] - 50:8
**porous** [5] - 41:16, 42:19, 79:3, 88:5, 91:18
**portion** [10] - 28:23, 73:23, 75:2, 75:9, 100:23, 101:8, 102:21, 105:9, 120:17, 127:10
**portions** [1] - 80:24
**position** [4] - 47:6, 62:14, 90:6, 96:10
**positively** [1] - 98:7
**possessed** [3] - 146:2, 151:6, 151:9
**possession** [2] - 87:17, 87:22
**possibility** [5] - 58:20, 145:20, 146:4, 151:3, 151:10
**possible** [24] - 13:3, 58:25, 59:6, 59:7, 69:19, 116:4, 116:12, 116:15, 116:18, 116:23, 124:15, 141:9, 141:12, 141:19, 141:20, 141:23, 141:25, 142:2, 142:24, 143:10, 145:23, 147:4, 147:5, 153:5
**potential** [10] - 50:18, 64:20, 64:21, 64:25, 65:4, 65:17, 66:3, 66:20, 73:2, 120:13
**potentially** [4] - 53:1, 92:7, 125:23, 155:20
**PPE** [1] - 89:2
**practical** [1] - 110:12
**PRCS** [2] - 13:20, 13:22
**pre** [2] - 155:1, 155:5
**pre-admitted** [2] - 155:1, 155:5
**precautions** [1] - 58:24
**preliminary** [1] - 122:16
**prepare** [1] - 62:21
**prepared** [1] - 138:11
**present** [16] - 20:23, 31:3, 60:4, 60:7, 95:1, 120:2, 122:1, 122:3, 122:9, 124:5, 124:10, 135:11, 141:8,

149:15, 151:8
**presented** [2] - 119:6, 120:12
**preserve** [2] - 62:19, 146:18
**preserved** [1] - 93:13
**pretty** [3] - 21:21, 22:18, 67:19
**prevent** [2] - 35:2, 146:10
**previously** [7] - 8:18, 31:18, 99:16, 100:9, 100:24, 104:1, 150:3
**primarily** [2] - 78:14, 102:21
**primary** [1] - 140:19
**print** [2] - 62:24, 156:13
**prints** [2] - 19:13, 23:1
**probabilities** [3] - 130:6, 132:10, 150:11
**probability** [1] - 150:14
**problem** [1] - 7:21
**problems** [1] - 139:8
**procedure** [9] - 18:25, 20:5, 20:9, 21:9, 25:14, 25:17, 42:13, 89:6, 89:9
**procedures** [5] - 14:8, 58:8, 87:10, 88:16, 129:3
**proceed** [4] - 27:19, 49:9, 61:13, 95:24
**PROCEEDINGS** [1] - 1:13
**proceedings** [2] - 156:20, 157:11
**process** [17] - 56:3, 62:23, 66:19, 67:17, 81:25, 82:14, 88:18, 88:21, 113:10, 114:17, 114:22, 115:2, 117:8, 120:18, 121:21, 122:16, 140:9
**produce** [4] - 119:24, 122:13, 124:18, 125:12
**professional** [1] - 111:4
**proficiency** [2] - 112:5, 112:19
**profile** [49] - 94:14, 113:10, 119:24, 119:25, 120:1, 120:2, 122:13, 122:24, 123:10, 123:23, 124:1, 124:2, 124:8, 124:18, 124:19,

124:23, 125:1, 125:6, 125:8, 125:12, 125:22, 126:4, 128:3, 128:18, 129:4, 129:13, 129:16, 129:18, 130:10, 130:14, 131:1, 131:13, 131:18, 131:20, 132:2, 133:12, 133:18, 133:25, 134:4, 134:25, 135:24, 145:3, 148:20, 149:11, 150:4, 150:15, 152:1
**profiles** [9] - 112:14, 112:15, 120:3, 128:22, 129:1, 143:8, 143:25, 150:6, 150:8
**program** [4] - 123:9, 123:22, 124:22, 124:25
**programs** [1] - 138:16
**projectile** [2] - 99:6, 99:9
**proof** [1] - 6:13
**proper** [5] - 58:24, 63:19, 63:20, 87:25
**properly** [5] - 112:17, 114:10, 114:23, 115:4, 131:25
**property** [21] - 14:24, 19:1, 19:5, 19:7, 19:18, 22:18, 22:19, 56:1, 56:6, 56:23, 56:24, 67:4, 67:6, 67:12, 68:6, 69:13, 69:24, 71:9, 79:14, 81:12, 81:14
**proposition** [2] - 131:17, 134:3
**protect** [4] - 15:13, 87:11, 88:20, 89:16
**protecting** [1] - 88:11
**protocol** [2] - 64:13, 89:13
**protocols** [1] - 14:8
**provide** [5] - 38:16, 56:16, 103:3, 103:25, 136:18
**provided** [9] - 29:14, 38:19, 56:23, 103:22, 106:18, 108:2, 117:19, 118:7, 144:13
**provides** [2] - 131:17, 134:2
**psychobiology** [1] - 110:7

**public** [1] - 83:17
**publish** [1] - 100:24
**pull** [3] - 10:2, 52:13, 52:16
**pulled** [1] - 9:22
**pulling** [1] - 9:24
**puncture** [1] - 41:17
**purifies** [1] - 121:18
**purpose** [8] - 7:1, 42:11, 50:12, 51:7, 58:11, 87:1, 100:12, 140:6
**purposes** [5] - 5:20, 46:19, 57:2, 100:2, 147:22
**purse** [1] - 107:13
**pursuant** [1] - 157:9
**pursuing** [1] - 26:1
**put** [27] - 12:22, 13:1, 15:5, 18:17, 18:19, 18:25, 19:12, 20:9, 22:12, 22:16, 23:1, 23:22, 23:25, 24:4, 24:5, 49:11, 54:14, 55:12, 55:13, 69:16, 79:25, 84:19, 100:15, 109:3, 143:19, 153:5
**putting** [2] - 58:23, 69:15

## Q

**qualified** [6] - 113:20, 115:2, 120:24, 135:16, 137:11, 137:16
**qualifies** [1] - 110:5
**Quantico** [1] - 96:22
**quantification** [5] - 119:23, 121:6, 121:24, 121:25, 136:24
**quantitation** [2] - 121:22, 122:10
**quarterly** [1] - 97:5
**questions** [13] - 25:7, 26:23, 41:5, 43:3, 64:10, 85:3, 85:7, 95:5, 105:20, 107:17, 108:8, 136:10, 152:12
**quite** [3] - 13:4, 78:15, 106:7

