1     UNITED STATES DISTRICT COURT

2   CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3   HONORABLE ANDRÉ BIROTTE JR., U.S. DISTRICT JUDGE

4

5 UNITED STATES OF AMERICA,   )
               )
6       PLAINTIFF,   )
               )
7     vs.      ) No. CR 20-0387-AB
               )
8 STEVEN DUARTE,      )
               )
9      DEFENDANT.   )
 _____)

10

11

12

13    REPORTER'S TRANSCRIPT OF PROCEEDINGS

14   DAY 2 OF JURY TRIAL, MORNING SESSION

15    WEDNESDAY, AUGUST 25, 2021

16      9:11 A.M.

17     LOS ANGELES, CALIFORNIA

18

19

20

21

22 _____

23    **CHIA MEI JUI, CSR 3287, CCRR, FCRR**
     FEDERAL OFFICIAL COURT REPORTER
24    350 WEST FIRST STREET, ROOM 4311
     LOS ANGELES, CALIFORNIA 90012
25      cmjui.csr@gmail.com

```
1    APPEARANCES OF COUNSEL:

2    FOR THE PLAINTIFF:

3            OFFICE OF THE UNITED STATES ATTORNEY
             BY: JUAN M. RODRIGUEZ
4            BY: KYLE WALKER KAHAN
             BY: LAUREN RESTREPO
5            ASSISTANT U.S. ATTORNEYS
             312 NORTH SPRING STREET
6            13TH FLOOR
             LOS ANGELES, CALIFORNIA 90012
7            (213) 894-2434

8    FOR THE DEFENDANT:

9            LAW OFFICE OF OLIVER P. CLEARY
             BY:  OLIVER P. CLEARY, ATTORNEY AT LAW
10           468 NORTH CAMDEN DRIVE
             SUITE 200
11           BEVERLY HILLS, CALIFORNIA 90210
             (424) 324-8874

12

13   ALSO PRESENT:

14           FBI SPECIAL AGENT UZONA ONWUMERE

15

16

17

18

19

20

21

22

23

24

25
```

```
 1          LOS ANGELES, CALIFORNIA; WEDNESDAY, AUGUST 25, 2021

 2                          9:11 A.M.

 3                            - - -

 4      (The following was heard in open court outside the

 5       presence of the jury:)

 6          THE COURT:  Why don't we go on the record now.

 7          All the parties are present.  Mr. Duarte is

 8  present.

 9          My courtroom deputy gave you copies of the opening

10  jury instructions.  Have the parties had a chance to review

11  them, starting with the government?

12          MR. RODRIGUEZ:  Yes, Your Honor, the government

13  has reviewed the opening instructions, and there are no

14  objections from the government.

15          THE COURT:  No objections or changes at all?

16          MR. RODRIGUEZ:  That's correct.

17          THE COURT:  All right.

18          And from the defense.

19          MR. CLEARY:  May we be seated, Your Honor?

20          THE COURT:  Go ahead.

21          MR. CLEARY:  Thank you.

22          I was just going to inquire if the judge's

23  practice -- the Court's practice -- I'm sorry -- is to read

24  the beyond a reasonable doubt instruction preliminarily or

25  just the presumption of innocence instruction.  Or does that
```

```
 1    cover it?
 2              THE COURT:  I was just going to read what you all
 3    were provided, which was the presumption of innocence
 4    instruction.
 5              MR. CLEARY:  Okay.
 6              THE COURT:  I'm sorry.  You are talking about
 7    Instruction Number 2?
 8              MR. CLEARY:  2.
 9              THE COURT:  Okay.  Do you have an objection to
10    that?
11              MR. CLEARY:  I don't have an objection to -- in
12    reading -- the presumption of innocence instruction but I --
13    if I am not mistaken, isn't there an instruction that
14    incorporates the government's burden?
15              THE COURT:  In the opening instructions?  I'm
16    not -- if there is one, let me know, and I will consider it.
17              But this came from the Ninth Circuit Model Jury
18    Instruction.  I don't recall seeing that instruction.  But
19    if there is one and you want me to consider it, let me know.
20              MR. CLEARY:  Okay.  And one more.
21              All I would request is the Court supplement the
22    jury instructions by adding the 3.5 reasonable doubt
23    instruction.
24              THE COURT:  What's the government's position?  I
25    don't know that it's required.  They're going to get the
```

1  reasonable doubt instruction at the end of the case.  So I'm

2  not sure if it really matters.

3         MR. RODRIGUEZ:  Thank you, Your Honor.

4         The government's position would be that that is a

5  closing instruction, not a preliminary instruction; so there

6  is no need for the jury to be read that instruction at this

7  point.

8         THE COURT:  Respectfully, Mr. Cleary, I just went

9  from the Ninth Circuit Model Jury Instructions.  These are

10  in the opening instructions.  Wrong or right, I served on

11  the committee as relates to these instructions.  So my

12  leaning is to abide by what the instructions state.

13         I don't believe that there is an opening one with

14  respect to reasonable doubt.  It talks about what I think is

15  probably most important, is that Mr. Duarte is presumed

16  innocent as they begin this process.

17         So the objection is noted but overruled.

18         Any other objections, comments, edits to the

19  instructions?

20         MR. CLEARY:  Not as to the instructions,

21  Your Honor.

22         I was just going to remind the Court that we had

23  left on the table the Docket Number 36's.  If today is the

24  trial beginning, Officer Barragan may testify today.  I

25  recall the Court had inquired as to if the government had

1    determined that there was any Brady evidence, which was the

2    defense request.

3            The government distinguished it by saying there

4    was Henthorn evidence, that their Henthorn team had

5    determined was not to be turned over.  It was identified but

6    decided not to be turned over, to the defense.

7            I believe that the decision was made by a -- by

8    the prosecutor's consultation with their Henthorn team that

9    determines what is to be disclosed to the defense and what

10   is not.

11           But I also think that, if that falls within the

12   Court -- I mean, it's the law of the case.  If the Court

13   ordered the prosecution, if they were going to claim a

14   privilege, to identify what the items of -- that were

15   identified but were -- and the claim of privilege.

16           I have no objection to the government going in

17   camera to explain to the Court if there were items

18   identified and a privilege that was going to be asserted to

19   not disclose the documents to the defense.

20           But if the documents relate to one of the

21   testifying officers today, this would be the last chance for

22   the government to provide those in order for the defense to

23   cross-examine if it was -- would be deemed appropriate.

24           THE COURT:  Mr. Rodriguez, what is the

25   government's position?

```
 1              Or, Mr. Kahan, is there any information out there?

 2          MR. KAHAN:  No further information, Your Honor.

 3          THE COURT:  Mr. Cleary, you have made your record.

 4     You made your request.

 5              Let's hope there is not a scenario where there is

 6     some evidence that gets discovered, but they indicated they

 7     have no other information.  Is there something else you

 8     think the Court should be doing?

 9          MR. CLEARY:  I am not asking for more information.

10     They have a continuing duty.  I understand about that.

11              I was under the understanding that there were

12     items of discoverable material that they classified as

13     Henthorn which they were asserting were not going to be

14     disclosed to the defense, that they were --

15          THE COURT:  Let me stop you there.

16              Is that accurate?  I don't think it is, but go

17     ahead.

18          MR. KAHAN:  It is not accurate, Your Honor.  We

19     did not categorize the materials that we have not disclosed

20     as Henthorn or Brady related, and ergo they are not

21     discoverable.

22          THE COURT:  They've made a decision -- well, they

23     have made a decision that they've -- whatever they reviewed,

24     whatever is Brady they've turned over.

25              You think there is something else.  Is that the
```

1    issue?  You think there is something else that they made a

2    decision that they reviewed and they decided is not Brady or

3    Henthorn?

4           MR. CLEARY:  That's what I'm -- I understand

5    now -- I believe the clarification is I was adding a

6    positive, and it was a negative.

7           They decided that it was not Henthorn and not

8    Brady, and, therefore, they decided to not disclose it.  I

9    think that's what the government is saying.

10          MR. KAHAN:  That is correct.

11          THE COURT:  There is something that you have that

12   you believe is not Brady or Henthorn, and hence you have not

13   turned it over.

14          MR. KAHAN:  That is correct.

15          THE COURT:  And your issue is you believe that the

16   Court should review it?

17          MR. CLEARY:  Because of the docket and the order

18   of the case which states that, if the government was going

19   to produce all evidence that is favorable to the defendant

20   to the issue of guilt or punishment and --

21          THE COURT:  Which they have indicated that they

22   have.

23          MR. CLEARY:  Correct.  That if there is any

24   evidence the government has not produced and the legal basis

25   for withholding such evidence -- state whether there is any

```
 1    evidence that the government has not produced and the legal

 2    basis for withholding such evidence.

 3              THE COURT:  So I can have them state the legal

 4    basis for withholding this evidence.  Right?

 5              MR. CLEARY:  I believe so.

 6              THE COURT:  Do you want to state for the record

 7    what you believe the basis for not turning over this

 8    information.

 9              MR. KAHAN:  The basis for not turning over the

10    information is that it is neither Brady nor Henthorn, ergo

11    it is not discoverable.

12              THE COURT:  So they've made a determination.  You

13    can challenge them, but I think that comports with

14    Judge Olguin's order.

15              MR. CLEARY:  Very well.  I am satisfied,

16    Your Honor.  Thank you.

17              THE COURT:  All right.  So what we're going to do,

18    we're making copies of the jury instructions.  Once those

19    are done, we're bringing the jurors out, they will all be

20    seated out in the gallery.  No one will be seated in the

21    jury box.  I will read the instructions.  You will make

22    openings, start calling your witnesses.

23              We're going straight through until 11:30 today

24    because I have a change of plea at 11:30 with a custody that

25    needs to be brought.  So we have to deal with that.
```

```
 1                    We'll come back at 12:30, resume trial until 4:30.
 2          Mr. Kahan.
 3          MR. KAHAN:  If I can make one request for the
 4     record.  Yesterday at the close of court we discussed the
 5     exhibit list --
 6          THE COURT:  Okay.
 7          MR. KAHAN:  -- by the government, and I was asked
 8     to provide which specific exhibits will be pre-admitted.
 9          THE COURT:  Right.  And you submitted -- I thought
10     you filed a document or at least gave a document to our
11     courtroom deputy.
12          MR. KAHAN:  I filed a second and a third exhibit
13     list which is the most recent exhibit list.  I just want to
14     state for the record that -- and move those exhibits into
15     evidence.
16          THE COURT:  All right.
17          MR. KAHAN:  The ones that the government are
18     admitting because some on the exhibit list are withdrawn due
19     to the stipulation that happened, but they're still in the
20     binder.
21          THE COURT:  Okay.  But that's as it relates -- I
22     have the government's second exhibit list.  You said there
23     is a third exhibit list?
24          MR. KAHAN:  I filed a third exhibit list after
25     court last night.  I can provide a courtesy copy to the
```

```
 1    Court right now.
 2              THE COURT:  I don't have it.  So provide that
 3    third copy.  I assume defense counsel has been served with
 4    it?
 5              MR. KAHAN:  Yes.
 6              THE COURT:  Just approach with it and let me have
 7    this third copy.
 8              And, Mr. Cleary, do you have any objection to the
 9    government's third exhibit list?
10              MR. CLEARY:  No, Your Honor.
11              THE COURT:  All right.  So you are moving the
12    items -- the items identified to be admitted, the ones for
13    which on this document say "no objection," you are moving
14    all of those into evidence or --
15              MR. KAHAN:  No.  I can state the specific numbers.
16    It's Exhibits 1 through 18, 43, and 49 to 51.  There are
17    several items marked --
18              THE COURT:  Hold on.  Say that again.  1 through
19    18.
20              MR. KAHAN:  That's correct.  43 and 49 through 51.
21              THE COURT:  Okay.  You want those items admitted
22    into evidence for purposes of today?
23              MR. KAHAN:  For the purposes of the trial,
24    correct, Your Honor.  We will still lay foundation for the
25    jury's sake.
```

```
 1                 THE COURT:  Any objection to Exhibits 1 through
 2      18, 43, and 49 through 51?
 3                 MR. CLEARY:  No.
 4                 THE COURT:  Those items will be admitted into
 5      evidence.
 6                 MR. KAHAN:  Thank you.
 7            (Government's Exhibits 1 through 18, 43, and 49 through
 8              51 were admitted into evidence.)
 9                 MR. KAHAN:  Permission to enter the well to pick
10      up the cup I just dropped.
11                 THE COURT:  Go ahead.
12                 MR. KAHAN:  Your Honor, the government has couple
13      clear masks for the witnesses, if I could --
14                 THE COURT:  Bring them up there.  That's your
15      responsibility.  Just have them put them on when they get up
16      to testify.
17                 So you will all be doing your openings from, I
18      guess, the microphones there?
19                 MR. KAHAN:  My intention was to do my opening from
20      here.
21                 THE COURT:  So you will face them.  Perfect.
22                 All right.  I think we can -- I just want to make
23      sure we have the exhibits.
24                 MR. KAHAN:  I would ask, if possible, to maybe
25      move this back microphone assuming it works?
```

```
 1            THE COURT:  Assuming you can move it because you
 2   see the tape on the floor.  That's going to limit the
 3   movement of it.  So just don't rip up the tape.
 4            MR. KAHAN:  I am ripping up the tape by moving it.
 5   So I will not do that.  I can improvise, Your Honor.
 6            THE COURT:  Okay.  You may want to move your cart
 7   because it may obstruct the view of some of the jurors.  I
 8   just want to make sure they can see everything they need to
 9   see.
10            All right.  So I think we're set otherwise.  Let's
11   bring in the jury, and then I can give them their
12   instructions.
13        (The following was heard in open court in the presence
14         of the jury:)
15            THE COURT:  All right.  Good morning, everyone.
16   Thank you all for being here.
17            For those of you that are court watchers on
18   television and certainly, I think, for Mr. McCall I think
19   this may be a little foreign for most of you, and I notice a
20   couple of you instinctively walked over to the jury box.
21            We're in a different world right now.  We're doing
22   what we can to try to keep things as safe as possible.  So
23   this is where you will be seated throughout the trial.
24   Remember your positions, if you will, and you will just
25   assume those seats each and every time you enter the
```

```
 1   courtroom.

 2           Just so you get a run of the show for today, what

 3   we're going to start with is some opening jury instructions

 4   which you should have in your respective seats.  Those will

 5   be instructions to guide your consideration of the evidence.

 6           Then after that you will begin with some opening

 7   statements and some testimony.

 8           Today because of my schedule -- so this is my

 9   fault -- I have got another matter that I have to deal with

10   at 11:30.  So we'll take an early lunch break today, ending

11   at 11:30, have you come back at 12:30.  We'll resume the

12   trial with a break in between until about 4:00, 4:30 today.

13           So does anyone not have the opening jury

14   instructions in the jury?  If you do not, please raise your

15   hand.

16           Okay.  Great.  Seeing no hands.  So I am going to

17   read the opening instructions that are to guide your

18   consideration of the evidence in this case.

19                   You are now the jury in this case,

20               and I want to take a few moments to tell you

21               something about your duties as jurors and to

22               give you some preliminary instructions.

23                   At the end of the trial, I will give

24               you more detailed written instructions that

25               will control your deliberation.  When you
```

1     deliberate, it will be your duty to weigh and

2     to evaluate all the evidence received in the

3     case and, in that process, to decide the

4     facts.  To the facts as you find them, you

5     will apply the law as I give it to you whether

6     you agree with the law or not.

