1      UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3      HONORABLE ANDRÉ BIROTTE JR., U.S. DISTRICT JUDGE

4

5  UNITED STATES OF AMERICA,        )
                                    )
6                  PLAINTIFF,       )
                                    )
7          vs.                      ) No. CR 20-0387-AB
                                    )
8  STEVEN DUARTE,                   )
                                    )
9                  DEFENDANT.       )
   _____ )

10

11

12

13      REPORTER'S TRANSCRIPT OF PROCEEDINGS

14      DAY 3 OF JURY TRIAL

15      THURSDAY, AUGUST 26, 2021

16      8:57 A.M.

17      LOS ANGELES, CALIFORNIA

18

19

20

21

22  _____

23      **CHIA MEI JUI, CSR 3287, CCRR, FCRR**
        FEDERAL OFFICIAL COURT REPORTER
24      350 WEST FIRST STREET, ROOM 4311
        LOS ANGELES, CALIFORNIA 90012
25      cmjui.csr@gmail.com

```
 1   APPEARANCES OF COUNSEL:

 2   FOR THE PLAINTIFF:

 3          OFFICE OF THE UNITED STATES ATTORNEY
            BY: JUAN M. RODRIGUEZ
 4          BY: KYLE WALKER KAHAN
            BY: LAUREN RESTREPO
 5          ASSISTANT U.S. ATTORNEYS
            312 NORTH SPRING STREET
 6          13TH FLOOR
            LOS ANGELES, CALIFORNIA 90012
 7          (213) 894-2434

 8

 9   FOR THE DEFENDANT:

10          LAW OFFICE OF OLIVER P. CLEARY
            BY:  OLIVER P. CLEARY, ATTORNEY AT LAW
11          468 NORTH CAMDEN DRIVE
            SUITE 200
12          BEVERLY HILLS, CALIFORNIA 90210
            (424) 324-8874

13

14   ALSO PRESENT:

15          FBI SPECIAL AGENT UZONA ONWUMERE

16

17

18

19

20

21

22

23

24

25
```

CHIA MEI JUI, CSR 3287, CCRR, FCRR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              LOS ANGELES, CALIFORNIA; THURSDAY, AUGUST 26, 2021

 2                              8:57 A.M.

 3                                - - -

 4         (The following was heard in open court outside the

 5          presence of the jury:)

 6              THE COURT:  Good morning, everyone.

 7              Have you had a chance to go over the jury

 8    instructions?  For the government.

 9              MR. KAHAN:  Yes, Your Honor.

10              THE COURT:  Mr. Cleary.

11              MR. CLEARY:  Yes, Your Honor.

12              THE COURT:  All right.  Any edits, changes,

13    suggestions, comments?

14              From the government.

15              MR. KAHAN:  Yes, Your Honor.  The government would

16    propose adding Ninth Circuit Model Jury Instruction 2.3,

17    which is regarding the stipulations that were entered

18    into --

19              THE COURT:  Let me pull it up one second.  Hold

20    on.  Let's see.  2.3.

21         (Brief pause in the proceedings.)

22              THE COURT:  Right.  What's the defense position?

23    I read that instruction at the time of the stipulation.  I

24    think I read it almost verbatim, if not verbatim, but what's

25    the defense position?
```

```
 1              MR. CLEARY:  I will submit to the Court on it.

 2              THE COURT:  I think we can add it.  I don't think

 3     there is any harm in doing that.  So we'll add that.

 4              Let's see.  I would fit it in probably -- I'll

 5     probably put it after Closing Instruction Number 4.  That

 6     talks about what is evidence, and it's the third item that

 7     says, "Any facts to which the parties have agreed."  Then

 8     the next page I would probably insert it there.

 9              Is that all right?

10              MR. KAHAN:  That's fine with the government,

11     Your Honor.

12              THE COURT:  Any other edits, suggestions, or

13     comments?

14              MR. KAHAN:  Depending on whether defendant

15     testifies, we will need to add either Model Jury

16     Instruction 3.3 or 3.4.

17              THE COURT:  All right.

18              Has there been any change, Mr. Cleary, as to that

19     status?

20              MR. CLEARY:  He's not going to testify,

21     Your Honor.

22              THE COURT:  Okay.  And I will just ask:  Does the

23     defense intend to rest when I bring the jury out?

24              MR. CLEARY:  Yes.

25              THE COURT:  Okay.  So those -- we don't need
```

1   those.

2           MR. KAHAN:  We need to add Instruction 4.3.

3           THE COURT:  About?

4           MR. KAHAN:  I apologize.  I am missing my notes on

5   that one.

6           THE COURT:  Consideration of evidence?

7           MR. KAHAN:  My apologies, Your Honor.  Do you know

8   what?  That is already in.  My mistake.

9           THE COURT:  Okay.

10          MR. KAHAN:  Then we need to either -- I believe at

11  this point we need to eliminate Instruction 4.6 which is

12  about the impeachment of defendant which is currently in

13  here as Instruction Number 11.

14          Because while it does mention that "You have heard

15  evidence that the defendant has been previously convicted of

16  a crime," this is all about the impeachment of the defendant

17  in the event he testifies.

18          Alternatively, we can modify it so that it only

19  reflects whether the government has met --

20          THE COURT:  I think it is better to just strike

21  it, particularly in light of Instruction Number 10 which

22  covers that area.

23          What's the defense position?

24          MR. CLEARY:  Right.  I think Instruction 10 bears

25  on the fact that they have heard about a prior conviction.

1           THE COURT:  Right.  So we'll take out what I have

2     that as Closing Instruction Number 11.  We'll strike that.

3           MR. KAHAN:  And the final modification, the

4     government's request is to modify the substantive

5     instruction for 18 USC 922(g).

6           THE COURT:  Tell me what closing instruction we're

7     talking about so I know where you are suggesting an edit.

8           MR. KAHAN:  This would be Closing

9     Instruction Number 13.

10          THE COURT:  Unlawful possession.  What is your

11    edit suggestion?

12          MR. KAHAN:  We would request that the third and

13    fourth elements include the stipulations.  I believe the

14    model instruction allows for that to be added to the

15    elements if --

16          THE COURT:  I mean, look.  I appreciate that, but

17    you have got to tell me what you want.  Because there is a

18    part of me that says what -- those elements have been met,

19    the parties have agreed to that.  What are you proposing

20    exactly?

21          MR. KAHAN:  To add to the third element, we would

22    request at the end of the sentence to add:  The defendant

23    stipulates that, before March 20th, 2020, the defendant had

24    been convicted of a crime punishable by imprisonment for a

25    term exceeding one year.

1              And then after the fourth element to include the

2    following language:  The defendant stipulates that, on

3    March 20th, 2020, defendant knew he had been convicted of a

4    crime punishable by imprisonment for a term exceeding one

5    year.

6              We have a copy for the Court if needed.

7              THE COURT:  Bring that to the Court.

8              What's the defense position?

9              MR. CLEARY:  I think that is correct, that

10   defendant stipulated to -- that adding the sentence on the

11   third element as the government proposes is the correct way

12   to modify the instruction to include the fact of the

13   stipulation.

14             THE COURT:  All right.  So then we'll add that to

15   Instruction Number 13.

16             Any other edits, comments, or suggestions from the

17   government?

18             MR. KAHAN:  No, Your Honor.

19             THE COURT:  Mr. Cleary.

20             MR. CLEARY:  Is the Court disinclined or inclined

21   to give the mere presence instruction --

22             THE COURT:  If it's not here, that means I am

23   disinclined to do that.  I considered -- you had a number of

24   proposals, I believe.  I considered them and don't intend to

25   use them.  But if -- I want to give you the opportunity to

1    be heard, try to tell me what I am missing and why you think

2    those instructions should be included.

3              MR. CLEARY:  The mere presence instruction just

4    goes to cover situations, arguably situations like this

5    where there is insufficient evidence to establish that he

6    committed the crime, and, therefore, when there is a

7    possibility that others may be responsible, the jury can be

8    instructed on what they can use -- the fact that the

9    defendant is present, how they can use that fact.

10             For example, if the government argues we're done,

11   he's in the car, we found a gun in the car, period, the mere

12   presence instruction says, well, in order to commit the

13   crime being present isn't sufficient.  It can be considered

14   but is not sufficient in and of itself.

15             THE COURT:  What's the government's position?

16             MR. KAHAN:  The government would object to the

17   inclusion of that instruction.  The government's argument is

18   that the defendant was seen tossing the firearm and was

19   within proximity and the only person within the car who was

20   within proximity of the magazine that was recovered.  His

21   DNA --

22             THE COURT:  Walk me through why you believe he was

23   the only person.  Where was the magazine -- just so you can

24   have a record, where was the magazine found in relation to

25   where Mr. Duarte and the driver?

```
 1            MR. KAHAN:  Certainly.

 2            The defendant was in the back passenger seat of

 3    the red Infiniti.  The magazine was found stuffed in between

 4    the passenger seat and the center console.

 5            Officer Wunderlich, if I recall correctly,

 6    indicated that the magazine as found would have been within

 7    arm's reach of the defendant but not within the arm's reach

 8    of Ms. Ortiz.

 9            THE COURT:  Wait.  Did he say -- I remember the

10    arm's reach of Mr. Duarte.  Did he say also the con- -- not

11    the converse, the opposite, not within arm's reach of

12    Ms. Ortiz?

13            MR. KAHAN:  He did.

14            THE COURT:  Okay.  I just don't remember that.

15            MR. KAHAN:  In his opinion he -- that came out

16    during direct examination.

17            THE COURT:  Anything further?

18            MR. KAHAN:  Not on that subject.

19            THE COURT:  Mr. Cleary, I don't think that that

20    instruction is necessary.  Look, you are going to argue it

21    could be anyone's gun, but I don't think that the evidence

22    that has been presented suggests that that instruction is

23    necessary.  So I am not going to include that instruction.

24            MR. CLEARY:  Just to clarify for the purposes of

25    the record, that, when the government indicated that it was
```

```
 1    found stuffed between the console and the passenger seat,

 2    that was the front passenger seat, not the rear passenger

 3    seat.

 4              THE COURT:  Right.  That's my understanding.

 5              Or are you saying no?

 6              MR. KAHAN:  No, that's correct.  The front

 7    passenger seat and the center console.