## R

**radio** [4] - 12:19, 12:22, 13:1, 29:6
**rain** [4] - 132:12, 132:13, 132:14,

132:16
**raise** [6] - 27:9, 48:25, 61:3, 95:14, 108:17, 154:12
**ran** [1] - 30:18
**range** [2] - 133:4, 149:10
**rates** [1] - 143:24
**rather** [1] - 59:2
**ratio** [8] - 130:3, 130:4, 130:5, 130:12, 130:17, 130:19, 130:24, 132:18
**ratios** [1] - 150:11
**reach** [2] - 97:20, 103:2
**reached** [3] - 103:21, 103:22, 105:2
**reaching** [1] - 98:15
**reaction** [1] - 122:17
**read** [2] - 9:8, 77:25, 82:25
**reading** [1] - 9:11
**ready** [1] - 8:11
**real** [1] - 111:13
**really** [2] - 60:3, 146:24
**Realtime** [1] - 157:6
**rear** [3] - 35:2, 102:21, 105:9
**reason** [4] - 25:16, 107:22, 130:7, 139:10
**reasons** [1] - 124:13
**reboot** [1] - 68:19
**rebuttal** [1] - 154:18
**receive** [13] - 28:25, 29:5, 66:19, 66:22, 82:6, 96:21, 97:6, 117:13, 117:24, 119:2, 126:11, 126:21, 127:12
**received** [19] - 29:21, 53:18, 74:12, 96:22, 97:1, 110:8, 110:10, 110:13, 117:24, 118:20, 119:4, 119:5, 119:16, 119:17, 119:19, 126:22, 128:1, 128:8, 138:19
**receives** [1] - 94:8
**receiving** [2] - 30:16, 67:21
**recent** [1] - 112:25
**recess** [4] - 5:23, 85:9, 86:4, 86:5
**recognize** [20] - 7:10, 32:25, 33:8, 33:16, 34:7, 39:1, 39:18, 56:20, 68:9, 70:6, 70:15, 72:9,

72:17, 79:16, 90:1, 99:21, 100:1, 104:7, 104:11, 118:17
**recollection** [11] - 9:9, 20:3, 24:25, 25:21, 44:18, 57:17, 83:3, 126:13, 131:6, 131:10, 155:9
**record** [37] - 22:2, 27:13, 27:20, 32:12, 32:14, 36:8, 36:11, 37:16, 37:18, 38:18, 40:9, 40:22, 49:10, 51:23, 51:25, 55:11, 61:7, 62:2, 62:5, 62:18, 71:18, 73:13, 73:15, 73:21, 73:25, 75:1, 75:11, 75:14, 80:23, 81:1, 95:18, 96:2, 96:4, 108:21, 109:13, 109:15
**records** [1] - 106:17
**recover** [3] - 29:10, 34:24, 77:6
**recovered** [9] - 17:7, 34:1, 36:13, 36:22, 48:3, 68:12, 100:19, 103:17, 104:19
**recovering** [1] - 28:13
**RECROSS** [1] - 151:21
**rectangle** [1] - 75:2
**red** [14] - 32:13, 36:8, 40:10, 40:13, 40:20, 40:21, 40:22, 73:14, 73:22, 75:1, 75:4, 75:12, 80:23
**redirect** [6] - 25:8, 47:22, 60:18, 95:6, 107:18, 148:24
**REDIRECT** [4] - 25:10, 48:1, 107:20, 149:2
**refer** [5] - 51:4, 82:22, 86:15, 126:12, 131:5
**reference** [34] - 82:10, 82:12, 82:15, 83:7, 119:4, 119:5, 121:13, 125:1, 125:6, 125:8, 125:10, 125:15, 125:20, 126:8, 126:11, 126:21, 126:22, 127:6, 127:13, 127:15, 128:3, 128:8, 128:19, 128:21, 129:12, 130:14,

131:1, 133:18, 137:19, 138:4, 138:8, 142:14, 144:7, 150:15
**referenced** [3] - 154:23, 155:8, 155:10
**referring** [1] - 80:19
**reflect** [30] - 27:20, 32:12, 32:14, 36:8, 36:11, 37:16, 37:18, 38:18, 40:9, 40:22, 49:10, 51:23, 51:25, 55:11, 62:5, 71:18, 73:13, 73:15, 73:21, 73:25, 75:1, 75:11, 75:14, 80:23, 81:1, 96:2, 96:4, 109:13, 109:15, 135:23
**reflected** [3] - 75:5, 80:7, 80:9
**refrain** [1] - 28:16
**refresh** [3] - 9:8, 126:13, 131:6
**refreshed** [2] - 83:3, 131:10
**regarding** [5] - 47:7, 56:11, 63:24, 111:14, 138:4
**regards** [2] - 58:16, 101:20
**regions** [1] - 139:17
**regular** [3] - 21:16, 24:18, 41:23
**regulations** [1] - 157:13
**related** [6] - 96:19, 97:3, 110:24, 111:5, 113:4, 116:2
**relating** [1] - 119:2
**relationship** [1] - 101:22
**released** [1] - 60:14
**relevance** [4] - 8:3, 92:16, 94:17, 146:5
**relevant** [2] - 97:19, 98:5
**remember** [2] - 20:4, 47:11
**removal** [1] - 11:15
**remove** [8] - 17:2, 34:25, 35:2, 59:11, 99:17, 104:4, 116:13, 120:7
**removed** [5] - 11:4, 11:12, 18:11, 120:15, 120:17
**removing** [2] - 23:22, 116:4
**rendered** [4] - 34:1, 34:22, 102:7, 106:14
**rendering** [1] - 17:9

**repeat** [5] - 55:2, 107:10, 126:20, 129:2, 153:19
**repeatedly** [1] - 143:15
**repeats** [1] - 123:14
**rephrase** [2] - 71:22, 144:23
**report** [20] - 6:10, 8:25, 9:3, 9:5, 9:8, 9:11, 9:12, 25:1, 51:9, 54:15, 54:22, 54:23, 103:9, 103:11, 104:13, 118:2, 122:8, 131:5, 135:21, 135:23
**reported** [2] - 115:4, 157:11
**Reporter** [1] - 157:7, 157:20
**REPORTER** [2] - 1:23, 157:1
**REPORTER'S** [1] - 1:13
**reports** [4] - 23:14, 103:8, 114:10, 150:2
**representation** [2] - 101:1, 101:4
**request** [21] - 28:25, 29:5, 29:7, 29:9, 29:22, 29:24, 30:16, 66:19, 66:22, 66:23, 67:15, 67:22, 81:20, 81:22, 82:8, 82:21, 83:5, 83:7, 94:3, 94:6, 94:9
**requesting** [1] - 82:4
**requests** [1] - 98:23
**required** [3] - 100:13, 100:15, 102:10
**requires** [1] - 89:6
**research** [4] - 85:17, 106:14, 110:23, 153:10
**researcher** [1] - 110:25
**residential** [3] - 10:6, 39:25, 43:19
**respond** [3] - 7:12, 29:24, 62:17
**responsibilities** [2] - 96:12, 96:13
**responsibility** [3] - 18:14, 18:17, 62:17
**responsible** [1] - 137:5
**rested** [1] - 154:1
**RESTREPO** [2] - 2:6, 156:2
**Restrepo** [2] -