7          You must decide the case solely on

8     the evidence and the law before you.  Perform

9     these duties fairly and impartially.  You

10    should not be influenced by any person's race,

11    color, religious beliefs, national ancestry,

12    sexual orientation, gender identity, gender,

13    or economic circumstances.

14         Also, do not allow yourself to be

15    influenced by personal likes or dislikes,

16    sympathy, passion, prejudice, fear, public

17    opinion, or biases, including unconscious

18    biases.  Unconscious biases are stereotypes,

19    attitudes, or preferences that people may

20    consciously reject but may be expressed

21    without conscious awareness, control, or

22    intention.  Like conscious bias, unconscious

23    bias can affect how we evaluate information

24    and make decisions.

25         This is a criminal case brought by

```
 1          the United States government.  The government

 2          charges the defendant with being a felon in

 3          possession of a firearm and ammunition.  The

 4          charge against the defendant is contained in

 5          the Indictment.  The Indictment simply

 6          describes the charge the government brings

 7          against the defendant.  The Indictment is not

 8          evidence and does not prove anything.  The

 9          defendant has pleaded not guilty to the charge

10          and is presumed innocent unless and until the

11          government proves the defendant guilty beyond

12          a reasonable doubt.  In addition, the

13          defendant has the right to remain silent and

14          never has to prove innocence or present any

15          evidence.

16                    The evidence you are to consider in

17          deciding what the facts are consist of:

18                    One, the sworn testimony of any

19          witness;

20                    Two, the exhibits which are received

21          in evidence; and

22                    Three, any facts to which the

23          parties agree.

24                    The following things are not

25          evidence, and you must not consider them as
```

evidence in deciding the facts of this case:

One, statements and arguments of the attorneys;

Two, questions and objections of the attorneys;

Three, testimony that I instruct you to disregard; and

Four, anything you may see or hear when the court is not in session even if what you see or hear is done or said by one of the parties or by one of the witnesses.

Evidence may be direct or circumstantial.  Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did.  Circumstantial evidence is indirect evidence, that is, it is proof of one or more facts from which one can find another fact.

By way of example, if you wake up in the morning and see that the sidewalk is wet, you may find from that fact that it rained during the night.  However, other evidence, such as a turned-on garden hose, may provide an explanation for the water on the sidewalk.

1          Therefore, before you decide that a fact has

2     been proved by circumstantial evidence, you

3     must consider all the evidence in the light of

4     reason, experience, and common sense.

5          You are to consider both direct and

6     circumstantial evidence.  Either can be used

7     to prove any fact.  The law makes no

8     distinction between the weight to be given to

9     either direct or circumstantial evidence.  It

10    is for you to decide how much weight to give

11    any evidence.

12         There are rules of evidence that

13    control what can be received in evidence.

14    When a lawyer asks a question or offers an

15    exhibit in evidence and a lawyer on the other

16    side thinks that it is not permitted by the

17    rules of evidence, that lawyer may object.  If

18    I overrule the objection, the question may be

19    answered or the exhibit received.  If I

20    sustain the objection, the question cannot be

21    answered or the exhibit cannot be received.

22    Whenever I sustain an objection to a question,

23    you must ignore the question and must not

24    guess what the answer would have been.

25         Sometimes I may order that evidence

```
 1              be stricken from the record and that you

 2              disregard or ignore the evidence.  That means

 3              that when you are deciding the case, you must

 4              not consider the evidence that I told you to

 5              disregard.

 6                       In deciding the facts of this case,

 7              you may have to decide which testimony to

 8              believe and which testimony not to believe.

 9              You may believe everything a witness says, or

10              part of it, or none of it.

11                       In considering the testimony of any

12              witness, you may take into account:

13                       One, the witness's opportunity and

14              ability to see or hear or know the things

15              testified to;

16                       Two, the witness's memory;

17                       Three, the witness's manner while

18              testifying;

19                       Four, the witness's interest in the

20              outcome of the case, if any;

21                       Five, the witness's bias or

22              prejudice, if any;

23                       Six, whether other evidence

24              contradicted the witness's testimony;

25                       Seven, the reasonableness of the
```

1     witness's testimony in light of all the

2     evidence; and

3               Eight, any other factors that bear

4     on believability.

5               You must avoid bias, conscious or

6     unconscious, based on a witness's race, color,

7     religious beliefs, national ancestry, sexual

8     orientation, gender identity, gender, or

9     economic circumstances in your determination

10    of credibility.

11              The weight of the evidence as to a

12    fact does not necessarily depend on the number

13    of witnesses who testify about it.  What is

14    important is how believable the witnesses are,

15    and how much weight you think their testimony

16    deserves.

17              I will now say a few words about

18    your conduct as jurors.

19              First, keep an open mind throughout

20    the trial and do not decide what your verdict

21    should be until you and your fellow jurors

22    have completed your deliberations at the end

23    of the case.

24              Second, because you must decide this

25    case based only on the evidence received in

```
 1            this case and on my instruction as to the law

 2            that applies, you must not be exposed to any

 3            other information about the case or to issues

 4            it involves during the course of your jury

 5            duty.  Thus, until the end of the case or

 6            unless I tell you otherwise:

 7                      Do not communicate with anyone in

 8            any way and do not let anyone else communicate

 9            with you in any way about the merits of the

10            case or anything to do with it.  This

11            restriction includes discussing the case in

12            person, in writing, by phone, tablet, or

13            computer, or any other means, via e-mail, via

14            text messaging, or any Internet chat room,

15            blog, Website or application, including but

16            not limited to Facebook, YouTube, Twitter,

17            Instagram, LinkedIn, Snapchat, TikTok, or any

18            other forms of social media.  This restriction

19            also applies to communicating with your fellow

20            jurors until I give you the case for

21            deliberation, and it applies to communicating

22            with everyone else including your family

23            members, your employer, the media or press,

24            and the people involved in the trial, although

25            you may notify your family and your employer
```

1          that you have been seated as a juror in the

2          case, and how long you expect the trial to

3          last.  But, if you are asked or approached in

4          any way about your jury service or anything

5          about this case, you must respond that you

6          have been ordered not to discuss the matter.

7          In addition, you must report the contact to

8          the Court.

9                    Because you will receive all the

10         evidence and legal instruction you properly

11         may consider to return a verdict:  Do not

12         read, watch, or listen to any news or media

13         accounts or commentary about the case or

14         anything to do with it; do not do any

15         research, such as consulting dictionaries,

16         searching the Internet or using other

17         reference materials; and do not make any

18         investigation or in any other way try to learn

19         about the case on your own.  Do not visit or

20         view any place discussed in this case, and do

21         not use the Internet or any other resource to

22         search for or view any place discussed during

23         the trial.  Also, do not do any research about

24         this case, the law, or the people involved,

25         including the parties, the witnesses or the

```
1              lawyers, until you have been excused as

2              jurors.  If you happen to read or hear

3              anything touching on this case in the media,

4              turn away and report it to me as soon as

5              possible.

6                   Now these rules are -- protect each

7              party's right to have this case decided only

8              on evidence that has been presented here in

9              court.  Witnesses here in court take an oath

10             to tell the truth, and the accuracy of their

11             testimony is tested through the trial process.

12             If you do any research or investigation

13             outside the courtroom, or gain any information

14             through improper communications, then your

15             verdict may be influenced by inaccurate,

16             incomplete or misleading information that has

17             not been tested by the trial process.  Each of

18             the parties is entitled to a fair trial by an

19             impartial jury, and if you decide the case

20             based on information not presented in court,

21             you will have denied the parties a fair trial.

22             Remember, you have taken an oath to follow the

23             rules, and it is very important that you

24             follow these rules.

25                   A juror who violates these
```

1          restrictions jeopardizes the fairness of these

2          proceedings, and a mistrial could result that

3          would require the entire trial process to

4          start over.  If any juror is exposed to any

5          outside information, please notify the Court

6          immediately.

7                    At the end of the trial you will

8          have to make your decision based on what you

9          recall of the evidence.  You will not have a

10         written transcript of the trial.  I urge you

11         to pay close attention to the testimony as it

12         is given.

13                   If you wish, you may take notes to

14         help you remember the evidence.  If you do

15         take notes, please keep them to yourself until

16         you and your fellow jurors go to the jury room

17         to decide the case.  Do not let note-taking

18         distract you from being attentive.  When you

19         leave the Court for recesses, your notes

20         should be left in the courtroom.  No one will

21         read your notes.

22                   Whether or not you take notes, you

23         should rely on your memory of the evidence.

24         Notes are only to assist your memory.  You

25         should not be overly influenced by your notes

```
 1          or those of your fellow jurors.
 2                    The next phase of the trial will now
 3          begin.  First, each side may make an opening
 4          statement.  An opening statement is not
 5          evidence.  It is simply an outline to help you
 6          understand what the parties expect the
 7          evidence will show.  A party is not required
 8          to make an opening statement.
 9                    The government will then present
10          evidence and counsel for the defendant may
11          cross-examine.  Then, if the defendant chooses
12          to offer evidence, counsel for the government
13          may cross-examine.
14                    After the evidence has been
15          presented, the attorneys will make closing
16          arguments and I will instruct you on the law
17          that applies to the case and the attorneys
18          will make closing arguments.
19                    After that, you will go to the jury
20          room to deliberate on your verdict.
21                    During the trial, it may become
22          necessary for me to take up legal matters with
23          the attorneys privately, either by having a
24          conference at the bench when the jury is
25          present in the courtroom, or by calling a
```

```
 1              recess.  Please understand that while you are
 2              waiting, we are working.  The purpose of these
 3              conferences is not to keep relevant
 4              information from you, but to decide how
 5              certain evidence is to be treated under the
 6              rules of evidence and to avoid confusion and
 7              error.
 8                      Of course, we will do what we can to
 9              keep the number and length of these
10              conferences to a minimum.  I may not always
11              grant an attorney's request for a conference.
12              Do not consider my granting or denying a
13              request for a conference as any indication of
14              my opinion of the case or what your verdict
15              should be.
16              All right.  At this time, does the government wish
17      to make an opening statement?
18              MR. KAHAN:  Yes, Your Honor.
19              THE COURT:  All right, Mr. Kahan, you may proceed.
20          (Brief pause in the proceedings.)
21              MR. KAHAN:  If I may proceed.
22              THE COURT:  Yes, please.
23              MR. KAHAN:  He tried to hide the gun, but he could
24      not hide his DNA.  On March 20th, 2020, the defendant who
25      was prohibited from owning or possessing firearm or
```

1   ammunition was sitting in the back passenger seat of a car

2   as it drove through Inglewood, California.

3          Right as Inglewood police officers turn on their

4   spotlights to pull the car over, the defendant rolled down

5   the back passenger window and tossed out a Smith & Wesson

6   .380 semi-automatic pistol that he was holding.  He tossed

7   it out into the streets of Inglewood, and he hid the

8   magazine, the Smith & Wesson .380 magazine loaded with six

9   bullets in the seat in front of him.

10         So let's talk about what those offers who are

11   about to pull the car over saw before and after the

12   defendant tried to hide the gun and the ammunition.

13         Well, those officers, Tyler Villicana and

14   Troy Wunderlich, they saw a red car turning on to Doty

15   Avenue and Inglewood.  They were about to pull the car over,

16   and they turned on their spotlights before activating the

17   red and flashing light.

18         Now, even though it was dark, the street, the

19   residential area, the street lights, parked cars, sidewalks,

20   homes, even with that they have the spotlights on, they had

21   a clear unobstructed view of what they were about to see.

22   And what they saw was the back passenger window rolled down

23   right as they activated the spotlight, an arm come out and

24   toss a gun out on to Doty Avenue.

25         It hit a parked car and landed on a nearby

1  sidewalk.  They called it in, asked for assistance from

2  other officers who were nearby to locate the gun, and then

3  they pulled the car over a block away.

4       And when they pulled that car over, they found two

5  people inside -- the driver in the driver's seat and the

6  defendant in the back passenger seat.

7       There was no shuffling, no movement, no switching

8  of places between the driver and the defendant during that

9  one block between when the officers saw the gun get tossed

10  out to when they pulled the car over.

11       Now, shortly after that after they pulled the car

12  over, Officer Wunderlich conducted a search of the car.  And

13  during the search, he searched the back passenger seat area.

14  And when he did this, he found a Smith & Wesson .380 caliber

15  magazine loaded with six rounds of Blazer .380 automatic

16  caliber ammunition.

17       He found it stuffed in the seat right in front of

18  where the defendant was sitting, namely, the passenger seat

19  and in between the center console.

20       Meanwhile, as this happened, another officer,

21  Nicolas Bobbs, also with Inglewood Police, responded to the

22  officers' earlier call for a request to help find a gun.