 8              THE COURT:  Right.  Yes.

 9              Anything further, Mr. Cleary?

10              MR. CLEARY:  No, Your Honor.

11              THE COURT:  We're going to make the changes.  I

12    will get a final copy to you all.  We'll get the jury in.  I

13    will ask the parties -- I will ask Mr. Cleary on the record

14    if he intends to call any witnesses, he will rest, then I

15    will do the closing instructions, and then you can argue.

16              Does that answer your question, Mr. Rodriguez?

17              MR. RODRIGUEZ:  No.  I wanted permission, Your

18    Honor, to argue from the back microphone.

19              THE COURT:  Okay.  That's fine.

20              MR. RODRIGUEZ:  Permission to use the physical

21    exhibits during closing.

22              THE COURT:  Right, as long as you're not passing

23    them around to the jurors, that's fine.

24              MR. RODRIGUEZ:  Yes.  Thank you, Your Honor.

25              THE COURT:  Mr. Cleary, anything else that we need
```

```
 1   to discuss before we bring the jurors in?
 2              MR. CLEARY:  No, Your Honor.  Thank you.
 3              THE COURT:  All right.  So what I'll do is I will
 4   make copies, give them to you all, give you a few moments.
 5   If there is no edits or suggestions, then I am just bringing
 6   the jury out, they'll have the instructions, and we'll do
 7   the instructions and then begin our closing.
 8              Mr. Kahan.
 9              MR. KAHAN:  Final topic, Your Honor.
10              With regards to the Indictment that would be
11   provided to the jury in the back --
12              THE COURT:  Right.
13              MR. KAHAN:  When would the Court like a copy of
14   the --
15              THE COURT:  Probably now would be a good time if
16   you have one.
17              MR. KAHAN:  I do not have one at this time.  I can
18   have one after --
19              THE COURT:  No one has worked on that at all?
20              MR. KAHAN:  It's done.  It is just not printed.
21              THE COURT:  Okay.  There is a computer.  Is a
22   printer not available?  I'm teasing you, but I am wondering
23   what would be the holdup.
24              MR. KAHAN:  We can work on that.
25              THE COURT:  Obviously, as soon as -- how long do
```

```
 1   you think your closing is going to be?

 2            MR. RODRIGUEZ:  Ten minutes, Your Honor.

 3            THE COURT:  Okay.  Mr. Cleary, how long?  I

 4   anticipate your closing is going to be somewhere in the

 5   20 --

 6            MR. CLEARY:  Twenty minutes.

 7            THE COURT:  Twenty minutes.

 8            So you have got about an hour before we need to

 9   get this to the jury.  So the sooner the better.  That's all

10   I would suggest.  Okay?

11            MR. RODRIGUEZ:  Will do, Your Honor.  Thank you.

12            THE COURT:  So I will step off the bench, we can

13   get these instructions done, and we'll get them to you all.

14   All right?  Thank you.

15            THE CLERK:  All rise.  Court stands in recess.

16       (Recess taken 9:09 A.M. to 9:52 A.M.)

17            THE COURT:  Thank you for your eagle eyes with

18   respect to the jury instructions.

19            So we're going to bring the jury in.  I will ask

20   whether defense intends to call any witnesses.  Once I get

21   that response, I will have our courtroom deputy or one of my

22   law clerks pass out the jury instructions to the parties.

23   I'll read the instructions, and we'll begin closing

24   argument.

25            So if we can get the jury in, that would be great.
```

```
1   Thank you.
2        (The following was heard in open court in the presence
3         of the jury:)
4            THE COURT:  Good morning, everyone.  Apologies for
5   the delays.  As I mentioned to you earlier during the
6   earlier instructions, while you are there, we are working.
7   And so we have been trying to get this matter to you as soon
8   as possible.
9            So yesterday the prosecution rested their case.
10           Mr. Cleary, does the defense intend to call any
11  witnesses at this time?
12           MR. CLEARY:  The defense rests, Your Honor.
13           THE COURT:  So the prosecution having rested, the
14  defense having rested, ladies and gentlemen, it's time for
15  me now to provide you with closing jury instructions.
16           Those will help guide your consideration of the
17  evidence in this case.  We'll go through those jury
18  instructions.  After that you will hear closing arguments.
19  After that the matter will be submitted to you, and you can
20  begin your deliberation.  So just bear with me one moment,
21  please.
22       (Brief pause in the proceedings.)
23           THE COURT:  All right.  Do any of the jurors not
24  have the jury instructions?  If you don't, please raise your
25  hand.
```

1          The following are the Court's jury instructions to

2   guide your consideration of the evidence in this case.

3               (Reading:)  Members of the jury, now

4          that you have heard all the evidence, it is my

5          duty to instruct you on the law that applies

6          to this case.  Copies of these instructions

7          you have been given and will be available in

8          the jury room for you to consult.

9               It is your duty to weigh and

10         evaluate all the evidence received in the case

11         and, in that process, to decide the facts.  It

12         is also your duty to apply the law as I give

13         it to you to the facts as you find them,

14         whether you agree with the law or not.  You

15         must decide the case solely on the evidence

16         and the law.  Do not allow personal likes or

17         dislikes, sympathy, prejudice, fear, or public

18         opinion to influence you.  You should also not

19         be influenced by any person's race, color,

20         religious beliefs, national ancestry, sexual

21         orientation, gender identity, gender or

22         economic circumstances.  Also, do not allow

23         yourself to be influenced by the personal

24         likes or dislikes, sympathy, prejudice, fear,

25         public opinion, or biases, including

```
 1          unconscious biases.  Unconscious biases are
 2          stereotypes, attitudes, or preferences that
 3          people may consciously reject but may be
 4          expressed without conscious awareness,
 5          control, or intention.  You will recall that
 6          you took an oath promising to do so at the
 7          beginning of the case.
 8                    You must follow all these
 9          instructions and not single out some and
10          ignore others.  They are all important.
11          Please do not read into these instructions or
12          into anything I may have said or done as my
13          suggestion as to what the verdict you should
14          return.  This matter is entirely up to you.
15                    The Indictment is not evidence.  The
16          defendant has pleaded not guilty to the
17          charge.  The defendant is presumed to be
18          innocent unless and until the government
19          proves the defendant guilty beyond a
20          reasonable doubt.  In addition, the defendant
21          does not have to testify or present any
22          evidence.  The defendant does not have to
23          prove innocence.  The government has the
24          burden of proving every element of the charge
25          beyond a reasonable doubt.
```

1            A defendant in a criminal case has a

2       constitutional right not to testify.  In

3       arriving at your verdict, the law prohibits

4       you from considering in any manner that the

5       defendant did not testify.

6            Proof beyond a reasonable doubt is

7       proof that leaves you firmly convinced that

8       the defendant is guilty.  It is not required

9       that the government prove guilt beyond all

10      possible doubt.

11           A reasonable doubt is a doubt based

12      upon reason and common sense and is not based

13      purely on speculation.  It may arise from a

14      careful and impartial consideration of all the

15      evidence or from lack of evidence.

16           If after a careful and impartial

17      consideration of all the evidence you are not

18      convinced beyond a reasonable doubt that the

19      defendant is guilty, it is your duty to find

20      the defendant not guilty.  On the other hand,

21      if after careful and impartial consideration

22      of all the evidence you are convinced beyond a

23      reasonable doubt that the defendant is guilty,

24      it is your duty to find the defendant guilty.

25           The evidence you are to consider in

1    deciding what the facts are consists of:

2           One, the sworn testimony of any

3    witness;

4           Two, the exhibits received in

5    evidence;

6           Three, any facts to which the

7    parties have agreed.

8           The parties have agreed to certain

9    facts that have been stated to you.  Those

10   facts are now conclusively established.

11          In reaching your verdict you may

12   consider only the testimony and exhibits

13   received in evidence.  The following things

14   are not evidence and you may not consider them

15   in deciding what the facts are:

16          One, questions, statements,

17   objections, and arguments by the lawyers are

18   not evidence.  The lawyers are not witnesses.

19   Although you must consider a lawyer's

20   questions to understand the answers of a

21   witness, the lawyer's questions are not

22   evidence.  Similarly, what the lawyers may

23   have said in their opening statements, or they

24   will say in their closing arguments, and at

25   other times is intended to help you interpret

1    the evidence, but it is not evidence.  If the

2    facts as you remember them differ from the way

3    the lawyers state them, your memory of them

4    controls.

5              Two, any testimony that I have

6    excluded, stricken, or instructed you to

7    disregard is not evidence.  In addition, some

8    evidence was received only for a limited

9    purpose.  When I have instructed you to

10   consider certain evidence in a limited way,

11   you must do so.

12             Three, anything you may have seen or

13   heard when the Court was not in session is not

14   evidence.  You are to decide the case solely

15   on the evidence received at the trial.

16             Evidence may be direct or

17   circumstantial.  Direct evidence is direct

18   proof of a fact such as testimony by a witness

19   about what that witness personally saw or

20   heard or did.  Circumstantial evidence is

21   indirect evidence, that is, it is proof of one

22   or more facts from which you can find another

23   fact.

24             By way of example, if you wake up in

25   the morning and see that the sidewalk is wet,

1          you may find from that fact that it rained

2          during the night.  However, other evidence,

3          such as a turned-on garden hose, may provide

4          an explanation for the water on the sidewalk.

5          Therefore, before you decide that a fact has

6          been proved by circumstantial evidence, you

7          must consider all the evidence in the light of

8          reason, experience, and common sense.

9                  You are to consider both direct and

10         circumstantial evidence.  Either can be used

11         to prove any fact.  The law makes no

12         distinction between the weight to be given to

13         either direct or circumstantial evidence.  It

14         is for you to decide how much weight to give

15         to any evidence.

16                 In deciding the facts in this case,

17         you may have to decide which testimony to

18         believe and which testimony not to believe.

19         You may believe everything a witness says, or

20         part of it, or none of it.

21                 In considering the testimony of any

22         witness, you may take into account:

23                 The witness's opportunity and

24         ability to see or hear or know the things

25         testified to;

1              The witness's memory;

2              The witness's manner while

3      testifying;

4              The witness's interest in the

5      outcome of the case, if any;

6              The witness's bias or prejudice, if

7      any;

8              Whether other evidence contradicted

9      the witness's testimony;

10              The reasonableness of the witness's

11      testimony in light of all the evidence; and

12              Any other factors that bear on

13      believability.

14              Sometimes a witness may say

15      something that is not consistent with

16      something else he or she said.  Sometimes

17      different witnesses will give different

18      versions of what happened.  People often

19      forget things or make mistakes in what they

20      remember.  Also, two people may see the same

21      event but remember it differently.  You may

22      consider these differences but do not decide

23      the testimony is untrue just because it

24      differs from other testimony.

25              However, if you decide that a

1          witness has deliberately testified

2          untruthfully about something important, you

3          may choose not to believe anything that

4          witness said.  On the other hand, if you think

5          the witness testified untruthfully about some

6          things but told the truth about others, you

7          may accept the part you think is true and

8          ignore the rest.

9               The weight of the evidence as to a

10         fact does not necessarily depend on the number

11         of witnesses who testify.  What is important

12         is how believable the witnesses were, and how

13         much weight you think their testimony

14         deserves.

15              You are here only to determine

16         whether the defendant is guilty or not guilty

17         of the charge in the Indictment.  The

18         defendant is not on trial for any conduct or

19         offense not charged in the Indictment.

20              The Indictment charges that the

21         offense alleged in Count 1 was committed "on

22         or about" a certain date.  Although it is

23         necessary for the government to prove beyond a

24         reasonable doubt that the offense was

25         committed on a date reasonably near the date