155:25, 156:4
**restricted** [2] -
113:14, 113:18
**rests** [2] - 152:21,
152:22
**result** [2] - 89:17,
148:21
**results** [5] - 112:17,
135:12, 136:4,
138:14, 149:13
**resume** [1] - 8:11
**retrieve** [12] - 39:13,
51:1, 51:3, 67:1, 67:8,
67:10, 67:24, 78:20,
78:21, 84:6, 84:19,
103:25
**retrieved** [27] -
17:13, 21:8, 45:20,
46:6, 46:7, 46:13,
46:23, 66:7, 67:4,
67:6, 67:11, 67:14,
67:15, 68:6, 69:1,
69:5, 69:10, 69:13,
69:24, 70:3, 70:12,
71:9, 71:14, 72:24,
77:18, 78:7
**retrieving** [3] -
35:25, 46:18, 67:22
**reuse** [2] - 41:22,
43:1
**reused** [1] - 42:9
**review** [13] - 9:5,
94:16, 114:3, 115:1,
115:2, 128:25, 129:3,
131:7, 135:15, 136:1,
136:15, 136:18,
138:23
**reviewed** [6] - 25:1,
135:5, 135:8, 135:13,
135:17, 135:19
**revolver** [2] - 36:18,
65:19
**rifle** [2] - 36:14,
65:19
**right-hand** [1] -
100:22
**rise** [7] - 5:8, 8:7,
85:20, 86:6, 86:9,
153:14, 156:18
**Rodriguez** [1] -
154:17
**RODRIGUEZ** [21] -
2:5, 25:9, 25:11, 26:8,
26:9, 26:23, 27:3,
95:12, 95:25, 96:2,
96:5, 98:23, 99:1,
104:3, 105:11,
105:13, 105:20,
107:19, 107:21,
108:7, 108:12

**role** [1] - 55:8
**Rolex** [3] - 107:14,
107:15
**ROOM** [1] - 1:24
**room** [17] - 22:13,
22:14, 22:16, 22:18,
23:11, 56:1, 56:6,
67:12, 68:6, 71:10,
81:14, 93:14, 93:16,
93:18, 113:13, 141:2,
141:7
**roughly** [1] - 38:12
**round** [4] - 17:19,
35:1, 35:4, 102:19
**rounds** [7] - 68:10,
72:20, 72:24, 91:7,
98:20, 98:22, 104:20
**route** [1] - 10:2
**row** [1] - 143:17
**RPR** [1] - 157:20
**rule** [1] - 145:19
**rummaging** [1] -
15:20
**run** [2] - 45:1, 45:4

## S

**safe** [7] - 17:9, 34:1,
34:22, 99:20, 102:7,
113:1
**saliva** [1] - 115:20
**sample** [42] - 53:21,
58:8, 75:19, 83:8,
87:21, 88:9, 89:10,
89:14, 119:4, 119:5,
121:13, 122:1,
124:11, 125:15,
126:8, 126:11,
126:21, 126:25,
127:2, 127:13,
127:16, 128:4, 128:8,
128:19, 128:21,
129:12, 130:14,
131:1, 133:18,
137:19, 137:21,
138:9, 139:11, 144:1,
144:3, 144:7, 146:18,
147:3, 149:16, 150:15
**sample's** [1] - 87:16
**samples** [28] - 49:25,
50:17, 66:7, 76:13,
76:14, 76:19, 80:5,
87:12, 87:25, 88:17,
89:7, 93:12, 93:22,
111:12, 112:13,
112:14, 113:10,
121:4, 124:12,
128:23, 128:24,
129:1, 129:5, 137:22,
138:19, 140:3,

142:19, 145:20
**sanitizing** [1] - 116:3
**satisfy** [1] - 17:24
**saw** [8] - 9:12, 25:19,
32:17, 32:21, 39:8,
45:8, 119:9, 128:11
**scale** [1] - 132:24
**scenario** [1] - 130:9
**scene** [23] - 12:11,
15:22, 15:25, 16:1,
16:6, 16:23, 19:17,
20:16, 20:19, 23:7,
24:7, 31:3, 33:13,
37:7, 38:1, 38:5,
43:11, 44:22, 46:21,
47:7, 47:9, 47:13,
78:14
**scenes** [3] - 62:17,
62:20, 62:21
**Science** [1] - 110:7
**science** [1] - 24:19
**scientific** [2] -
130:18, 142:11
**screen** [7] - 31:20,
32:13, 40:16, 73:7,
73:17, 101:3, 118:15
**screwdriver** [1] -
64:5
**se** [2] - 58:4, 90:20
**seal** [9] - 28:14,
52:19, 54:10, 54:17,
54:18, 76:15, 79:9,
79:11, 81:4
**sealed** [25] - 23:2,
50:24, 52:23, 54:5,
54:6, 54:7, 54:12,
55:16, 55:23, 55:25,
59:8, 59:11, 59:15,
59:17, 65:6, 65:8,
65:10, 67:11, 67:13,
77:16, 117:16, 119:7,
127:1, 128:9, 139:14
**sealing** [1] - 87:10
**search** [14] - 6:21,
7:2, 7:25, 11:24, 12:3,
13:17, 13:19, 13:22,
16:14, 16:17, 16:25,
30:21, 38:3, 62:18
**searched** [5] - 12:1,
13:24, 14:3, 16:11,
16:24
**searching** [3] -
11:22, 14:5, 16:20
**seat** [5] - 11:12, 15:8,
15:15, 35:12, 151:16
**seated** [16] - 8:9,
11:8, 27:12, 37:12,
37:14, 49:3, 51:19,
51:21, 61:6, 85:22,
85:23, 86:8, 86:9,

95:17, 108:20, 153:16
**seats** [1] - 14:17
**second** [5] - 16:14,
40:12, 73:11, 115:2,
135:16
**secondary** [1] -
140:25
**seconds** [3] - 30:12,
53:17, 74:9
**section** [8] - 63:9,
63:10, 66:23, 67:4,
67:6, 79:14, 81:12,
117:9
**Section** [1] - 157:9
**secure** [6] - 17:8,
18:15, 30:10, 43:11,
54:3, 117:12
**secured** [4] - 11:21,
12:10, 17:6, 47:15
**securing** [1] - 17:9
**security** [1] - 139:15
**see** [55] - 6:11, 15:8,
15:10, 17:16, 18:1,
18:20, 25:23, 26:2,
26:10, 31:9, 31:20,
32:2, 32:6, 32:8,
34:14, 35:24, 36:5,
37:10, 38:9, 45:23,
50:15, 53:1, 56:14,
68:21, 69:25, 70:1,
70:23, 71:20, 71:23,
73:5, 74:15, 74:16,
74:22, 74:24, 77:21,
79:22, 80:15, 84:8,
84:12, 85:19, 86:3,
89:24, 91:2, 91:4,
91:8, 93:7, 94:19,
96:3, 101:3, 118:15,
124:2, 124:4, 125:20,
126:16, 153:12
**see-through** [1] -
96:3
**seeing** [3] - 8:3,
25:21, 44:1
**seem** [2] - 92:14,
92:21
**seize** [1] - 96:15
**seized** [2] - 22:2,
60:8
**self** [1] - 99:25
**self-loading** [1] -
99:25
**semen** [1] - 115:20
**semi** [2] - 65:21, 75:4
**semi-automatic** [1] -
65:21
**semi-circle** [1] - 75:4
**semiautomatic** [2] -
36:18, 36:21, 65:18
**send** [6] - 81:23,