23       He did a search of Doty Avenue, and he found on

24  the sidewalk a black Smith & Wesson .380 caliber

25  semi-automatic handgun missing its magazine.  And the

```
 1    magazine is what holds the bullets.  It's what holds the
 2    ammunition for a firearm.  And this gun that Officer Bobbs
 3    found on the sidewalk was missing it.
 4             He carefully collected it.  He carefully recovered
 5    it, and he took it back to Officer Wunderlich who still had
 6    the magazine.
 7             Officer Wunderlich took the firearm.  He took the
 8    magazine that he had, and he placed it into the recovered
 9    Smith & Wesson, and it fit perfectly.
10             Now, it's not just what the officers saw that
11    night that is going to lead you to a guilty verdict in this
12    case because, as much as the defendant tried to hide that
13    gun from the officers, he could not hide his DNA.
14             A few days after the defendant tossed the gun,
15    Detective Jose Barragan of the Inglewood Police Department
16    took a DNA sample from the defendant's mouth.  He took a
17    swab, and he swabbed the inside of the defendant's mouth in
18    order to collect the DNA sample.
19             And then another person with the Inglewood
20    Police Department, Celeste Hewson, a senior forensics
21    specialist, she took the gun that was recovered on Doty
22    Avenue and the magazine, and she also took DNA samples.
23             She took a DNA sample from the gun's grip and the
24    gun's trigger and slide, areas which you would hear are good
25    at collecting DNA due to their texture, the serrated part,
```

1  the part that is good that can catch and hold DNA.  She also

2  took a sample of the magazine as well.

3       Now, all these samples, the defendant's sample

4  from his mouth and the samples that were collected by

5  Ms. Hewson, were all sent to the Los Angeles Sheriff

6  Department for DNA analysis and comparison.  And during

7  that, you will hear that they were able to extract DNA

8  profiles from the firearm, from the firearm samples that

9  were recovered by Ms. Hewson.

10      You will hear that, when compared to DNA sample

11  from his mouth, that it was 2 million times more likely that

12  the defendant's DNA was on the DNA profile that they

13  recovered from the gun's grip and 100,000 times more likely

14  that his DNA was on -- was contained in the DNA profile that

15  was recovered from the firearm's trigger and slide.

16      So because of this, because the defendant is

17  prohibited from owning or possessing a firearm and

18  ammunition and because of what those officers saw because of

19  what those officers collected and because of the DNA that

20  was compared and analyzed and retrieved from what those

21  officers collected, the defendant has been charged with

22  being a felon in possession of a firearm and ammunition,

23  namely, the firearm that was recovered off Doty Avenue on

24  the sidewalk that the defendant tossed out of the car and

25  the magazine that he hid inside of the car.

```
 1              And when you hear from the officers, when you hear
 2    what they saw, when you hear what they did, when you see the
 3    actual gun itself, when you hear how DNA analysis and
 4    comparison is actually done and what it means, you are going
 5    to come to the only reasonable conclusion that this case has
 6    to offer, and that is a guilty verdict.
 7              THE COURT:  Thank you, Mr. Kahan.
 8              Mr. Cleary, do you wish to make an opening
 9    statement?
10              MR. CLEARY:  Yes.  Thank you.
11              THE COURT:  You may proceed.
12              MR. CLEARY:  Good morning, ladies and gentlemen.
13    My name is Oliver Cleary, and I have the honor and the
14    privilege to represent Steven Duarte.
15              Mr. Duarte is innocent.  I am going to prove to
16    you why he is innocent through the course of this trial to
17    the examination of the evidence, to the cross-examination of
18    witnesses, and to the testimony you are going to hear about
19    this DNA.
20              At the conclusion of the trial, I am going to ask
21    you to return a verdict which would be the only fair and
22    just verdict after a fair consideration of the evidence that
23    is going to be presented to you.
24              Let me break down the evidence that is going to be
25    presented to you.
```

1          First off, on this night of April 20th, Steven

2    Duarte was like many of us living during the Coronavirus

3    pandemic, out looking for essentials.

4          You remember there was a run on toilet paper.  For

5    some reason it was impossible to get toilet paper.  That

6    hand sanitizer could be the difference between life and

7    death and how important it was to try to find it.

8          Some neighborhoods, they were selling hand

9    sanitizer for ten times the value of what it was because it

10   was considered so vital to protect yourself that you had to

11   have it.

12         Remember those times.  We've come a long ways

13   since then.  But remember at the heart in the middle of the

14   pandemic during the shutdown that even leaving your house to

15   get a carton of milk felt like taking your life in your

16   hands.

17         At this time Officers Wunderlich, Villicana, and

18   Bobbs were out patrolling.  You will learn that Wunderlich

19   and Villicana were in an unmarked police vehicle.

20         That means they had no siren bar at the top, there

21   were no symbols painted on the side.  It wasn't a black and

22   white unit that you are used to seeing on TV or on the

23   streets.  This was a totally discrete vehicle where the

24   sirens are hidden behind the grille.  The flashing lights

25   are also hidden behind the grille, and the spotlights and

 1    floodlights are inside the windshield.  So from the exterior

 2    there is nothing to indicate that the vehicle is a police

 3    vehicle.

 4            So they are in this unmarked vehicle, and they are

 5    looking out, and they see the driver of a red Infiniti G37,

 6    a woman by the name of Anna Ortiz's car.  She's driving the

 7    vehicle down 108th Street near Doty and 109th on the way

 8    home after having been out with Mr. Duarte looking for

 9    essentials.

10            So this is a residential neighborhood.  Like many

11    residential neighborhoods, it's just lined with houses.

12    There is a lot of parking on the street, a lot of cars lined

13    up along the street.  Not a lot of overhead lighting, it's

14    not a commercial area.  This is a dark residential area at

15    night, 9:00, 9:30 at night.  It's dark out, and Ms. Ortiz is

16    just driving down the street.

17            What draws her to the attention of the police

18    officers, they are going to explain, that they thought her

19    window was overly tinted.  They are going to explain to you

20    that this tint on the window prevented them from observing

21    the driving compartment of the vehicle.  You will be the

22    judge of that.

23            They will say that, while being followed, that

24    they observed another violation, street stop sign violation

25    under California law.  They said -- I guess she didn't stop

1    at the stop sign or didn't stop at the limit line or

2    something to that effect, California stop.  So this they

3    thought gave them the grounds to do a full light-up of this

4    vehicle.

5            So what did the officers do?  They turned on their

6    Class 4 siren, they turn on their floodlights, they turn on

7    a spotlight, and they turn on their red flashers.  Okay?

8            So this dark, discrete vehicle that probably goes

9    unnoticed or is invisible, turns up to -- turned out to

10   light up like Disneyland.

11           It is using everything they got and spotlight in

12   the car while they say in the middle of this being lit up

13   like a Christmas tree, they say they saw an arm while the

14   car is being lit up, spotlighted, floodlighted, siren,

15   Class 4 sirens, drop a firearm out the window.

16           So the vehicle pulls over, all the while

17   maintaining this pursuit with the lights and everything.

18   There is no attempt to flee.  There is no -- there is

19   nothing but cooperation.

20           The vehicle pulls over in a location where there

21   is such space to pull over.  She turns the corner and stops

22   right at the corner there where there is a space.

23           Like I said, it's a residential neighborhood, many

24   cars, people parked.  You will see pictures.  People park

25   along the street.

```
 1          So if she was going to stop in the middle of the

 2   street, she could have stopped, but she turned and pulled

 3   over right by the intersection so that she wouldn't be

 4   blocking the street, and the officers pulled in right behind

 5   her, and then the officers will discuss with you what their

 6   observations were, what they noted.

 7          And what you all hear -- and I want you to pay

 8   close attention -- is what happened with the collection of

 9   evidence in this case with this crime scene and how it was

10   conducted because that will be important because, obviously,

11   the government is relying to a significant degree on what

12   they're considering scientific evidence.

13          They have told you that the defendant cannot hide

14   his DNA.  You will learn that nobody can hide their DNA.

15   But you will also learn that the DNA in this case did not

16   match Steven Duarte.  This is not a case where they took his

17   DNA and matched it to the gun.  That is not the case.  Okay?

18          And what you'll learn is that they created a

19   sampling -- a machine does this, and the operator of the

20   machine is going to come in and testify for you that this

21   machine created a sample, and it identified a number of

22   possible contributors.  And I guess they range anywhere from

23   100,000 to 2 million.  That seems like a big difference to

24   me, if you inherited $100,000 versus $2,000,000 I think

25   you'd --
```

```
 1          MR. KAHAN:  Objection.  Argumentive.

 2          THE COURT:  Overruled.

 3          Please continue.

 4          MR. CLEARY:  You would consider that a difference.

 5          So one way or the other, what you are going to

 6   learn through the testimony from the witnesses is that this

 7   heavily relied upon by the government evidence is not going

 8   to be the be-all end-all that they are suggesting to you,

 9   that the Court has already instructed you about the

10   credibility of the witnesses and what you can take to be

11   their biases whether intrinsically or extrinsically, their

12   ability to view things whether enhanced or unenhanced, their

13   interest in the conclusion of the case whether they have a

14   bias, interest, or motive in what you decide, and you can

15   judge all that in determining the credibility of the

16   government's case and whether or not the state of the

17   evidence is satisfactory that they can come before you in

18   the end and ask you to tell them they deserve that you find

19   the defendant guilty beyond a reasonable doubt because I

20   suggest to you and I believe that, after you do a fair

21   reasoned analysis, after you hear all the evidence, not just

22   what the government wants you to hear but you listen to the

23   evidence from what I extract from the witnesses on

24   cross-examination because that is evidence as well.

25          When the government asks a witness a question they
```

 1   say that answer is evidence.  But when I ask a witness a

 2   question and they give me an answer, that too is evidence.

 3          So I want you to keep an open mind.  They're going

 4   to go first.  But I get an opportunity to cross-examine.

 5   Keep an open mind and listen not just to the government's

 6   answers but to the answers that I elicit from the witnesses

 7   so that you can judge for yourself what the whole story is,

 8   what all the evidence is, and weigh it fairly in this case.

 9          There may be witnesses or evidence that you wish

10   to have, and you will learn that the Inglewood Police

11   Department has a policy of not issuing their officers

12   body-worn cameras.

13          They say they're not authorized in this day and

14   age.  They also don't have what's very common in other

15   departments Dash Cam videos so you can judge the evidence

16   for yourself.  And I think that goes to bias and motive as

17   well.

18          But not everything are you going to have in your

19   hand to evaluate for yourself what the state of the evidence

20   is because it wasn't collected.  It wasn't processed, and

21   it's not going to be presented to you in the case.

22          The government has the burden of the proof.  They

23   have the burden of proving beyond a reasonable doubt to you

24   what happened here.

25          I ask you to keep an open mind, listen to all the

1    witnesses, listen to all the testimony elicited through

2    direct and cross-examination, and I will return at the end

3    of this case and I will ask you for a verdict of not guilty.

4           Thank you very much.

5           THE COURT:  All right.

6           Thank you, Mr. Cleary.

7           Before we begin with the testimony, the parties

8    have agreed and reached what's called a stipulation of fact.

9           For purposes of this trial, you should treat this

10   stipulation as a fact that has been proven and conclusively

11   established during the course of this trial, and the

12   stipulation reads as follows.

13                  (Reading:)  At the time of the

14                  offense alleged in the Indictment, Steven

15                  Duarte had been convicted of a crime

16                  punishable by imprisonment for a term

17                  exceeding one year.

18                      Number 2, at the time of the offense

19                  alleged in the Indictment, Steven Duarte knew

20                  that he had been convicted of a crime

21                  punishable by imprisonment for a term

22                  exceeding one year.

23          As I mentioned earlier, this stipulation will --

24   constitutes conclusive proof of the above, what I just read

25   to you for purposes of this trial.

```
 1                With that, does the government wish to call its
 2    first witness?
 3                MR. KAHAN:  Yes, Your Honor.
 4                The government wishes to call Officer
 5    Tyler Villicana.
 6                THE COURT:  All right.
 7                     TYLER VILLICANA,
 8                  having been first duly sworn,
 9                    testified as follows:
10                THE CLERK:  Do you solemnly swear that the
11    testimony you shall give in the cause now before this Court
12    shall be the truth, the whole truth, and nothing but the
13    truth, so help you God?
14                THE WITNESS:  I do.
15                THE CLERK:  Thank you.  Please be seated.
16                Please state and spell your full name for the
17    record.
18                THE WITNESS:  Tyler Villicana.  T-y-l-e-r,
19    V-i-l-l-i-c-a-n-a.
20                THE COURT:  All right.  You may proceed.
21                MR. RODRIGUEZ:  Thank you, Your Honor.
22                Just want to note for the record that the witness
23    is wearing a clear see-through mask.
24                THE COURT:  Record will so reflect.
25                Go ahead.
```

```
 1                        DIRECT EXAMINATION

 2   BY MR. RODRIGUEZ:

 3   Q    Good morning, Officer Villicana.

 4             Where do you currently work?

 5   A    Inglewood Police Department.

 6   Q    What is your current position?

 7   A    Police officer.

 8   Q    How long have you been a police officer?

 9   A    I'm sorry?

10   Q    How long have you been a police officer?

11   A    Seven years.

12   Q    What are your duties as a police officer?

13   A    I currently work for our SWAT team and also part of the

14   special enforcement team.

15   Q    In your seven years, do you have any experience with

16   gun tossing?

17   A    I'm sorry?

18   Q    In your seven years as a police officer, do you have

19   any experience with gun tossing?

20   A    Yes.

21   Q    Can you describe that experience, please.

22   A    I have had multiple situations that I have been

23   involved in, yes.

24   Q    What have you learned from those situations?

25             MR. CLEARY:  Objection.  Relevance, Your Honor.
```

```
 1              THE COURT:  Sustained.

 2              MR. RODRIGUEZ:  I will move on.

 3    Q    I would like to ask you about March 20th, 2020.

 4              Were you working that night?

 5    A    Yes.

 6    Q    Were you on shift around 9:30 P.M.?

 7    A    Yes.

 8    Q    Were you working alone that night?

 9    A    No.

10    Q    Were you working with a partner?

11    A    Yes.

12    Q    Who was your partner that night?

13    A    Officer Troy Wunderlich.

14    Q    At approximately 9:30 P.M. that night, what were you

15    and Officer Wunderlich doing?

16    A    We were doing routine patrol duties.

17    Q    Can you describe what it means to be on routine patrol

18    duty.

19    A    As part of the special enforcement team, we drove

20    around, patrolled, handled any situations that the city was

21    requiring that we were special enforcement duties, as well

22    as making traffic stops, things of that nature.

23    Q    Were you and Officer Wunderlich patrolling in the same

24    patrol vehicle?

25    A    Yes.
```

```
 1   Q     Were you two patrolling in an unmarked patrol vehicle?

 2   A     Yes.

 3   Q     Can you please describe that vehicle.

 4   A     It's a black Dodge Charger.

 5   Q     Are there any red lights on that Charger?

 6   A     Yes.  They are built into the -- right above the

 7   windshield.

 8   Q     Are there any spotlights on that vehicle?

 9   A     Yes.

10   Q     Are there any -- are there floodlights on that vehicle?

11   A     Yes.

12   Q     On that night were you wearing what you are wearing

13   here today?

14   A     No.

15   Q     What were you wearing that night?

16   A     I was wearing a black special enforcement team uniform

17   which is a black polo shirt with police screen on the front

18   and back as well as a tactical vest.

19             THE COURT:  Slow down.  If you could slow down a

20   little bit.  Maybe if you could bring your mic maybe a

21   little lower because I am having a little trouble hearing

22   you.  I want to make sure we get -- more importantly the

23   jurors can hear you.

24             Go ahead.

25
```

```
1    BY MR. RODRIGUEZ:

2    Q    Who was driving that night?

3    A    Officer Wunderlich.

4    Q    Do you recall where you and Officer Wunderlich were

5    patrolling?

6    A    Yes.  We were in the area of Prairie and 109th Street.

7    Q    Is that in the city of Inglewood?

8    A    Yes.

9    Q    Is the city of Inglewood in the central district of

10   California?

11   A    Yes.

12   Q    Is this a residential area?

13   A    Yes, it is.

14   Q    Were there people walking that night?

15   A    Not that I recall.

16   Q    Are there street lights on 109th and Prairie Avenue?

17   A    Yes.

18   Q    How would you describe the area's lighting?

19   A    It's lit from the street lights.

20   Q    I am going to show you what's previously been admitted

21   as Exhibit 10.

22        Does this picture fairly represent the lighting in

23   the area that night?

24        THE COURT:  May be on the screen in front of you,

25   sir.
```

```
 1                THE WITNESS:  Yes.

 2                THE JURORS:  We don't have it.

 3                THE COURT:  I'm sorry.  Thank you.  To my left, is

 4     the screen working?

 5                Okay.  It's the right side.

 6           (Brief pause in the proceedings.)

 7                MR. RODRIGUEZ:  I will just re-ask the question,

 8     if that's okay, Your Honor.

 9                THE COURT:  Yes, please.

10     BY MR. RODRIGUEZ:

11     Q    On the screen is what's previously admitted as

12     Exhibit 10, does Exhibit 10 fairly represent the lighting in

13     the area that night?

14     A    Yes.

15     Q    While you and Officer Wunderlich were patrolling that

16     night at approximately 9:30 P.M., did any vehicle catch your

17     attention?

18     A    Yes.

19     Q    Can you describe the vehicle that caught your

20     attention.

21     A    It was a red Infiniti.

22     Q    Do you recall what direction the vehicle was traveling

23     in?

24     A    It was traveling eastbound on 109th.

25     Q    Do you recall what direction you and your partner were
```