```
 1          alleged in Count 1 of the Indictment, it is

 2          not necessary for the government to prove that

 3          the offense was committed precisely on the

 4          date charged.

 5               You have heard evidence that the

 6          defendant committed other crimes, wrongs, or

 7          acts not charged here.  You may consider this

 8          evidence only for its bearing, if any, on the

 9          question of the defendant's motive or

10          knowledge and for no other purpose.  You may

11          not consider this evidence as evidence of

12          guilt of the crime for which the defendant is

13          now on trial.

14               You have heard testimony from

15          Federal Bureau of Investigation

16          Special Agent Daniel Lewis and Los Angeles

17          County Sheriff's Department Scientific

18          Services Bureau Senior Criminologist

19          Luis Olmos, who testified to opinions and the

20          reasons for their opinions.  This opinion

21          testimony is allowed because of the education

22          or experience of these witnesses.

23               Such opinion testimony should be

24          judged like any other testimony.  You may

25          accept it or reject it and give it as much
```

1        weight as you think it deserves, considering

2        the witness's education and experience and the

3        reasons given for the opinions and all the

4        other evidence in the case.

5                The defendant is charged in the

6        Indictment with possession of a firearm and

7        ammunition in violation of Section 922(g)(1)

8        of Title 18 of the United States Code.  For

9        the defendant to be found guilty of that

10        charge, the government must prove each of the

11        following elements beyond a reasonable doubt:

12                First, the defendant knowingly

13        possessed a firearm or ammunition, with all of

14        you agreeing to which firearm or ammunition

15        the defendant possessed, or both.

16                Second, the firearm or ammunition

17        had been shipped or transported from one state

18        to another, with all of you agreeing to

19        whether the firearm or ammunition, or both,

20        had been so transported.

21                Third, at the time the defendant

22        possessed the firearm or ammunition, the

23        defendant had been convicted of a crime

24        punishable by imprisonment for a term

25        exceeding one year.  The defense stipulates

1    that, before March 20, 2020, the defendant had

2    been convicted of a crime punishable by

3    imprisonment for a term exceeding one year.

4          Fourth, at the time the defendant

5    possessed the firearm or ammunition, the

6    defendant knew he had been convicted of a

7    crime punishable by imprisonment for a term

8    exceeding one year.  The defense stipulates

9    that on March 20, 2020, defendant knew he had

10   been convicted of a crime punishable by

11   imprisonment for a term exceeding one year.

12          A person has possession of something

13   if the person knows of its presence and has

14   physical control of it or knows of its

15   presence and has the power and intention to

16   control it.

17          More than one person can be in

18   possession of something if each knows of its

19   presence and has the power and intention to

20   control it.

21          An act is done knowingly if the

22   defendant is aware of the act and does not act

23   through ignorance, mistake, or accident.  You

24   may consider evidence of the defendant's

25   words, acts, or omissions, along with all the

1          other evidence, in deciding whether the

2          defendant acted knowingly.

3                    When you begin your deliberations,

4          elect one member of the jury as your

5          foreperson who will preside over the

6          deliberations and speak for you here in court.

7          You will then discuss the case with your

8          fellow jurors to reach agreement if you can do

9          so.  Your verdict, whether guilty or not

10         guilty, must be unanimous.

11                   Each of you must decide the case for

12         yourself, but you should do so only after you

13         have considered all the evidence, discussed it

14         fully with the other jurors, and listened to

15         the views of your fellow jurors.

16                   Do not be afraid to change your

17         opinion if the discussion persuades you that

18         you should.  But do not come to a decision

19         simply because other jurors think it is right.

20                   It is important that you attempt to

21         reach a unanimous verdict but, of course, only

22         if each of you can do so after having made

23         your own conscientious decision.  Do not

24         change an honest belief about the weight and

25         effect of the evidence simply to reach a

```
1              verdict.

2                        Perform these duties fairly and

3              impartially.  Do not allow personal likes or

4              dislikes, sympathy, prejudice, fear, or public

5              opinion to influence you.  You should also not

6              be influenced by any person's race, color,

7              religious beliefs, national ancestry, sexual

8              orientation, gender identity, gender, or

9              economic circumstances.  Also, do not allow

10             yourself to be influenced by personal likes or

11             dislikes, sympathy, prejudice, fear, public

12             opinion, or biases, including unconscious

13             biases.  Unconscious biases are stereotypes,

14             attitudes, or preferences that people may

15             consciously reject but may be expressed

16             without conscious awareness, control, or

17             intention.

18                        It is your duty as jurors to consult

19             with one another and to deliberate with one

20             another with a view towards reaching an

21             agreement if you can do so.  During your

22             deliberations, you should not hesitate to

23             re-examine your own views and change your

24             opinion if you become persuaded that it is

25             wrong.
```

```
1              Because you must base your verdict

2         only on the evidence received in the case and

3         on these instructions, I remind you that you

4         must not be exposed to any other information

5         about the case or to the issues it involves.

6         Except for discussing the case with your

7         fellow jurors during your deliberations:

8              Do not communicate with anyone in

9         any way and do not let anyone else communicate

10        with you in any way about the merits of the

11        case or anything to do with it.  This

12        restriction includes discussing the case in

13        person, in writing, by phone, tablet,

14        computer, or any other means, via e-mail, text

15        messaging, or any Internet chat room, blog,

16        Website, or any other forms of social media.

17        This restriction applies to communicating with

18        your family members, your employer, the media

19        or press, and the people involved in the

20        trial.  If you are asked or approached in any

21        way about your jury service or anything about

22        this case, you must respond that you have been

23        ordered not to discuss the matter and to

24        report the contact with the Court.

25             Do not read, watch, listen to any
```

```
 1          news or media accounts or commentary about the

 2          case or anything to do with it.  Do not do any

 3          research, such as consulting dictionaries,

 4          searching the Internet or using other

 5          reference materials, and do not make any

 6          investigation or in any other way try to learn

 7          about the case on your own.

 8                  The law requires these restrictions

 9          to ensure the parties have a fair trial based

10          on the same evidence that each party has had

11          an opportunity to address.  A juror who

12          violates these restrictions jeopardizes the

13          fairness of these proceedings and a mistrial

14          could result that would require the entire

15          trial process to start over.  If any juror is

16          exposed to any outside information, please

17          notify the Court immediately.

18                  Some of you have taken notes during

19          the trial.  Whether or not you took notes, you

20          should rely on your memory of what was said.

21          Notes are only to assist your memory.  You

22          should not be overly influenced by your notes

23          or those of your fellow jurors.

24                  The punishment provided by law for

25          this crime is for the Court to decide.  You
```

1      may not consider punishment in deciding

2      whether the government has proved its case

3      against the defendant beyond a reasonable

4      doubt.

5              A verdict form has been prepared for

6      you.  After you have reached a unanimous

7      agreement on a verdict, your foreperson should

8      complete the verdict form according to your

9      deliberations, sign and date it, and advise

10     the clerk that you are ready to return to the

11     courtroom.

12             If it becomes necessary during your

13     deliberations to communicate with me, you may

14     send a note through the bailiff or clerk,

15     signed by any one or more of you.  No member

16     of the jury should ever attempt to communicate

17     with me except by a signed writing, and I will

18     respond to the jury concerning the case only

19     in writing or here in open court.  If you send

20     out a question, I will consult with the

21     lawyers before answering it, which may take

22     some time.  You may continue your

23     deliberations while waiting for the answer to

24     any question.  Remember, you are not to tell

25     anyone, including me, how the jury stands,

 1                    numerically or otherwise, on any question

 2                    submitted to you, including the question of

 3                    guilt of the defendant, until after you have

 4                    reached a unanimous verdict or have been

 5                    discharged.

 6                    So that concludes the jury instructions.

 7                    At this time, does the government wish to make a

 8        closing argument?

 9                    MR. RODRIGUEZ:  Yes, Your Honor.

10                    THE COURT:  All right, Mr. Rodriguez.

11                    MR. RODRIGUEZ:  For the record, the gun has been

12        rendered safe.

13                    THE COURT:  Maybe for better safety, have it

14        pointed towards me instead of any of these jurors.  All

15        right?

16                    MR. RODRIGUEZ:  Defendant Steven Duarte is a

17        convicted felon, a fact which he concedes.  And because of

18        that, it is a federal crime for him to carry or possess a

19        firearm or ammunition.  Yet in March of last year he did

20        exactly that.

21                    It was March 20th, he was the back seat passenger

22        in a vehicle traveling eastbound on 109th Street.  At that

23        same time Inglewood police officers were traveling westbound

24        on 109th Street.  As they passed by each other, the officers

25        noticed the illegal tinting on the vehicle the defendant was

1    in.  So they began following the vehicle.

2            As the vehicle approached the intersection of

3    109th Street and Doty where a stop sign was located, the

4    vehicle did not stop.  It made a left onto Doty running the

5    stop sign.

6            That's when Inglewood police officers turned on

7    their sirens, turned on their floodlights, turned on their

8    spotlights, and that's when the defendant panicked.

9            He knew he was a convicted felon.  He knew he was

10   on PRCS.  He knew he had search conditions, and he knew he

11   could not possess a firearm or ammunition, and he had both.

12           He knew that, when those officers pulled him over,

13   they were going to confirm he was on PRCS, they were going

14   to confirm his search conditions, and they were going to

15   find the firearm or ammunition.

16           So what did he do?  He rolled down the window and

17   tossed the firearm as the vehicle was going on Doty Avenue.

18   But the vehicle couldn't stop.  It would stop right next to

19   the firearm.  So it drove another block.

20           And common sense tells you that, if he tried to

21   get rid of the firearm, he was going to try to hide the

22   magazine carrying the ammunition, and he tried.

23           He was in the back seat, and he tucked the

24   magazine carrying the ammunition between the center console

25   and the right front passenger seat hoping that law

1    enforcement wouldn't recover either.

2            Unfortunately for defendant, law enforcement

3    recovered both.  And because that, he is charged with being

4    a felon in possession of a firearm and ammunition.

5            So what does the United States have to prove in

6    this case?  Normally the United States has to prove four

7    things:  That the defendant knowingly possessed a firearm or

8    ammunition, that the firearm or ammunition had been shipped

9    or transported from one state to another, that the defendant

10   was convicted -- was a convicted felon at the time he

11   possessed the firearm or ammunition and that the defendant

12   knew that he was a convicted felon at the time he possessed

13   a firearm or ammunition.

14           But this case is even simpler.  The defendant has

15   stipulated -- he has agreed that at the time of the offense

16   he had been convicted of a crime punishable by imprisonment

17   for a term exceeding one year, in other words, a felony.

18   And he's also conceding that he knew that he was a felon, as

19   you can see for yourself in Exhibit 43.

20           So what does this mean?  It means that you must

21   accept the Elements 3 and 4 have been met.  That means that,

22   for you to find defendant guilty, the United States must now

23   only prove two things.

24           Let's start with the first one, whether defendant

25   knowingly possessed a firearm or ammunition.