82:1, 82:2, 82:4, 94:3,
106:22
**sends** [1] - 81:17
**senior** [7] - 62:15,
62:16, 66:15, 86:19,
109:21, 109:24,
109:25
**sent** [5] - 82:8,
93:25, 106:21, 118:3,
138:5
**separate** [4] - 75:19,
76:15, 77:18, 123:8
**separated** [2] -
76:18, 76:20
**sequence** [1] -
123:17
**sergeant** [1] - 22:18
**serial** [18] - 70:18,
70:19, 72:11, 72:13,
79:22, 79:23, 90:25,
99:25, 100:9, 100:12,
100:13, 100:15,
100:21, 102:14,
102:19, 106:15,
106:18, 106:21
**SESSION** [1] - 1:14
**set** [1] - 120:1
**sets** [4] - 24:9, 24:11,
110:12, 112:5
**seven** [2] - 28:8, 63:4
**several** [2] - 13:9,
134:14
**shake** [1] - 88:17
**share** [1] - 143:6
**shed** [3] - 142:15,
143:12, 143:24
**shedding** [4] - 142:7,
145:24, 150:21,
150:24
**sheds** [1] - 142:5
**shell** [3] - 92:14,
92:21, 93:1
**Sheriff's** [20] - 56:7,
63:18, 63:22, 81:15,
82:9, 94:1, 94:8,
109:20, 110:3,
110:17, 110:23,
113:12, 113:18,
113:25, 114:18,
117:6, 118:4, 120:22,
121:10
**shield** [1] - 21:25
**shiny** [2] - 91:13,
92:13
**shipped** [1] - 107:3
**shirt** [6] - 14:25,
37:15, 51:22, 143:1,
143:7, 143:8
**shirts** [1] - 64:5
**shoe** [1] - 140:23

**shoes** [1] - 64:5
**shoot** [1] - 99:9
**shooting** [1] - 96:23
**short** [4] - 12:13, 12:14, 123:13, 154:16
**shotgun** [1] - 65:20
**show** [30] - 7:8, 26:5, 31:18, 32:1, 32:23, 33:7, 33:15, 34:6, 36:4, 38:25, 39:16, 40:20, 46:4, 58:7, 68:3, 68:8, 68:14, 69:4, 69:8, 70:5, 72:8, 72:16, 79:15, 92:14, 99:15, 99:19, 100:20, 104:6, 105:8, 118:13
**shower** [1] - 143:19
**showering** [1] - 143:15
**showing** [3] - 7:25, 34:10, 58:16
**shown** [2] - 118:22, 155:10
**shows** [2] - 90:22, 101:21
**side** [11] - 10:14, 10:16, 26:10, 36:9, 44:25, 74:22, 75:10, 98:4, 100:22, 101:7, 153:22
**sides** [1] - 75:10
**sidewalk** [7] - 31:1, 31:17, 32:5, 33:23, 35:14, 35:19, 39:8
**sign** [1] - 59:18
**significant** [1] - 149:14
**signs** [5] - 10:10, 10:11, 69:25, 70:1, 138:20
**similar** [4] - 46:24, 47:2, 77:9, 84:25
**simple** [1] - 140:15
**single** [9] - 118:3, 124:1, 124:3, 124:20, 125:16, 126:4, 137:7, 150:3, 150:6
**sirens** [2] - 9:22, 26:4
**sister** [1] - 105:4
**sit** [2] - 22:14, 23:13
**sitting** [1] - 23:17
**situation** [4] - 21:20, 90:12, 91:14, 111:9
**situations** [3] - 21:18, 57:25, 89:3
**six** [8] - 51:5, 67:21, 72:20, 72:24, 104:10, 104:20, 112:9, 113:9
**six-day** [1] - 67:21

**size** [1] - 147:20
**skin** [20] - 66:6, 89:11, 141:13, 142:6, 143:18, 143:23, 143:24, 144:21, 144:24, 145:3, 145:7, 145:24, 150:21, 150:25, 151:8, 151:23, 151:25, 152:3, 152:4, 152:7
**sleeved** [1] - 51:22
**slide** [16] - 35:2, 65:25, 73:11, 73:20, 73:23, 75:17, 76:3, 76:10, 79:9, 84:17, 91:22, 91:25, 118:24, 133:19, 135:1
**small** [8] - 120:17, 147:20, 148:2, 148:4, 148:5, 148:6, 148:11, 148:13
**smaller** [3] - 17:20, 52:13, 52:15
**Smith** [8] - 35:16, 48:3, 72:2, 99:24, 103:22, 106:5, 106:8, 106:11
**smooth** [5] - 79:3, 91:13, 92:21, 92:23, 116:15
**sneezed** [1] - 24:23
**software** [4] - 123:9, 123:22, 124:22, 124:25
**solo** [1] - 156:8
**someone** [14] - 7:19, 51:2, 57:21, 58:7, 90:5, 90:17, 93:20, 115:21, 115:24, 140:21, 143:18, 146:21, 151:5, 151:11
**sometime** [1] - 90:7
**sometimes** [2] - 57:19, 67:18
**somewhere** [3] - 21:2, 50:19, 107:5
**soon** [2] - 21:3, 153:5
**sorry** [11] - 30:20, 40:6, 40:8, 54:25, 68:15, 82:18, 88:19, 107:10, 121:5, 129:2, 155:3
**sort** [47] - 28:9, 28:12, 29:12, 29:14, 34:20, 49:24, 50:5, 54:4, 57:23, 63:1, 63:15, 63:24, 64:17, 66:4, 66:24, 67:7, 68:1, 71:4, 71:10,