1    traveling in?

2    A    We were traveling westbound.

3    Q    Would it be fair to say that you saw the car as it was

4    driving past you on 109th Street?

5    A    Correct.

6    Q    What about the car caught your attention?

7    A    The front windows were tinted.

8    Q    What about the tinting caught your attention?

9    A    It was too dark to see into the passenger compartment.

10   Q    I am going to show you what has been marked as

11   Exhibit 7.

12            Is this a fair representation of the vehicle that

13   you saw that night?

14   A    Yes.

15   Q    What happened after you observed the tinting on the red

16   Infiniti?

17   A    My partner turned our vehicle around.  We began to

18   trail it.

19   Q    So you began to trail the vehicle.  Then what did you

20   see, if anything?

21   A    The vehicle turned northbound on Doty from 109th and

22   failed to stop at the stop sign.

23   Q    When you say the vehicle turned left on -- to the

24   northbound on Doty, you mean it made a left from 109th

25   Street onto Doty?

```
 1   A    Correct.

 2   Q    You say you observed the vehicle fail to stop at the

 3   stop sign?

 4   A    Yes.

 5   Q    Where was that stop sign located?

 6   A    It was posted at 109th and Doty.

 7   Q    Once you observed the vehicle fail to stop at the stop

 8   sign, what, if anything, did you do?

 9   A    Officer Wunderlich illuminated our floodlights and also

10   our overhead red lights and sirens.

11   Q    Did he also illuminate the spotlight?

12   A    Correct.

13   Q    Once Officer Wunderlich illuminated the -- turned on

14   the spotlight, full lights, and the sirens, what, if

15   anything, did you see?

16   A    The right rear passenger window rolled down, and a arm

17   extended out and discarded a handgun.

18   Q    After you saw the arm -- did you see -- once you saw

19   the handgun being tossed, did you hear any noise or see any

20   other observation?

21   A    Yes.  I heard the handgun hit a car.

22   Q    Once you saw the gun being tossed from the vehicle, did

23   the vehicle immediately stop?

24   A    No.

25   Q    Approximately how -- did the vehicle ultimately stop?
```

```
 1   A    Yes.
 2   Q    Between the time you saw the gun being tossed and --
 3   let me rephrase.
 4            From the time you saw the handgun being tossed to
 5   the time the vehicle ultimately stopped, how much time
 6   passed?
 7   A    Less than a minute.
 8   Q    How much -- what was the distance the car traveled?
 9   A    Approximately one block.
10            MR. RODRIGUEZ:  I would now like to publish
11   exhibit -- what's been previously admitted as Exhibit 7 to
12   the jury.
13   Q    Is that the right rear passenger window that you saw
14   the handgun being tossed from?
15   A    Yes.
16   Q    Do you remember the approximate location where you saw
17   the firearm being tossed?
18   A    It was mid-block between 109th and 108th on Doty.
19   Q    Once you saw the firearm being tossed, what, if
20   anything, did you do?
21   A    I put over the radio to our other special enforcement
22   unit that a handgun was tossed.
23   Q    Was Officer Nicolas Bobbs one of the officers who you
24   called for assistance?
25   A    Yes.
```

```
 1   Q     Later that same night, did Officer Bobbs show you a
 2   firearm?
 3   A     Yes.
 4   Q     Did the firearm have a magazine in the magazine level?
 5   A     No.
 6   Q     In your experience, is it dangerous for a loaded
 7   firearm to be tossed?
 8              MR. CLEARY:  Objection.  Relevance.
 9              THE COURT:  Overruled.
10              THE WITNESS:  Yes.
11   BY MR. RODRIGUEZ:
12   Q     Why?
13   A     Chance of firing pin could activate the cartridge
14   inside causing the firearm to discharge.
15              MR. RODRIGUEZ:  Your Honor, at this point, I would
16   like the case agent to approach the witness to provide
17   Exhibit -- what's been previously admitted as Exhibit 49.
18              THE COURT:  He may do so.
19   BY MR. RODRIGUEZ:
20   Q     Officer Villicana, you have been handed an evidence bag
21   which contains Exhibit 49.
22              Can you please remove the exhibit from within.
23   Can you please hold it up for the jury to see.
24              This is Exhibit 49.  Is this the firearm that
25   Officer Bobbs showed you that night?
```

```
1    A    Yes.

2    Q    Is this firearm consistent in size, color, and shape

3    with the firearm you saw thrown from the right rear

4    passenger side of the vehicle that night?

5    A    Yes.

6    Q    When the vehicle stopped, what did you and Officer

7    Wunderlich do?

8    A    Officer Wunderlich approached the driver's side of the

9    vehicle to the driver, and I approached the passenger side

10   to the right rear passenger.

11   Q    As you approached the vehicle, could you determine how

12   many individuals were inside?

13   A    Yes.

14   Q    How many individuals were inside?

15   A    Two.

16   Q    Where were the individuals sitting?

17   A    Driver was in the driver's seat, and right rear

18   passenger was in the right rear passenger seat.

19   Q    At any point since you began trailing the vehicle did

20   you notice the individuals in the car switch seats?

21   A    No.

22   Q    When you approached the vehicle from the right side,

23   did you see the passenger in the right rear passenger seat?

24   A    Yes.

25   Q    Who was that passenger?
```

```
 1    A    The defendant.

 2    Q    By "the defendant," do you mean Steven Duarte?

 3    A    Yes.

 4    Q    Do you see Steven Duarte in the courtroom here today?

 5    A    I do.

 6    Q    Can you please describe what he is wearing.

 7    A    Wearing a gray button-up shirt with a -- looks like a

 8    checkered tie.

 9          MR. RODRIGUEZ:  Your Honor, I would like the

10    record to reflect that the witness has identified the

11    defendant.

12          THE COURT:  Record will so reflect.

13    BY MR. RODRIGUEZ:

14    Q    After you approached the vehicle and saw the defendant,

15    what happened next?

16    A    The driver and the right rear passenger were both

17    detained in handcuffs.

18    Q    Did you pat the defendant down for any reason?

19    A    Yes.

20    Q    Why did you pat him down?

21    A    I pat him down for weapons after seeing the firearm

22    being discharged, felt it was the safe thing to do.

23    Q    Did you find any weapons on him?

24    A    No.

25    Q    Do you know what post release community supervision, or
```

```
 1   PRCS, for short is?

 2   A    Yes.

 3   Q    What is it?

 4   A    A form of parole.

 5   Q    Can you describe what parole is.

 6            MR. CLEARY:  Objection.  Relevance.

 7            THE COURT:  Overruled.

 8            THE WITNESS:  Parole is being released with the --

 9   into the community with the assumption that they served

10   enough time that they can be amongst the community; however,

11   they do have to forfeit the right for search and seizure at

12   all times.

13   BY MR. RODRIGUEZ:

14   Q    Does that mean that you can search the defendant?

15   A    Yes.

16   Q    On March 20th, 2020, at the time of the stop, did you

17   know whether defendant was on PRCS?

18   A    Yes.

19   Q    And did you confirm whether the defendant was still in

20   fact on PRCS that night?

21   A    I did.

22   Q    Did you confirm whether he also had search conditions?

23   A    I did.

24   Q    And did he?

25   A    Yes.
```

```
 1   Q     After the stop, did either you or Officer Wunderlich

 2   search the vehicle?

 3   A     Officer Wunderlich did.

 4   Q     What, if anything, did Officer Wunderlich find as a

 5   result of the search?

 6   A     He located a magazine to a firearm.

 7   Q     Did Officer Wunderlich show you that magazine?

 8   A     He did.

 9   Q     Do you recall if there was anything inside the

10   magazine?

11   A     Yes.

12   Q     What was inside the magazine?

13   A     Ammunition.

14   Q     Did Officer Wunderlich show you that ammunition?

15   A     Yes.

16         MR. RODRIGUEZ:  Your Honor, I'd now like the case

17   agent to approach the witness with Exhibit 50.

18         THE COURT:  All right.  He may do so.

19   BY MR. RODRIGUEZ:

20   Q     Please show Exhibit 50 to the jury, please.  Do you

21   know what this is?

22   A     Yes.

23   Q     What is it?

24   A     It's the magazine Officer Wunderlich found in the

25   vehicle.
```

1   Q    What is -- in relation to a firearm, what is the

2   magazine for?

3   A    Magazine contains the ammunition that can be loaded

4   into the magazine well of the firearm which allows bullets

5   to be consistently fired.

6            MR. RODRIGUEZ:  Your Honor, I'd also like the case

7   agent to take Exhibits 49 and 50 from the witness but at the

8   same time provide the witness with Exhibit 51.

9            THE COURT:  He may do so.

10  BY MR. RODRIGUEZ:

11  Q    Can you please show the jury Exhibit 51.  Can you

12  describe what you are holding up, please.

13  A    Holding up a bullet.

14  Q    Is this bullet consistent with the shape, size, and

15  color of the bullet that Officer Wunderlich showed you that

16  night?

17  A    It is.

18  Q    Was the magazine that you saw that night that was just

19  up there with you as Exhibit 50 the same brand as the

20  firearm that Officer Bobbs recovered?

21  A    Yes.

22  Q    Is the ammunition that you have before you that's been

23  marked Exhibit 51 the same caliber as the gun that Officer

24  Bobbs recovered?

25  A    It is.

1   Q    After the search of the vehicle was complete, what

2   happened next?

3   A    The defendant was placed in the back seat of our

4   vehicle.

5   Q    Did you see what Officer Wunderlich did with the

6   magazine, firearm, and ammunition?

7   A    Yes.

8   Q    What did he do with it?

9   A    Placed it in a brown evidence bag.

10  Q    Did you see what he did with those brown evidence bags?

11  A    Yes.

12  Q    What did he do with them?

13  A    Placed it in the trunk of our vehicle.

14  Q    Would it be possible for the defendant who was seated

15  in the back seat of your patrol vehicle to assess the

16  evidence bags that were in the trunk?

17  A    No.

18  Q    You just went over the account of what happened on

19  March 20th.  Is there footage of what you described?

20  A    No.

21  Q    Why not?

22  A    We don't wear body cams.

23  Q    Does Inglewood Police Department require you to wear

24  body cameras?