```
 1              First, let's start off with the gun.  You heard
 2    from both Officers Villicana and Wunderlich that they saw an
 3    arm extend out the right rear passenger seat and toss a
 4    firearm.  They also told you that there were only two
 5    individuals in that vehicle -- the driver and the defendant,
 6    who was sitting in the right rear passenger seat.
 7              They also told you that they saw the firearm
 8    tossed on Doty Avenue just north of 109th Street.
 9              Officer Bobbs, the officer who recovered the
10    firearm, told you he recovered the firearm on Doty Avenue
11    just north of 109th Street.
12              This evidence alone establishes that the defendant
13    knowingly possessed a firearm.  But there is more.
14              Defendant's DNA is also on that firearm.  You
15    heard from Senior Criminologist Luis Olmos.  He told you
16    that he compared defendant's DNA profile to the DNA profile
17    found on the firearm, and he concluded that it was 2 million
18    times more likely that defendant's DNA profile was on that
19    firearm.
20              What does this mean?  He said there -- this means
21    that there is very strong support for the conclusion that
22    defendant's DNA is, in fact, on that firearm.
23              This is the highest level of support that exists
24    in his field.  Because of this, defendant knowingly
25    possessed a firearm.
```

```
 1          Let's move on to the magazine.  Again, Officers

 2   Wunderlich and Villicana told you that they saw defendant in

 3   the right rear passenger seat.

 4          Officer Wunderlich told you that he searched the

 5   vehicle and he found a magazine tucked between the center

 6   console and the right front passenger seat.

 7          He told you that it was within defendant's arm's

 8   reach.  He told you that the magazine, the firearm, and the

 9   ammunition were the same brand and the same caliber.

10          He told you that he took the firearm recovered by

11   Officer Bobbs, the magazine that he found in the vehicle,

12   and that he tested it, and he said that it fit.  It fit

13   perfectly.

14          This too proves that the defendant knowingly

15   possessed an ammunition, the ammunition that was inside the

16   magazine.

17          So where does that leave us now?  The final

18   element, whether the firearm or ammunition had been shipped

19   or transported from one state to another.

20          You heard from FBI Special Agent Daniel Lewis.  He

21   told you that the firearm was assembled in Massachusetts,

22   and was found here in Inglewood, California.  Not only that,

23   the firearm itself tells you Springfield, Massachusetts.

24          As for the ammunition, he told you.  FBI Special

25   Agent Daniel Lewis told you it was manufactured in Idaho and
```

1    it was found in California.  Thus, both the firearm and the

2    ammunition were transported from one state to another.

3         And that's it.  This is defendant's firearm.  This

4    is defendant's ammunition both of which he illegally

5    possessed in March of last year.

6         The evidence in this case points to only one

7    logical conclusion:  Defendant is guilty beyond a reasonable

8    doubt.

9         THE COURT:  Thank you, Counsel.

10        Mr. Cleary, do you wish to make your argument at

11   this time?

12        MR. CLEARY:  Yes.  Thank you, Your Honor.  May I

13   have just a moment.

14        THE COURT:  Yes.

15        MR. CLEARY:  Good morning, ladies and gentlemen.

16   Thank you for your attention thank you for your patience.

17        As you know, the government, they make a closing

18   argument.  This is my sole and only opportunity to address

19   you.  I get one time, and then I have to sit down.

20        The government then sends up their second member

21   of their three-member cast and crew, and they get to argue

22   to you one more time.

23        The idea behind the system and how it was designed

24   is to believe that the government bears the burden of proof.

25   They have to prove the case to you, ladies and gentlemen.

1   And because they bear the burden of proof, they're given the

2   opportunity because of this heavy burden to go first and to

3   go last.

4          Now, examining that as the defendant accused

5   Mr. Duarte, you understand that, of course, that there is a

6   psychological component to those system.  And my address to

7   you is I was hoping to reach you and to address what we

8   know -- in the psychological field they call it primacy and

9   recency.

10         Primacy and recency tells us that people are more

11  inclined to remember the first thing they hear and the last

12  thing they hear.  That's the concept of the theory of

13  primacy and recency.

14         So in the primacy and recency theory, that would

15  innately tell you that the government's ability to go first

16  and last in their closing argument is a definite advantage.

17  It is an advantage to them that I hope you will recognize

18  that because I do not get up and get to address you again

19  that it's because I wish to remain silent or I had nothing

20  else to say.  I hope you will consider my arguments and

21  recall those arguments when you go back and deliberate.

22         This is the phase of the trial where the

23  lawyers -- the Court turn the case over to you.  You are now

24  the fact finders, and you are charged with presenting the

25  facts and the law and deciding how the facts and the law

1   decide the case.

2          You are the powerful ones here.  We have nothing

3   else to do after this argument session in deciding the

4   verdict in the case.  It is entirely up to you.  This makes

5   our democracy different than any other country.  Other

6   countries may have trials.  Some countries don't have trials

7   at all.

8          But other countries have trials.  And in England

9   and Scotland, and they have a system where they have

10  different verdicts in Scotland.  I understand that they have

11  a guilty, not guilty, not proven.  That -- in our system, we

12  take not proven and not guilty and combine them together.

13  It's guilty or not guilty.

14         That kind of incorporates what the Scottish have

15  in their system, which is a not proven element, but that's

16  incorporated here in ours.

17         So let me address after that introduction the

18  facts of the case, as I recall.  You, of course, are 12, 14,

19  16 of you, wide range of experience and ability to

20  recollect.

21         If I say something that is contradictory to your

22  recollection of what happened, please rely on your

23  recollection.  There is only one of me.  I am not

24  infallible.  I may make a mistake.  So just rely on your own

25  memories as to the facts as you heard them, but let me try

1   to summarize those for you now.

2          Okay.  We know it is approximately -- wrong

3   glasses.  It was approximately 9:30 P.M., and we know that

4   Defendant Mr. Duarte was a passenger in Anna Ortiz's

5   vehicle.  It was her car.  It was not Mr. Duarte's car.  She

6   was the driver of the vehicle.  They were driving through a

7   residential neighborhood, and they were stopped for the

8   alleged tinted windows and stop sign violation.

9          As the officer testified -- I think it was

10  Mr. Villicana -- that the standard for tinted windows is up

11  to each and every officer to decide whether or not they

12  think the window is too tinted.  So they have very broad

13  discretion to pull a driver over for anything.

14         I asked him, Well, let's talk more about the

15  driving.  How bad was it?  Were they speeding?  Were they

16  braking?  Were they weaving?  Was there any loud music?

17         No.  They were driving at the appropriate speed.

18  The car was being maintained properly.  There wasn't any

19  excessive noise.  There was nothing going on with this

20  vehicle to raise alert or suspicion.

21         One way or the other, they decided to light it up

22  like a Christmas tree.  During this period of time, as the

23  vehicle turns, the officers testify -- at least Villicana

24  testifies he sees an arm.

25         Both officers say they hear the sound of an

1    object.  I think one of the officers might have said he

2    heard metal on metal.  That's a very distinct sound.

3    Doesn't see who is the one who threw the weapon, just says

4    it's an arm.

5           Doesn't have a face on the arm.  Doesn't say it's

6    clearly a male arm.  Doesn't say anything about the

7    description other than an arm.

8           The metal on metal is -- the officer's belief is

9    that it's because the weapon strikes a parked car.  So the

10   vehicle is moving, something is thrown out of the vehicle,

11   strikes a parked car from a moving vehicle, they hear the

12   sound of -- telltale sound of metal on metal.  And it's --

13   Officer Villicana puts out over the radio to the surrounding

14   units that are available via radio that he -- that he thinks

15   a weapon may be located in the vicinity.

16          Officer Villicana testifies that it was mid-block.

17   He wasn't able to exactly define how long the block was, but

18   Villicana, who is the report writer -- he is the one who

19   actually memorialized the incident -- he wrote it down.  He

20   says it was mid block.

21          Officer Wunderlich testified differently.  Officer

22   Wunderlich did not write the report.  He read Villicana's

23   report when he testified.

24          I asked him, "How did you refresh your

25   recollection today?"

1          He said, "I read the report written by my partner,

2     Officer Villicana."

3          So Villicana's report stated that the gun was

4     located by Officer Bobbs in the middle of the street.

5     That's what Officer Villicana's report stated.  That's what

6     Officer Villicana testified to.  That's what his

7     recollection was when he wrote the report.  It was fresh in

8     his mind at the time of the incident on April 20th, 2020,

9     and they discussed that -- that there was photographed.

10         But what did we find out?  We find out that

11    another officer testified contradictory to that, said that

12    the weapon was thrown at the curb.  A photograph was

13    introduced that shows the weapon was sitting in the middle

14    of a sidewalk.

15         So what they are asking you to believe is that

16    somehow this weapon hit -- struck a parked vehicle, either

17    bounced in the street, from the street bounced over a

18    vehicle and back a half a block to the street corner or that

19    this is a different weapon, this is not the weapon that was

20    the object that was discarded.

21         One way or the other, it's contradictory to what

22    they reported in the report at the time of the incident and

23    contradictory to Officer Villicana's recollection where it

24    was that the weapon was discarded.

25         And he said it was photographed.  But one thing

1   you will find is missing or lack of evidence in this case is
2   they never took a picture.  If it struck a parked car, a
3   metal object would -- if it was metal on metal it would
4   leave a mark or a scratch.  They could have easily taken a
5   picture of the vehicle to show you with your own eyes this
6   is where the car -- the weapon was discarded from this
7   vehicle, and here is the ding or scratch on the parked car.
8   We don't see that.
9           What else don't we see?  Well, in today's day and
10  age, it's hard to believe, but officers from the Inglewood
11  Police Department are not using body-worn cameras at all.
12  Officers from the Inglewood Police Department are also not
13  utilizing the Dash Cam.
14          It's a camera that you are all familiar with, I'm
15  sure, but it sits on the dashboard and records off the
16  officer's windshield so that, if an incident occurs, they
17  have it all on video, there is no question what happened,
18  you can see it.
19          If we had that video, then there would be the
20  ability for you jurors to look and see with your own eyes
21  what was visible from the vehicle to see, what the officers
22  actually saw.
23          It seems more likely than not that the officers
24  may have heard something, but it's very unclear that they
25  saw something.