71:11, 74:15, 74:18, 75:3, 76:22, 77:9, 78:7, 78:10, 78:12, 78:17, 80:15, 80:17, 98:13, 99:9, 102:2, 110:10, 113:6, 113:17, 113:24, 114:25, 115:23, 121:15, 122:14, 126:25, 127:15, 129:22, 130:2
**sounds** [1] - 59:6
**source** [11] - 124:3, 124:20, 125:16, 125:18, 126:3, 126:4, 126:5, 130:11, 150:3, 150:6
**sources** [3] - 96:15, 125:15, 141:10
**south** [1] - 40:6
**southern** [1] - 28:23
**space** [1] - 10:2
**spaces** [1] - 113:15
**speaking** [1] - 90:13
**special** [6] - 24:19, 96:11, 96:12, 96:18, 96:21, 98:24
**Special** [8] - 38:15, 39:12, 46:2, 46:4, 56:16, 95:12, 99:15, 105:24
**specialist** [15] - 58:6, 62:15, 62:16, 66:15, 86:20, 88:1, 97:7, 97:8, 97:9, 97:14, 97:16, 97:22, 97:24, 98:12, 98:15
**specific** [7] - 24:22, 25:21, 29:7, 63:24, 66:1, 81:20, 142:13
**specifically** [5] - 42:10, 71:23, 75:3, 110:1, 118:23
**spectrum** [2] - 133:15, 148:12
**speculation** [1] - 146:5
**Speer** [1] - 105:4
**spell** [5] - 27:13, 49:4, 61:7, 95:18, 108:21
**spend** [1] - 102:1
**Splenda** [3] - 147:18, 147:23, 147:24
**spot** [1] - 149:11
**spotlights** [2] - 9:21, 26:4
**spouse** [2] - 124:14, 143:6
**SPRING** [1] - 2:7

**spring** [1] - 6:6
**Springfield** [5] - 72:4, 101:15, 106:5, 106:8, 106:12
**staff** [3] - 64:7, 64:9, 114:8
**stamp** [5] - 102:21, 105:7, 105:8, 106:5, 106:6
**stamps** [1] - 98:6
**stand** [1] - 48:7
**standard** [15] - 14:13, 20:5, 20:9, 21:9, 25:13, 25:17, 41:17, 42:13, 46:11, 48:8, 56:4, 64:13, 74:10, 114:9, 127:12
**standards** [1] - 114:11
**standing** [4] - 31:8, 65:5, 67:7, 118:10
**start** [4] - 68:22, 74:2, 124:5, 153:2
**started** [2] - 63:2, 153:4
**state** [8] - 27:13, 49:4, 61:7, 72:3, 95:18, 102:1, 102:3, 108:21
**STATE** [1] - 157:4
**STATES** [6] - 1:1, 1:5, 2:4, 2:4, 2:6, 2:7
**States** [4] - 48:24, 157:7, 157:9, 157:14
**station** [7] - 19:12, 23:9, 24:1, 24:6, 64:2, 64:6, 64:8
**stationed** [1] - 66:10
**stations** [2] - 64:2, 64:6
**statistic** [4] - 129:25, 130:2, 133:4, 133:24
**statistics** [1] - 130:18
**status** [2] - 5:14, 13:25
**stay** [1] - 66:4
**steering** [2] - 124:16, 124:18
**stenographically** [1] - 157:11
**step** [14] - 27:5, 48:22, 60:24, 95:10, 119:17, 121:20, 122:5, 122:10, 122:25, 124:20, 124:21, 133:9, 141:3, 152:18
**steps** [19] - 117:20, 119:21, 119:22,

120:4, 120:25, 121:1, 121:2, 121:5, 121:9, 122:2, 125:11, 126:8, 127:25, 128:25, 135:9, 137:16, 137:20, 138:4, 140:21
**sterile** [8] - 64:18, 64:19, 64:22, 64:23, 69:16, 69:22, 74:3, 89:2
**Steven** [23] - 54:21, 80:4, 82:15, 82:17, 82:19, 99:11, 119:4, 119:15, 127:18, 128:6, 128:19, 129:13, 130:14, 130:25, 131:14, 131:18, 133:17, 133:25, 134:3, 134:8, 144:8, 150:18
**STEVEN** [1] - 1:8
**stick** [2] - 50:8, 120:15
**sticky** [1] - 77:21
**still** [5] - 8:16, 13:3, 37:6, 60:16, 114:15
**stop** [12] - 9:20, 10:14, 26:3, 29:10, 30:5, 30:7, 37:6, 37:20, 39:21, 43:11, 44:19, 46:20
**stopped** [1] - 13:14
**stopping** [1] - 10:3
**store** [2] - 81:12, 93:22
**storing** [1] - 93:10
**straightforward** [1] - 152:11
**straw** [1] - 154:16
**Street** [3] - 40:11, 40:13, 40:23
**STREET** [2] - 1:24, 2:7
**street** [10] - 10:4, 10:11, 25:3, 25:20, 25:22, 25:23, 29:18, 31:8, 45:1, 45:15
**STRmix** [15] - 124:23, 125:2, 125:12, 125:14, 125:25, 126:1, 126:2, 129:19, 129:21, 130:18, 130:21, 130:23, 130:24, 138:17
**STRMIX** [1] - 125:2
**strong** [8] - 131:17, 132:20, 132:23, 133:5, 133:8, 133:9, 133:10, 134:2

**UNITED STATES DISTRICT COURT**

**stuff** [1] - 24:24
**stuffed** [1] - 151:16
**style** [2] - 39:6, 42:24
**subject** [5] - 37:14, 56:13, 85:18, 114:3, 153:10
**subject's** [3] - 59:2, 119:12, 119:14
**submit** [1] - 137:22
**submitted** [14] - 81:14, 85:14, 94:2, 94:3, 116:25, 117:5, 117:21, 119:20, 120:22, 121:2, 121:9, 138:6, 138:8, 153:7
**submitting** [3] - 118:12, 119:8, 119:9
**substantially** [2] - 100:4, 104:14
**substantiated** [1] - 115:5
**substitutes** [1] - 149:4
**successfully** [1] - 128:18
**sugar** [2] - 147:20, 149:4
**suggest** [3] - 7:1, 90:16, 90:17
**SUITE** [1] - 2:12
**supervisor** [2] - 81:23, 82:1
**supplies** [1] - 65:2
**support** [12] - 131:17, 132:21, 132:23, 133:6, 133:8, 133:9, 133:10, 133:11, 133:15, 134:2, 134:8, 134:13
**supposed** [3] - 41:16, 55:14, 139:12
**surface** [10] - 79:2, 79:3, 92:7, 92:21, 92:23, 92:24, 92:25, 116:14, 116:15
**surfaces** [1] - 91:14
**susceptible** [1] - 42:16
**suspect** [2] - 51:8, 79:25
**suspect's** [2] - 51:11, 54:19
**suspects** [3] - 49:25, 50:4, 50:18
**swab** [76] - 50:4, 50:5, 50:6, 50:7, 50:13, 50:17, 50:20, 51:2, 52:7, 52:17, 53:9, 53:16, 53:21, 54:1, 54:3, 54:8,