25  A    No.

```
 1    Q     Is there a Dash Cam footage?

 2    A     No.

 3    Q     Why not?

 4    A     Our vehicles are not equipped with Dash Cam footage.

 5          MR. RODRIGUEZ:  May have a moment, Your Honor.

 6          THE COURT:  Yes.

 7          (Brief pause in the proceedings.)

 8  BY MR. RODRIGUEZ:

 9    Q     I know you just mentioned that it's not Inglewood

10  policy to wear camera -- or body camera or to have a

11  Dash Cam, but were you in fact wearing one that night?

12    A     No.

13    Q     Do you recall if your vehicle was equipped with one

14  that night?

15    A     No.

16    Q     It was not equipped with one?

17    A     It was not.

18    Q     Going back to where you saw the defendant toss the

19  firearm, was there anything obstructing your view?

20    A     No.

21    Q     Can you describe the lighting.

22    A     It was very well lit.

23          MR. RODRIGUEZ:  No further questions, Your Honor.

24          THE COURT:  Cross-examination.

25          MR. CLEARY:  Thank you, Your Honor.
```

```
 1                        CROSS-EXAMINATION
 2   BY MR. CLEARY:
 3   Q    Good morning, Officer Villicana.
 4   A    Good morning.
 5   Q    You were the one who wrote the report in this case; is
 6   that correct?
 7   A    I am.
 8   Q    And is your report full, complete, and accurate?
 9   A    Yes.
10   Q    Are there any mistakes you wish to correct at this
11   time?
12   A    No.
13   Q    You were in an unmarked or hybrid vehicle; is that
14   correct?
15   A    A what now?
16   Q    Unmarked or hybrid vehicle?
17   A    A hybrid vehicle?  No.
18   Q    Was it unmarked?
19   A    It was unmarked.
20   Q    And that means that the lights were hidden behind --
21   for example, the flashers were hidden behind the front
22   grille of the vehicle; is that correct?
23   A    Correct.
24   Q    And you don't have a light bar mounted on the top of
25   the car; correct?
```

```
 1    A    No.

 2    Q    And you do have spotlights and floods; correct?

 3    A    Correct.

 4    Q    Those are mounted on the inside of the windshield so

 5    they're not apparent from the outside.  Is that correct?

 6    A    The spotlights are mounted on the A pillars on the

 7    outside of the vehicle, and the floodlights are mounted at

 8    the top of the windshield.

 9    Q    The top of the windshield, is that on the inside or

10    outside of the vehicle?

11    A    Inside.

12    Q    Okay.  So someone might mistake that vehicle for not

13    being a police vehicle; is that correct?

14              MR. RODRIGUEZ:  Objection.  Calls for speculation.

15              THE COURT:  Overruled.

16    BY MR. CLEARY:

17    Q    Because it's not marked, it's obvious --

18              THE COURT:  Did you have a question that was

19    pending, or did you want to rephrase the question?

20              MR. CLEARY:  I'm sorry, Your Honor.  You're right.

21    I was going to rephrase it for him but -- let me just remind

22    him.

23    Q    Do you remember the question?

24    A    Yes.

25    Q    So is -- someone might mistake that vehicle for not
```

```
 1   being a police vehicle; is that correct?

 2   A     Possible.

 3   Q     And you were working not in your uniform like you are

 4   today but in a Polo shirt; correct?

 5   A     Correct.

 6   Q     Officer Wunderlich was wearing a Polo shirt too; right?

 7   A     Yes, sir.

 8   Q     Officer Bobbs was also on patrol in coordination with

 9   you and Officer Wunderlich; is that correct?

10   A     Correct.

11   Q     He was in a marked unit, though; is that correct?

12   A     No.

13   Q     He was also unmarked?

14   A     Yes.

15   Q     You guys were communicating by radio?

16   A     Correct.

17   Q     And you indicated that you observed a tinted window

18   violation.  Is that correct?

19   A     Correct.

20   Q     And is it your understanding that people can tint their

21   windows and not be in violation of the law?

22   A     Yes.

23   Q     The only thing that makes it a violation under the

24   Vehicle Code section is if it obstructs your view; correct?

25              MR. RODRIGUEZ:  Objection.  Calls for legal
```

```
1    conclusion.

2              THE COURT:  Overruled.

3              THE WITNESS:  Yes.

4    BY MR. CLEARY:

5    Q    What is it about the tinting on this vehicle that

6    obstructed your view?

7    A    The front window on the driver's side obstructed our

8    view into the passenger compartment.

9    Q    The front window obstructed your view into the

10   passenger compartment?

11   A    Correct.

12   Q    Is that in the back you mean?

13   A    No.  The front window obstructed our view into the

14   passenger compartment of the vehicle.

15   Q    Where is the passenger compartment of the vehicle?

16   Just the inside of the vehicle; right?

17   A    Correct.

18   Q    So you couldn't see if there were people in the

19   vehicle?

20   A    Correct.

21   Q    You couldn't make out if there was anybody in the

22   vehicle?

23   A    Correct.

24   Q    Couldn't see the driver?

25   A    Correct.
```

```
 1   Q    Didn't know if she was male or female?

 2   A    Correct.

 3   Q    Couldn't see a passenger?

 4   A    Correct.

 5   Q    All because -- maybe it was because it was dark out or

 6   because of the window tint?

 7   A    Because the window tinting was too dark.

 8   Q    Okay.  But the window tinting different color tint than

 9   the other windows in the car?

10   A    No.

11   Q    They were all the same?

12   A    Correct.

13   Q    Your testimony is that the front windshield was tinted

14   the exact same tint as the side windows?

15   A    That's not what I said.

16   Q    All right.  So tell me what it is you said.

17   A    We weren't referencing the front windshield.  We were

18   referencing the front driver's side window.

19   Q    Okay.  So if -- the windshield was not obstructed?

20   A    Correct.

21   Q    You could see clearly through the windshield?

22   A    No.

23   Q    Okay.  What was prohibiting you from seeing through the

24   windshield?

25   A    I didn't look through the windshield.
```

```
1    Q    Wasn't she traveling eastbound and you were traveling
2    westbound?
3    A    Correct.
4    Q    Wasn't that vehicle coming right at you guys?
5    A    Yes.
6    Q    Didn't you have -- did you have your lights on?
7    A    Yes.
8    Q    You couldn't see through the windshield?
9    A    I didn't look through the windshield I said.
10   Q    So the car is driving towards you, you are driving past
11   it, but you didn't look through the windshield?
12   A    Correct.
13   Q    But then you initiate a U-turn to follow that vehicle;
14   is that correct?
15   A    Yes.
16   Q    And your stated reason for that is being you looked
17   over and saw that the passenger window -- or the driver's
18   side, the side windows were tinted?
19   A    Correct.
20   Q    And you are saying that the glazing on the tinting on
21   the window on the side obstructed your view?
22   A    Correct.
23   Q    What is the minimum light transmission that is allowed
24   for that type of glazing on your window?
25   A    There is not specific percentage.
```

```
 1   Q    So it's just up to whether or not you could see through
 2   it or not?  Each officer decides whether or not it's okay?
 3   A    Correct.
 4   Q    Did you take in factors like lighting, daytime,
 5   nighttime, stuff like that in evaluating whether or not that
 6   tint is too dark?
 7   A    No.
 8   Q    You don't.
 9        So you're unable to look inside the vehicle, but
10   you don't look through the windshield, and based on that you
11   observe a violation?
12   A    Correct.
13   Q    As you are driving along behind them, they're not
14   speeding; correct?
15   A    Correct.
16   Q    Not weaving; correct?
17   A    No.
18   Q    Not braking erratically?
19   A    No.
20   Q    Not playing loud music?
21   A    Not that I recall.
22   Q    And in this neighborhood there are -- it's a
23   residential neighborhood; correct?
24   A    It is.
25   Q    Cars parked along the street?
```

```
 1    A     Yes, sir.

 2    Q     And there are landscaping in the yards, there is trees

 3    and yards and stuff like that?

 4    A     Yes.

 5    Q     You indicate that the vehicle failed to stop at the

 6    stop sign; is that correct?

 7    A     That is correct.

 8    Q     Okay.  So is it the stop sign or limit line or where

 9    did the vehicle fail to stop?

10    A     The limit line is what the Vehicle Code references as

11    far as stopping behind it at a full and complete stop.

12    Q     And if there is a building or trees or vegetation such

13    that a vehicle when it stops at the limit line can't see the

14    intersection, they are allowed to go forward; correct?

15    A     No.  Vehicles must stop before the limit line.

16    Q     So if they stop at the limit line, then they are free

17    to proceed?

18    A     Correct.

19    Q     And if trees and other obstacles are blocking their

20    view, is it fair to say a vehicle can move forward to the

21    intersection without entering the intersection?  Is that

22    fair to say?

23    A     As far as safely to do so, or are you referencing the

24    Vehicle Code?

25    Q     Well, as far as the -- is it safe to do so?
```

1    A      If it's safe to do so, vehicle actions are permittable.

2    But if you are referencing the Vehicle Code, vehicles must

3    stop before the limit line on a posted stop sign.

4    Q      And where was the limit line located in this

5    intersection?

6    A      It is on the ground.

7    Q      Where in relation to the stop sign is the limit line

8    located?

9    A      Directly to it.

10   Q      It's right opposite it?

11   A      Yes.

12   Q      So if you drew a line from the limit line to the stop

13   sign, you would draw a line right to the stop sign?

14   A      Generally speaking, yes.

15   Q      I am asking you specifically.  Is that where the limit

16   line is located in this case?

17   A      I don't recall.

18   Q      But you don't know if the limit line and the stop sign

19   are on the same location or different locations at this

20   intersection?

21   A      Correct.

22   Q      And the forward facing red lights, are those flashers?

23   A      No.

24   Q      They are just red lights?

25   A      Correct.

```
 1    Q    The floodlights, are those bright white lights?

 2    A    Yes, they are.

 3    Q    Is there a bar of white lights?

 4    A    Yes.

 5    Q    They light up like day time; right?

 6    A    Pretty much, yes.

 7    Q    And a spotlight is what we see in all the police cars,

 8  they're the round light that the officer can move with the

 9  handle from inside?

10    A    Yes, sir.

11    Q    How many floodlights do you have on that vehicle?

12    A    Total as far as how many bars or how many --

13    Q    The spotlights.  I'm sorry.

14    A    -- individual LED's?

15    Q    The spotlights.

16    A    Two.

17    Q    One on each side?

18    A    Yes.

19    Q    Were both on?

20    A    Yes.

21    Q    Were you operating one of them?

22    A    Yes.

23    Q    And what area of the vehicle were you spotlighting?

24    A    I was spotlighting the rear window of the passenger

25  compartment.
```

```
 1    Q    Was any tinting obstructing your view into the

 2    compartment?

 3    A    Yes.

 4    Q    Were you able to see who was inside the vehicle?

 5    A    No.

 6    Q    You couldn't see if there was one passenger or two

 7    passengers?

 8    A    Correct.

 9    Q    You couldn't see if there was a male or female?

10    A    Correct.

11    Q    For all you knew there were four people in the vehicle?

12    A    I didn't make any assumptions.

13    Q    So you don't know, then, if that -- which person inside

14    the vehicle discarded that weapon; is that correct?

15    A    Correct.

16    Q    When the vehicle pulled over, it pulled over in a safe

17    manner in a location that wasn't blocking the roadway; is

18    that correct?

19    A    Yes.

20    Q    You indicate that before the vehicle stopped that you

21    heard the sound of something hitting a parked car, you think

22    it was the black handgun; correct?

23    A    Correct.

24    Q    What did it sound like?

25    A    Sound like metal hitting metal.
```

```
 1   Q    Was the vehicle moving at the time?

 2   A    Yes.

 3   Q    Did you see what vehicle that the black handgun hit?

 4   A    No.

 5   Q    Did you make a call-out at that time that a vehicle --

 6   that you think a weapon had been thrown?

 7   A    Yes.

 8   Q    And the location?

 9   A    Yes.

10   Q    And did you make that call-out to Officer Bobbs?

11   A    I made it to our responding units that were assisting

12   us.

13   Q    Did that include Officer Bobbs?

14   A    Yes.

15   Q    And you told them the approximate location?

16   A    Yes.

17   Q    So he could retrieve it; correct?

18   A    Correct.

19   Q    And he could also secure the scene; correct?

20   A    Yes, sir.

21   Q    And did you know approximately what the vehicle that

22   was parked that was struck looked like?

23   A    No.

24   Q    Couldn't tell if it was a truck or passenger sedan?

25   A    Correct.
```

1   Q    Did you see it land in the middle of the street or on

2   the sidewalk?

3   A    I didn't see where it landed.

4   Q    And I believe you wrote in your report that Officer

5   Bobbs located a firearm in the center of the street on Doty

6   just north of 108th.  Is that correct?

7   A    I believe so.

8   Q    You did not note that it was located in the middle of

9   the sidewalk; correct?

10  A    No.

11  Q    When you stopped Anna Ortiz's vehicle, who did you

12  direct your attention to?  Mr. Duarte or Ms. Ortiz?

13  A    Mr. Duarte.

14  Q    And did you -- you were involved in the detention of

15  Mr. Duarte; is that correct?

16  A    Correct.

17  Q    You removed him from the vehicle; correct?

18  A    I did.

19  Q    And you moved him to the side of the road and placed

20  him at the curb; is that correct?