```
 1          And one of the reasons you can consider is the
 2   lighting at the time.  They may have turned on their
 3   Christmas tree lights and their floodlights, et cetera, but
 4   it was dark out.  And I know it was dark out because of the
 5   photographic evidence that we have seen.
 6          Some of it is shown and it looks like daylight,
 7   and some of it is shown and you can tell actually how dark
 8   it was that night.  It bears on the factor if you can see a
 9   black object at night.
10          Okay.  Some of the instructions the Court read I
11   wanted to review a little bit.  The burden of proof and the
12   presumption of innocence, as the Court instructed, the
13   defendant, Mr. Duarte, is presumed innocent.
14          Mr. Duarte does not have to testify or present any
15   evidence.  As you can see, he did not testify at my advice.
16   You cannot hold that against him that the attorney might
17   have said, hey, this case doesn't require any testimony or
18   presenting any evidence, they haven't proved their case.
19          If that's the decision I made, you are not to hold
20   it against him for failing to testify.
21          Because he does not have the burden of proof, the
22   defendant does not have to prove his innocence.  It's the
23   government entirely who has to prove his guilt.
24          It has to prove his guilt to every element beyond
25   a reasonable doubt.  There has been some agreement in the
```

1   case.  There has been a stipulation as to two of the

2   elements because the real crux of the case comes down to the

3   possession, and that's what the focus has been.

4          And we took the elements that were not necessary

5   to fight over off the table so that you could focus on what

6   really is important.

7          So the standard to apply to the evidence, of

8   course, is that, after a careful and impartial consideration

9   of the evidence, and a reasonable doubt can be raised

10  through a lack of evidence.

11         So it's -- a lack of evidence is also grounds or

12  reasons for there to be a doubt.  And doubts are based on

13  what is reasonable and/or common sense.

14         As jurors we, of course, anticipate that you are

15  going to bring your life and world experiences with you, you

16  are not checking your common sense at the courtroom door,

17  you are being able to exercise -- that's why you are here --

18  your common sense in what happened today.

19         Okay.  I think I covered this a little bit in my

20  introduction, but we know that the weapon was found

21  eventually in the middle of a sidewalk.  It was not in the

22  middle of the block that Villicana wrote in his report.

23         It was also not in the middle of the street.  And

24  I did raise the fact that, if it hit a parked car and it was

25  metal on metal, there is no photo to show you, no dash car

1    camera or body camera to show you what happened.  And in

2    today's technological world clearly that technology is

3    available.

4           This is a circumstantial case.  So circumstantial

5    case tells you that it's not because of direct evidence that

6    they see the defendant standing there with the gun in his

7    waist belt.  It's a circumstantial case.

8           They're saying, well, look.  We found the gun over

9    here.  We found Mr. Duarte over there.  We are saying he

10   possessed it.  Even though he's not seen in possession,

11   they're saying that it's possession because that's the gun,

12   and that's Mr. Duarte.  So that's what a circumstantial case

13   is.  It's a weak case.

14          We know this alleged violation was stopped, was

15   based on these tinting of windows, which is unclear to me,

16   that the standard that was used to stop the vehicle in the

17   first place.

18          We know one of the things that they're using or

19   relying on very heavily -- you heard it in their opening

20   statement -- was DNA, you can't hide his DNA.  Well, we're

21   going to talk about the DNA.

22          One of the things I wanted to point out was that

23   Officer Villicana participated in the arrest of Mr. Duarte.

24   Officer Wunderlich participated in the arrest of Mr. Duarte.

25   That is important because that's, as you know, where the

1    beginnings of the cross-contamination or the DNA transfer

2    can occur, at the scene.  And the controls at the scene to

3    prevent that -- and we'll examine that a little bit further.

4         But because Wunderlich and Villicana both

5    participated in the arrest -- Wunderlich was actually the

6    one who searched inside the car, searched the front area,

7    searched all the objects in the car, glove box, whatever

8    containers, whatever he could find.  He searched the.

9    Vehicle, he was eventually the officer who located the clip

10   in between the front passenger seat and the front center

11   console.

12        So Officer Wunderlich and Villicana both are in

13   the chain of custody of the evidence, meaning that they both

14   had participation in the seizure and cataloging and eventual

15   filing of the found object.  So they're part of the chain of

16   custody.

17        And no matter how clean Mr. Olmos says his lab was

18   or how well Ms. Hewson was trained, whatever happened

19   outside of their environment affects the ability for their

20   results to be considered evidence just as much as what

21   happens inside the laboratory.

22        You will remember the one grand packet of Splenda,

23   DNA transferred.  This is just an example of how small --

24   it's 1 gram, a thousand particles, I assume, and it was a --

25   a nanogram is a thousandth of a gram.

1    I say, well, isn't it one particle?

2    And he said, it's even smaller than that.

3    Is it even visible to the human eye?

4    No, it's not.

5    That's enough for your DNA to be considered

6  evidence, something that you can't even see with the human

7  eye, something that you shed at a rate of 30,000 skin cells

8  an hour, depending.

9    So this is something that is very easy for human

10  beings to deposit on podiums, on Splenda packages.  I am

11  sure Mr. Rodriguez has now planted his skin cells and his

12  DNA on the firearm and magazine in this case when he

13  displayed it to you all.  So without having to see anything,

14  your DNA can be present on an object.

15    So I wanted to bring that up, that we know that

16  Wunderlich and Villicana were using duty gloves unlike

17  Officer Bobbs who put on a neoprene or some plastic glove

18  that he said that he utilized for the collection of the

19  firearm.

20    Before that firearm was collected, Officer

21  Wunderlich and Villicana were just wearing what I think he

22  described it as a baseball, but you saw pictures of it.  It

23  looked kind of used, what they use every day, their duty

24  gloves when they're making arrests and stuff like that.

25    So they weren't using special gloves that

1  prevent -- that are not porous, that prevent the bodily

2  fluids or skin or anything like that from transferring.

3  Those are not what they were using.  They handled Mr. Duarte

4  and the evidence in this case -- the firearm, the bullets,

5  and the magazine.

6        Wunderlich handled them with his hands, his duty

7  gloves on maybe, but he was the one who looked in the car,

8  found it.  What can he do when he is looking in the car?  He

9  can pick up skin cells from somebody who is sitting in that

10 car.

11       I mean, look.  We don't have a match of DNA in

12 this case.  We have got a mixture of possible contributors

13 who may have contributed to it.

14       Well, we don't doubt that's possible because what

15 we have learned is that there are so many skin cells that

16 can possibly be deposited that it isn't a surprise that, if

17 you are in an area where there is an object that your skin

18 cell can be located on it, does it prove possession?  No.

19       I asked does it even prove that you touched the

20 item?

21       No.

22       So what do we know?  Wunderlich also took the

23 magazine, put it in the firearm.  That means he held the

24 firearm, he held the magazine, he put them together, and he

25 was the one who inserted the magazine into the firearm,

1    thereby contaminating both the firearm and the magazine from

2    whatever was on the magazine to the firearm, whatever was on

3    the firearm to the magazine.  That all occurred because he

4    was wearing his duty gloves, and he's -- after he's

5    conducted a search, after he's participated in the removal

6    of Mr. Duarte from the vehicle and placing him in handcuffs

7    and putting him on the curb.

8           And same thing with Ms. Ortiz.  That is outside

9    the laboratory world and where this contamination in this

10   case took place, and that's what the science says.

11          Finally, as careful as Ms. Hewson is to place each

12   swab carefully in their own coin envelope and taping it and

13   writing her initials and the time of her touching the items

14   down, it doesn't matter when that item has been touched and

15   mixed together in a brown paper bag in the back of a trunk

16   of a police car.

17          For all the DNA that may be in there to mix with

18   everything else when they are all put together in the same

19   bag, you have contaminated those items.

20          And we know that's what happened in this case

21   because that's what the officers testified to, that the

22   items were all put in a brown bag in the back of the trunk,

23   they drove to the police station, and that's when they took

24   it out and started doing their paperwork.  And so they had

25   more opportunities.

1              But one way or the other, this is not the way to

2      do it.  If you want to eliminate cross-contamination and DNA

3      transfer, you don't put everything you are going to test

4      into the same bag.

5              Can what happened at the scene affect the results

6      of the lab?  We know that's true because the lab has no

7      knowledge of any tampering or cross-contamination that

8      occurred outside their presence.  They have no knowledge.

9              They had no testimony to offer as to whether or

10     not the items were tampered with or cross-contaminated.

11     They have no idea.

12             We know that -- I think I have already queried

13     that the DNA transfer at the scene is what is at issue here

14     and that the officer handled everything and including the

15     magazine and the firearm and then placed it all into the

16     bag.  That's the definition of a DNA transfer.

17             Ms. Hewson was very well trained.  She had over

18     1,300 hours of fingerprint evidence.  I found it interesting

19     they did not bring that up to you.

20             And her extensive experience in training in

21     fingerprinting wasn't brought up by the government, but on

22     cross-examination she did admit that she had extensive

23     fingerprint evidence training, that she did check the

24     firearm for fingerprints, she checked the magazine for

25     fingerprints, and she even checked the bullet casings for

1    fingerprints, and she found none.

2            So interesting bit of evidence considering the

3    evidence bag that they had had at the top of it in big bold

4    letters "Hold for Prints."

5            So it's the first thing she did was check those

6    items for prints.  Now maybe they're going to argue in

7    closing that DNA is better, we didn't need to do it.

8            But they did do it, and they did ask for it to be

9    done, and it came back negative on all counts.  No

10   fingerprint on the metal magazine, and no fingerprints on

11   the metal casings.

12           And they gave you reasons why the porous --

13   reasons for the gun would not have fingerprints.  But the

14   slide which is the top of the firearm, the part that hit the

15   car, the metal on metal sound, it is not all rubber.  The

16   grip is rubber and rubberized.  The bottom of the clip has

17   got some rubber on it.  But the clip itself is made of

18   metal, and the slide and the trigger and the hammer of the

19   firearm are metal, and metal surfaces can retain

20   fingerprints, and they found none here.

21           Mr. Olmos was a very honest guy.  He did admit

22   that he made a report that even when he submitted it to peer

23   review they came back and said that he had made a mistake

24   and he changed his opinion.

25           He had changed his opinion that initially he

1   thought the results were three out of a million or whatever,

2   it was people, and then he came back and said, "Oh, no, I

3   guess it's four."  So it shows you that it is subject to

4   interpretation and subject to error.

5          And remember you have to put in context what this

6   is.  These are machines or instruments that Mr. Olmos is

7   trained to use.  He is not a scientist with a burner and a

8   beaker doing these tests.

9          He is placing items into a machine and pressing a

10  button and the machine is spitting out STRMix and

11  genealogy -- computer programs that they are operating.

12         Just like I don't know how to program a computer

13  because I can touch the keypad on my computer and words can

14  appear.  I have no idea how that happens.  It's a mystery to

15  me.

16         So Mr. Olmos did testify that the DNA presence

17  doesn't mean Mr. Duarte ever touched or possessed a gun.  It

18  is not evidence that Mr. Duarte touched or possessed a

19  firearm, the fact that Mr. Olmos said the machine calibrated

20  some amount of DNA on it.

21         I talked to Mr. Olmos about the procedures and

22  techniques that he followed at the lab in order to avoid

23  cross-contamination.  They have procedures.  He uses latex

24  gloves.  He changes them every time.  Very simple to do,

25  especially during COVID-19 when we have latex gloves.  We

1    were all wearing latex gloves.  And very easy to get a pack

2    of latex gloves and stick them in the trunk of the police

3    car with everything else you take out on your duty that day.

4            Would not have been very difficult for Officer

5    Wunderlich and Villicana to just open the trunk, put on

6    their latex gloves, and preserve the evidence, and not

7    contaminate it, but they didn't.  They used their baseball

8    gloves, their duty gloves that they use every single day.

9            Olmos said he changed he gloves every day.  Each

10   time he does a different test, he wears a lab coat, he keeps

11   a clean workstation, cleans it every time after each test,

12   not same as the trunk of the police car.

13           I asked him specifically, "Can DNA transfer be

14   ruled out as to why your machine produced this result in

15   this case?"

16           No.  It cannot.  No, it cannot.  DNA transfer

17   cannot be ruled out.

18           And the DNA present doesn't mean Mr. Duarte ever

19   touched or possessed a firearm.  It is not the magic button

20   they claim it is.

21           This is Special Agent Lewis's testimony in a

22   nutshell:  He said the gun was made in 2011, doesn't know

23   how or where it traveled, doesn't know how the gun came to

24   California.  I think the same thing applies to the bullets.

25           He merely sent an e-mail when he looked at the

1    serial numbers on the weapon, not a huge amount to help you

2    decide the issues from Mr. Lewis other than he can testify

3    that like most things that aren't manufactured in California

4    it may have crossed state lines.  When that happened,

5    unknown.

6              All right.  So you know, as Mr. Duarte has been

7    accused in this case of being a person who has been

8    convicted of a crime punishable for more than one year.  How

9    are you to use that evidence?  How are you to consider that?

10             Well, the Court instructed that it's not evidence

11   of guilt of -- I think I misspelled that but -- not

12   evidence -- it can't be used as evidence of guilt for the

13   crime for which he is on trial now.

14             So whether or not he is guilty of being a felon in

15   possession of a firearm, the fact that he has been convicted

16   of a crime in the past is not evidence that he is guilty in

17   this case.  Does that make sense?

18             So it is no bearing on what your job is to

19   deliberate as to whether or not it was proof he was in

20   possession and control of a firearm.  The fact that he has

21   been convicted of a crime punishable by more than one year

22   has no bearing on that fact.

23             All right.  These are my ten reasonable doubts.

24   You only need one.

25             Olmos admits an error caught only after work