54:15, 55:18, 55:23, 56:11, 57:21, 58:21, 58:24, 59:1, 59:4, 59:8, 59:14, 59:21, 60:13, 63:20, 64:9, 64:11, 64:12, 64:17, 64:18, 64:19, 64:22, 64:23, 65:12, 65:24, 73:1, 73:9, 73:10, 73:11, 74:2, 74:3, 74:4, 74:5, 74:8, 75:16, 75:24, 76:3, 76:8, 76:10, 77:1, 77:3, 77:10, 77:14, 77:15, 82:11, 82:12, 82:13, 82:15, 118:24, 120:12, 120:14, 120:15, 120:16, 121:15, 127:6, 128:1, 133:19, 134:5
**swabbed** [6] - 73:19, 74:9, 75:7, 77:12, 84:22, 84:25
**swabbing** [5] - 53:23, 55:17, 65:22, 66:8, 77:14
**swabs** [39] - 59:12, 63:17, 64:24, 65:1, 65:3, 65:4, 65:7, 65:13, 65:16, 65:23, 66:1, 73:10, 75:19, 76:2, 76:12, 76:14, 77:16, 77:18, 79:8, 79:10, 79:20, 80:12, 81:24, 82:10, 84:10, 93:18, 94:3, 117:16, 118:8, 118:23, 119:2, 120:21, 121:2, 121:9, 134:22, 138:4, 138:6, 138:23, 139:1
**sweat** [3] - 58:21, 66:6, 88:8
**sweater** [1] - 14:25
**sweats** [1] - 139:24
**sweet** [1] - 149:10
**switch** [1] - 146:13
**sworn** [5] - 8:18, 27:17, 49:7, 61:11, 95:22
**synopsis** [3] - 82:2, 94:5, 94:19

---

## T

**T-shirts** [1] - 64:5
**T2760** [2] - 70:20, 99:25
**Tab** [1] - 126:17
**table** [5] - 19:3, 22:14, 23:13, 45:23,

56:14
**tactical** [1] - 96:24
**tactics** [1] - 96:24
**tags** [1] - 24:19
**tampered** [1] - 87:14
**tampering** [7] - 69:25, 87:21, 90:14, 90:17, 90:20, 128:12, 138:21
**tandem** [1] - 12:15
**tape** [8] - 52:18, 76:15, 79:12, 80:19, 81:4, 81:5, 87:11
**targeted** [1] - 122:12
**task** [1] - 137:14
**tasks** [1] - 137:6
**taught** [1] - 28:13
**team** [2] - 12:17, 26:21
**tear** [2] - 7:11, 65:11
**tearing** [1] - 42:17
**tears** [1] - 53:4
**technical** [3] - 115:1, 119:23, 135:10
**technically** [1] - 135:8
**techniques** [1] - 63:20
**technologies** [1] - 110:14
**temperature** [5] - 93:14, 93:16, 93:17, 93:18
**ten** [1] - 152:23
**tend** [1] - 91:13
**term** [3] - 101:19, 138:10, 139:6
**terms** [4] - 99:7, 120:20, 121:1, 130:12, 132:7, 132:8, 135:21, 155:9
**TERRI** [4] - 1:23, 157:6, 157:19, 157:20
**tertiary** [1] - 141:6
**test** [7] - 89:17, 91:4, 91:7, 112:17, 147:12, 147:14, 148:21
**tested** [8] - 112:3, 112:10, 112:14, 121:13, 138:7, 138:9, 138:10, 142:18
**testified** [11] - 5:25, 8:19, 9:6, 25:13, 25:19, 27:18, 34:18, 49:8, 61:12, 95:23, 111:23
**testify** [1] - 131:8
**testifying** [1] - 6:10
**testimony** [8] - 8:4, 8:11, 9:15, 20:1, 20:6,

22:9, 44:17, 45:17
**testing** [8] - 87:2, 94:2, 100:7, 112:12, 112:16, 139:11, 147:12, 149:4
**tests** [4] - 112:5, 112:8, 112:19, 112:22
**texture** [9] - 41:16, 74:15, 77:5, 78:25, 79:1, 79:2, 84:15, 116:7, 116:21
**textured** [13] - 66:2, 66:4, 74:14, 74:17, 74:18, 74:19, 74:22, 74:25, 75:8, 77:7, 77:9, 116:11, 116:12
**THE** [155] - 2:3, 2:10, 5:6, 5:8, 5:10, 5:14, 5:21, 6:1, 6:5, 6:12, 6:19, 6:22, 6:24, 7:1, 7:6, 7:15, 8:3, 8:7, 8:10, 8:20, 25:8, 26:7, 26:24, 27:2, 27:5, 27:9, 27:11, 27:12, 27:14, 27:19, 27:22, 32:14, 36:11, 37:18, 38:14, 38:17, 38:20, 39:14, 40:15, 41:6, 47:22, 47:25, 48:15, 48:18, 48:21, 48:25, 49:2, 49:3, 49:5, 49:9, 49:12, 51:25, 55:10, 55:13, 56:18, 57:8, 60:18, 60:20, 60:22, 60:24, 61:3, 61:5, 61:6, 61:8, 61:13, 61:18, 61:20, 61:21, 61:24, 62:1, 62:4, 62:7, 68:15, 68:20, 68:24, 73:15, 73:25, 75:5, 75:14, 81:1, 83:14, 83:16, 83:20, 83:23, 85:5, 85:8, 85:20, 85:22, 85:23, 85:24, 86:3, 86:4, 86:6, 86:8, 86:10, 92:17, 92:19, 94:18, 94:19, 95:6, 95:8, 95:10, 95:14, 95:16, 95:17, 95:19, 95:24, 96:4, 98:25, 104:2, 105:12, 105:21, 107:18, 108:8, 108:10, 108:13, 108:17, 108:19, 108:20, 108:22, 108:23, 109:8, 109:9, 109:10, 109:11, 109:12, 109:15, 115:8, 115:10, 136:9,

136:11, 146:6, 148:24, 149:1, 151:20, 152:13, 152:16, 152:18, 152:22, 153:14, 153:16, 153:17, 153:21, 153:25, 154:14, 154:19, 155:3, 155:12, 155:15, 155:22, 155:25, 156:3, 156:6, 156:11, 156:18
**theirs** [1] - 105:4
**themselves** [3] - 91:7, 92:13, 93:1
**theory** [1] - 94:15
**therefore** [1] - 98:8
**thermo** [1] - 122:15
**thoroughly** [1] - 135:9
**thousand** [1] - 148:15
**three** [18] - 52:14, 67:16, 67:19, 79:8, 79:10, 79:20, 82:10, 112:11, 112:25, 121:4, 129:5, 130:22, 131:15, 133:23, 135:16, 135:20, 150:18, 152:6
**three-person** [1] - 135:16
**throughout** [1] - 114:12
**throw** [1] - 146:15
**thrown** [2] - 12:23, 16:4
**tie** [2] - 37:15, 51:22
**tint** [1] - 26:17
**tinting** [1] - 26:19
**tip** [1] - 74:3
**tissues** [1] - 115:19
**title** [1] - 49:19
**Title** [1] - 157:9
**today** [5] - 9:6, 18:20, 37:10, 45:25, 139:8
**together** [1] - 12:17
**tomorrow** [9] - 132:12, 132:13, 132:17, 153:1, 153:12, 153:18, 153:23, 154:2, 154:6
**tongue** [1] - 127:9
**tonight** [1] - 156:15
**took** [17] - 15:19, 31:23, 47:1, 47:6, 54:2, 56:11, 70:9, 73:10, 75:16, 79:8, 83:7, 84:9, 90:4, 90:6,