21  A    Yes, sir.

22  Q    And did you use handcuffs?

23  A    I did.

24  Q    And was he calm, polite, and cooperative?

25  A    Yes.

```
1    Q    And did you observe the inside of the vehicle at that
2    time?
3    A    As far as when I was removing him from the vehicle?
4    Q    Yes.
5    A    Yes.
6    Q    Did you see the magazine when you were interacting with
7    Mr. Duarte, in the vehicle?
8    A    No.
9    Q    Did you search the vehicle?
10   A    No.
11   Q    And was Officer Wunderlich, your partner, the one who
12   handled Ms. Ortiz?
13   A    Yes.
14   Q    And when he -- did he remove Ms. Ortiz from the
15   vehicle?
16   A    Yes.
17   Q    Did he also handcuff her?
18   A    Yes.
19   Q    Did he place her on the sidewalk next to Mr. Duarte?
20   A    Yes.
21   Q    Did Officer Wunderlich search the vehicle?
22   A    Yes, he did.
23   Q    Did you observe him searching the vehicle?
24   A    Yes.
25   Q    Was he involved in the arrest of Mr. Duarte as well?
```

```
 1   A    No.

 2   Q    And when he searched the vehicle, did he find anything

 3   inside the vehicle at that time?

 4   A    Yes, he did.

 5   Q    And that is the magazine that you held up and displayed

 6   for the jury?

 7   A    Yes, sir.

 8   Q    Did you observe the magazine in the vehicle when

 9   Officer Wunderlich found it?

10   A    No.

11   Q    Did he remove the magazine from the vehicle and show it

12   to you?

13   A    Yes.

14   Q    And did he show it to you standing on the side of the

15   road by Mr. Duarte and Ms. Ortiz?

16   A    No.

17   Q    Did you walk farther away towards the corner of the

18   intersection?

19   A    No.

20   Q    Where were you when you -- when Officer Wunderlich

21   showed you the magazine?

22   A    We were at our patrol vehicle.

23   Q    Where was that located?

24   A    About 10, 15 feet behind Mr. Duarte's location.

25   Q    Towards the intersection?
```

```
1    A    As far as towards Doty and 108th?

2    Q    Yeah.

3    A    Yeah.

4    Q    At that time had Officer Bobbs arrived?

5    A    Yes.

6    Q    Okay.  When Officer Bobbs arrived, Officer Wunderlich

7    asked him to look for firearms; is that correct?

8    A    Asked Officer Bobbs to look for firearm?

9    Q    Correct.

10   A    No.

11   Q    Did you ask Officer Bobbs to look for a firearm?

12   A    No.

13   Q    Did Officer Bobbs spontaneously decide to look for a

14   firearm?

15   A    No.  I put out a request over the radio, but it wasn't

16   specifically to Officer Bobbs.

17   Q    When Officer Bobbs arrived at the location where you

18   and Officer Wunderlich were looking at the magazine, did he

19   walk up with a firearm?

20   A    Correct.

21   Q    So he had already retrieved the firearm when he arrived

22   at the scene?

23   A    I believe so, yes.

24   Q    You believe so because you think that's what happened,

25   or do you have a recollection?
```

```
1    A    That's what I recall.

2    Q    So did Officer Bobbs show you the firearm?

3    A    Yes.

4    Q    Did you handle it?

5    A    No.

6    Q    Did Officer Bobbs show Officer Wunderlich the firearm?

7    A    He did.

8    Q    Did he handle it?

9    A    Officer Wunderlich?

10   Q    Yes.

11   A    Yes.

12   Q    And Officer Wunderlich took the firearm from Officer

13   Bobbs and he inserted the magazine into it; is that correct?

14   A    Correct.

15   Q    That was to check to see if it fit; right?

16   A    Yes.

17   Q    And then Officer Wunderlich secured the firearm; is

18   that correct?

19   A    Yes.

20   Q    And he did so by removing the magazine?

21   A    Yes.

22   Q    And what did he do then?

23   A    Placed it in the brown evidence bag.

24   Q    Did he place the firearm in the brown evidence bag with

25   the magazine?
```

```
 1    A    I believe so.  Yes.

 2    Q    What did he do with the brown evidence bag?

 3    A    He put it in the trunk of our vehicle.

 4    Q    Was the brown evidence bag the only evidence that was

 5    located or placed in the trunk of your vehicle?

 6    A    Yes.

 7    Q    Was there anything else placed in the trunk of your

 8    vehicle?

 9    A    No.

10    Q    And before the firearm was secured and placed in the

11    brown evidence bag, there were photographs taken; correct?

12    A    Yes.

13    Q    And did you take the photographs?

14    A    No.

15    Q    Did Officer Wunderlich take the photographs?

16    A    I believe so, yes.

17    Q    So in order for Officer Wunderlich to take the

18    photographs, did he have to ask Bobbs to walk down the

19    street and place the firearm where he located it so he could

20    take a photograph of it?

21    A    No.

22    Q    Well, how did Officer Wunderlich take a photograph of

23    the firearm when Officer Bobbs carried it to the scene and

24    showed it to him?

25    A    From what I believe, Officer Bobbs took photographs
```

```
1    before he recovered it and then Officer Wunderlich took

2    photographs of the vehicle prior to processing the evidence.

3    Q    Did you see what Officer Bobbs did when he photographed

4    the firearm?

5    A    No.

6    Q    You didn't have any observation of the photographing at

7    all of the firearm; correct?

8    A    Of Officer Bobbs photographing, no.

9    Q    Did you have any observations of Officer Wunderlich

10   photographing the firearm?

11   A    Yes.

12   Q    And what did you see Officer Wunderlich photographing?

13   A    He was photographing the serial number as well as the

14   firearm along with our report number.

15   Q    That was prior to him putting it in the evidence bag;

16   correct?

17   A    Yes.

18   Q    And when Officer Wunderlich searched the vehicle, did

19   he search the entire vehicle?

20   A    Yes.

21   Q    Did he search the front passenger compartment?

22   A    Yes.

23   Q    Did he search the rear passenger compartment?

24   A    Yes.

25   Q    That was all in an attempt to locate evidence; correct?
```

1  A   It was for a PRCS compliance.

2  Q   And eventually he searched the rear area, there was --

3  there was items inside the vehicle besides the magazine he

4  located; correct?

5  A   Yes.

6  Q   While he searched the interior of the vehicle -- that

7  it was necessary for him to check the seat; correct?

8  A   Correct.

9  Q   And he checked behind the seat area to see if anything

10 was tucked along behind the seat; correct?

11 A   It's general procedures, yes.

12 Q   And other general procedures would be if there was a

13 bag or some items inside to check the items to see if there

14 was something wrapped up or hidden inside of them; correct?

15 A   Correct.

16 Q   Officer Wunderlich checked the items inside the

17 vehicle, the personal items, any clothing materials while he

18 was searching the vehicle; correct?

19 A   I can assume so, but I wasn't the one that searched.

20 Q   It would be part of your procedure, though; right?

21 A   Yes.

22 Q   And he would have searched likewise the front passenger

23 area, the driver area, and any personal items that were

24 contained therein?

25 A   Yes.

```
 1   Q    In essence he would search the entire interior of the
 2   vehicle; correct?
 3   A    Yes.
 4   Q    He would open glove box; correct?
 5   A    General procedures, yes.
 6   Q    Open up if there was a console in the center with a
 7   handle on it, he would open it and look inside there;
 8   correct?
 9   A    Yes.
10   Q    And if there was any clothing or sweatshirts, he'd pick
11   them up and see if they had anything in the pockets;
12   correct?
13   A    Correct.
14   Q    All right.  Let me ask you this:  Were you the officer
15   that was in charge of recording the list of items that were
16   removed from the vehicle, the evidence?
17   A    No.
18   Q    Was that Officer Wunderlich?
19   A    Yes.
20   Q    So Officer Wunderlich, if he was charged with recording
21   the items, did he record the items as he went, or does he do
22   a laundry list at the end?
23            MR. RODRIGUEZ:  Objection.  Calls for speculation.
24            THE COURT:  If he knows he may answer.
25            THE WITNESS:  Everybody's procedure is different.
```

```
 1            It depends on how you process the evidence when

 2    you have it.  I can't speak exactly on how Officer

 3    Wunderlich does it in his head, how he catalogs everything,

 4    but for the most part everybody one has their own procedure.

 5    As long as it's, you know, not tampering with the evidence,

 6    then everybody has their own procedure doing so.

 7    BY MR. CLEARY:

 8    Q    And the procedure is that you are trying to do is

 9    trying to write down the item that was found and catalog it

10    so that you have a record of the item that was seized;

11    correct?

12    A    Yes.

13    Q    So you write down what the item is, maybe a little

14    brief description, and that goes onto a piece of paper;

15    correct?

16    A    Goes onto our evidence bag.

17    Q    He writes it onto the evidence bag itself?

18    A    Correct.

19    Q    Writes it on with a pen; correct?

20    A    Generally speaking, yes.

21    Q    And the pen is his own personal pen, or is there a

22    separate evidence pen that is used that's removed from a

23    sealed envelope for the purposes of recording things like

24    this?

25    A    I can speak to what I do, and I use the pen that I have
```

```
 1    on my person.
 2    Q    Okay.  Your personal pen that you have for report
 3    writing or whatever?
 4    A    Correct.
 5    Q    And while Officer Wunderlich was writing this down, you
 6    don't have any recollection about whether or not, when he
 7    was recording the items on the envelope, whether or not he
 8    scratched his head with his pen?
 9    A    No, I don't have any recollection of that.
10    Q    You don't know if he held his pen in his mouth or --
11    some people do that, they suck on the tip of their pen or
12    whatever.  You didn't see if he did that?
13              MR. RODRIGUEZ:  Relevance.
14              THE COURT:  Where is this going, Counsel?
15              MR. CLEARY:  I think the evidence is going to show
16    that there was a mixture of four individuals that were
17    sampled when this DNA was tested.
18              THE COURT:  I will allow it.  Go ahead.
19    BY MR. CLEARY:
20    Q    Did you observe Officer Wunderlich, whether he sucked
21    on the tip of his pen or held his pen in his mouth while he
22    was handling the evidence bag?
23    A    No.
24    Q    Did you observe whether he was wearing gloves?
25    A    I don't recall.
```

1  Q    When he recorded the list, do you know if he coughed or

2  sneezed?

3  A    I don't recall.

4  Q    Was he wearing a face mask?

5  A    I don't recall.

6  Q    When the collected evidence was placed in the trunk,

7  was it -- the gun, the firearm, and the magazine placed in

8  the same envelope?

9  A    Yes.

10 Q    And was it sealed?

11 A    Yes.

12 Q    And was it sealed upon collection or sealed at the end?

13 A    Sealed at the end once that's been processed.

14 Q    Okay.  How long does that take, the processing usually?

15 A    Each officer is different.  It just depends on how much

16 evidence we have.  But we do have to fill out, for example,

17 the exhibits that were presented -- those are the evidence

18 bags that we fill out.

19        So they do take some time to manually fill out the

20 information on the front as well as photograph the evidence,

21 put it in there, seal it, sign off on it.  So it does take a

22 bit of time.

23 Q    So you're talking about this bag right here that looks

24 like a lunch bag here on the table, the counsel table?