```
 1   reviewed by another.  That to me raises an issue as to the
 2   validity of the testing.
 3          We know that the DNA in this case is a mixture of
 4   several person's DNA.  I think four.  If it was five, he
 5   said they would come up -- the computer would say no or
 6   can't calculate based on this algorithm that they utilized
 7   that I am sure is very complicated.
 8          But, three, not aware if it was tampered with or
 9   contaminated before testing.  I think the logic and reason
10   tells you it was at least contaminated.
11          And, I mean, we know that the -- Ms. Hewson said
12   that there was a picture that somebody else had put with
13   some numbers that she didn't do.  Who is that?  We have no
14   idea.
15          So we know this gun was handled by somebody other
16   than Hewson and -- yes, we do.  Who that is?  We have no
17   idea.  That is a doubt.  Who touched it?
18          The DNA, when I asked Olmos about the numbers, how
19   much would you normally leave?  I asked him isn't it like
20   3-, 5,000 skin cells that you leave when you touch something
21   normally?  And he was a little standoff-ish on that
22   question, but I will tell you that what we do know is that,
23   for the ease on which a -- invisible to the human eye piece
24   of DNA can be found on a weapon and used by the government
25   as evidence of touching a weapon is just not reasonable.
```

```
 1   It's not reasonable.  It's not.
 2            The magazine, and their own expert's testimony has
 3   limited support for the probability that Duarte possessed it
 4   based on the DNA mixture and the calculations that they did.
 5            You would think, wouldn't you, that, if the
 6   machine can tell your DNA, what does it matter if it's just
 7   one skin cell or a hundred?  It's yours.  It should be able
 8   to be the same.  There shouldn't be these probabilities --
 9   40 percent maybe he did it, 30 percent possible.
10            And I mean it's just math that they've gone to the
11   nth degree in support of a possible theory that are -- and
12   at the same time there is limited support.
13            I mean, that doesn't make sense either really.  So
14   if their theory is that it was Mr. Duarte that removed the
15   magazine from the gun and hid it and -- in the car between
16   the seat and then threw the gun out the window, you would
17   expect that he would have had more DNA on the magazine where
18   there is, you know -- underwent the squeezing of the
19   magazine between the seats to hide it, than limited support.
20            A magazine, according to their theory, the
21   government's theory, the magazine would have his DNA all
22   over.  3,000, 5,000 skin cells.  It would be loaded with his
23   DNA because it didn't go flying through the air and hit a
24   car and bounced in the middle of the street and bounced back
25   another half a block flying through the air.
```

1          It was sitting in the car right there all the

2     entire time.  That should have been loaded with it, but

3     that's the item that has the least support.

4          GeneMapper, STRMix, computer programs, they are

5     able to make mistakes by operator error and interpretation.

6     Remember, it's not just that Mr. Olmos saying the computer

7     says no or the computer says yes.

8          He interprets it because he interprets the result,

9     and then his colleague said, no, you got it wrong.  There is

10    one more person's DNA in this sample, not three.  There is

11    four.

12         So how is it that this computer program that is

13    supposed to be neutral and scientific can come up with one

14    result by one operator and another result by another?  So

15    subject to interpretation and error.

16         Shedding of skin cells explains how DNA transfer

17    occurs.  And that there is -- Number 8 reasonable doubt, no

18    fingerprints on the bullets, magazine, or the firearm

19    despite a very experienced and trained Ms. Hewson doing

20    those tests.

21         The brown paper bag, the unlabeled brown paper bag

22    that nobody put anything on, no label, no initials, no date,

23    nothing and then everything mixed in into the bag itself is

24    the reason that DNA transfer was possible between separate

25    items that they argue -- wait a minute.  DNA can't transfer

1  because they have separate -- they're items.  The gun was

2  out the window, and the clip was in the car.  Well, not when

3  you take the clip and the gun and you put them into one bag.

4          And then, of course, Number 10, Anna Ortiz, the

5  driver of the vehicle, the owner of the vehicle, the

6  individual we knew nothing about, but they didn't prove to

7  you that Anna Ortiz was eliminated as a possible contributor

8  to this sample.

9          They didn't even test her DNA.  They didn't even

10  look for her fingerprints.  Zero evidence to you to satisfy

11  you that she is not the one that did this.  She's not the

12  one that possessed -- it was her car.

13          She's not the one who threw it out the window.

14  They didn't prove to you one iota that Ms. Ortiz is not

15  responsible for the possession and control of that firearm

16  that day.

17          That's why and I -- that Mr. Duarte is entitled to

18  a not guilty.  There is no proof that he possessed the

19  firearm or the ammunition.  There is no evidence that he had

20  physical control over it.  There is no evidence he knew of

21  its presence or had the power and intention to control it.

22          And as we stated repeatedly, the lack of evidence

23  can give rise to reasonable doubt.  And here the evidence is

24  not proven beyond a reasonable doubt.

25          If -- the instruction says, if that's the case,

1    then it is your duty to find him not guilty.  And it says it

2    in that exact language, that it is your duty to find him not

3    guilty.  It doesn't say it's your option.  It doesn't say

4    it's your choice.  It says it's your duty.

5           Ladies and gentlemen, I just want to show you

6    there is a couple photographs that maybe you didn't get to

7    take a look at and I didn't have in my -- but I just wanted

8    to show you -- this is Exhibit 3.  Those are the officer's

9    duty gloves.  As you can see, they're soiled.  These are not

10   laboratory gloves.

11          I wanted to show you another photograph to get you

12   an idea of what the color -- what the difference is.  You

13   saw this photograph -- this is Exhibit 9 -- and you can even

14   see the color of the grass if I can show you there where I

15   think it was Officer Bobbs standing with the gun.

16          It looks like daylight.  You could see the grass

17   is green.  What does that scene show you?  That there is a

18   lot of lighting going on in this photograph.  That's not

19   what the scene looked like when -- earlier.  That's later.

20          Earlier the scene looked more like this.  This is

21   Exhibit 12.  I mean, you can't even make out what's here.

22   You will have the exhibits when you go back, but this is

23   taken in the natural light of the scene on the date in

24   question without the advantages of spotlights, flashers, and

25   everything else or whatever they were using when they took

1    pictures and had the whole scene lit up saying, look, here

2    is the lighting.  It was like dusk.  It wasn't like dusk.

3    It was 9:30 P.M. in March.  It is a residential

4    neighborhood, not a commercial area.  It was dark.

5          Thank you, ladies and gentlemen.  That concludes

6    my argument.  Like I said, I wish I could stand up one more

7    time and address questions or issues that are going to be

8    raised by Mr. Kahan.  I cannot but perhaps you can imagine

9    what I might say in response.

10          Thank you very much.

11          THE COURT:  All right.  Thank you, Mr. Cleary.

12          Government wish to make a rebuttal argument?

13          MR. KAHAN:  Yes, Your Honor.

14          Do you know what proves that someone physically

15    touched an item in order to get their DNA on it?  When they

16    are seen tossing that item out of a car in front of police

17    officers because that's exactly what happened here.

18          Officers Wunderlich and Villicana were following

19    the red Infiniti that the defendant was the back passenger

20    in, and they saw the right passenger rear passenger window

21    roll down and a gun fly out.