103:21, 112:25,
143:19
**tool** [3] - 121:15,
122:14, 122:15
**tools** [1] - 114:17
**top** [7] - 70:21,
73:23, 80:15, 80:17,
80:24
**tossed** [5] - 13:6,
13:12, 26:2, 29:11,
151:12
**touch** [5] - 76:2,
116:6, 141:16,
146:22, 152:5
**touched** [6] - 58:21,
92:15, 141:20,
141:21, 144:15, 146:2
**touches** [1] - 115:21
**touching** [3] -
141:14, 142:3, 147:3
**tow** [5] - 6:21, 6:22,
6:23, 7:3, 8:1
**towards** [3] - 44:24,
71:17, 80:20
**track** [3] - 78:5,
100:15, 100:18
**trade** [1] - 102:2
**traffic** [7] - 29:10,
30:5, 37:6, 37:20,
39:21, 43:11, 44:19
**trained** [6] - 42:15,
67:23, 113:5, 113:9,
137:3, 139:7
**training** [38] - 28:9,
28:12, 35:22, 49:24,
50:2, 50:3, 53:18,
57:20, 57:24, 58:4,
58:11, 63:15, 63:19,
63:24, 66:5, 74:12,
78:10, 78:12, 78:13,
78:15, 86:20, 86:24,
87:1, 87:25, 88:2,
96:21, 96:24, 96:25,
97:1, 97:4, 97:5,
97:24, 98:12, 110:8,
110:10, 110:13, 113:4
**trainings** [1] - 87:8
**TRANSCRIPT** [1] -
1:13
**transcript** [2] -
157:10, 157:12
**transfer** [20] - 57:4,
116:19, 140:9,
140:16, 140:19,
140:23, 140:25,
141:6, 141:13,
141:21, 142:21,
145:17, 145:21,
146:10, 146:12,
147:4, 147:6, 151:13,

151:17
**transferred** [6] -
81:14, 140:12,
140:22, 141:3,
144:17, 150:21
**transferring** [1] -
141:16
**translate** [1] - 133:5
**transportation** [1] -
56:25
**transported** [1] -
47:10
**travel** [3] - 20:20,
101:24, 102:3
**traveled** [4] - 102:25,
103:18, 104:21,
106:25
**traveling** [1] - 101:22
**trial** [3] - 6:6, 57:2,
155:6
**TRIAL** [2] - 1:13,
1:14
**tried** [1] - 91:10
**trigger** [13] - 65:24,
73:11, 73:19, 73:22,
75:17, 76:3, 76:10,
79:9, 84:17, 118:24,
133:19, 135:1, 151:24
**triggered** [1] - 13:11
**trillion** [3] - 148:7,
148:8, 148:11
**trouble** [1] - 8:3
**TROY** [1] - 8:17
**truck** [6] - 6:21, 6:22,
6:23, 7:3, 8:1, 32:5
**true** [5] - 92:22,
141:10, 142:21,
147:12, 157:10
**trunk** [9] - 18:19,
19:24, 20:10, 20:11,
20:13, 20:14, 25:13,
36:3, 93:23
**try** [5] - 6:12, 58:18,
78:17, 139:10, 145:2
**trying** [2] - 26:3, 40:5
**tube** [1] - 120:17
**turn** [6] - 18:15, 21:3,
69:12, 126:17, 131:7,
145:2
**turning** [2] - 68:18,
103:15
**twins** [2] - 115:16,
123:18
**two** [21] - 20:18,
22:25, 65:23, 66:9,
73:10, 73:21, 75:19,
77:16, 97:23, 112:5,
112:11, 112:21,
112:25, 124:2, 124:3,
130:5, 132:9, 134:1,

143:6, 143:7
**type** [20] - 20:11,
35:14, 36:13, 36:20,
50:9, 65:16, 65:20,
71:22, 87:5, 87:20,
88:11, 89:22, 103:11,
107:13, 129:16,
140:4, 146:25, 147:7,
147:9
**typed** [1] - 138:16
**types** [5] - 36:16,
65:18, 110:14, 120:1,
132:10
**typical** [1] - 117:17
**typically** [5] - 66:2,
67:16, 91:22, 117:7,
117:9
**typing** [7] - 119:24,
121:8, 123:3, 123:4,
123:6, 123:7, 136:24

# U

**U.S** [1] - 1:3
**UCLA** [2] - 110:7,
110:25
**ultimate** [1] - 89:16
**ultimately** [4] -
112:15, 119:20,
120:23, 125:1
**unaware** [1] - 47:10
**uncomfortable** [2] -
57:13, 57:14
**under** [6] - 8:16,
14:17, 15:8, 64:9,
101:17, 140:23
**undercover** [2] -
44:4, 44:6
**undergo** [1] - 57:20
**undergoing** [1] -
58:11
**underneath** [1] -
72:3
**underwent** [1] -
86:20
**UNIDENTIFIED** [2] -
83:18, 83:22
**uniform** [1] - 21:12
**unique** [5] - 17:21,
55:4, 78:2, 100:16,
115:15
**unit** [2] - 29:8, 63:7
**UNITED** [6] - 1:1,
1:5, 2:4, 2:4, 2:6, 2:7
**United** [4] - 48:24,
157:7, 157:9, 157:14
**universal** [1] - 18:3
**unknown** [4] -
112:13, 131:15,
131:16, 134:1, 134:2,

137:21, 150:18,
150:19
**unless** [1] - 153:2
**unmarked** [3] - 44:6,
44:7, 44:13
**unseal** [1] - 81:8
**unusual** [5] - 35:20,
76:5, 76:7, 77:12,
78:22
**up** [32] - 5:12, 6:6,
7:11, 9:24, 23:5,
28:13, 47:2, 55:13,
55:16, 58:16, 58:23,
68:16, 68:17, 79:9,
83:12, 83:25, 84:8,
84:22, 88:23, 89:11,
98:5, 106:15, 113:15,
129:11, 133:3,
141:19, 142:1,
143:19, 145:7,
145:20, 147:17, 156:1
**upside** [4] - 40:5,
40:18, 109:8, 109:9
**US** [1] - 99:11
**USA** [4] - 72:4,
106:5, 106:9, 106:12
**useful** [1] - 125:11
**uses** [1] - 121:18
**utilize** [4] - 137:5,
137:13, 137:17, 155:6