25 A    No.  The exhibits that were presented to me which are

```
 1    the evidence bags that the special agent brought up.
 2    Q    There's a couple bags you indicated.  If I had the
 3    agent bring you the evidence bag, could you hold it up and
 4    show it to us?
 5    A    Yes.
 6          MR. CLEARY:  If I could please ask the special
 7    agent if you could please carry the evidence bag to Officer
 8    Villicana.
 9          SPECIAL AGENT ONWUMERE:  This bag?
10          MR. CLEARY:  Maybe both of them.  So he can tell
11    us which is which.
12          Thank you, Mr. Special Agent.
13    Q    Officer Villicana, you have now in front of you some
14    bags.
15    A    Correct.
16    Q    Could you hold up the evidence bag that you are talking
17    about that you had at the scene that was part of the
18    collection of the evidence.
19    A    Well, I doubt this would be the evidence bag that was
20    used at the scene.  I can't speculate which one this is.
21    This looks like something that to transport this from the
22    station to here.
23    Q    The brown paper bag that you have that looks like a
24    lunch bag, does it say anything on it?
25    A    No.
```

```
 1   Q    You don't know where it came from?

 2   A    No.

 3   Q    There is no writing on it about where the evidence was

 4   obtained or located?

 5   A    Correct.

 6   Q    Normally, like on your other bag we're going to get to,

 7   normally if somebody touches that bag and transports it,

 8   they put down their name, the date, the time, where they

 9   took it from, and where they are going to; right?

10   A    Yes.

11   Q    All that is missing from that evidence bag; correct?

12   A    Correct.

13   Q    You don't know where that came from?

14   A    Correct.

15   Q    Let's talk about the other evidence bags you have in

16   front of you now.  There is two of them it looks like; is

17   that correct?

18   A    Yes.

19   Q    Why don't you hold them both up for us to see.

20        Okay.  So those look like manila envelopes?

21   A    Yes.

22   Q    And on those looks like there is some writing?

23   A    Yes.

24   Q    And some computer-generated tagging?

25   A    Correct.
```

```
 1   Q    So you could put them down.

 2         Do you notice where Officer Wunderlich would have

 3   filled out his information?

 4   A    Yes.

 5   Q    And can you see is it done in pen?

 6   A    It is.

 7   Q    It is a blue or black pen?

 8   A    Black.

 9   Q    And that's what Officer Wunderlich would have written

10   on the envelope at the time that he put the evidence into

11   the envelope; is that correct?

12   A    Correct.

13   Q    Did you observe him do that?

14   A    No.

15   Q    There are some other tags on that envelope too; is that

16   correct?

17   A    Yes.

18   Q    Those are not generated by Officer Wunderlich; is that

19   correct?

20   A    Those are generated by our computer system.

21   Q    Okay.  That happened when the evidence was processed

22   back at the station?

23   A    No.  That happens prior to the report being submitted.

24   The officer that processes the evidence and puts it in the

25   bag then goes to our computer and puts in that information.
```

```
 1   The computer self-generates a stickable tag that goes onto

 2   the front of our evidence bags.

 3   Q    And that is all taking place at the station after

 4   you've transported the evidence to the station from the

 5   scene; correct?

 6   A    Correct.

 7   Q    And before the report is submitted.  You don't wait for

 8   days and days; correct?

 9   A    Correct.

10   Q    You are supposed to do it at the time that you seize

11   the evidence; correct?

12   A    Yes.

13   Q    Part of the job of finishing the report writing; right?

14   A    Yes.

15   Q    And is there a time stamp on there that says when he

16   finished this thing up at?

17   A    No.

18   Q    All right.

19        The other envelope that you have there has the

20   same thing together with some Stickies, it looks like; is

21   that right?

22   A    "Stickies," what are you referring to as "Stickies"?

23   Q    Maybe it's the other bag, the purple papers that --

24   part of your evidence tags.

25   A    This is from the County of Los Angeles.  So I'm not
```

```
1    sure what this stuff is right here.

2    Q    Okay.  You didn't generate that?

3    A    No.

4    Q    Officer Wunderlich didn't generate that?

5    A    No.

6    Q    Somebody else did?

7    A    (No audible response.)

8    Q    Okay.  How long did it take you to transport -- or

9    Officer Wunderlich to transport that item to the station?

10   A    I don't know how long it would take to get from our

11   report writing room to the station.  Maybe couple minutes.

12   Q    Couple minutes.  Okay.

13            And the storage conditions were it was just in the

14   trunk of the car; right?

15   A    Yes.

16   Q    How did the evidence get to the lab?

17   A    I don't handle that part of the investigation.

18   Q    Okay.  And was the evidence bags, when they were placed

19   in the trunk of the car, is there a special, like, container

20   in the car so they don't get contaminated with other things

21   in the trunk of the car?

22   A    No.

23   Q    It's just placed into the trunk?

24   A    Yes.

25   Q    Whatever was existing in the trunk isn't decontaminated
```

```
 1    or something like that; correct?

 2    A    No.

 3    Q    All right.  Nothing further.

 4              THE COURT:  Redirect.

 5              MR. RODRIGUEZ:  One moment.

 6                      REDIRECT EXAMINATION

 7    BY MR. RODRIGUEZ:

 8    Q    Officer Villicana, I want to briefly walk you back

 9    through the tinting and what you saw.

10              So first of all, I'll pull up Exhibit 5, please.

11              Do you recognize this?

12    A    Yes.

13    Q    What is it?

14    A    The license plate of the vehicle I stopped.

15              MR. RODRIGUEZ:  Move on to Exhibit 6, please.

16    Q    Do you recognize this?

17    A    Yes.

18    Q    What is it?

19    A    It's a depiction of the front of the vehicle I stopped.

20              MR. RODRIGUEZ:  Then I'll move on to Exhibit 7,

21    please.

22    Q    Do you recognize this?

23    A    Yes.

24    Q    What is it?

25    A    It's a depiction of the passenger side of the same
```

```
 1  vehicle.
 2  Q    What direction were -- when you and Officer Wunderlich
 3  were patrolling that night, what direction were you
 4  traveling in?
 5  A    Westbound.
 6  Q    What direction was defendant -- the vehicle defendant
 7  was in traveling in?
 8  A    Eastbound.
 9  Q    So when you noticed the vehicle, was the vehicle
10  parallel to you?
11  A    Yes.
12  Q    So you never actually -- did you notice the vehicle
13  when the vehicle was in front of your unmarked patrol
14  vehicle?
15  A    No.
16  Q    From the time you began trailing the vehicle to the
17  time the vehicle stopped and you made contact with the
18  defendant, did you see anyone leave the vehicle?
19  A    No.
20  Q    So the only two individuals that -- who were the only
21  two individuals that were inside the vehicle once you
22  approached the vehicle?
23  A    Miss Anna Ortiz was the driver, and Mr. Steven Duarte
24  was the passenger in the rear seat.
25  Q    Going back to you -- earlier you testified that you saw
```

```
 1   an arm extend out the right rear window and toss a firearm.
 2   A    Correct.
 3   Q    Did you hear a sound shortly after you saw the firearm
 4   being tossed?
 5   A    Yes.
 6   Q    What was the sound you heard?
 7   A    Sound of metal hitting metal.
 8   Q    Did you see where the gun actually landed?
 9   A    No.
10   Q    You also earlier testified that Officer Bobbs recovered
11   the firearm.  Do you remember that?
12   A    Yes.
13   Q    Did you personally see Officer Bobbs find the firearm?
14   A    No.
15   Q    So you don't know exactly where he found it?
16   A    Correct.
17   Q    Do you know the general area where he found it?
18   A    Yes.
19   Q    Was -- what was the general area?
20   A    Mid-block on Doty between 108th and 109th Street.
21   Q    Can you remind us of the area where you saw the firearm
22   being tossed?
23   A    Same area.
24   Q    From the moment that Officer Wunderlich put the
25   evidence bag in the trunk, at any point from the time that
```

```
 1  he put -- I will rephrase.
 2          From the moment Officer Wunderlich put the
 3  evidence bag in the trunk to the moment you dropped off
 4  defendant for processing, did defendant ever access the
 5  trunk compartment of the vehicle?
 6  A    No.
 7  Q    Going back to when you and Officer Wunderlich were
 8  trailing the vehicle, did the car stop at the limit line or
 9  just completely run through the stop sign?
10  A    Completely ran through the stop sign.
11  Q    Thank you.  No further questions, Your Honor.
12          THE COURT:  Any further examination, Mr. Cleary?
13          MR. CLEARY:  Just briefly.
14                   RECROSS-EXAMINATION
15  BY MR. CLEARY:
16  Q    You didn't write in your report that Anna Ortiz
17  completely ran the stop sign, did you?
18  A    No.
19  Q    That's fresh testimony today; correct?
20  A    No.  It's -- it's consistent with somebody not stopping
21  at the limit line.  It's just perspective of that type of
22  Vehicle Code violation.
23  Q    Let me ask you this:  You say that the firearm is
24  located mid-block.  Is that correct?
25  A    Correct.
```

```
 1   Q    So that's not on the end of the block or at the
 2   intersection.  It's in the middle of the block; right?
 3   A    Somewhere in between 108th and 109th, yes.
 4   Q    How long a block is it?
 5   A    It's a very short block.
 6   Q    So when you say, "very short," is it a hundred feet, a
 7   thousand feet, how long is it?
 8   A    I don't know the exact measurement, no.
 9   Q    Is it a quarter mile, eighth of a mile?  How many
10   houses are on the block?
11   A    I don't know.
12   Q    Is it an average city block?
13   A    Yes.
14   Q    Okay.  So there is a row -- a block of houses.  There
15   is more than five houses on the block; right?
16   A    Possibly.
17   Q    Do you patrol this area frequently?
18   A    Yes.
19   Q    Is this near Duty (phonetic) sector?
20   A    No.
21   Q    How close is it to the police station?
22   A    Probably about, say, two or three miles from the police
23   station.
24   Q    You have been at the police station now -- you said you
25   been there for seven years?
```

```
 1   A    Yes.

 2   Q    In the seven years time you've had the opportunity to

 3   drive on this block more than once, I would say?

 4   A    Yes.

 5   Q    And -- all right.  Thank you very much.

 6             THE COURT:  Anything further from the government?

 7             MR. RODRIGUEZ:  One moment, Your Honor.

 8        (Brief pause in the proceedings.)

 9             MR. RODRIGUEZ:  No, Your Honor.  Thank you.

10             THE COURT:  May this witness be excused?

11             MR. RODRIGUEZ:  Yes, Your Honor.

12             MR. CLEARY:  Yes, Your Honor.

13             THE COURT:  Thank you, sir.  You may step down.

14             You may call your next witness.

15             MR. RODRIGUEZ:  Yes, Your Honor.  The government

16   calls Officer Wunderlich.

17                       TROY WUNDERLICH,

18               having been first duly sworn,

19                  testified as follows:

20             THE CLERK:  Do you solemnly swear that the

21   testimony you shall give in the cause now before this Court

22   shall be the truth, the whole truth, and nothing but the

23   truth, so help you God?

24             THE WITNESS:  Yes.

25             THE CLERK:  Thank you.  Please be seated.
```

```
 1              Please state and spell your name for the record.
 2              THE WITNESS:  Troy Wunderlich.  T-r-o-y,
 3  W-u-n-d-e-r-l-i-c-h.
 4              THE COURT:  You may proceed.
 5              MR. RODRIGUEZ:  Like the previous witness, just
 6  like the record to reflect the witness is wearing clear
 7  see-through mask.
 8              THE COURT:  Record will so reflect.
 9                       DIRECT EXAMINATION
10  BY MR. RODRIGUEZ:
11  Q    Good morning, Officer Wunderlich.
12  A    Good morning.
13  Q    Where do you work?
14  A    Inglewood.
15  Q    Where -- what department in the City of Inglewood?
16  A    I'm a patrol officer for the City of Inglewood.
17  Q    For the police department?
18  A    Yes, sir.
19  Q    How long have you been employed by the -- by Inglewood
20  Police Department?
21  A    13 1/2 years.
22  Q    What's your official title?
23  A    Patrol officer.
24  Q    What are your duties as a patrol offer?
25  A    Patrol the City of Inglewood, answer radio calls,
```

```
 1   et cetera.

 2   Q    In addition to being an officer, do you hold any other

 3   titles within the Inglewood Police Department?

 4   A    Yes, sir.  I am a senior defensive tactic instructor.

 5   I am a senior officer on the SWAT team, and I was on the

 6   special enforcement team for five years.

 7   Q    I would like to ask you about March 20th, 2020.

 8        Were you working that night?

 9   A    Yes, sir.

10   Q    Were you on shift around 9:30 P.M.?

11   A    Yes, sir.

12   Q    Were you working with a partner that night?

13   A    Yes, sir.

14   Q    Who was your partner that night?

15   A    Officer Villicana.

16   Q    At approximately 9:30 P.M. that night, what were you

17   and Officer Villicana doing?

18   A    We were on patrol in the area of 109 and Prairie.

19   Q    Can you describe what it means to be on patrol?

20   A    We were basically driving around the area looking for

21   any traffic violations, any crimes, any type of, like,

22   burglaries, et cetera.

23   Q    Were you and Officer Villicana patrolling in the same

24   patrol vehicle?

25   A    Yes, sir.
```

1    Q    Was it an unmarked patrol vehicle?

2    A    Yes.

3    Q    Can you please describe it.

4    A    Black, Dodge Charger with lights and sirens, spotlights

5    and floodlights.

6    Q    On that night were you wearing what you are wearing

7    here today?

8    A    No, sir.

9    Q    What were you wearing that night?

10   A    I was wearing my black special enforcement uniform.

11   It's a black overvest with the "City Inglewood" and a gold

12   patch on the left breast, and "Police" on the back.

13   Q    Do you recall who was driving that night?

14   A    I was driving.

15   Q    And then please remind me what area were you patrolling

16   in.

17   A    109 and Prairie.

18   Q    Is this a residential area?

19   A    Yes.

20   Q    And do you recall there were people walking around at

21   that time?

22   A    No, I do were not.

23   Q    Are there street lights in that area?

24   A    Yes, sir.

25   Q    I would like to show you what's been marked as --

```
 1   sorry.  Before I get there, how would you describe the
 2   area's lighting that night?
 3           How would you describe the lighting in that area?
 4   A    In 109 and Prairie it's relatively well lit.
 5   Q    I'd like to show you what's been previously marked and
 6   admitted as Government's Exhibit 10.
 7           Does this fairly represent the lighting in the
 8   area that night?
 9   A    Yes, sir.
10   Q    While you and Officer Villicana were patrolling that
11   night at approximately 9:30 P.M., did any vehicle catch your
12   attention?
13   A    Yes.
14   Q    Can you describe the vehicle.
15   A    Vehicle was a red Infiniti.
16   Q    Do you recall the direction the vehicle was traveling
17   in?
18   A    The vehicle was traveling eastbound.
19   Q    Do you recall the direction that you were traveling in?
20   A    We were traveling westbound.
21   Q    So it would be fair to say that you saw the car as it
22   was passing you?
23   A    Yes.
24   Q    What about the vehicle caught your attention?
25   A    Dark tint.
```

```
 1   Q    I'd like to show you a couple -- one exhibit in

 2   particular, Exhibit 7.

 3            Is this the vehicle that you saw that night?

 4   A    Yes, sir.

 5   Q    Does this accurately reflect the tinting that you saw

 6   that night?

 7   A    Yes, sir.

 8   Q    What happened after you observed -- let me step back.

 9            What about the tinting caught your attention?

10   A    It was dark.  I couldn't see in.

11   Q    What happened after you observed the dark tinting on

12   the vehicle?

13   A    I conducted a U-turn of our vehicle, and I attempted to

14   catch up to the vehicle to issue a citation for the

15   violation.

16   Q    As you began trailing the vehicle, what happened next?

17   A    We approached 109 and Doty, and there was a stop sign,

18   and the vehicle failed to stop at the stop sign.

19   Q    So as the vehicle was turning left from the Doty,

20   failed to stop at the stop sign, what, if anything, did you

21   do next?

22   A    I light up our forward facing red lights and sirens,

23   our floodlights, and our spotlights to conduct traffic stop.

24   Q    At that point do you notice anything?

25   A    Yes.
```

```
1    Q    What did you notice?

2    A    An arm extends out the back window of the vehicle and

3    discards what appeared to be a firearm.

4    Q    Do you recall which side of the vehicle?

5    A    Passenger side, rear passenger side.

6    Q    I'd like to again republish Exhibit 7.

7              Is that -- I can represent to you that this

8    picture shows the right rear window rolled down.

9              Is that the window that you saw the arm extend out

10   of and toss the firearm?

11   A    Yes, sir.

12   Q    Do you remember the approximate location where the

13   firearm was thrown from the vehicle?

14   A    From the vehicle or from the -- in the area?

15   Q    Do you remember the approximate location where you

16   observed the firearm being tossed?

17   A    From the rear passenger window of the car.

18   Q    Sorry.  In terms of the street.

19   A    Oh.  It was at -- when the car conducted a left turn to

20   go northbound onto Doty, the firearm was thrown out of the

21   rear passenger window and hit a parked car and dropped into

22   the street.

23   Q    Did you actually see where the firearm landed?

24   A    No, I did not see where the firearm landed, but I heard

25   it hit a car and hit the street.
```

1   Q    Once you saw the firearm being tossed from the vehicle,

2   did you or Officer Villicana request assistance?

3   A    Yes, sir.

4   Q    Was Officer Nicolas Bobbs one of the officers Officer

5   Villicana called for assistance?

6   A    Yes, sir.

7   Q    Did Officer Bobbs later show you a firearm?

8   A    Yes, sir.

9   Q    Did the firearm have a magazine in the magazine well?

10  A    No, it did not.

11  Q    In your experience, is it dangerous for a loaded

12  firearm to be tossed from a vehicle?

13  A    Yes, it is.

14  Q    Why?

15  A    Because it --

16          MR. CLEARY:  Objection.  Relevance.  Asked and

17  answered.

18          THE COURT:  Overruled.

19          THE WITNESS:  Yes, it is.

20  BY MR. RODRIGUEZ:

21  Q    Why?

22  A    Because it is liable to discharge.  I have personally I

23  have had that happen on another occasion where a subject

24  threw a firearm out of the vehicle or threw a firearm, and

25  it went off in my direction.

```
1              MR. CLEARY:  Objection.  Relevance.  Motion to
2    strike.
3              THE COURT:  Sustained.  Stricken.
4              MR. RODRIGUEZ:  Your Honor, at this point I would
5    like the special agent approach the witness and provide him
6    with what has been admitted as Exhibit 49.
7              THE COURT:  All right.
8    BY MR. RODRIGUEZ:
9    Q    Can you please show the jury -- can you place take
10   Exhibit 49 outside the evidence bag and show the jury what
11   is in the evidence bag.
12   A    No gloves or anything?
13   Q    No need for gloves.
14             Is this the -- is what has been marked as
15   Government's Exhibit 49, the firearm that Officer Bobbs
16   showed you that night?
17   A    Yes, sir.
18   Q    Is this firearm consistent in shape, size, and color
19   with the firearm you saw thrown from the right rear
20   passenger side of the vehicle that night?
21   A    Yes, sir.
22   Q    Did the vehicle immediately stop once you saw the
23   firearm being tossed from the vehicle?
24   A    It rolled to 108, took a right turn, and then rolled
25   eastbound about a house.
```

```
1    Q    So the vehicle did not immediately stop?

2    A    No, it did not.

3    Q    Approximately how far from where you saw the firearm

4    being tossed did the vehicle stop?

5    A    I'd say about half a block.

6    Q    When the vehicle stopped, what did you do?

7    A    We exited our vehicle, I approached the driver's side,

8    and my partner Officer Villicana approached the passenger

9    side.

10   Q    As you approached the vehicle, could you determine how

11   many individuals were inside?

12   A    Yes.  Before I approach any vehicle I order them to

13   roll the windows down and turn the car off.

14   Q    How many individuals were inside the vehicle?

15   A    Two.

16   Q    Where were they seated?

17   A    The driver was in the driver's seat, and the right rear

18   passenger was in the right rear passenger seat.

19   Q    Can you remind me what side of the vehicle you saw the

20   firearm tossed from.

21   A    Right rear passenger seat.

22   Q    Who was in the driver's side?

23   A    The driver.  I believe her name is Anna Ortiz.

24   Q    Did you see who was the right rear passenger?

25   A    Yes.
```

1  Q    Who was the right rear passenger?

2  A    The defendant.

3  Q    When you say, "the defendant," do you mean Steven

4  Duarte?

5  A    Yes, sir.

6  Q    Can you please describe what he is wearing.

7  A    He's to my right wearing a light shirt with a black

8  tie, white face mask.