22          When it comes to the lighting in the area, defense

23    counsel keeps on saying it was dark.  He also says it was

24    lit up like a Christmas tree.  But you have evidence of how

25    light it was and not just the various photographs that

 1   defense counsel keeps showing you and trying to insinuate

 2   about the lighting.  You actually have a photograph of what

 3   the headlights would have looked like, Exhibit 10.

 4          Look on the left side.  You heard from Officer

 5   Wunderlich that, while this is not his car, it is a similar

 6   car to the car that he and Officer Villicana were driving.

 7          And if we can zoom in.

 8          Look what you can see in front of that car.  The

 9   headlights, just the headlights mind you.  Look how bright

10   those are.  Now compare that to the street lights that would

11   have been on the scene plus the spotlights plus the

12   floodlights plus the flashing lights.

13          At some point you have to realize that these

14   officers saw what they saw.  And there was nothing

15   obstructing their view.  They're alert.  They're on the

16   lookout.  They're about to pull this car over for running

17   the stop sign, for tinted windows, and then they see a gun

18   come out.

19          And that's why they approached the stop the way

20   they did because they saw a gun come out.  And then

21   coincidentally that gun was found in the area where it was

22   thrown.

23          It doesn't -- Villicana didn't see exactly where

24   it landed.  So whether he said it was mid-block or early

25   block or where Officer Bobbs found it, that's irrelevant.

```
 1            What is relevant is that the officers saw the gun

 2   fly out of the car from the right rear passenger seat, that

 3   the gun was found within the vicinity where it was thrown,

 4   and that the defendant was in the right rear passenger seat.

 5            That is why you can rule out transfer DNA in this

 6   case.  That's why all the arguments about Officer Wunderlich

 7   and his search of the car and the evidence all being put in

 8   one bag together -- that's why you can ignore all of that

 9   because, if this was a case where it was simply just gun

10   found on the side of a street and it has a 2 million times

11   more likely that defendant's DNA was on it, if that was just

12   this case, perhaps the defendant's argument would have

13   weight.

14            But he can't explain away how that matches up with

15   what the officers saw.  He tries.  He tries to attack every

16   single angle of this case.

17            You can't trust the science behind the DNA because

18   it's computer.  Oh, you can't trust Mr. Olmos because he

19   made one error that he immediately corrected.  Oh, you can't

20   trust the DNA itself even if my client's DNA is on it

21   because of the transfer DNA.  Oh, you can't trust the

22   collection of the evidence because of how Officer Wunderlich

23   handled it.

24            You can't trust this.  You can't trust that.  You

25   can't trust what the officers saw because it was dark
```

1    outside even though it was bright as day.

2            He keeps on trying to attack every single angle of

3    this case, but that's not your job.  Your job is not to look

4    at those -- any of these things in isolation.

5            What you do, in order to come to a reasonable and

6    just conclusion, in order to prove whether a case has been

7    proven beyond a reasonable doubt, is to look at all the

8    evidence as if it's on a giant table all together.

9            You see how bits and pieces align with each other,

10   how they corroborate each other, how they lend credibility

11   to each other because at the end of the day your job is to

12   only consider credible evidence.

13           You don't consider possibilities because, when you

14   deliberate on possibilities, on what could be possible

15   without anything supporting it, without anything credible,

16   that leads to speculation.

17           You cannot deal in speculation.  You are a jury.

18   You deal in facts, logic, evidence, testimony.  That is

19   reasonable.

20           Possibility plus deliberation is speculation, and

21   you cannot speculate to come to a reasonable conclusion.

22   What you can rely on is the evidence and testimony presented

23   before you.

24           And what the evidence and testimony presented

25   before you shows that the officers saw what was clearly

```
1    defendant toss out a gun into the streets of Inglewood, it
2    landed on the sidewalk, they found the gun, they found a
3    matching magazine only within the vicinity of where the
4    defendant was seated, not where Ms. Ortiz the driver was
5    seated, who even though the government has the burden in
6    this case the defense didn't call to talk about the stop
7    sign, the tinted windows.
8              MR. CLEARY:  I object to shifting the burden.
9              THE COURT:  Overruled.
10             MR. KAHAN:  Know what you have is what the
11   officers saw, and what the officers saw is supported by the
12   DNA and each other's testimony and the photographs at the
13   scene.
14             Now, likewise in terms of what you can and can't
15   consider, arguments also isn't a thing.  So when defense
16   counsel leaves up a slide that talks about the 30,000 skin
17   cells being put out on the scene despite him repeatedly
18   trying to get Mr. Olmos to commit to that and Mr. Olmos
19   saying, "No, that's not what we deal with.  We don't deal
20   with measuring skin cells," you can't consider that.  That
21   30,000 statistic that defense counsel left up there on that
22   screen, that's not evidence.
23             What is evidence are the results in this case, and
24   you deal with what's reasonable.  You don't deal with
25   matches because much like the Los Angeles Sheriff's
```

1    Department and their DNA analysis doesn't deal with matches.

2    They don't do match for multiple contributor DNA.  They deal

3    with probabilities.  They deal with likelihood ratio.

4          Think about that number -- 2,000,000 times more

5    likely that the defendant's DNA was on the grip of the gun

6    and 100,000 times more likely that it was on the trigger and

7    slide of the gun.

8          Those are areas because of their texture are good

9    at collecting DNA.  Yes, the magazine had limited support,

10   but you heard from Ms. Hewson and Mr. Olmos about why that

11   would be the case, why the magazine could and did likely in

12   case have a limited support for defendant leaving his DNA.

13         It's not the right texture.  It's not the right

14   structure.  Just like how the gun itself is not the right

15   structure to leave fingerprints behind as Ms. Hewson said,

16   as Ms. Hewson said in her direct examination with me,

17   despite defense counsel's insinuations to the contrary.

18         So let's think about then what defense counsel is

19   insinuating here because what is he saying without directly

20   saying to you?  That gun ended up on the street, that

21   magazine was found in the car where defendant sat.

22         He is insinuating something without directly

23   telling you, and that's because there is nothing credible

24   supporting it.  He is just picking holes, trying to take all

25   the evidence on the table, hold something up, say this has

```
 1    an issue and then hope that that means for you that it's

 2    reasonable doubt.

 3              That's not your job.  You look at the evidence as

 4    a whole, see how --

 5              MR. CLEARY:  I object to mischaracterization of

 6    the defense arguments and to the government's burden.

 7              THE COURT:  The objection is overruled.

 8              MR. KAHAN:  Look at everything together and

 9    remember what is reasonable and what is not because at the

10    end of the day that's what you have to consider -- what is

11    reasonable and what is not.

12              Our arguments that the government hasn't proven

13    when the firearm and the ammunition crossed over to

14    California reasonable?  No because that's not something the

15    government has to prove.

16              Look at the jury instruction.  Look at what the

17    government actually has to prove.  The government simply has

18    to prove that the firearm was transferred from one state to

19    another.  Same with the ammunition.