# V

**value** [1] - 113:16
**variability** [1] -
123:16
**variables** [1] -
115:25
**variation** [1] - 142:8
**variety** [4] - 64:2,
64:5, 115:19, 124:13
**various** [3] - 63:11,
120:18, 146:22
**varying** [2] - 103:8,
137:9
**Vega** [3] - 43:8,
43:10, 46:8
**Vega's** [3] - 36:3,
45:18, 45:20
**vehicle** [57] - 7:8,
9:22, 10:13, 10:21,
11:4, 11:15, 11:22,
11:24, 12:1, 12:3,
12:24, 13:7, 13:8,
13:13, 13:14, 13:17,
13:19, 13:24, 14:3,
14:5, 14:6, 16:11,
16:14, 16:17, 16:21,
17:3, 18:19, 21:3,
26:2, 26:10, 26:11,

26:13, 26:15, 26:16,
26:17, 26:18, 26:19,
26:20, 26:22, 29:11,
30:7, 30:9, 31:8, 36:3,
36:5, 42:10, 44:4,
44:13, 44:21, 45:18,
45:21, 46:8, 46:23,
124:14, 124:15, 143:6
**verbal** [1] - 132:24
**verify** [2] - 112:15,
126:12
**versus** [4] - 42:1,
48:11, 130:11, 130:15
**vessel** [1] - 59:15
**via** [2] - 29:6, 155:8
**victim** [1] - 51:8
**video** [12] - 5:12,
6:15, 6:17, 6:18, 6:20,
7:5, 7:8, 7:17, 7:22,
7:25, 68:15
**videotape** [1] - 62:21
**Villicana** [16] - 9:3,
9:17, 10:15, 10:24,
11:11, 11:21, 11:24,
12:22, 25:2, 29:4,
30:4, 30:9, 31:6,
38:11, 44:19, 44:24
**Villicana's** [1] - 9:8
**violations** [1] - 96:13
**Virginia** [1] - 96:23
**visible** [3] - 90:23,
138:20, 148:18
**visibly** [1] - 53:1
**VOICE** [2] - 83:18,
83:22
**VS** [1] - 1:7

# W

**wait** [9] - 7:6, 13:21,
14:2, 68:18, 82:3,
154:4, 156:13
**waited** [1] - 17:2
**waiver** [1] - 13:16
**walked** [3] - 37:4,
141:2, 143:19
**WALKER** [1] - 2:5
**wash** [1] - 143:14
**washing** [1] - 116:3,
152:9
**watch** [2] - 7:16,
107:14
**water** [1] - 74:4
**ways** [1] - 133:3
**weapon** [19] - 10:25,
16:8, 17:6, 17:7, 17:8,
17:9, 17:17, 17:20,
17:21, 17:25, 90:5,
90:18, 91:11, 91:14,
99:5, 99:8, 105:25,

19

106:1, 106:4
**weapons** [1] - 10:20
**wear** [23] - 14:13,
15:13, 21:21, 28:15,
53:12, 53:14, 57:15,
58:17, 88:2, 88:5,
88:11, 88:14, 89:21,
139:19, 139:22,
139:24, 139:25,
140:4, 143:7, 146:8,
146:13, 146:21
**wearer** [1] - 143:3
**wearing** [25] - 14:11,
21:8, 21:10, 21:25,
22:8, 24:6, 27:21,
34:1, 34:16, 37:13,
51:20, 51:21, 57:15,
62:6, 88:15, 96:3,
105:15, 105:18,
109:14, 140:1,
142:22, 143:16,
146:21, 146:23, 147:1
**WEDNESDAY** [2] -
1:14, 5:1
**week** [2] - 66:10,
81:18
**weekly** [1] - 81:17
**weeks** [2] - 67:16,
67:19
**weighs** [1] - 147:21
**weight** [2] - 130:1,
133:3
**Wesson** [8] - 35:16,
48:3, 72:2, 99:24,
103:22, 106:5, 106:8,
106:11
**WEST** [1] - 1:24
**wet** [1] - 74:3
**wheel** [2] - 124:16,
124:18
**white** [6] - 52:13,
54:5, 54:9, 54:12,
54:16, 54:17
**whole** [2] - 54:5,
59:24
**wide** [1] - 64:5
**window** [1] - 151:12
**wipe** [1] - 89:9
**wish** [2] - 9:12, 154:3
**wishes** [1] - 154:12
**WITNESS** [19] - 3:2,
27:11, 27:14, 27:22,
49:2, 49:5, 55:10,
61:5, 61:8, 61:20,
61:24, 68:24, 94:19,
95:16, 95:19, 108:19,
108:22, 109:9, 109:11
**witness** [39] - 5:23,
5:24, 8:13, 27:2, 27:6,
27:20, 32:12, 36:8,

37:16, 38:18, 40:9,
40:22, 48:7, 48:23,
49:10, 51:23, 55:11,
60:20, 60:22, 60:25,
61:22, 62:5, 73:13,
73:21, 75:1, 75:4,
75:11, 80:23, 95:8,
95:11, 96:3, 108:10,
108:15, 109:13,
111:23, 146:5,
152:16, 152:20,
155:18
**witnesses** [4] -
153:18, 153:23,
154:3, 155:8
**WITNESSES** [1] - 3:1
**woke** [1] - 143:18
**wonderful** [2] -
153:13, 156:17
**word** [3] - 41:13,
93:7, 149:24
**words** [1] - 17:21
**wore** [1] - 143:9
**workers** [2] - 22:18,
113:10
**workload** [1] - 67:18
**works** [2] - 118:4,
151:5
**worn** [1] - 61:24
**worry** [1] - 5:22
**wrapped** [2] - 24:20,
59:12
**write** [10] - 6:10,
8:25, 22:5, 23:14,
51:10, 54:14, 54:19,
54:22, 56:10, 93:19
**writing** [3] - 23:14,
53:6, 90:16
**written** [3] - 23:2,
94:15, 105:7
**wrote** [5] - 9:3, 90:6,
93:9, 93:11, 104:12
**Wunderlich** [11] -
6:17, 7:17, 7:20, 8:16,
8:23, 9:16, 37:22,
38:11, 44:20, 47:3,
47:5
**WUNDERLICH** [1] -
8:17
**Wunderlich's** [1] -
30:4

## Y

**year** [5] - 6:25, 21:20,
55:1, 112:21, 114:12
**years** [15] - 28:8,
49:23, 63:4, 63:6,
66:11, 66:12, 66:13,
97:23, 107:5, 110:4,

110:21, 111:19,
113:9, 130:22, 149:22
**yellow** [4] - 19:2,
19:13, 23:1, 147:18
**yourself** [4] - 15:13,
16:21, 82:25, 113:5
**YouTube** [2] - 5:12,
5:17

## Z

**zoom** [6] - 26:18,
32:4, 70:14, 70:21,
71:17, 101:7
**zoomed** [3] - 32:6,
70:24, 71:18
**zoomed-in** [2] - 32:6,
70:24

**UNITED STATES DISTRICT COURT**