9         MR. RODRIGUEZ:  Let the record reflect that

10  Officer Wunderlich has identified the defendant.

11         THE COURT:  Record will so reflect.

12  BY MR. RODRIGUEZ:

13  Q    After you approached the vehicle, what happened next?

14  A    Based on the circumstances we had, the driver stepped

15  out of the vehicle and the passenger stepped out of the

16  vehicle.

17  Q    Can you explain to the jury what you mean by "the

18  circumstances."

19  A    We just saw a firearm tossed out of the vehicle.

20  Q    See you have the individuals step out of the vehicle.

21  Then what do you do?

22  A    I had the driver step out of the vehicle.  I checked

23  her for weapons, and I have her stand -- or sit to the back

24  of her vehicle.

25  Q    What was Officer Villicana doing in the meantime?

```
 1   A    Waiting until I assisted him on having the defendant
 2   step out of the vehicle.
 3   Q    Are you familiar with the phrase Post Release Community
 4   Supervision, sometimes referred to as PRCS for short?
 5   A    Yes.
 6   Q    What is it?
 7            MR. CLEARY:  Object on cumulative.
 8            THE COURT:  Overruled.
 9   BY MR. RODRIGUEZ:
10   Q    Are you familiar with Post Release Community
11   Supervision, sometimes referred to as PRCS?
12   A    Yes.
13   Q    What is it?
14   A    It's probation.
15   Q    Can you explain what that is.
16   A    When someone has a prior conviction and is put on
17   probation and they're released out into public.
18   Q    Do you know whether an individual on PRCS has search
19   conditions?
20   A    Some do, some do not.
21   Q    Can you explain what "search conditions" means?
22   A    "Search conditions" means they are liable to search and
23   seizure at any time.
24            MR. CLEARY:  I'd object on relevance grounds, Your
25   Honor.
```

```
 1              THE COURT:  Overruled.
 2   BY MR. RODRIGUEZ:
 3   Q    On March 20th, 2020, at the time of the stop, did you
 4   know whether defendant was on PRCS?
 5   A    Yes.
 6   Q    Was he on PRCS?
 7   A    We clarified it through our vehicle's computer, yes.
 8   Q    Did he have search conditions?
 9   A    Yes.
10   Q    Did you confirm those search conditions?
11   A    Yes.
12   Q    And this was done prior to you searching the vehicle?
13   A    Yes, sir.
14   Q    At any point in time did you or Officer Villicana
15   search the vehicle?
16   A    I searched the vehicle.
17   Q    Did Officer Villicana?
18   A    No.
19   Q    What, if anything, did you find as a result of you
20   searching the vehicle?
21   A    I found a loaded Smith & Wesson .380 caliber magazine
22   stuffed in between the center console and the front
23   passenger seat.
24   Q    I want to show you a few exhibits.  I'll start off with
25   Exhibit 1.  Do you recognize this photo?
```

```
 1   A    Yes, sir.
 2   Q    What is it?
 3   A    It's a magazine stuffed in between the console and the
 4   seat.
 5   Q    Now I will move on to Government's Exhibit 2.  Do you
 6   recognize this?
 7   A    Yes.
 8   Q    What is it?
 9   A    It's a magazine stuffed in between the center console
10   which is gray and the light tan seat to the right which is
11   the front passenger seat.
12   Q    Thank you.
13        And I will move on to Government Exhibit 3.  Do
14   you recognize this?
15   A    Yes.
16   Q    What is it?
17   A    .380, Smith & Wesson .380 magazine with bullets in it.
18   Q    Is this the magazine that you found?
19   A    Yes, sir.
20   Q    Does it accurately depict the ammunition that was found
21   in the magazine?
22   A    Yes, sir.
23   Q    Is that your hand?
24   A    Yes.
25   Q    Were you wearing gloves that day?
```

```
 1   A    Yes, sir.
 2            MR. RODRIGUEZ:  Your Honor, I'd like for the
 3   special agent to please bring up Exhibit 50.
 4            THE COURT:  All right.
 5   BY MR. RODRIGUEZ:
 6   Q    Can you please take it out of the evidence bag.  Please
 7   show it to the jury.
 8            What is it?
 9   A    .380 magazine, Smith & Wesson.
10   Q    Is this the magazine that you found that day?
11   A    Yes, sir.
12            MR. RODRIGUEZ:  I'd now like the special agent to
13   retrieve that exhibit and provide the witness with
14   Exhibit 51.
15   Q    Can you please show the jury what it is.
16            What is it?
17   A    .380 caliber bullet.
18   Q    Is this the ammunition that you found in the magazine?
19   A    Yes, sir.
20   Q    Are Exhibits 50, 51, the magazine and ammunition that
21   you just handled and showed the jury what you found after
22   searching the vehicle that night?
23   A    Yes, sir.
24   Q    In relation to where you found the magazine and
25   ammunition, where was Defendant Steven Duarte sitting?
```

```
 1   A    He was in the rear passenger seat of the vehicle.
 2   Q    Is that right in front of -- is the right rear
 3   passenger seat right behind where the magazine and
 4   ammunition were located?
 5   A    Yes.
 6   Q    Do you recall that earlier you testified that Officer
 7   Bobbs showed you the firearm that he recovered?
 8   A    Yes, sir.
 9   Q    Did you try to insert the magazine that you found in
10   the vehicle into the firearm that Officer Bobbs provided
11   you?
12   A    Yes, sir.
13   Q    How did it fit?
14   A    It matched up caliber and in make.
15   Q    By "make," do you mean brand?
16   A    Brand too, yes.
17   Q    Did you eventually put the firearm magazine and
18   ammunition into evidence bags?
19   A    Yes.
20   Q    Where did you place those evidence bags?
21   A    Trunk of our black Charger.
22   Q    Do you recall where the defendant was placed?
23   A    He was put in the rear seat of our vehicle.
24   Q    From where the defendant was placed, could he have
25   access to the evidence bags?
```

```
 1   A    No.

 2   Q    Did you request DNA analysis on the firearm or

 3   ammunition?

 4   A    Yes.

 5   Q    On one or both?

 6   A    Both.

 7   Q    Now I'd like to show you what has been previously

 8   admitted as Government's Exhibit 14.

 9        Do you recognize this?

10   A    Yes, sir.

11   Q    What is it?

12   A    Those are the evidence bags the evidence was put in and

13   put in the IPD evidence room.

14   Q    Is this your handwriting?

15   A    Yes, sir.

16   Q    What did you put in each of these bags?

17   A    One has the handgun, and the other has the magazine and

18   the bullets.

19   Q    Did you seal the bags after you placed the respective

20   contents inside of them?

21   A    Yes, sir.

22   Q    Is that the red tape that we can see?

23   A    Yes.

24   Q    When you retrieved these evidence bags, did it look

25   like the evidence bags had -- had been tampered with or
```

 1  otherwise altered?

 2  A    No.

 3  Q    What case number are these evidence bags associated

 4  with?

 5  A    20-17470.

 6  Q    What is the serial number of the firearm that you

 7  submitted for DNA analysis?

 8  A    For the firearm is EAT2760.

 9  Q    Where did you ultimately place these evidence bags?

10  A    In the IPD evidence room.

11  Q    Why did you place them there?

12  A    Because that's where the evidence goes after you put in

13  the evidence bag.

14  Q    Is that where they are retrieved for the DNA

15  processing?

16  A    Yes, they were retrieved from there.  Yes.

17  Q    You just testified about the events of March 20th,

18  2020.  Is there camera footage or any type of footage of the

19  events you just described?

20  A    No.

21  Q    Why not?

22  A    We don't -- we do not have any cameras, body cams on us

23  or in our car per policy.

24  Q    So the department does not issue them?

25  A    No.  And we cannot have our own also.

```
 1            MR. RODRIGUEZ:  One moment, Your Honor.

 2            THE COURT:  All right.

 3        (Brief pause in the proceedings.)

 4  BY MR. RODRIGUEZ:

 5  Q    Going back to the magazine and where you located it,

 6  would it be fair to say that it was within the arm's reach

 7  of the defendant?

 8  A    Yes, sir.

 9  Q    In your opinion, was it within the arm's reach of the

10  driver?

11  A    No.

12            MR. CLEARY:  Objection.  Speculation.

13            THE COURT:  Overruled.

14            MR. RODRIGUEZ:  Going -- I want to publish what's

15  been previously admitted as Government's Exhibit 7.

16  Q    Does this picture depict the window as -- does this

17  picture depict the vehicle in the same condition that you

18  pulled it over?

19  A    Yes.

20  Q    So the right rear window was rolled down when you

21  pulled the vehicle over?

22  A    Yes.

23  Q    The same right rear window you saw the firearm tossed

24  from?

25  A    Yes.
```

```
 1    Q     Now I want to publish what's been previously admitted
 2    as Government Exhibit 14.
 3          Do you -- can you tell me the make and model of
 4    the firearm.
 5    A     It is a Smith & Wesson Bodyguard .380 caliber.
 6    Q     And the color?
 7    A     Black.
 8    Q     And what about the type?  The type of handgun it is.
 9    A     Semi-auto handgun.
10    Q     Got it.
11          No further questions at this time, Your Honor.
12          THE COURT:  Given the time, as I mentioned to the
13    jurors I have another matter that I have to tend to at
14    11:30, we'll take a lunch break at this time.
15          I am going to ask just in the abundance of caution
16    because I don't want to unnecessarily delay you.  I am going
17    to ask that you come back at 12:45 because that will give me
18    I think enough time for me to handle my other matter and
19    we'll resume the trial at that time.
20          You will hear me say this ad nauseam, forgive me,
21    but I have to do it.
22          Please do not form or express any opinions about
23    the case until the matter is finally submitted to you.
24    Don't talk with anyone, don't allow anyone to talk to you
25    about the case, and please do not conduct any research of
```

```
 1    any kind on any subject matter connected with the case.
 2            I will also note, you know, we're in a new world
 3    here.  You all are convening in what is a judge's chambers,
 4    I believe.  I'm not certain of this.  But there are legal
 5    books in the chambers.  Please do not look at the books,
 6    don't conduct any research of any kind.  I just want to make
 7    sure you don't -- it's fine to glance at them, but don't
 8    pull any out and start reading them, please.
 9            Let's have you come back -- oh, you know, for
10    lunch, you can exit out the back door and enjoy your lunch,
11    and we'll have you back at 12:45.  Please be on time.  If
12    you're here at 12:45 we'll be ready to go and get started.
13    Thank you all.
14            THE CLERK:  All rise for the jury.
15       (The following was heard in open court outside the
16        presence of the jury:)
17            THE COURT:  Is there anything we need to discuss?
18            MR. RODRIGUEZ:  No, Your Honor.
19            THE COURT:  Mr. Cleary.
20            MR. CLEARY:  Not that I am aware of.
21            THE COURT:  Just so everyone knows.
22            At some point, Mr. Cleary, I was looking at the
23    defense exhibits.  We're going to have to have a discussion
24    about this YouTube video.  I watched it.  I don't know
25    what's going on.  So I am going to ask you about it at some
```

```
 1   point.  All right?

 2             MR. CLEARY:  All right.

 3             MR. KAHAN:  The government has not been provided

 4   this YouTube video.

 5             THE COURT:  You did not get the exhibit list?

 6             MR. KAHAN:  The -- we have not been provided any

 7   exhibit list from defense counsel.  My understanding is --

 8             THE COURT:  Hold on.

 9             Mr. Cleary, you didn't give them an exhibit list?

10             MR. CLEARY:  No, Your Honor, I didn't because it

11   would be for cross-examination purposes, and that's why --

12   for impeachment.

13             THE COURT:  All right.  We're going to have to

14   have a discussion about it because I don't understand -- I

15   am just letting you know I have questions about the exhibit.

16             MR. CLEARY:  We'll address it before -- I won't

17   show it until we've addressed it.

18             THE COURT:  Tell me when you are going to do it

19   because I am not going to have this jury waiting.  If you

20   think it's going to happen today, then we'll discuss it

21   either right before lunch, right before we come back for

22   lunch or at the end of today.

23             MR. KAHAN:  If I can also note, I asked defense

24   counsel --

25             THE COURT:  I'm sorry.  I can't hear you.
```

```
 1              MR. KAHAN:  If I can also note, I asked defense
 2    counsel this morning if he had any exhibits, and he told me
 3    no.
 4              THE COURT:  Okay.  Well --
 5              MR. CLEARY:  Thank you very much.
 6              THE COURT:  All right.  Let's have you come back a
 7    little before 12:45.  You are going to start
 8    cross-examination right at that point.  All right?
 9              MR. CLEARY:  Okay.
10              THE COURT:  All right.  Thank you.
11              THE CLERK:  All rise.  This Court is in recess.
12         (Lunch recess taken 11:30 A.M.)
13                          --oOo--
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                            CERTIFICATE

 2

 3        I hereby certify that pursuant to Section 753,

 4   Title 28, United States Code, the foregoing is a true and

 5   correct transcript of the stenographically reported

 6   proceedings held in the above-entitled matter and that the

 7   transcript page format is in conformance with the

 8   regulations of the Judicial Conference of the United States.

 9

10   Date:   July 1, 2022.

11

12

13

14                    /S/ CHIA MEI JUI

15               Chia Mei Jui, CSR No. 3287

16

17

18

19

20

21

22

23

24

25
```