20              You heard from Agent Lewis about how this firearm

21    was assembled in Springfield, Massachusetts, and on

22    March 20th, 2020, it was found being tossed by the defendant

23    from a moving car onto the sidewalk of Inglewood,

24    California.

25              It got from Massachusetts to California.  How it
```

1  got here, not your concern.  Irrelevant, not an issue in

2  this case.  What is in issue is simply what has been proven

3  to you beyond a reasonable doubt, and that is that that

4  ammunition and firearm were transported.

5          So at the end of the day, when you ask yourself

6  what is reasonable in this case, that's what's going to lead

7  you to a guilty verdict, when you realize what Officer

8  Villicana saw, what Officer Wunderlich saw, how they both

9  saw a gun being tossed out of the car, how the defendant was

10  the only person who could have tossed that gun, how there

11  was no shifting of the driver and the defendant.  The

12  defendant, frankly, didn't even have time given it was only

13  a block away to switch seats with the driver.

14          There was no bad driving during that time period

15  supporting a shuffling of people, brakes, putting the car in

16  neutral, random acceleration from trying to switch seats and

17  hit -- inadvertently hitting the gas pedal or the brake.

18          There is nothing supporting that because what this

19  case simply comes down to is that the defendant realized

20  that law enforcement was behind him, that he was about to be

21  caught with a gun, and did his best to try to hide whatever

22  he could.

23          Because he tried to hide the gun, but he could not

24  hide his DNA.  And when you consider how those line up and

25  corroborate each other, you are going to come to a guilty

```
 1   verdict.

 2              THE COURT:  All right.  Thank you, Counsel.

 3              I believe we have a bailiff here that can be sworn

 4   in at this time.

 5              THE CLERK:  Please state your name for the record.

 6              THE BAILIFF:  Joseph Edward Lewis II.

 7              THE CLERK:  Please raise your right hand.

 8              Do you solemnly swear to keep this jury together

 9   in some private and convenient place, that you will not

10   permit any person to speak to or communicate with them, nor

11   do so yourself unless by order of the Court, or to ask them

12   whether they have agreed on a verdict, and that you will

13   return them to court when they have so agreed or when

14   ordered by the Court, so help you God?

15              THE BAILIFF:  I do.

16              THE COURT:  Ladies and gentlemen of the jury, the

17   bailiff will now take you to the jury room with our

18   courtroom deputy with some brief instructions and you can

19   begin your deliberations.

20              THE CLERK:  All rise.

21       (The following was heard in open court outside the

22        presence of the jury:)

23              THE COURT:  Everyone, be seated.

24              If you wouldn't mind, please make sure our

25   courtroom deputy has phone numbers or method by which he can
```

```
 1   contact both sides of the case in the event there are
 2   questions and/or verdict.  I think they're going to be
 3   giving lunch soon; so -- yes, Mr. Rodriguez.
 4            MR. RODRIGUEZ:  Your Honor, I just wanted to
 5   confirm whether the original 12, the 12 in the box are the
 6   only ones deliberating as opposed to all 16 --
 7            THE COURT:  I figured I'd have them all in there.
 8   No.  Of course, of course.  We're going to have 12.  The
 9   four alternates are going to get separated, and they're
10   going to be eating lunch somewhere else.
11            MR. RODRIGUEZ:  Got it.  Thank you, Your Honor.
12            THE COURT:  I have been doing this for a little
13   while.  Even a broken clock is right twice a day.  So I try
14   not to mess up that often.  I am teasing you, giving you a
15   hard time.  I appreciate your diligence.
16            If you wouldn't mind just waiting to make sure our
17   courtroom deputy has the contact -- because my courtroom
18   deputy who is assigned is out today.  So Mr. Reddick may not
19   have that information handy but just confirm to make sure
20   that he has it.
21            If I were you, again, your choice.  I wouldn't --
22   I would try not to leave the building today if you can avoid
23   it.
24            And I think your office is on the Westside.
25   Right?
```

```
 1              MR. CLEARY:  I am going to stay in the courthouse
 2    or in the immediate vicinity.
 3              THE COURT:  And you all have, I think, an office
 4    in the building.  So respectfully I would ask that you stay
 5    in the building if there are any questions or a verdict
 6    today.
 7              Mr. Kahan.  And it's Kahan (pronouncing); right?
 8              MR. KAHAN:  It is Kahan.  There is a fierce debate
 9    within my family as to how it is actually pronounced.
10              MR. CLEARY:  What do they say it should be?
11              MR. KAHAN:  I will talk about it off the record.
12              THE COURT:  If there is a family debate, boy.  I
13    wonder what your Thanksgivings are like.
14              MR. KAHAN:  My Thanksgivings are actually with the
15    Contreras side of the family.
16              Since the jury is now deliberating, I just want to
17    make sure it's okay for us to remove the physical exhibits
18    from the courtroom even though they are now deliberating
19    because they are admitted into evidence, albeit they aren't
20    being --
21              THE COURT:  You mean the gun, the bullets, and the
22    magazine.  I have no objection to that.
23              Does the defense have an objection to that?
24              MR. CLEARY:  No.
25              THE COURT:  Related to that, because normally, and
```

```
 1    I believe this will happen with our current courtroom
 2    deputy.  You will need to stay here for a moment and go
 3    through all the exhibits to make sure -- confirm what goes
 4    back there.
 5              MR. KAHAN:  We did that.
 6              THE COURT:  You did it already?  Great.  So he was
 7    on top -- great.
 8              Anything further?  Can I help --
 9              MR. KAHAN:  Nothing for the government,
10    Your Honor.
11              THE COURT:  Mr. Cleary, anything further?
12              MR. CLEARY:  No, thank you, Your Honor.
13              THE COURT:  We'll wait and see what the jury does.
14    Thank you all.
15         (Recess taken at 11:23 A.M.)
16         (The following was heard in open court outside the
17          presence of the jury:)
18              THE COURT:  All right.  Good afternoon, everyone.
19              We have received a note indicating that the jury
20    has reached a unanimous verdict.  So at this time why don't
21    we bring the jury in so we can get the verdict.
22              THE CLERK:  Yes, Your Honor.
23         (The following was heard in open court in the presence
24          of the jury:)
25              THE COURT:  I received a note from our foreperson
```

```
 1    whose handwriting is quite elegant, but I wanted to make

 2    sure I got it right.

 3             Mr. Franchi?  Okay.  Great.

 4             The -- I got a note indicating that the jury has

 5    reached a unanimous verdict; is that correct, sir?

 6             FOREPERSON:  Yes.

 7             THE COURT:  Do you have the verdict form with you?

 8             Yes, if you could hand that to our courtroom

 9    deputy, please.

10             THE CLERK:  In the matter of United States of

11    America versus Steven Duarte, Case No. CR 20-387-AB.

12             We, the jury in the above-captioned case, present

13    the following unanimous verdict.

14             We, the jury in the above-captioned case,

15    unanimously find Defendant Steven Duarte guilty of being a

16    felon in possession of a firearm and/or ammunition, in

17    violation of 18 USC 922(g)(1), as charged in the Indictment.

18             Dated August 26th, 2021, at Los Angeles,

19    California.  Signed by the foreperson of the jury.

20             THE COURT:  All right.  Does either side wish the

21    jury to be polled?

22             Mr. Rodriguez.

23             MR. RODRIGUEZ:  No, Your Honor.

24             THE COURT:  Mr. Cleary.

25             MR. CLEARY:  No, thank you.
```

1          THE COURT:  All right.  So, ladies and gentlemen,

2     I want to thank you on behalf of our Court for your time as

3     jurors in this case.  I know it takes a lot of time.

4          You heard me talk about this during voir dire

5     about the time and effort it takes from your respective

6     lives, but it's vitally important that we have good people

7     like you willing to serve on cases like this.

8          So now that the jury has reached a verdict, you

9     are no longer under any orders of the Court not to discuss

10    the case.  You have the absolute right to discuss the case

11    if you wish or not.  The choice is entirely up to you.

12         If you do choose to talk about the case, I go by

13    what I used to call the "L.A. Times" rule at my old job.

14    Don't say anything that you wouldn't feel comfortable being

15    on the cover of the "L.A. Times."

16         Sometimes the lawyers are waiting out in the

17    hallway when you are excused to discuss the case.  It is

18    entirely up to you.  Sometimes the attorneys appreciate

19    comments about their performance, what worked, what didn't

20    work.  You can talk to them if you wish or not.  The choice

21    is entirely up to you.

22         Again, thank you for your service.  I am going to

23    have you hold off in the jury room for a moment so I can

24    thank you personally, and then you will be excused.  So

25    thank you again for your service.

```
 1                THE CLERK:  All rise.

 2           (The following was heard in open court outside the

 3            presence of the jury:)

 4                THE COURT:  All right.  Why don't we just -- just

 5      about five minutes.  I am just going to go back to thank

 6      them, and then I'll come back and discuss any future dates

 7      that we need to deal with with respect to sentencing in this

 8      case.  We'll take a brief recess, and if you would just stay

 9      here that would be great, thank you.

10                THE CLERK:  Court is in recess.

11           (Recess taken at 2:03 P.M. to 2:06 P.M.)

12                THE COURT:  Now that the jury has reached a

13      verdict, we need to deal with sentencing.  My proposed date

14      is December the 17th at 1:30 P.M.

15                Does that date and time work for counsel?  I am

16      assuming someone from the government will be here.

17                MR. RODRIGUEZ:  Yes, Your Honor.

18                THE COURT:  Mr. Cleary.

19                MR. CLEARY:  Yes.  That works for me.  Thank you

20      so much.

21                THE COURT:  Sentencing, December 17th.  We'll

22      order a presentence report, and Mr. Duarte will be remanded

23      back to the custody of the U.S. Marshal.

24                Anything further from the government?

25                MR. RODRIGUEZ:  No, Your Honor.
```

1           THE COURT:  Anything further from the defense?

2           MR. CLEARY:  No.  Thank you.

3           THE COURT:  Both sides did an excellent job.

4           Mr. Duarte, obviously, the result, the verdict is

5    probably not what you wanted, but you should take solace

6    that you had an excellent lawyer representing you.  He put a

7    lot of work in this case and presented a very robust defense

8    on your behalf.

9           We'll see you all for sentencing.  Good luck.

10   Stay safe.  Thank you.

11          THE CLERK:  All rise.  This Court is adjourned.

12       (Proceedings concluded at 2:07 P.M.)

13                       --oOo--

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                         CERTIFICATE

 2

 3        I hereby certify that pursuant to Section 753,

 4   Title 28, United States Code, the foregoing is a true and

 5   correct transcript of the stenographically reported

 6   proceedings held in the above-entitled matter and that the

 7   transcript page format is in conformance with the

 8   regulations of the Judicial Conference of the United States.

 9

10   Date:   July 3, 2022.

11

12

13

14                     /S/ CHIA MEI JUI

15                 Chia Mei Jui, CSR No. 3287

16

17

18

19

20

21

22

23

24

25
```